ACCEPTED
14-14-00855-cv
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
3/18/2015 12:34:30 PM
CHRISTOPHER PRINE
CLERK

No. 14-14-00855-CV

IN THE COURT OF APPEALS FOR THE
FOURTEENTH SUPREME JUDICIAL DISTRICT
AT HOUSTON, TEXAS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
3/18/2015 12:34:30 PM
CHRISTOPHER A. PRINE
Clerk

ADEEL ZAIDI, A. K. CHAGLA, PRESTIGE CONSULTING, INC.,
and APEX KATY PHYSICIANS – TMG, L.L.C., Appellants,

v.

PANKAJ K. SHAH and APEX KATY PHYSICIANS, LLC, Appellees.

On Appeal from the 61st District Court, Harris County, Texas
Trial Court Cause No. 2009-02578

**BRIEF OF APPELLANTS ADEEL ZAIDI, A. K. CHAGLA, PRESTIGE
CONSULTING, INC., and APEX KATY PHYSICIANS – TMG, LLC
● ORAL ARGUMENT REQUESTED ●**

Douglas R. Little
State Bar No. 12416600
440 Louisiana Street, Suite 900
Houston, Texas  77002
713.275.2069

Robin L. Harrison
State Bar No. 09120700
Campbell, Harrison & Dagley L.L.P.
909 Fannin Street, 40th Floor
Houston, Texas 77010
(713) 752-2332
(713) 752-2330 Facsimile

March 17, 2015                    ATTORNEYS FOR APPELLEES

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

RECORD AND PARTY REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . xv

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xvi

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    1.   The Court should reverse and remand this case for a new trial, because the trial court's conclusion of law that Zaidi committed perjury is flawed in its over-breadth and not based upon legally sufficient evidence, and its consequent findings as to the relative credibility of the parties is against the great weight and preponderance of the evidence and constitutes an abuse of discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.  The trial court erred in failing to specify the statement(s) it found to be perjury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    B.  The elements of perjury have not been met here where there has been no fabrication of evidence or intent to deceive the court. . . . . . . . . . . . 17

    C.  Shah's inconsistent testimony, contradicted by independent witnesses and documents, belies the trial court's finding as to his credibility. 19

    2.   Appellants are prevented from adequately making their appeal to this Court because the trial court's gross award of damages is neither tied to specific causes of action nor broken down into specific items of damage

- i -

awarded, and there is no evidence, or alternatively insufficient evidence, to support one or more of the causes of action or items of damage pleaded. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

3.  The gross award of damages is reversible because it likely includes damages for with there is insufficient evidence . . . . . . . . . . . . . . . . 35

A.  <u>An award in any amount for recovery of lost accounts receivable</u>. . 35

B.  <u>An award based upon a contingent asserted liability</u> . . . . . . . . . . . . 44

C.  <u>An award of $2.8 million for Medistar's units in the Landlord</u> . . . . 45

D.  <u>An award of $638,000 on the letter of credit</u> . . . . . . . . . . . . . . . . . 46

E.  <u>An award of $1,350,000 in alleged commissions</u> . . . . . . . . . . . . . . 48

F.  <u>Conclusion</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

4.  Damages apparently awarded by the trial court for fraud, misrepresentation, and fraudulent inducement were not proximately caused by representations made by the "Defendants" upon which Plaintiffs admittedly did not rely . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

5.  Damages apparently awarded by the trial court for breach of contract, fraud, misrepresentation, and fraudulent inducement cannot be recovered because Plaintiffs ratified the actions upon which such damages were based . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

6.  The trial court's award of damages for monies paid in settlement by Shah to former members of the Landlord constitutes an impermissible double recovery where Shah received the members' interests in the Landlord and will profit again from the Landlord's recovery . . . . . 56

7.  The exemplary damages awarded by the trial court are excessive in light of the flawed findings of compensatory damages . . . . . . . . . . . . . . 57

8. The evidence is insufficient to show the level of egregious conduct on the part of either Zaidi or Chagla required to support the award of exemplary damages against them . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

9. The elements of the various causes of action pleaded have not been met with sufficient evidence here, where the non-interested witnesses gave testimony contradicting Plaintiffs' theory of the case, Shah's own testimony and pleadings show he had requisite knowledge and intention to enter into the Landlord mortgage regardless of any representations made by Zaidi, and documentary evidence shows Shah and the Landlord ratified certain material actions of the "Defendants." . . . . . . . . . . . 59

   A.  Fraud, including common law and statutory fraud, fraudulent inducement, fraudulent transfer, and fraud by non-disclosure. 59

   B.  Negligent misrepresentation and gross negligence. . . . . . . . . 59

   C.  Breach of contract and tortious interference with contract . . 59

   D.  Breach of fiduciary duties, including as to Chagla, notwithstanding that the evidence showed that he did nothing material. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

10. Defendants cannot be held liable for fraudulent inducement when they did not enter into any contracts with the Plaintiffs as counterparties.67

11. Defendants cannot be held jointly and severally liable for civil conspiracy when there was no evidence, or alternatively insufficient evidence, of an agreement by Defendants to accomplish an unlawful purpose, and no evidence, or alternatively insufficient evidence, of an intent to harm Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

12. Defendants cannot be held jointly and severally liable on a theory of alter ego when there was no evidence, or alternatively insufficient evidence, that the only corporation they owned was used to commit an actual fraud on Plaintiffs for Defendants' direct personal benefit . . 70

13. Chagla, who affirmatively pleaded the statute of limitations, cannot be held liable for tort claims arising from actions that occurred more than two years prior to his having been added as a defendant in this lawsuit in December 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

14. The trial court committed harmful error when it improperly found all inferences against Chagla simply because he did not appear for trial when the court had previously granted Chagla's motion to quash a subpoena to appear due to his ill health, which prevented him from traveling from his home in Pakistan, and plaintiffs never requested Chagla's deposition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

15. A default judgment cannot be rendered against Apex TMG on the basis that it had forfeited its corporate charter prior to trial when it is clear that Apex TMG appeared and answered and participated in trial only to defend itself and not seek affirmative relief . . . . . . . . . . . . . . . . . . . 73

CONCLUSION AND PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Separately submitted

# IDENTITY OF PARTIES AND COUNSEL

*Appellants*:

Adeel Zaidi,, A. K. Chagla,
Prestige Consulting, Inc., and
Apex Katy Physicians – TMG, LLC

*Counsel*:

Douglas R. Little
State Bar No. 12416600
440 Louisiana Street, Suite 900
Houston, Texas 77002
713.275.2069
doug@douglasrlittle.com

Robin L. Harrison
State Bar No. 09120700
Campbell, Harrison & Dagley L.L.P.
909 Fannin Street, 40th Floor
Houston, Texas 77010
(713) 752-2332
(713) 752-2330 Facsimile

*Appellees*:

Pankaj K. Shah and
Apex Katy Physicians, LLC

*Counsel*:

Jeremy Gaston
State Bar No. 24012685
Andrew K. Meade
State Bar No. 24032854
Hawash Meade Gaston Neese
  & Cicack, LLP
2118 Smith Street
Houston, Texas 77002
713-658-9001
713-658-9011 (Facsimile)

## INDEX OF AUTHORITIES

<u>Cases</u>

*Aim-Ex Industry, Inc. v. Slover*, 2010 WL 2136599 (Tex. App.
–Amarillo, 2010, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 57

*Allen v. Devon Energy Holdings, LLC*, 367 S.W.3d 355 (Tex. App.
–Houston [1st Dist. 2012], pet. granted, dism'd by agmt) . . . . . . . . . . . 61, 64

*Brazosport Bank of Texas v. Oak Park Townhouses*, 889 S.W.2d 676
(Tex. App–Houston [14th Dist.] 1994, writ denied) . . . . . . . . . . . . . . . . 63, 64

*Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000) . . . . . . . . . . . 31

*Cruse v. O'Quinn*, 273 S.W.3d 766 (Tex. App.–Houston
[14th Dist. 2008, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Dallas Ry. & Terminal Co. v. Gossett,* 156 Tex. 252,
294 S.W.2d 377 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Daniel v. Kelly Oil Corp.*, 981 S.W.2d 230 (Tex. App.–Houston [1st Dist.]
1998, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671 (Tex. 2000) . . . . . . . . . . 50, 54

*Ghidoni v. Stone Oak, Inc.*, 966 S.W.2d 573 (Tex. App.
—San Antonio 1998, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Goodyear Tire & Rubber Co. v. Rios,* 143 S.W.3d 107
(Tex. App.–San Antonio 2004, pet. denied) . . . . . . . . . . . . . . . . . . . . . . 41

*Haase v. Glazner,* 62 S.W.3d 795 (Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Harris County v. Smith*, 96 S.W.3d 230 (Tex. 2002) . . . . . . . . . . . . . . . . . . . 31

*Hoggett v. Brown*, 971 S.W.2d 472 (Tex. App.–Houston
[14th Dist. 1997, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*In re Texas American Exp., Inc.*, 190 S.W.3d 720 (Tex. App.
– Dallas 2005, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Kyle v. Zepeda*, 2013 WL 2246030 (Tex. App.–Houston
[1st Dist.] 2013, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Lundy v. Masson*, 260 S.W.3d 482 (Tex. App. – Houston
[14th Dist.] 2008, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Marauder Corp. v. Beall*, 301 S.W.3d 817 (Tex. App.–Dallas 2009, no pet.) . . . 44

*Martinez v. Molinar*, 953 S.W.2d 399 (Tex. App.—El Paso, no writ) . . . . . . . . 32

*Massey v. Armco Steel Co.*, 652 S.W.2d 932 (Tex. 1983) . . . . . . . . . . . . . . . . . . 68

*Priddy v. Rawson*, 282 S.W.3d 588 (Tex. App. – Houston
[14th Dist.] 2009, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156
(Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Schakosky v. Client Services, Inc.*, 634 F. Supp. 2d 732 (E.D. Tex 2007) . . . . . . 54

*Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*,
435 S.W.2d 854 (Tex. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Schronk v. Laerdal Medical Corp.*, — S.W.3d —, 2013 WL 6570907
(Tex. App.–Waco 2013, pet. denied 2014) . . . . . . . . . . . . . . . . . . . . . . 41

*S.E.C. v. Resource Development Intern., LLC,* 487 F.3d 295 (5th Cir. 2007) . . . 71

*Shook v. Walden,* 368 S.W.3d 604 (Tex. App.–Austin 2012,
pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Somers v. Crane*, 295 S.W.3d 5 (Tex. App.–Houston
[1st Dist. 2009, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Southern Elec. Serv., Inc. v. City of Houston*, 355 S.W.3d 319
(Tex. App.–Houston [1st Dist. 2011], pet. denied) . . . . . . . . . . . . . . . . . . 44

*Spiritas v. Robinowitz*, 544 S.W.2d 710 (Tex. Civ. App.–Dallas 1976, writ ref'd, n.r.e.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*SSP Partners v. Gladstrong Investments (USA) Corp.*, 275 S.W.3d 444 (Tex. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513 (Tex. 2002) . . . . . . . . . . . . . . . . . . . . . 55

*State v. Eversole*, 889 S.W.2d 418 (Tex. App.–Houston [14th Dist.] 1994, pet. disc. pet. den.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1 (Tex.1991) . . . . . . . . . . . . . . 56

*Strebel v. Wimberly*, 371 S.W.3d 267 (Tex. App.–Houston [1st Dist.] 2012, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65

*Suntech Processing Systems, LLC v. Sun Communications, Inc.*, 2000 WL 1780236 (Tex. App.–Dallas 2000, pet. denied) . . . . . . . . . . . . . 62

*Tagle v. Galvan*, 155 S.W.3d 510 (Tex. App.—San Antonio 2004, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*Tana Oil & Gas Corp. v. McCall*, 104 S.W.3d 80 (Tex. 2003) . . . . . . . . . . . . . . 44

*Tex. Indus., Inc. v. Vaughn,* 919 S.W.2d 798 (Tex. App.—Houston [14th Dist.] 1996, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Thomas v. Oldham*, 895 S.W.2d 352 (Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . . 33

*Triplex Communications Inc. v. Riley*, 900 S.W.2d 716 (Tex. 1995) . . . . . . . . . 68

*U.S. Renal Care v. Jaafar*, 345 S.W.3d 600 (Tex. App.–San Antonio 2011, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*Vanscot Concrete Co. v. Bailey*, 853 S.W.2d 525 (Tex. 1993) . . . . . . . . . . . . . . 73

*Vickery v. Commission for Lawyer Discipline*, 5 S.W.3d 241 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) . . . . . . . . . . . . . . . . . 32

*Whitaker v. Rose,* 218 S.W.3d 216, 224 (Tex. App.—Houston
   [14th Dist.] 2007, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Willis v. Donnelly*, 199 S.W.3d 262 (Tex. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 54

<u>Statutes and Rules</u>

Tex. Bus. & Comm. Code Ann. § 9.607 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Tex. Bus. Org. Code § 101.114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 71

Tex. Penal Code Ann. § 37.02(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Tex. Tax Code § 171.252 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Tex. R. App. P. 61.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

Tex. R. Civ. P. 299, 299a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

RECORD AND PARTY REFERENCES

1.  "CR" refers to the original Clerk's Record filed in one digital volume on December 5, 2014.

2.  "Supp CR" refers to the first Supplemental Clerk's Record requested by Appellants.  If not filed by the time this Brief is submitted, then the references made to the Perryman Deposition made the subject of the first Supplemental Record request will be to page and line of that deposition.  "Supp CR 2" refers to the second Supplemental Clerk's Record requested by Appellants.  If not filed by the time this Brief is submitted, then the Response to be included in the second Supplement will be included in the Appendix.  "Supp CR 3" refers to the third Supplemental Clerk's Record requested by Appellants.  If not filed by the time this Brief is submitted, then the pleadings to be included in the third Supplement will be included in the Appendix. "Supp CR 4" refers to the fourth Supplemental Clerk's Record requested by Appellants.  If not filed by the time this Brief is submitted, then the pleadings to be included in the fourth Supplement will be included in the Appendix."RR" refers to the Reporter's Record filed in nine digital volumes on  December 17, 2014.  References to individual volumes will be designated "1RR," "2RR," etc.  Volumes 1 – 5 contain the testimony adduced on March 17 – 20, 2014.  Volumes 6 – 9 contain the parties' Exhibits.

3. Individual parties will be identified by their last names. Appellant Prestige Consulting, Inc., which did business as Turn-Around Management Group, will be identified as "TMG." Appellant Apex Katy Physicians – TMG, LLC, the general partner of the Hospital, will be identified as "Apex TMG." The Hospital, Apex Long Term Acute Care – Katy, L.P., which having gone through a completed bankruptcy case was not in fact a party at the time of trial (see 9RR D. Exs. 62, 65), will be identified as the "Hospital." Appellee Apex Katy Physicians, LLC, will be identified as the "Landlord."

No. 14-14-00855-CV

---

IN THE COURT OF APPEALS
FOR THE FOURTEENTH JUDICIAL DISTRICT
AT HOUSTON, TEXAS

ADEEL ZAIDI, A. K. CHAGLA, PRESTIGE CONSULTING, INC.,
and APEX KATY PHYSICIANS – TMG, L.L.C., Appellants,

v.

PANKAJ K. SHAH and APEX KATY PHYSICIANS, LLC, Appellees.

---

On Appeal from the 61st District Court, Harris County, Texas
Trial Court Cause No. 2009-02578

---

**BRIEF OF APPELLANTS**

---

TO THE HONORABLE COURT OF APPEALS FOR
THE FOURTEENTH SUPREME JUDICIAL DISTRICT:

Appellants Zaidi, Chagla, TMG, and Apex TMG appeal from a bench trial

Judgment awarding in excess of $50 million in purported fraud and related damages,

and exemplary damages, in what was really a breach of contract case involving a

business deal that simply went awry.  Appellants challenge all of the trial court's

findings and conclusions as unsupported and insupportable either by legally or

factually sufficient evidence.  Appellants also challenge the trial court's award of

damages as not having been supported by the court's findings of fact and conclusions

of law.  Appellants seek a reversal of the Judgment and a remand for a new trial.

## STATEMENT OF THE CASE

Shah and the Landlord filed this case in the 61st District Court on January 15, 2009 (CR 8 – 89) following a dispute with numerous member owners of the Landlord. Allegations of breach of contract and fraud were made. These members who had opposed Shah's action with respect to the Landlord then filed suit against him in the 11th District Court on January 18, 2009 (Supp CR 3; Appendix), alleging breach of the Landlord company agreement. The cases were consolidated by the Order of the 61st District Court on April 9, 2009 (3 Supp Cr; Appendix).

Partial summary judgment was rendered against Shah on the contract claims of many of the Landlord members in August 2009 (CR 379, 381, 383, and 385), and Shah thereafter settled with these parties (4RR 101 – 103:14), effectively terminating that case and their involvement. The case was abated by the bankruptcy of the Landlord for a period of a year that was finally settled and dismissed in February 2013 (9RR, D. Ex. 68). This case was tried to the Court beginning on March 17, 2014 (1 RR).

The trial court concluded at the end of the testimony that, although he was not convinced that fraud at the time of the transactions involved had been proved, he nevertheless believed that someone (Zaidi it turned out) had lied to the court (5RR 140:21 – 142:20). He signed his Judgment (Appendix 1) against the Defendants who are Appellants (judgment was not granted against all Defendants) on July 24, 2014,

awarding damages, including actual damages and exemplary damages, interest, and attorneys' fees, in excess of $50,000.000.00.

Before the Judgment was signed, Plaintiffs, on April 28, 2014, submitted their proposed findings of fact and conclusions of law (CR 1049) and filed a brief in support of their claim for enhanced exemplary damages. Defendants filed an extensive response to Plaintiffs' brief on May 7, 2014 (2 Supp CR; Appendix 4), and submitted their objections (CR 1087) to Plaintiff's proposals and their own proposed findings and conclusions (CR 1134) on May 12, 2014.

After the Judgment was signed, there followed Defendants' request for findings of fact and conclusions of law on August 12 (CR 1169), Defendants' notice of past-due findings and conclusions on September 10 (CR 1171), Plaintiffs' amended proposed findings and conclusions on September 30 (CR 1173), Defendants' objections to the amended proposals on October 3 (CR 1195), the trial court's actual findings of fact and conclusions of law, also on October 3 (CR 1199, Appendix 2), and Defendants' request for additional findings and conclusions on October 10 (CR 1207). The court did not enter any of the requested additional findings and conclusions. Appellants' notice of appeal was timely filed on October 21, 2014 (CR 1252).

## STATEMENT REGARDING ORAL ARGUMENT

This case involved a business deal involving numerous people who were trying to open and operate a long-term acute care hospital in Katy, Texas –the Hospital. The operative agreements the parties entered into occurred in late 2006 and early 2007 for the most part. These parties had agreements and disagreements over a period from January 2008 until January 2009, as all people who do business together do, and which no one characterized as fraudulent or malicious at the time, or even until 2010, when Shah and the Landlord filed their third amended petition. Suddenly the business dispute was a colossal fraud, and Appellants, who were all repeatedly tarred along with many others with the same illusory brush at trial, even though they are separate entities in every legal and factual respect, were made to be the instigators.

The trial judge bought into the narrative for reasons that will never be known, and as a result awarded damages, in a case in which the largest item of dispute was a $9.0 million secured loan, of **$50,617,101.50**, plus attorneys' fees of another $350,000.00. The exemplary damages alone amount to **$33,521,260.00**, and $6,704,252.00 of that was assessed against Chagla, who was not present at the trial because he was too ill to travel to Houston from Pakistan, a fact known at all times to the trial court, which had refused to order him to appear for that very reason (see 4 Supp CR, Appendix).

Under these circumstances, and for these reasons, Appellants believe that the Court would benefit from argument on the merits of the trial court's actions, and Appellants further believe that such argument will be further the interests of justice between these parties.

## ISSUES PRESENTED

1. Can the trial court's conclusion that Zaidi committed perjury be upheld where the court did not specify any statements it found to be perjury and the evidence is legally insufficient to show fabrication of evidence and malicious intent to deceive the court (CL 2), and did the trial court abuse its discretion in making its consequent findings with respect to the relative credibility of Shah and Zaidi (Preliminary Findings)?

2. Have Appellants been prevented from adequately making their appeal to this Court because the trial court's gross award of damages is neither tied to specific causes of action nor broken down into specific items of damage awarded, when there is no evidence, or alternatively insufficient evidence, to support one or more of the causes of action or items of damage pleaded?

3. Is there sufficient evidence to support the nonspecific damages awarded, including:

    A.    An award in any amount for recovery of loss of accounts receivable pursuant to an asserted lien interest of the Landlord against

the Hospital?

B.    An award based upon a contingent asserted liability in the amount of $5,445,291.87, the full amount of which is disputed by Shah?

C.    An award of $2.8 million for units in the Landlord owned by Medistar that Plaintiffs knew were carried for it?

D.    An award of $638,000 for the Landlord's purported inability to draw against a Hospital letter of credit?

E.    An award of $1,350,000 in alleged commissions?

4.    Can damages apparently awarded by the trial court for fraud, misrepresentation, and fraudulent inducement have been proximately caused by representations made by the "Defendants" upon which Plaintiffs admittedly did not rely? (FF 19)

5.    Can damages apparently awarded by the trial court for breach of contract, fraud, misrepresentation, and fraudulent inducement be recovered when such damages are alleged to have been caused by actions of the "Defendants" that were ratified by Plaintiffs?

6.    Does the trial court's award of damages for monies paid in settlement by Shah to former members of the Landlord constitute an impermissible double recovery where Shah received the members' interests in the Landlord and will profit again from the Landlord's recovery? (FF 16)

7. Are the exemplary damages awarded by the trial court excessive, in light of the flawed findings of compensatory damages?

8. Is there sufficient evidence of the level of egregious conduct on the part of either Zaidi or Chagla required to support the award of exemplary damages against them?

9. Where the non-interested witnesses gave testimony contradicting Plaintiffs' theory of the case, Shah's own testimony and pleadings show he had requisite knowledge and intention to enter into the Landlord mortgage regardless of any representations made by Zaidi, and documentary evidence shows Shah and the Landlord ratified certain material actions of the "Defendants," have all of the elements of the various causes of action pleaded, including whether those actions were relied on by Plaintiffs and whether the actions proximately caused damages to Plaintiffs, been met (FF 19), including whether there is sufficient evidence to support the findings and conclusions of:

    A. Fraud, including common law and statutory fraud, fraudulent inducement, fraudulent transfer, and fraud by non-disclosure? (FF 4, 5, 8, 9, 10, 11, 14, 15, 16, 18, and CL 4, 5, 6, 7, 8)

    B. Breach of fiduciary duties, including as to Chagla, notwithstanding that the evidence showed that he did nothing material? (FF 3, 6, 7, 13, 14, 15, 18, and CL 10, 11)

C. Negligent misrepresentation and gross negligence? (FF 5, 8, 9, and CL 12, 13)

D. Breach of contract and tortious interference with contract? (FF 11, 12, 14, 15, and CL 14, 15)

10. Can Defendants be held liable for fraudulent inducement when they did not enter into any contracts with the Plaintiffs as counterparties, including whether Defendants can be found to have fraudulently induced contracts Plaintiffs made with third parties? (CL 6)

11. Can Defendants be held jointly and severally liable for civil conspiracy when there was no evidence, or alternatively insufficient evidence, of an agreement by Defendants to accomplish an unlawful purpose, and no evidence, or alternatively insufficient evidence, of an intent to harm Plaintiffs? (FF 2, 3, 4, 5, 6, 7, 10, 11, 12, 13, 14, 15, 16, 17, and CL 9)

12. Can Defendants be held jointly and severally liable on a theory of alter ego when there was no evidence that the only corporation they owned was used to commit an actual fraud on Plaintiffs for Defendants' direct personal benefit? (FF 2, 3, 4, 5, 6, 7, 10, 11, 12, 13, 14, 15, 16, 17, and CL 9)

13. Can Chagla, who affirmatively pleaded the statute of limitations, be held liable for tort claims arising from actions that occurred more than two years prior to his having been added as a defendant in this lawsuit in December 2010? (CL 4, 5, 6,

7, 8, 12, 13, 15)

14. Can the trial court properly find all inferences against Chagla simply because he did not appear for trial when the court had previously granted Chagla's motion to quash a subpoena to appear due to his ill health, which prevented him from traveling from his home in Pakistan, and plaintiffs never requested Chagla's deposition? (CL 3)

15. Can a default judgment be rendered against Apex TMG on the basis that it had forfeited its corporate charter prior to trial when it is clear that Apex TMG appeared and answered and participated in trial only to defend itself, and not seek affirmative relief? (CL 1)

STATEMENT OF FACTS

*The Parties Involved*:

TMG: Prestige did business under the name Turn-Around Management Group (hereafter "TMG"; 2RR 62:17–64:17). Chagla originally formed TMG, but ceased to be as active when he retired. Zaidi took over the business and operated it as President. Zaidi owned 71% and Chagla owned 29%. TMG had done and did consulting work for Medistar Corp. (5RR105:16–108:12; 9RR D. Ex. 25), an established hospital developer and operator in Houston, from which the Landlord ultimately purchased the property occupied by the Hospital (6RR P. Ex. 13). TMG managed the Hospital under a written management agreement dated October 9, 2006

(9RR D. Ex. 7), signed by TMG, the Hospital, and Apex TMG as the general partner of the Hospital.

Zaidi:  Adeel Zaidi dreamed of developing and operating a long-term acute care hospital (in the industry, an "LTACH") in 2006.  The Katy LTACH that became the Hospital was to have been the fulfillment of that dream.  Zaidi was not a physician, but a "successful business person" (2RR 64:8–9).  Zaidi owned a small limited partner interest in the Hospital along with numerous physicians (6RR P. Ex. 7).  He and numerous physicians also owned small interests in Apex TMG (6RR P. Ex. 5).  Neither he nor TMG ever owned any interest in the Landlord (6RR P. Ex. 10; 2RR 83:20–23; 5RR 102:16–103:10).

Chagla:  A. K. Chagla came out of retirement to assist in the handling of paperwork for TMG.  "Mr. Chagla's role was to review contracts" (2RR 64:18–21).  Shah testified as follows:  "A. K. Chagla. . . . I believe you testified that he didn't have any involvement with this [Apex business].  Who formed Indus Associates for you?  A.  Mr. Chagla."  That was the extent of it (4RR 319:5–13).   After this litigation began in 2009, Chagla became ill and started working from home (2RR 67:12–20).  Thereafter, he returned to Pakistan and was hospitalized.  He has remained hospitalized there and was medically unable to travel to Houston as late as February 24, 2014 (Supp CR4, Appendix 6) when his motion to quash the trial subpoena served on his counsel was heard and granted.

Shah:  P. K. Shah is a physician and had been an investor in health care entities long before the Hospital and the Landlord (4RR 56:20–57:6).  He owned an interest in each and every entity involved in this case except TMG (4RR 128:24–132:8; 6RR P. Exs. 5, 7, 10), although he received a 25% interest in the income to be paid to TMG under the Hospital management agreement pursuant to a joint venture agreement that he demanded to be made part of (compare the joint venture agreements of 2006 and 2007, 9RR D. Ex. 6; see 4RR 146:21–150:18).  He owned over half of the Landlord (4RR 154:10–155:25; 9RR P. Ex. 10).

Apex TMG:  Apex TMG was created in August 2006 (6RR P. Ex. 4) as a limited liability company, although its company agreement was not executed until October 2006 (6RR P. Ex. 5).  It was the general partner of the Hospital (6RR P. Ex. 7). Its managers were Zaidi, representing TMG, which owned 50%, and Shah, Steven Koch, and Waseem Peracha, "on a rotational basis," representing the Hospital.

The Hospital:  The Hospital was created as Apex Long Term Acute Care Hospital–Katy, LP, a limited partnership, in September 2006 (6RR P. Ex. 7). Numerous doctors owned limited partnership interests.  Apex TMG was the general partner and owned a 1% interest.  The Hospital signed leases with both Medistar and the Landlord for the Katy hospital property.  Both – they were identical – were dated January 4, 2007 (6RR P. Exs. 14, 14b).  The Hospital also had a line of credit and a letter of credit thereunder for operating needs (9RR D. Ex. 16; 8RR P. Ex. 42).  The

- 3 -

original plan was for the Hospital to rent from Medistar, which would own at least 50% of the real estate (see Shah Binding Letter of Intent, 9RR D. Ex. 4). That changed after a meeting with Monzer Hourani, the principal of Medistar, on December 22, 2006 (see 9RR D. Ex. 10; 4RR 154:18–156:24). After that meeting, the deal changed and the Landlord was formed to buy 100% of the hospital property from Medistar and lease it to the Hospital.

The Landlord: The Landlord was formed as Apex Katy Physicians, LLC, by the signing of a company agreement on February 9, 2007 (6RR P. Ex. 10), although it conducted business "informally" beginning by at least January 4, when it signed the purchase and sale agreement with Medistar (6RR P. Ex. 13) and executed a lease with the Hospital (6RR P. Ex. 14b). Shah and Zaidi were initially named co-managers, The reasons for this were hotly contested (compare 4RR 65:10–66:19 with 5RR 75:21–76:22). Despite Zaidi's titular status as co-manager, after at least February 2007 Shah exerted complete control over the Landlord (5RR 76; 82:17–23).

*The Business Deal involving the Landlord and the Hospital*:

The first memorandum of understanding between Medistar, which had the rights to the Katy real estate, as landlord, and TMG, representing the interests of an as yet unformed hospital, was signed on July 28, 2006 (6RR P. Ex. 1).

The Hospital was created on August 24 (6RR P. Ex. 6), and its limited partnership agreement (6RR P. Ex. 7) was signed up as of September 12, 2006. The

investment structure was simple and expressly disclosed: *Each* limited partner put in a small amount of cash and guaranteed a portion of the Hospital's debt to Bank of America (4RR 165:1–17; 9RR D. Ex. 16), by which the Hospital acquired its necessary working capital (5RR 72:10–24).

Medistar hosted a meeting some time in September with the group of doctors who had expressed interest in the hospital project. Shah was among the doctors who attended (4RR 137:19–23). On September 6, 2006, Medistar put the project's terms in a letter that would, upon acceptance, become a binding letter of intent (e.g., Shah's LOI, 9RR D. Ex. 4).

After describing the physical project, the LOI summarized the terms as follows:

1 Unit = $40,000 Investment
150 Units = $6,000,000 Investment, 33.33% Ownership
225 Units = $9,000,000 Investment, 50.00% Ownership

There were no payment terms, there were no provisions for partial payment, and there were no provisions for any purchase other than for cash. The LOI was accompanied by Medistar's projections for the five-year net dollar return (2RR 80:5–81:10). Medistar's projections were accepted because, according to Shah, it was the "expert in this business" (4RR 142:11–143:4). Although his signature on the September 6 letter is undated, Shah executed the LOI indicating that he would purchase 125 units which, at $40,000 per unit, would cost $5,000,000. Numerous other physicians, whose names are listed in the Landlord company agreement, also signed LOI's and paid $40,000 in cash for each unit they purchased.

A second MOU between Medistar and TMG, still on behalf of the unnamed hospital entity, was signed on September 19, 2006 (6RR P. Ex. 2). This MOU reflected the delivery of the LOI's by the doctors and proposed that they would own between 33% and 50% of the "Katy project," although it also provided in a hand-written addition that they would own "around 225 units," which pursuant to the LOI's summary would be 50%. A down payment of $500,000.00 would be required, and closing was scheduled for December 9, 2006. As a very large prospective owner in

the Katy project, per his LOI, Shah was aware of these negotiations. He had already made his investment in the Hospital in August 2006 (4RR 126:12–127:3), and he had also invested in Apex TMG (4RR 128:24–129:13). Shah always wanted to be involved in owning the real estate and touted his real estate expertise as a reason for obtaining the 25% interest in TMG's management fee in January 2007. (5RR 66:8–18; 9RR D. Ex. 5, 1/24/07 agreement).

Apex TMG, the only entity with a bank account (4RR 170:13–22), issued a check identified as for "Apex Katy Physicians" to Medistar on November 7, 2006, for the $500,000 down payment (9RR D. Ex. 8). By December 21, no other funds had been paid. Unhappy with the hospital group's progress in raising the necessary money – Shah had not paid <u>any</u> of his investment yet – Mr. Hourani of Medistar issued an ultimatum (6RR P. Ex. 15), demanding that the group perform one of three options set out in the letter, and threatening to cancel the transaction if no agreement was reached.

Zaidi informed Shah of this development. Shah instructed Zaidi to contact Hourani to set up a meeting to "get this straightened out" (4RR 160:12–18). The meeting occurred in the evening of December 22, 2006, after which *everything* – except the LOI documents memorializing the doctors' investments – changed.

During the meeting, which included Hourani, Shah, Mrs. Shah, Zaidi, and a TMG employee, Abeer Saqer, Shah told Zaidi that he wanted to own the majority

share of the real estate (Zaidi, 5RR 75:4–76:22; Shah, 4RR 154:6–155:25). Shah handled the negotiations with Medistar for his own account, which resulted in a "final deal" with Shah owning 55% of the real estate (4RR 155:2–156:24). This was a totally different package than had previously been on the table (Supp CR 1; Perryman 37:3–38:13, Appendix 3). Shah was completely involved and set this structure up (Supp CR 1, Perryman 248:6–249:12, Appendix 3). In fact, Shah *brought himself* into this deal (Supp CR 1, Perryman 272:25–273:14, Appendix 3).

This new deal was reflected by several handwritten and typed documents marked as Defendants' Exhibit 10 (9RR). These contain scenarios A and B, and it is plain that scenario A was the "final deal." The first handwritten page of D. Ex. 10 (confirmed by two typed versions as pages 2 and 3) was signed by everyone and provided that if "you," which was Shah, would pay $13.5 million for the property now, the "total price" would be $17.5 million. A four-payment schedule for the "remainder" was set out, and Shah was listed as a personal guarantor. Although Shah claims that he did not know what the "extra" $4.0 million was all about, he was forced to admit that Medistar sued him to collect that $4.0 million (4RR 153:16–20). Medistar always contended that Shah owed the $4.0 million (Shah, 4RR 167:15–169:22; Supp CR 1, Perryman 154:8–155:12, Appendix 3). That lawsuit was settled (4RR 316:23–317:6).

From the moment the December 22 meeting ended, Shah and his wife were

in complete control of the real estate investment (5RR 75:21–76:9). There were no new LOI's or other disclosures about the new terms of the investment that all the other doctors had already signed up and paid for, however (4RR 240:20–241:21). Shah finally paid $1.5 million as a "30% down payment" for his units in 2007 (9RR D. Ex. 11), but, after being refunded $240,000 by Apex TMG for six units sold to others (2RR 135:3–21; 9RR D. Ex. 19), he ended up paying only $1,260,000 for his 244 units. And this was expressly his intent at all times (4RR 248:22–249:8).

On January 4, 2007, numerous actions in furtherance of the Landlord's real estate purchase occurred. First, Shah finally delivered his $1.5 million check for what he called his 30% down payment for his units (it was actually 30% of the $5.0 million price that he had agreed to pay Medistar for the 125 units he agreed to buy under the September 2006 LOI). Second, Medistar, Alamo Title, and "Apex Katy Physicians, Ltd.," which the Landlord was being called at the time, executed an escrow agreement providing for the deposit of an additional $2.2 million "pending the closing" (9RR D. Ex. 12). Apex TMG, on "Apex Katy Physicians, Ltd.'s" behalf, issued a check for that amount that day (9RR D. Ex. 14). It was comprised of funds from all the doctor/investors, including Shah (5RR 100:16–22).

The purchase and sale agreement between "Apex Katy Physicians, Ltd.," and Medistar (9RR D. Ex. 13), and the two leases, one between Medistar and the Hospital (9RR D. Ex. 15), designed to protect Medistar until the property sale closed, and the

other between "Apex Katy Physicians, Ltd.," and the Hospital (9RR D. Ex. 15A) were also executed on January 4, 2007.

On January 12, 2007, the Hospital and its limited partners attended a closing of the Hospital/Bank of America credit facility (Shah, 4RR 209:13; Note, 9RR D. Ex. 16). This was crucial to the Hospital because the revolving note provided it with working capital to use until it could open and secure its LTACH license (which ultimately took until June 20, 2008 [8RR P. Ex. 50], during which time no LTACH patients could be admitted as such) and the letter of credit that was required to secure the leases. Shah testified that he was at the closing, he saw his name on the list of investor/guarantors, and he recognized the long list of documents that all the parties had signed, one of which was a landlord lien waiver. By the waiver, Medistar and the Landlord subordinated their lien on certain described assets of the Hospital, specifically cash, to Bank of America's lien, that was required for Bank of America to issue the letter of credit. Shah especially wanted the letter of credit, and he understood that the landlord lien waiver was a prerequisite (4RR 210:9–216:11).

On February 1, 2007, MetroBank issued a commitment letter proposal (9RR D. Ex. 18) to Shah, his friend Vora, and his cousin Suneja for a $9.0 million loan to the Landlord to be secured by a mortgage on the real estate and their personal guaranties of a portion of the debt. Zaidi was not copied with the commitment letter and denied having seen it or having discussed its details with the MetroBank officer,

Mr. Tariq (5RR 77:11–25). Shah, Vora, and Suneja accepted the commitment on February 8, 2007, agreeing to the terms of the loan.

As of the next day, all the Landlord investors signed the Landlord company agreement (9RR D. Ex. 20). The company agreement named both Shah and Zaidi as co-managers. Shah said that it was Zaidi's idea, even though Zaidi owned no interest in the Landlord, to have Shah named as a manager (4RR 65–66). Conversely, Zaidi said that Shah asked him to be a co-manager, which was acceptable to Zaidi because of his trust in Shah (5RR 75–76).

On March 9, 2007, Medistar was issued a certificate for 70 units in the Landlord, for which it said it had provided services and not cash (Supp CR 1, Perryman 110:12–11:20, 113:9–13, Appendix 3). Despite his testimony at trial on direct (4RR 77:18–23), Shah admitted on cross that he knew that Medistar had these units for which it had not paid any cash (Shah, 4RR 166:22–25: "They [Medistar] were a partner in the sense that they had 70 units that they didn't pay anything for? A. That's true, sir.").

The closing of the MetroBank loan occurred on March 22, 2007 (closing documents, 7RR P. Ex. 30), and again there is strong disagreement about who knew what. Shah's bank officer, Mr. Tariq, said that Zaidi knew all the details (3RR 92:1–93:11), while Zaidi said only that he knew there was a loan, but not any details about a lien (2RR 109:23–112:6). Zaidi also said that he was at the closing

- 11 -

representing the interests only of the Hospital side, that he asked Shah if it was alright for him to sign the closing documents as such, and that he was told that it was (5RR 78:23–79:5). Zaidi also insisted that Shah had originally told him that he, Vora, and Suneja intended to seek loans to purchase their units, as the LOI's required (2RR 111:5-9), and that he was reassured before the closing that they still intended to do so and take care of the mortgage (5RR 101:4–102:15). In fact, the loan documents contained a provision that allowed for a penalty-free payoff within four months (4RR 252:14–253:15). At least Vora expressed that he desired that they pay off the loan during the four-month period, as indicated in an email that Shah read aloud in court (4RR 256:19–258:17). Zaidi was happy about this (5RR 101:18–102:15).

The timing of the closing was driven by a Medistar ultimatum, of which both Zaidi (5RR 100:4–22) and Shah (4RR 231:22–233:19) were aware. If the closing did not go forward on March 22, Medistar threatened to cancel the transaction and *retain* the doctors' earnest money of $2.7 million. It was all at risk.

After March 22, Zaidi had virtually no further personal involvement in the management of the Landlord. Apex TMG collected funds and issued unit certificates at the instance of Shah or Mrs. Shah. Despite the fact that no document anywhere indicated that Shah (through his investment company, Indus Industries) should receive 244 units instead of the 125 Shah had committed for (5RR 108:12–109:8), Shah believed that he was entitled to 244 (his 55%) (4RR 156:1–24), and he

requested and received them. Indus was issued certificates for 214 units on July 24, 2007 (9RR D. Ex. 27), and for 30 units on December 10, 2007 (9RR D. Ex. 36).

On about March 23, Medistar issued checks for $500,000+ to TMG for consulting services that it had performed for Medistar over a long period of time on projects that were later memorialized in the memorandum of understanding of May 2007 (9RR D. Ex. 25). None of the money paid to TMG was for any service rendered or commission in connection with the Katy real estate (Supp CR 1, Perryman, 43:12–45:7; 284:6–19, Appendix 3; Saqer, 5RR83:3–84:5).

The Hospital opened its doors in January 2007, and then admitted its first patient in March (2RR 233:4–7). Because the Hospital did not have its LTACH license, however, and would not obtain it until June 2008, its cash flow was very limited, and it fell further and further behind in its rent obligations to the Landlord. In fact, throughout 2007 and 2008, the Hospital was paying approximately 50% of the rent on a monthly basis, by agreement with Shah (Shah, 4RR 90:2–17; Odhav, 4RR 186:19–23).

On August 21, 2007, the Steering Committee of the Hospital, comprised of many of the doctors investing and practicing there, including Shah, authorized Zaidi to approach Shah and request a loan of $700,000 for the Hospital's operational needs (5RR 109:18–110:3). Shah wrote a check on the Landlord account for the $700,000, but erroneously made it payable to itself. The check was picked up by an Apex TMG

- 13 -

employee and deposited into the Apex TMG account that contained the Hospital funds. All of the $700,000 was used for the Hospital's operating expenses (5RR121:13–123:24). Shah was thanked for the loan by the Steering Committee on several occasions, and he acknowledged making the loan (Odhav, 4RR 185:18–186:12; 191:1–8; Saqer 5RR 84:19–85:8).

In January 2008, Shah unilaterally wrote a memo for the Landlord to Zaidi claiming that "he" owed the Landlord a large sum of money (8RR P. Ex. 40), notwithstanding that Zaidi personally had not borrowed or received any money for anything, with the exception of expense reimbursements from TMG or Apex TMG. On behalf of the Hospital, Zaidi and Dr. Koch answered the memo by a letter on January 17, 2008 (9RR D. Ex. 40), responding line by line and agreeing with Shah's positions on most points. Full disclosure was made. Shah admitted that all of the amounts listed in his memo and in the response constituted loans the Landlord had made to the Hospital (4RR 282:13–283:7).

In April 2008, Bank of America contacted Zaidi, at Apex TMG, representing the Hospital, its borrower, and told him that a routine audit revealed that the landlord lien waiver from the original closing in January 2007 could not be found in the bank's files and had to be replaced. Zaidi attempted to discuss the matter with Shah but was unable to do so, so he furnished the required replacement, identical to the original, dated as of the original date (5RR 111:18–112:23).

Further disputes erupted in late 2008, and threats of default and eviction were made, but then dropped. Things came to a head again in January 2009, and eviction proceedings were again initiated but dropped. This suit was filed on January 15, 2009, and Zaidi was "unelected" manager of the Landlord on January 19, 2009 (4RR 269:15–20). TMG's management agreement was terminated on May 11, 2009 (9RR D. Ex. 60), by a document that recited that agreed and unpaid management fees at that time amounted to $480,000. The Hospital filed a no-asset bankruptcy petition in September 2009. The Landlord filed a claim in the Hospital's bankruptcy case on November 17, 2009, and amended it on about January 25, 2010 (9RR D. Ex. 62). The Landlord asserted the claims against the Hospital that it asserts against Defendants here.

SUMMARY OF THE ARGUMENT

The trial court's judgment for actual and exemplary damages in excess of $50,000,000 is fatally flawed and must be reversed and sent back for a new trial. The damages awards are stated in gross amounts, and there are no damage findings to show how the amounts were arrived at, even though these findings were requested. As a result, Appellants are left to guess as to how to contest these damages on appeal. Many of the elements of damage claimed by Plaintiffs, and the causes of action upon which they were based, were not supported by legally or factually sufficient evidence. Particularly, the damages awarded may well have contained amounts for (i) accounts

- 15 -

receivable, when there was no actual evidence of receivables in the record, (ii) a contingent and disputed claim, and (iii) loans made to an entity whose debts have been adjudicated in bankruptcy.

The trial court's findings hold all of the Defendants liable "individually and collectively" on the various causes of action. These findings likewise are flawed and constitute harmful error because the record quite simply does not contain evidence to support an alter ego finding or civil conspiracy. Rather, the record shows that one Appellant, Chagla, who was also assessed over $6 million in exemplary damages, served an almost entirely ministerial function in the underlying events.

Appellants believe and contend that many of the harmful and erroneous results in this case flow directly from the trial court's mistaken conclusion that Appellant Zaidi committed perjury.

ARGUMENT AND AUTHORITIES

As a preliminary matter, Appellants must observe that the trial court did some extraordinary things in both the trial and post-trial phases of this case after apparently deciding the first day of trial that Zaidi had committed perjury. While the evidence does not support a finding of perjury, the court's conclusion appears to have colored the entire case. First, the court ignored the great weight and preponderance of the actual evidence, as opposed to the speculation, innuendo, and insinuation that Plaintiffs built their case on, in determining the relative credibility of the testimony

of Shah and Zaidi. The trial court's fact findings on credibility should be disregarded or at the very least discounted. (See Supp CR 2, Response, Appendix 4.)

Second, the court ignored all settled Texas law to award Plaintiffs a default judgment against Apex TMG, for having forfeited its charter, even though it was clear that Apex TMG sought no affirmative relief and did nothing other than appear and defend itself.

Third, the court found all inferences against Mr. Chagla for his failure to attend trial, and then awarded not only actual damages but exemplary damages of $6,704,252 against him, even though the court knew he was too ill to travel from his hospital bed in Pakistan and had quashed Plaintiffs' trial subpoena for that very reason. Even Shah admitted that Chagla "didn't have any involvement with" the Apex matters (4RR 319:5–13), except that he formed Shah's investment company. No *evidence* was offered to support Chagla's liability for anything, only insinuation and baseless accusation.

Finally, without identifying how or why, or the supposed evidence upon which the conclusion was based – because there was none – the trial court simply issued as if by fiat the conclusion of law that all Appellants operated the business entities involved in this case together as one business enterprise and therefore were liable for all damages together as co-conspirators and under the theory of alter ego. The court grossly overstepped its legitimate bounds as a fact finder and awarded the

judgment under appeal based upon punitive notions rather than evidence. It must be reversed in the interests of justice.

1. The Court should reverse and remand this case for a new trial, because the trial court's conclusion of law that Zaidi committed perjury is flawed in its over-breadth and not based upon legally sufficient evidence, and its consequent findings as to the relative credibility of the parties is against the great weight and preponderance of the evidence and constitutes an abuse of discretion

A. The trial court erred in failing to specify the statement(s) it found to be perjury.

B. The elements of perjury have not been met here where there has been no fabrication of evidence or intent to deceive the court.

The trial court found that Zaidi made false statements under oath and committed perjury "on more than one occasion." The court did not identify one false statement, however, made by Zaidi to deceive the court. Because of this failure, Appellants are left to guess at what constitutes the supposed perjury and cannot meaningfully address this issue on appeal. All we have is the court's statement at the close of the evidence that he had heard testimony that was not credible from "witnesses," plural. (5RR 140:21–141:14).

> THE COURT: To award exemplary damages, there is an intent element associated with that. And I'm not saying this is the case; *but what if the intent necessary for the cause of action that is pled has not been proven to my satisfaction* but I have determined that there was *intent in testimony presented to me that was intended to either deceive the Court* or to directly and intentionally testify contrary to the facts as I have found them based upon the documents. Two separate things.
> So, there's intent of – for instance – and I'm – this is part of the question,

not part of me reciting what I believe to be a finding of fact or conclusion of law. That's different from saying that someone, at the time that this transaction was going through, intended a fraud or intended to deceive someone at that time; but now that this case has been tried, sworn testimony has been presented to me, and I find that testimony wholly incredible based upon what the documents say and/or that there was intent to deceive this Court into believing that the document that I'm looking at did not represent the facts as I've determined them to be.

(5RR 141:20–142:17; emphasis added.)

Appellants acknowledge, as they must, that Zaidi had a great deal of difficulty explaining what and when he knew about the MetroBank mortgage and loan. He admitted he knew about the loan, but he said he was not sure what the mortgage was all about. His explanation was that Shah had told him several times that he and his colleagues would be borrowing money to buy their units, not as a company debt, and that he trusted Shah (5RR 77–78). The trial court may not have found that explanation particularly credible, but it was not "fabricated evidence" that Zaidi made up to deceive the Court. In fact, that is exactly the same thing he told the Landlord investors at the Hospital steering committee meeting on January 19, 2009. A that meeting, the non-Shah affiliated owners were told that the mortgage had been discovered (8RR P. Ex. 67), which caused them to sue Shah, *but not Zaidi*, even after they learned that Zaidi had indeed signed all the same papers for the loan as Shah had (see Koch deposition excerpts, admitted but omitted from the CR).

- 19 -

Importantly, Zaidi admitted that he knew <u>now</u>, at the time of trial, that both a loan and a mortgage had been made (2RR 110:12–111:9). He did not deny this.

Perjury is the fabrication of evidence. *See Daniel v. Kelly Oil Corp.*, 981 S.W.2d 230 (Tex. App.–Houston [1st Dist.] 1998, pet. denied). Perjury is committed if, "with intent to deceive <u>and</u> with knowledge of the statement's meaning," a person makes a false statement under oath or unsworn declaration." Tex. Penal Code Ann. § 37.02(a). That did not happen in this case. For better or worse, Zaidi continued to tell a story that may be hard for others to believe but that he has said for many years that he believes. If this was the perjury, then why did the trial court not say so? "Facts constituting the offense of perjury must be averred directly and with certainty." *State v. Eversole*, 889 S.W.2d 418, 422 (Tex. App.–Houston [14th Dist.] 1994, pet. disc. pet. den.). The trial court's conclusion of law that Zaidi committed perjury is fatally over-broad and not supported by legally sufficient evidence.

### C. Shah's inconsistent testimony, contradicted by independent witnesses and documents, belies the trial court's finding as to his credibility.

The court apparently decided that, if one side has committed perjury, then the other side must be credible. The weight of the evidence, even disregarding Zaidi's testimony, presents a more clear picture of whose testimony was credible and whose was not and also goes to disproving the asserted fraud. Appellants recognize that the burden to show abuse of discretion here is very high, but this Court should

know how the trial court really reached its conclusions. The court's had to have disregarded not only Zaidi's testimony but also <u>all</u> the other contrary evidence, including documents and the testimony of independent witnesses, to arrive at the findings about Shah's and Zaidi's credibility. These findings are so against the great weight and preponderance of the evidence as to constitute an abuse of discretion in this case.

The disputes between the Landlord, Shah's real estate company, and make no mistake, it <u>was</u> Shah's company (see, e.g., 4RR 62: "my company"), and the Hospital, as the tenant, arose in earnest in November 2008, with default notices, and then seemingly reached a boiling point with eviction notices and court proceedings in January and February 2009 (See, e.g., 8RR P. Exs. 55 and 56, 4RR 97). But then, <u>nothing</u> until the Hospital declared its no-asset Chapter 7 bankruptcy in September 2009. No fighting, no allegations of fraud or wrongdoing, no anything.

To be sure, there had been controversy in January of 2008, when Shah and the Hospital's steering committee exchanged the stern but not hostile letters concerning the financial dealings between them since March 2007. (8RR P. Ex. 40, 9RR D. Ex. 40.) Shah recounted his positions on what he said he was owed, and the Hospital replied, extensively agreeing with Shah's positions and promising to try to pay him back. (4RR 273:22–279:24.) Far from concealing anything from Shah, Zaidi and the steering committee freely disclosed all pertinent financial information

that existed at the time.  Shah agreed on cross that he had <u>no</u> evidence to suggest that the Hospital was <u>not</u> in fact trying over the next year to repay the amounts it conceded were due (4RR 282:13–283:7).

More importantly, the memo that Shah had sent to Zaidi, for the Hospital , setting out in detail <u>all</u> of the <u>loans</u> he had made to the Hospital (Shah, 4RR 282:13–283:7) and all of the funds he contended that the general partner of the Hospital had not yet accounted for, proves, as both Dr. Odhav and Ms. Saqer testified, that <u>everyone</u>, including Shah, had complete information about the Hospital's finances and financial condition at all times; no one kept or tried to keep Shah in the dark about *anything*.  (Odhav, 4RR 183:6–185:2; Saqer, 5RR 84:6–18)

The very next day after the Hospital sent its reply to Shah's memo, Shah claims, without any corroboration from any source, that he (the Landlord) tried to draw $638,000, the exact amount allowed under an *amended* letter of credit securing his rent (8RR P. Ex. 44), but was unable to do so, and lost the $638,000, because "Zaidi" had the document and refused to give it to him (4RR 73–74).  But Shah produced no evidence of <u>any</u> actual draw attempt at any time and no evidence that he complained to the Hospital of his inability to draw down the funds.  The evidence is that he did <u>nothing</u> until the default letters were sent to the Hospital in November 2008.  No fighting, no allegations of fraud or wrongdoing, no anything.

Shah's testimony on this subject was both uncorroborated and internally inconsistent. He also claimed that when he tried to draw upon the letter of credit in January 2008, he couldn't because Zaidi had effectively destroyed it by amending it in 2007. In fact, the amendment (8RR P. Ex. 44) was a ministerial non-event that only revised the letter of credit to reflect draws that had already happened, and Shah's January 18 "draw" letter (8RR P. Ex. 43), which the evidence shows was not in fact sent, purported to draw the exact amount allowable under the very amended letter of credit that Shah pretended not to know about (4RR 73:22–25). Plaintiffs' Exhibit 94 (8RR) shows, however, that over *a month later*, on February 25, 2008, his then lawyer Jeffrey Kaiser sent Shah an email telling him that he needed to get the document so a draw could be made before February 27. Shah said he asked for it, but where's the proof? Shah offered no proof of any actual draw attempt at any time, no correspondence from Bank of America about any such draw attempt, no correspondence refusing to honor any draw, no correspondence or *anything* with Zaidi about the "missing" letter of credit, no allegations of fraud or wrongdoing, no anything. Shah's story is not credible.

Shah also said at trial that "Zaidi" had stolen the $700,000 that the Hospital used for operating expenses in 2007. Shah claimed the Landlord had "borrowed" the money from and to itself to give to Apex TMG (there was <u>no</u> evidence that the check was given to or ever possessed by Zaidi himself) to open a new landlord account, for

- 23 -

reasons unknown, for unknown signatories (4RR 265:18–270:13). Yet in his January 2008 memo he called this money "borrowed" by the Hospital and to be repaid. Indeed, in perhaps a weak moment when he had strayed from his script on cross, Shah agreed that all the sums he listed as due in his January 2008 memo were *loans he had made to the Hospital* (4RR 282:13–283:7). Shah also admitted that, with the single exception of the mention of the $700,000 loan in the January 2008 letter, he never asked anyone about the "missing" money or the supposed "new" account for over *three and a half years*. This was true even though Shah knew the money had been debited from the Landlord's MetroBank account in September 2007 because Shah received monthly bank statements the entire time (4RR 265:18–273:21).

Others with knowledge did mention the $700,000 during this time, and they completely corroborated Zaidi's description of the check as a loan for Hospital operations at a time when it badly needed the funds (Zaidi, 5RR 109:9–110:1). Dr. Odhav, an independent witness (4RR 198:18–20), knew about this loan and others from many discussions at the steering committee meetings (4RR 185:18–186:12). Abeer Saqer likewise attended those meetings and heard discussion about the loans to the Hospital, and she also heard the steering committee thank Shah both for having made them and for allowing reduced rent to be paid (5RR 84:19–85:12). Shah's story is not credible.

Shah's behavior in 2007 and 2008 ( and even up to December 30, 2010, when the second amended petition was filed [CR 824]), is completely inconsistent with the claims of malice, intentional fraud, and deliberate breaches of fiduciary duty that were made in the amended petition and at trial. Why? Because they are not true.

Shah started the process of getting the Hospital out of the Landlord's real estate by declaring defaults in November and December 2008, and then appeared to continue that process in earnest in January and February 2009 (8RR P. Exs. 55, 55a, and 56), when formal eviction proceedings were commenced. *But then all such proceedings were dropped and never reasserted before the Hospital declared bankruptcy in September 2009.* Is this the behavior of someone who has been defrauded or cheated by his adversary, or does this sound like a business deal that everyone was trying to save until they simply couldn't? (Saqer, 5RR 90:16–17: "Everyone was an honest people trying to do the best on this project, as far as I know.")

During the contentious months of November 2008 through February 2009, when lawyers for Shah and the Landlord wrote to and met with Defendants' lawyers repeatedly, <u>no mention</u> was ever made in any letter, memo, email, or meeting, about anyone stealing $700,000, or anyone destroying a letter of credit, or anyone receiving illegal real estate commissions or kick-backs. *Shah admitted this* (4RR 266:15–273:21).

Even when Shah saw fit to file this suit, on January 15, 2009 (CR 1), *long after* he would have known about the $700,000 theft (4RR 86), the allegedly surreptitious landlord waiver (9RR D. Ex. 17; see 8RR P. Ex. 45), and the January 2008 letter of credit issue, Shah and the Landlord filed a garden variety case alleging breach of contract and, among other things, fraud in that *Medistar* and Zaidi had misrepresented the potential of the real estate and the Hospital in the Medistar 2006 projections that had accompanied the LOI's (2RR 80:5–7). No mention was made of any of the malefactions which were the main attraction at the trial: No theft, no waiver, no letter of credit, no free Medistar units, and no illegal real estate commissions.

Shah and Medistar settled the 2008 case that Medistar had filed against Shah for the $4,000,000 in purchase money that Shah had not paid with a dismissal in 2010. From that point on, Medistar was no longer a villain in his story.

Next, the lawsuit filed by the Landlord investors who had sued Shah, but not Zaidi, for breach of the Landlord company agreement, was settled. Shah admitted that he had not obtained the unanimous consent of the members, and Zaidi, as co-manager, likewise did not. The difference is that Shah testified in August 2009 in the Medistar case that he had had the authority to sign the loan and mortgage documents *without* the members' unanimous consent, because he was a manager (4RR 249:16–252:7). He also defended the investors' motions for summary judgment by

strenuously arguing that since the investors had access to all the books and records – just as he did – and had signed the company agreement after the loan commitment had been made (Supp CR 3, Shah response to motions for summary judgment and sur-reply to plaintiffs' response, Appendix 5), they were charged with knowledge of his actions as a matter of law and had no claim. The trial court granted summary judgment against Shah (4RR 102–03). Shah settled those claims with the then-existing investor/members of the Landlord for the payment of $552,500.00, over time, effective December 1, 2010 (4RR 101–02). The investor plaintiffs, and the troubling issues they presented to Shah, were also now dealt with.

Twenty-nine days later, on December 30, the second amended petition was filed, and a day after that, a third amended petition was filed (omitted from the CR; no. 47631147 in the district clerk's website for this case). For the first time, Shah's story morphed into what he testified to at trial: That Shah was an innocent passive investor – a "whale" in counsel's terms – who had been fleeced by the "promoters" of the real estate deal, most centrally Zaidi and Chagla. For the first time, allegations appear that the $700,000 had been stolen, the landlord lien waiver had been secretly (fraudulently) provided to Bank of America, the letter of credit had been fraudulently destroyed by Zaidi, and the consulting payments Medistar had made from its profit from the real estate sale had really been illegal real estate commissions.

Appellants contend that these allegations were conveniently contrived. They

are false, and the only "evidence" offered to support them was Shah's testimony, uncorroborated by the documents or other testimony one would have expected to see were the allegations true.

The inconsistencies in Shah's story, and that story's inherent lack of credibility, came out in his testimony. Some examples:

- Shah twice said that he was merely a passive investor (e.g., 4RR 56) who had little if any involvement in the development of the real estate project. He also said that he was made co-manager <u>by</u> Zaidi, who promised to "run everything" (4RR 64–65). An independent witness, however, Gary Perryman, Medistar's President, testified that the hospital deal "changed" in December 2006 (Supp CR 1, Perryman 37:3–38:13, Appendix 3) because Shah "brought himself into the deal." (Supp Cr 1, Perryman 248:6-249:12, 256:6-24, 272:25-273:14, Appendix 3).

- Shah originally insisted that he did not know about the real estate deal until near the end of the process in late 2006 (4RR 112–13), but then admitted on cross that he had attended the Medistar presentation in September, after which he made his subscription for 125 units (4RR 137–38). Shah originally said that the Medistar meeting on December 22, 2006, had been set up by Zaidi (4RR 60). He admitted on cross, however, that he instructed Zaidi to set up the meeting so that he and Hourani could straighten the problem out (4RR 160).

- Shah also admitted that <u>he</u> told Zaidi at the meeting that he wanted to

own the majority of the real estate, 55% (4RR 154:10–155:5). When the deal changed, and Shah was in charge, he would have his 55% with only a nominal cash investment (4RR 155–56, 248:22). He was forced to admit that there were never any other documents signed by the investors that disclosed this arrangement that was so different than the cash offer they had all signed up for (4RR 146), and that he had never told <u>any</u> of them that <u>his</u> deal, and the deal he made for his two colleagues, was different from everyone else's deal (4RR 164:1–167:7, 240:20–241:21). He admitted the result of what he had done very directly:

> Q. So, we have two classes of people. We have Medistar and the three of you that are in this class; and all the other poor schmucks that are in this class, they are paying cash, right?
>
> A. ***Yes, sir.***

(4RR 166:7–167:7; Emphasis added). Shah intentionally structured the deal to benefit himself and his friends at the expense of his fellow investors, and he intended it (4RR 248).

● Plaintiffs repeatedly stressed that if the Hospital did well, Zaidi (actually TMG, which had the management contract, but Plaintiffs always reduced it to Zaidi, personally, without evidence) would do well. Plaintiffs ignored the fact that, under the 2007 joint venture agreement with TMG, Saqer, and Peracha, Shah would also do just as well, since he had obtained a 25% interest in the management fees for free. When Shah was confronted with the joint venture agreement (9RR D. Ex. 5, pp. 3 and

- 29 -

4) that he had demanded from Zaidi when he learned that Saqer and his friend Peracha were involved in it, he looked at it and calmly declared, totally contrary to its plain and clear terms, that it was for "future" projects (4RR 146).

- Shah pretended that he had no idea what the $4,000,000 in "additional" purchase money for the real estate was (see 9RR D. Ex. 10) on direct examination (4RR 61–65). On cross he was forced to admit that he had signed a note and guaranty for that very $4,000,000, and that Medistar had sued him, *and only him* (4RR 153), to enforce that guaranty (4RR 161:2–163:25, 167:15–169:22).

- Shah, on direct, pretended that the investment structure of the Landlord was "set up by Mr. Zaidi" – who had *nothing* to do with that structure – and was the same as that for the Hospital investment (4RR 58–59). The evidence shows this to be completely false, and Shah knew it was false. Each of the Hospital investors paid a small amount down, which was all fully disclosed, and each signed a bank guaranty for a larger sum, also fully disclosed. On the contrary, the Landlord deal that everyone signed up for, before it was changed, required cash subscriptions, and the documents disclosed to everyone in what became the Landlord deal say just this, as Shah was forced to admit (4RR 143–45, 156:1–24, 164:1–167:7). Only Shah and his special class had the "Hospital" option.

- Shah testified intently that he would not have invested in the Landlord had he known that the landlord's lien had been waived, yet the facts are that the letter

- 30 -

of credit was important to him and he "understood" that Bank of America had to have collateral for the letter of credit it issued for his benefit. He also acknowledged that the landlord lien waiver was in fact listed as part of the original credit deal *he signed* in January 2007, <u>before</u> he invested and <u>before</u> he signed the MetroBank loan closing papers in March (4RR 208:1–210:3, 211:8–215:19). Even his banker friend, Mr. Tariq, who handled the Landlord loan for MetroBank, agreed on cross that Shah had to know about the landlord lien waiver (3RR 122:8–16).

The documents, independent witness testimony, and Shah's own words and actions lead to the inescapable conclusion that Shah is not credible.

2. Appellants are prevented from adequately making their appeal to this Court because the trial court's gross award of damages is neither tied to specific causes of action nor broken down into specific items of damage awarded, and there is no evidence, or alternatively insufficient evidence, to support one or more of the causes of action or items of damage pleaded.

The trial court's findings of fact and conclusions of law (CR 1199, Appendix 2) contain <u>no</u> findings of any damages amounts, and the Judgment recites only damages awarded without making any findings as to how any actual damages were arrived at. This happened even though the court, at the close of the evidence, asked for proposed findings and conclusions and said: "I do need the findings of fact which support the numbers, if any, that you suggest should go in a judgment" (5RR 145:13–20). This also happened even though, after the court issued its findings and

conclusions on October 3, 2014, Appellants requested additional findings and conclusions that would have quantified the damages, by claim, awarded to Plaintiffs (CR 1207).

Appellants are prevented from being able properly to present their appeal from this Judgment,  In 2002, the Texas Supreme Court in *Harris County v. Smith*, 96 S.W.3d 230 (Tex. 2002), considered whether a trial court had committed harmful error by submitting a broad-form question on damages.  *Id.* at 231.  The Court concluded that the error was harmful because the trial court's charge error "probably prevented the petitioner from properly presenting its case to the appellate courts." *Id.*, citing Tex. R. App. P. 61.1(b).  The Court single damages question was harmful because it prevented the appellate court from determining "whether the jury based its verdict on an improperly submitted," invalid element of damage.  *Id*. at 234.  In *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000), the Supreme Court had found that where a single broad-form liability question commingles valid and invalid grounds, and the appellant's objection is timely and specific, the error is harmful. The Court remanded for a new trial because the appellate court could not determine whether the verdict was based upon an invalid theory.

In 2004, the *Harris County* decision was applied to cases involving findings of fact and conclusions of law in *Tagle v. Galvan*, 155 S.W.3d 510 (Tex. App.—San Antonio 2004, no pet.).  The appellant urged the court to find that the trial court had

committed error in making a broad-form finding of $2,000,000 in actual damages, and in failing to make additional findings of fact which *would have separated each element of the damages*. *Id.* at 515. The Court found that the *Harris County/Casteel* rules would apply in the context of a bench trial and findings and conclusions. "We agree that a properly prepared request for findings or additional findings specifically drawing a trial court's attention to the *Harris County/Casteel* problem will likely be sufficient to preserve error." *Id.* at 516. The "problem" is the harm that results when an appellant must guess at the basis of the court's assessment of damages against it. *Martinez v. Molinar*, 953 S.W.2d 399 (Tex. App.—El Paso, no writ) ("The test for determining whether the complainant has suffered harm is whether the circumstances of the case would require an appellant to guess the reason or reasons the judge has ruled against it.").

Findings of fact and conclusions of law should not contain a cumulative damages amount. Rather, the findings of fact should track the suggestions of the Texas Pattern Jury Charge and the requirements of *Harris County*, to provide an appellant with sufficient information to enable it properly to present its case to the appellate court. A request for additional findings of fact acts in much the same way as an objection to a charge. *Vickery v. Commission for Lawyer Discipline*, 5 S.W.3d 241, 255-56 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

This is the situation in this case exactly. Appellants requested the proper additional findings and conclusions, but the Court refused to enter them, even though it knew of the *Harris County/Casteel* issue before it. Because Appellants did in fact request additional findings and conclusions that would have "detail[ed] the apportionment of damages among the court's findings" on liability, Appellants have preserved their right to have the damages assigned and quantified by claim, so that they are not forced "to guess" at what amounts were awarded for which claims or whether the damages awarded are attributable to invalid claims. The trial court's "broad-form" cumulative award of damages without specific allocation to any liability findings greatly impairs Appellants' ability to prosecute their appeal, which is harmful error. Appellants cannot determine what the damages awarded by the trial court are based on. This is precisely the situation condemned in *Casteel.* Appellants can and do contest the gross amounts under *Thomas v. Oldham*, 895 S.W.2d 352 (Tex. 1995). The only proper remedy is a reversal of this case and a remand for new trial.

The trial court's failure also to itemize the amounts found by it to be attributable to the several types of damages claimed by the two separate Plaintiffs on their separate causes of action further impairs Appellants' ability to present this appeal. The trial court's findings of fact make no damages finding with respect to any of the damage elements alleged by either of the Plaintiffs. The judgment simply

states total amounts of actual and punitive damages to be recovered by each Plaintiff. The judgment also simply doubles the amount of actual damages awarded to each Plaintiff to award punitive damages against Zaidi to each Plaintiff and takes one-half of the same actual damages amounts to award punitive damages against Chagla.

Because there are <u>no</u> findings of fact to support the judgment's damages awards, the judgment must be reversed. Tex. R. Civ. P. 299, 299a. Additionally, the judgment must also be reversed because the trial court's award of aggregate damages amounts includes invalid elements, as is shown below. Because the court did not address the separate damages elements claimed, and some have no support in the evidence, the error is harmful and the only proper remedy is a reversal of this case and a remand for new trial. *Harris County,* at 236. *See also Tex. Indus., Inc. v. Vaughn,* 919 S.W.2d 798, 804 (Tex. App.—Houston [14th Dist.] 1996, no pet.); *Whitaker v. Rose,* 218 S.W.3d 216, 224 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding that when a default judgment specifies a single damages award based on more than one damages element and there is no evidence to support the award as to one of the elements, then the entire award must be reversed and remanded even though one of the other elements might be sufficient to support the award). *Aim-Ex Industry, Inc. v. Slover*, 2010 WL 2136599 (Tex. App.—Amarillo 2010, no pet.) ("Because of . . . the lack of any attempt to itemize or segregate what sums of money, if any, were allotted to the myriad types of damages sought, we cannot but reverse

and remand the actual damages awarded.").

Plaintiffs submitted two different post-trial proposals for findings and conclusions, and the amounts Plaintiffs claimed as damages differed. In the first (CR1049), Plaintiffs claimed total actual damages for the Landlord of $17,476,465.84, and for Shah of $8,744,712.66. In the second (CR 1173), Plaintiffs claimed total actual damages for the Landlord of $18,111,624.90, and for Shah of $9,214,712.66. The trial court awarded actual damages to the Landlord of $4,071,584.00, and to Shah of $9,336,920.00. Appellants specifically pointed out in their objections to Plaintiffs' proposals (CR 1087) that several of the elements of damages claimed by Plaintiffs were not supported by the evidence, legally or factually. Not only could the Plaintiffs not agree on the amounts, the trial court could not agree with either suggestion, but it declined to provide any basis for its damage awards. Appellants have no idea what the court included and did not include in the Judgment. Appellants must "guess."

3. The gross award of damages is reversible because it likely includes damages for with there is insufficient evidence.

If the Judgment amount includes any amount attributable to the following elements, then there is harmful and reversible error.

A. <u>An award in any amount for recovery of lost accounts receivable</u>.

Plaintiffs claimed damages in the amount of $11,218,465,84 for the loss of

the Hospital's alleged accounts receivable in 2009, caused by the alleged fraudulent waiver of the landlord's lien in 2008. This claim was fictitious and supported by no legally or factually sufficient evidence.

The only proffered "evidence" of these alleged accounts receivable came in the brief testimony of Parag Parikh, Shah's nephew and a self-styled "forensic financial consultant" who has <u>never</u> testified in court before or had <u>any</u> of his "opinions" accepted by any Court (3RR 177:20–23). There is no scientific discipline involved in the work of a "forensic financial consultant," although Parikh said that he "knew something about accounting" (3RR 178:18–20).

Parikh testified that the Landlord lost the ability to seize $11.1 million in accounts receivable because the landlord's lien had been waived. Had it not been waived – and Parikh merely <u>assumed</u> that the waiver was not in place in 2007, which is contrary to the evidence (3RR 181:6–182:9) – Parikh said: "Essentially, you know, my understanding is that the landlord lien, if it had not been waived, would have been available for foreclosure by the landlord on the tenant to recover funds that the tenant owed the landlord" (3RR 160:24–161:3).

Parikh's methodology, if you will, was simple: Add numbers to create the biggest total possible. The source data that he claimed to rely upon was from Plaintiff's Exhibit 83c (8RR), which was a collection of bank statements and other financial records (beginning in May of 2008, 3RR 161:8) of the Hospital. These

records had been created by the Hospital's accountant, Shebay & Co. (Shebay, 5RR 14:1–15:16).

Parikh simply added together a series of numbers he found in Exhibit 83c for the period between May 2008 and an unknown date and called that number the Hospital's accounts receivable. As he put it: "It [his number] was calculated by taking all of the *revenue* from May of 2008, ***to the end of these records*** for – from Medicare, Medicaid, United Healthcare, Blue Cross Blue Shield, for the tenant, hospital tenant" (3RR 165:6–10, emphasis added). He looked at *revenue*, not accounts, for an indeterminate period, to the "end of the records," whenever that was.

There are many very serious factual problems with what Parikh did, but the foremost is that, ***as a matter of fact***, Exhibit 83c cannot factually support Parikh's opinion. As Michael Shebay, the CPA who created the records as business records during the time the Hospital was operating, said:

> Q. Based upon your preparation of these materials, all of these materials, can those serve as the basis of an opinion that the hospital ever owned $11.1 million in accounts receivable?
>
> A. No.

(Shebay, 5RR 15:24–16:2). Shebay's factual explanation was equally simple:

> Q. (BY MR. LITTLE) All right. As a matter of the facts reflected in the documents contained in Exhibit [8]3, do they reflect $11.1 million of accounts receivable at any time?
>
> A. No, sir.

Q. Do they reflect any accounts receivable information for the year 2009 at all?

A. No, sir.

(Shebay, 5RR 16:11–18).

Although Parikh may have known "something about accounting," his testimony makes clear that he didn't understand the document on which he based his testimony. As Shebay explained, Exhibit 83c, which he prepared, is a collection of bank statements and accounting records showing Hospital transactions on a ***cash received basis***:

Q. What's the significant of – significance of that with respect to accounts receivable?

A. They wouldn't show up in a cash basis because on the cash basis we only account for moneys coming in, moneys going out. On – on an accrual basis, you would include the receivables.

Q. But there is no accrual basis accounting in Exhibit 83, is there?

A. No, sir.

Q. So, there's no accounts receivable information in Exhibit 83, is there?

A. There's no accounts balances in this exhibit.

Q. And there's nothing from 2009?

A. No, sir.

(Shebay, 5RR 15:2–16).

Parikh unwittingly explained how he flouted the principles of accounting. To create his number, he took all the <u>revenue</u> numbers from May 2008 to whatever date the records ended and just added them up, as though they would in reality remain static and in place for 18 months. He did that because he had to have something to call accounts receivable. He made it up. But on cross, he took pains to explain the difference between revenue and accounts receivable: revenue is what you have *after* the accounts receivable *have been paid* and are *no longer accounts receivable* (3RR 179:22–180:1). They are, in other words, mutually exclusive.

He also said that to determine accounts receivable, you would never subtract the expenses to be paid (3RR 178:21–179:15), which would include accounting for the mere 30%-40% reimbursement factor that was proved to exist for the Hospital's accounts (Shah, 4RR 296:9–12; Shebay, 5RR 18:16–20). Even if Parikh's source numbers represented accounts, his calculation would have overstated the alleged damages based upon this one element by 60% to 790%, or $6.72 million to $7.84 million.

Parikh also stated as a fact that the Landlord "tried" to foreclose on its lien on these "accounts" in 2009, but was told by Bank of America that it could not because of the waiver. (3RR 161:14–22.) ***No other evidence of any attempt <u>actually</u> to foreclose this lien was offered by Plaintiffs.***

Finally, after opining that the Bank had the right to the accounts because of

the lien waiver, Parikh admitted that the Bank in fact did not collect the accounts after all:

> Q. (BY MR. LITTLE) Did – do you know if Bank of America collected accounts or was paid out of the furniture, fixture[s], and equipment?
>
> ***A. I believe neither.***

(3RR 183:5–8).

Parikh's opinion testimony that the Landlord lost $11.1 million in accounts receivable because of the lien waiver is utterly unreliable and not credible, and must be disregarded entirely.

This case presents a similar issue to that addressed in *U.S. Renal Care v. Jaafar*, 345 S.W.3d 600 (Tex. App.–San Antonio 2011, pet. denied). Like here, at issue was the proper valuation of the accounts receivable of a medical business. Unlike here, the expert used actual accounts receivable to compute his valuation. Like here, he simply added two lists of numbers to arrive at his value, and in the process, also like Parikh, he refused to age or adjust the accounts receivable to account for both inevitable non-collection <u>and</u> the discount from the totals that Medicare and the other insurers would apply (as here). "[T]he evidence at trial was uncontroverted that Sellers had no expectation of being paid the entire amount it billed for all patients." *U.S. Renal Care v. Jaafar*, 345 S.W.3d at 614. Because the expert's methodology was "flawed," as it is here, the Court said that "a party may

- 41 -

assert on appeal that unreliable scientific evidence or expert testimony is not only inadmissible, but also that its unreliability makes it legally insufficient to support a verdict." . . .; *see Goodyear Tire & Rubber Co. v. Rios,* 143 S.W.3d 107, 113 (Tex. App.–San Antonio 2004, pet. denied)." *Id.* at 606.

The Court rejected the expert's opinions and the judgment based upon them, holding as an initial matter that it is "the plaintiff's burden to prove damages with a reasonable degree of certainty." *Id.* at 613. Holding expressly that this reasonable certainty was absent, the Court held that the judgment amount was supported by "only speculation and conjecture":

> "It is well settled that the naked and unsupported opinion or conclusion of a witness does not constitute evidence of probative force and will not support a jury finding **even when admitted without objection**." *Dallas Ry. & Terminal Co. v. Gossett,* 156 Tex. 252, 256, 294 S.W.2d 377, 380 (1956). The jury's award of "damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or **direct inference from known facts**." *A.B.F. Freight Sys.,* 798 S.W.2d at 615.

*Id.* at 614 (emphasis added.) *See also Schronk v. Laerdal Medical Corp.*, — S.W.3d —, 2013 WL 6570907 at *4 (Tex. App.–Waco 2013, pet. denied 2014) (Conclusory and speculative opinion testimony is not relevant evidence and "therefore, constitutes no evidence." If an expert brings to court "little more than his credentials and a subjective opinion, his testimony will not support a judgment." *Id.* at *7.)

Parikh's opinion testimony was both the result of the same flawed methodology as was the expert's in the *U.S. Renal* case – because it did not take into account the reality of lowered payments by the insurance companies – and utterly speculative and conclusory because it directly contradicted the "known facts" that Plaintiffs' Exhibit 83c contained <u>no</u> information about the Hospital's accounts receivable at all, and certainly not for 2009. Adding 18 months of <u>revenue</u> together and calling it the Hospital's accounts receivable even violated Parikh's own principle that revenue is what has been paid on the accounts receivable, which in the process <u>eliminates</u> the account that was paid.

Parikh's testimony was also flawed, speculative, and unreliable for three additional reasons.

First, the opinions went beyond the numbers he created, and the alleged expertise he claimed, when he stated as a *fact* that the waiver of the landlord lien caused the loss to the Landlord, even though he did not know whether or not the lien waiver was actually in effect as part of the original credit transaction in 2007. Appellants have shown that it was, and that Shah knew and "had to know" this.

Second, even thought he stated that the Landlord was prevented from collecting the accounts (in August 2009) because of the waiver, this did not cause any loss, because the Bank did not collect them either. Why? There were none to collect (Zaidi, 5RR 116:3–117:3).

Third, the <u>only</u> accounts receivable that the Landlord *ever* could have collected, had it properly foreclosed and notified the account debtors to pay it directly upon the Hospital's default , see UCC, Tex. Bus. & Comm. Code Ann. § 9.607 – and there is <u>no</u> evidence that it did this – were those accounts that actually existed in August 2009, and not some fanciful accounts that were made up from revenue numbers in May 2008. As a matter of <u>fact</u>, even had Parikh's methodology been acceptable to create an accounts receivable balance for a point in time in 2009, Exhibit 83c had <u>no</u> information of any kind about the Hospital's revenue or accounts in 2009. There is no reliable accounts receivable value for <u>any</u> point in time in 2009.

Additionally, the delivery of the waiver in 2008 did not in fact harm the Landlord. Mr. Meade cross-examined Zaidi about his explanation of the delivery of the replacement waiver and made the point that Bank of America had, in an amendment to the January 2007 credit agreement (9RR D. Ex. 16) in March 2007, reserved a lien <u>only</u> on certain Hospital <u>cash</u> accounts (Zaidi, 5RR 124:8–127:11).

The replacement waiver delivered in April 2008 (9RR D. Ex. 17) *did not change* the definition of the collateral that had been given to Bank of America in 2007. It merely recited that collateral in the form of personal property had been given. If Bank of America only had an interest in cash, and not in accounts receivable, as Plaintiffs stated (Zaidi, 5RR 126:6–23), then neither the original waiver nor the resubmitted waiver granted Bank of America any additional lien on the

- 44 -

Hospital's accounts receivable. The resubmitted waiver, however it happened, could not have caused the Landlord to lose anything it otherwise had.

If the Judgment awarded any amount to the Landlord for these accounts receivable, then it contains harmful and reversible error.

B.  An award based upon a contingent asserted liability.

Part of the amount claimed by Shah was $5,445,291.87, the gross amount stated in an arbitration demand filed by MetroBank (8RR P. Ex. 72) for Shah's default on his guaranty of the MetroBank loan.  The only evidence introduced regarding this contingent claim was (1) the demand itself, and (2) Shah's testimony, under oath, that he had responded to the claim asserting both that he did not owe MetroBank any money and that MetroBank owed him more money than it claimed (4RR 308:15–24).  This contingent claim is not a proper element of recoverable damage.

The purpose of actual damages is compensation for an injury actually suffered. *Marauder Corp. v. Beall*, 301 S.W.3d 817 (Tex. App.–Dallas 2009, no pet.) There must be a real causal connection between the act complained of and the damages actually suffered.  *Tana Oil & Gas Corp. v. McCall*, 104 S.W.3d 80 (Tex. 2003).  "[A] party may not recover damages for breach of contract if those damages are remote, contingent, speculative, or conjectural." *Southern Elec. Serv., Inc. v. City of Houston*, 355 S.W.3d 319, 324 (Tex. App.–Houston [1st Dist. 2011], pet. denied).

- 45 -

Likewise, "[a] contingency which cannot be determined with reasonable certainty cannot be made the basis for recovery of a definite amount of damages." *Spiritas v. Robinowitz*, 544 S.W.2d 710, 720 (Tex. Civ. App.–Dallas 1976, writ ref'd, n.r.e.)  *Spiritas* involved a tract of land that the plaintiff claimed was burdened by an invalid lien which the plaintiff said would in the future destroy his equity.  He wanted a judgment now for the amount he claimed he might lose in the future.  The Court refused: "The fallacy of this argument is that it assumes that the second lien will not be discharged by any method other than the sale of the Tucker Tract," and the Court listed several other possible scenarios. Because of the other scenarios it could envision, the Court held that "we are not certain that Spiritas has suffered any pecuniary damage at this time."  *Spiritas v. Robinowitz*, 544 S.W.2d at 719.

Shah has other scenarios, too.  He testified under oath that he does not owe the debt.  He can prevail on his defenses.  He can settle for a lesser sum.  The MetroBank claim is a classic example of a claim that is "remote, contingent, speculative, [and] conjectural," and it is not a proper element of damage.  At the least, liability on that claim is not a "reasonable certainty."

If the Judgment awarded any amount to Shah for this contingent claim, then it contains harmful and reversible error.

C.  <u>An award of $2.8 million for Medistar's units in the Landlord</u>.

Plaintiffs' damages claims included $2.8 million in damages for the Landlord

for the 70 units that Plaintiffs say "Defendants" apparently "gave" to Medistar, depriving the Landlord of their value. This allegation is false.

First, there was not one iota of evidence offered that would tend to prove that Apex TMG, Zaidi, or any Appellant gave these 70 units to Medistar.

Second, we have already shown that Shah agreed in the December 22, 2006 meeting with Medistar to give Medistar an additional $4.0 million in purchase money for the Katy property over the stated $13.5 million amount. The only logical inference from the evidence that does exist is that Shah gave these units to his friends at Medistar. In any event, it is quite clear that he knew at all times that Medistar owned these carried units:

> Q. [Medistar was] a partner in the sense that they had 70 units that they didn't pay anything for?
>
> A. That's true, sir.

(4RR 166:7–167:7).

If the Judgment awarded any amount to the Landlord for the value of these units, then it contains harmful and reversible error.

D.  An award of $638,000 on the letter of credit.

Plaintiffs' claim included $638,888 in damages for the Landlord that they assert it lost when it was unable to draw against the letter of credit. No legally or factually sufficient evidence was presented to support this claim for damages.

The Hospital letter of credit (8RR P. Ex. 42) was indeed amended (8RR P. Ex. 44), but there is no evidence, nothing more than insinuation and speculation, that Zaidi or Apex TMG caused the amendment or that Zaidi had or ever had the amendment. All the November 2007 amendment did was reduce the total amount available under the letter of credit to account for draws that been made earlier in 2007 and shorten the expiry period accordingly. It was "accepted" by Zaidi as "GP" on behalf of the Hospital. Zaidi did not sign off on the amendment as a representative of the Landlord. The amendment did not preclude a draw against the letter of credit had the Landlord actually made one, and *there is no evidence that it ever did*. The draft letter of January 2008 (8RR P. Ex. 43) was not sent. Plaintiffs' Exhibit 94 (8RR) proves that over *a month later*, on February 25, 2008, Shah's then lawyer Jeffrey Kaiser sent him an email telling him that he needed to get the document so a draw could be made before February 27. Shah said he asked for it, and Zaidi said Shah didn't ask, and that he didn't have it. (Zaidi, 5RR 110:14–111:17.) That is all the evidence there is. There is no proof of any actual draw attempt by the Landlord, no correspondence to or from the Bank about any such draw attempt, no correspondence or testimony from the Bank regarding any refusal to honor any draw, and no correspondence or *anything* with Zaidi about the so-called "missing" letter of credit. Shah never mentioned it again until 2010, when he filed his new pleadings with his new story.

- 48 -

If the Judgment awarded any amount to the Landlord for the amount it claims it lost on the letter of credit, then it contains harmful and reversible error.

E. An award of $1,350,000 in alleged commissions.

Plaintiffs' claim included $1.35 million in damages for the Landlord that they assert constituted improper commissions paid to Zaidi and Apex TMG, although Plaintiffs did not explain, and offered no evidence to show, how payments from Medistar to someone else, whether or not commissions, caused it any harm of any kind. No legally or factually sufficient evidence exists to support this claim for damages.

The *evidence* that was admitted showed that four payments were made from Medistar out of its profits from the sale of the Katy property (8RR P. Ex. 32). These payments came out of those profits, but were for consulting work done on projects memorialized in the memorandum of understanding of May 2007 (9RR D. Ex. 25) and other projects that had never been paid for. TMG received something over $500,000, and two other people also received consulting payments. The only *evidence* offered on the subject was from Zaidi, Saqer, who had worked for Medistar before she worked for TMG (5RR 81:3–10), and Perryman, Medistar's President. All agreed without equivocation that none of the money Medistar paid was for any service or commission rendered in connection with the Katy real estate purchase (Zaidi, 5RR 105–108:11; Saqer, 5RR 82:24–83:5; Supp CR 1, Perryman, 43:12–45:7;

284:6–19, Appendix 3). There was no contrary evidence, only insinuation.

If the Judgment awarded any amount to the Landlord for these alleged commissions, then it contains harmful and reversible error.

F. Conclusion.

Appellants are forced to guess at how the trial court reached the damages awarded to the Landlord and Shah, and on what theories, because the trial court declined to make the requested findings that would have made these awards clear.

Appellants have shown that a total of $16,006,465.84, in categories A – E above, are invalid as to the Landlord and Shah and cannot be sustained. Plaintiffs claimed either $17,486,465.84 or $18,111,624.90 for the Landlord, and the court awarded $4,071.584.00. If we select the largest amount Plaintiffs claimed, and subtract the amount that cannot be sustained, then the maximum damages that could even arguably be claimed is $2,105,159.06. That means that the court must have awarded some part or parts of the impermissible damages to arrive at its damage award. Since there is absolutely no way to know how much, in which impermissible categories, was awarded, then the Judgment as a whole as to the Landlord is unsupported by legally or factually sufficient evidence and must be reversed and a new trial ordered.

With respect to Shah, the problem is slightly different. Appellants have shown that $5,445,291.87 in claimed damages for Shah is impermissible. Deducting

that from the court's gross award to Shah leaves $3,891,628.13. But the court's gross award is greater than the amount Plaintiffs asked for in either their original or their amended proposed findings. So, how much was added that has no legally or factually sufficient evidence to support it? We cannot know because the Court declined to make the additional requested findings and conclusions. Since there is absolutely no way to know how much, in which impermissible categories, was awarded, then the Judgment as a whole as to Shah is unsupported by legally or factually sufficient evidence and must be reversed and a new trial ordered. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 682 (Tex. 2000) (Remand for new trial is the appropriate remedy where there is some evidence of damages but no evidence to support the full amount of damages found.)

4. Damages apparently awarded by the trial court for fraud, misrepresentation, and fraudulent inducement were not proximately caused by representations made by the "Defendants" upon which Plaintiffs admittedly did not rely.

Appellants refer to Defendants here as "Defendants" because throughout the trial, Plaintiffs through counsel simply used that shorthand rendition to assess blame for everything that happened, as though "Defendants" were one unitary being, frequently without offering evidence as to which of the various Defendants might actually have done or omitted to do one or another thing. It is a classic strategy. But it will not support a Judgment.

To recover for fraud, a party must prove that: (1) a material representation was made; (2) the representation was false; (3) when the speaker made the representation, he knew it was false or made it recklessly without knowledge of the truth and as a positive assertion; (4) the speaker made it with the intention that it should be acted upon by the party; (5) the party acted in reliance upon it; and (6) the party thereby suffered injury. *Priddy v. Rawson*, 282 S.W.3d 588, 598 (Tex. App. – Houston [14th Dist.] 2009, pet. denied); *Lundy v. Masson*, 260 S.W.3d 482, 492 (Tex. App. – Houston [14th Dist.] 2008, pet. denied). Reliance and causation are essential.

Plaintiffs went to great pains to prove that Zaidi knew about the mortgage and that he lied to Shah by telling him that all of the members had approved the mortgage, a requirement under Shah's company agreement for the Landlord. All of the witnesses Plaintiffs called, except Parickh on damages, were called to establish one or the other of those two points.

Leaving aside the incongruity of believing that Shah would make such a huge issue of insuring that full consent existed, and then cavalierly satisfy that most significant of all his issues by merely asking Zaidi if he had it, and not doing one single other thing, Shah did not rely, as a matter of fact or law, on any representation of Zaidi no matter what Shah (or his lawyer; Shulte [3RR 131–154]) asked or what he was told.

Zaidi's admitted inconsistencies regarding the mortgage do not prove fraud. Shah claims that he would not have signed the closing papers if he had known that Zaidi did not have the authority of all the real estate members to do the deal (4RR 84:22-24). This is not true. When Shah testified in 2009 in the *Medistar v. Shah* case, before the new story had come out, Shah said, as he sort of admitted at trial, that on March 22 he considered that he had the full authority to sign the closing papers as a manager. Period. (4RR 251:4–7: " Q: Did you have the authority to go out and borrow the $9 million without the prior written consent of the members because of subparagraph 2 of 3.05 [of the company agreement], yes or no? A: Yes, sir.") Shah would have gone forward with the closing if Zaidi – who said he was there only with authority from the <u>Hospital</u> partners (Schulte, 3RR 148–498; Zaidi, 5RR 78:23–79:18) – had not been there at all. Why? Because there was no other way to get his deal done and obtain the real estate for the tiny cash price and guaranty he had arranged with his bank.

What Zaidi knew or didn't know, or said or didn't say, about the mortgage had no affect on Shah, although it might have had an affect on the other then-Landlord members. Appellants in this regard would only remind the Court that these members are no longer owners of the Landlord. Shah declared under penalty of perjury in the Landlord's bankruptcy schedules in 2012 that they are gone (9RR D. Ex. 67, pp. 36 and 37; ownership of the Landlord is now Indus Associates [Shah],

76.7%; Vora, 6.67%– 10%; and Suneja, 10%–13.3%).

There are two things about the closing that Shah and Zaidi agreed upon.

First, it had to happen when it did because Medistar had issued another ultimatum, and all the doctors' money (including Shah's, as he acknowledged, 4RR 233:9–16), would have been lost to Medistar if the closing had not happened  (Shah, 4RR 231:22–233:19; Zaidi, 5RR 100:8–102:15).  It seems very likely that this intense pressure involving other people's money explains a lot about what happened on March 22.  Shah knew this was the situation when he arrived at the closing.  Zaidi says that he had not seen the documents before the closing, and there is no credible evidence to suggest that he had.  Confronted with the facts at closing, however, and Medistar's ultimatum, Zaidi had to believe that he was doing the best for the investors that he could by going along and insuring that they did not lose their investments before the deal even got off the ground.

Second, there was a four-month period in which the loan could have been paid and the line cancelled, and at least Vora fully intended that this option should be exercised (Shah, 4RR 256:19–258:17; Zaidi, 5RR 99–102).  Shah admitted that *if* he and his colleagues had paid even the cash amount due for Shah's 125 shares and his colleagues' 90 shares, there would never have been a need for either a loan or a lien (4RR 260:8–21, 261:20–262:23).

There is legally or factually insufficient evidence in this record to support the finding that Shah (and the Landlord) relied upon any representations of Zaidi or any other "Defendant" to his or its detriment.

> 5. Damages apparently awarded by the trial court for breach of contract, fraud, misrepresentation, and fraudulent inducement cannot be recovered because Plaintiffs ratified the actions upon which such damages were based.

In *Fortune Prod. Co. v. Conoco, Inc.*, 53 S.W.3d 671 (Tex. 2000), the Supreme Court recognized that contracts, even fraudulently induced contracts, can be ratified. *Id.* at 676. Ratification forecloses a claim for damages. Appellants pleaded ratification (Supp CR 4, Amended Answer, Appendix 6).

Generally, ratification is a doctrine of agency law, and allows a principal to be bound by an agent's unauthorized contract in circumstances where the principal becomes aware of the contract and retains benefits under it. *Willis v. Donnelly*, 199 S.W.3d 262, 273 (Tex. 2006). A party need not show ratification by an express act, as ratification can occur when the principal retains the benefits of a transaction after he acquires full knowledge of the agent's unauthorized act; of critical importance is the principal's knowledge of the transaction and his actions in light of such knowledge. *Schakosky v. Client Services, Inc.*, 634 F.Supp.2d 732, 736 (E.D. Tex 2007). Even if a principal was unaware of its agent's unauthorized action, it may ratify that action and thus become liable for it if the principal retains the benefits of

- 55 -

the action after acquiring full knowledge of the unauthorized conduct. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 536 (Tex. 2002).

Although not directly a principal/agent relationship in all things, the relationship between the Landlord and the Hospital shared many features. Through Apex TMG, its general partner, the Hospital did in fact borrow sums from the Landlord, some with fore-knowledge, and candidly some without. The $700,000 loan is but one example of such a loan that was entered into with the Landlord's full fore-knowledge. The accrual of rent created by the Landlord's agreement to accept payment of essentially half rent through 2007 and 2008 is another.

What is important is that the Landlord had full knowledge of all of the transactions, or Shah simply could not have produced his January 2008 memo (8RR P. Ex. 40) that outlined each such transaction in full detail. And the Hospital did not withhold <u>any</u> information about each of the disclosed transactions in its response to Shah (9RR D. Ex. 40). With this full knowledge on both sides, Shah and the Landlord decided to retain the benefits of the Landlord/Hospital relationship for more than a year, with no changes. The Landlord and Shah ratified all conduct that had occurred by that time, including any "unauthorized conduct" on the part of the "Defendants."

Plaintiffs claims for these damages lie against the Hospital, and Plaintiffs asserted those claims in its bankruptcy case.

6. The trial court's award of damages for monies paid in settlement by Shah to former members of the Landlord constitutes an impermissible double recovery where Shah received the members' interests in the Landlord and will profit again from the Landlord's recovery.

Plaintiffs' proposed findings and conclusions contained $552,500 in damages for Shah, this being 100% of the amount he paid to the members of the Landlord LLC who sued him for breaching the company agreement. We cannot know if the court awarded any of this claim in damages, as explained above. No legally or factually sufficient evidence exists to support this claim for damages, and if awarded, it constitutes a double recovery here.

Shah and Zaidi both said that they should be held to the same standard when it comes to evaluating their conduct as co-managers (e.g., Zaidi, 2RR 64–65). Shah nevertheless demands that Zaidi reimburse him 100% of the losses for the breach, and not that they be treated equally.

Moreover, Shah, by acquiring the interests of the other members in the 2010 settlement now owns, along with Vora and Suneja, 100% of the Landlord (9RR D. Ex. 67, p. 36 of 42), and he (and they) will therefore recover 100% of any damages that are affirmed as awarded to the Landlord. To allow Shah to recover this and to recover what he paid to acquire that right gives Shah a double recovery.

The single recovery, or one satisfaction rule, holds that an injured party is entitled to only one satisfaction. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1,

7 (Tex.1991). Allowing Shah to recover 100% of what he paid to acquire the right to obtain 100% of the Landlord's recovery allows a double recovery in this case.

7. The exemplary damages awarded by the trial court are excessive in light of the flawed findings of compensatory damages.

Appellants contend that they have shown that all of the actual damages findings in this case are defective because, even though we are forced to guess at actual amounts, these findings inherently contain damages that have been awarded on impermissible theories of recovery. The award of exemplary damages must fall along with the actual damages, particularly under our circumstances. *See Aim-Ex Industry, Inc. v. Slover*, 2010 WL 2136599 (Tex. App.–Amarillo, 2010, pet. denied).

8. The evidence is insufficient to show the level of egregious conduct on the part of either Zaidi or Chagla required to support the award of exemplary damages against them.

The only conduct of Zaidi that could arguably be called egregious, for which legally or factually sufficient evidence exists, is his inconsistent testimony about his knowledge of the mortgage, and as we believe Appellants have shown, that did not in fact cause any harm. Everything else he was accused of, either directly or merely as a "Defendant," was supported only by the uncorroborated self-serving testimony of Shah. Also self-serving, to be sure, but Zaidi testified positively and without equivocation that he never lied to Shah, that he never cheated Shah, and that he never deliberately or carelessly induced Shah to do anything by giving him false

information (5RR 117:4–13). He also testified without contradiction, specifically involving the landlord lien waiver, that he approved it because the bank required it and because the letter of credit it supported was important to Shah. He never meant any harm to flow from it (5RR 111:18–112:23).

As to Chagla, the matter is even simpler: the record holds no evidence that he ever did anything wrong that caused any damage to anyone. He formed Indus for Shah, but there is no suggestion or evidence that this caused any harm (Shah, 4RR 319:5–13); he issued Landlord certificates when instructed by others to do so (2RR 88:15–21); he faxed a sample lease to Medistar in November 2006 for its use in preparing the Hospital lease (2RR 102:4–15); he merely notarized a few of the closing documents in March 2007 (2RR 162:19–163:6); he notarized Zaidi's signature on the landlord lien waiver in April 2008 (2RR 234:14–235:11); and he merely endorsed a check Apex TMG collected upon sale of some Medistar Landlord units (2RR 252:9–11). That is it.

Chagla did nothing to deserve an award against him of either actual or exemplary damages. Those awards were made because the court punitively resolved all doubts and indulged all inferences against him in favor of Plaintiffs because he did not appear for trial. This is gross error, given that Plaintiffs never in the five years this case was pending requested his deposition and that the court quashed his trial subpoena only three weeks before trial because of his uncontroverted medical

condition.

9. The elements of the various causes of action pleaded have not been met with sufficient evidence here, where the non-interested witnesses gave testimony contradicting Plaintiffs' theory of the case, Shah's own testimony and pleadings show he had requisite knowledge and intention to enter into the Landlord mortgage regardless of any representations made by Zaidi, and documentary evidence shows Shah and the Landlord ratified certain material actions of the "Defendants."

    A.    <u>Fraud, including common law and statutory fraud, fraudulent inducement, fraudulent transfer, and fraud by non-disclosure.</u>

    B.    <u>Negligent misrepresentation and gross negligence.</u>

    C.    <u>Breach of contract and tortious interference with contract.</u>

Appellants have already shown that Shah did not rely upon Zaidi's alleged misrepresentation about the unanimous consent of the Landlord members, assuming he even made such a representation, which is both doubtful and denied. For reasons already explained, Shah would have closed that mortgage alone because that was his ticket to wealth, he thought, and his and the other members' money was very much at risk on March 22.

What is striking about this case is the evidence that is <u>not</u> found in the record. No witness who testified on any subject other than Zaidi's knowledge corroborated Shah's story about anything, and there were numerous witnesses one would have expected to hear from, were Shah's story true. There is no documentary evidence of any draw on the letter of credit. There is no evidence that Zaidi or the

"Defendants" gave Medistar its units and Medistar's and Shah's own testimony contradicted this contention. There is no or insufficient evidence that the payment TMG received from Medistar was an impermissible real estate commissions, and Medistar, Zaidi, and Saqer all contradict this allegation. Likewise, there is no or insufficient evidence that the other people who received consulting payments from Medistar were any part of the "Defendants." There is no or insufficient evidence that any action by any "Defendant" prevented the Landlord from collecting actual accounts receivable of the Hospital. The accountant who created the books and records – for business, and not for trial purposes – proved beyond question that those books and records showed no such accounts. There is no or insufficient evidence that Shah believed the Landlord's $700,000 check was anything other than a loan to the Hospital when it happened, and Odhav's and Saqer's testimony provides ample evidence that Shah was recognized and thanked for the loan at the time. Shah's testimony by itself, as internally inconsistent and externally disputed as it was, is not more than a scintilla of evidence under these circumstances, and is certainly not factually sufficient to support and award of $50,000,000.

> D. Breach of fiduciary duties, including as to Chagla, notwithstanding that the evidence showed that he did nothing material.

The trial found that "Defendants, individually and collectively, owed fiduciary duties to Plaintiffs, individually and collectively," (FF 3) and that

- 61 -

"Defendants, individually and collectively, had conflicting interests in the transactions at issue in their capacity as fiduciaries to Landlord, Tenant, Apex TMG, Dr. Shah and Prestige" (FF 6). Fiduciary duties are created by specific and special relationships and do not occur "collectively." Moreover, breaches of such duties must occur with respect to specific transactions and actions, rather than unenumerated and vague transactions generally. Appellants have no way to obtain adequate appellate review of such broad and nonspecific findings or of any damages that might have been awarded on the basis of the court's fiduciary duty findings and conclusions. (FF 3, 6, 7, 13, 14, 15, and 18, and CL 10 and 11.)

Under Texas law, Zaidi did not owe a fiduciary duty to Shah as a member of the Landlord. "A director's fiduciary duty runs only to the corporation, not to individual shareholders or even to a majority of the shareholders." *Somers v. Crane*, 295 S.W.3d 5, 11 (Tex. App.–Houston [1st Dist. 2009, pet. denied), *quoting Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.–Houston [14th Dist. 1997, pet. denied). "Due to the 'extraordinary nature' of a fiduciary relationship, the law does not recognize such a relationship lightly." *Somers v. Crane*, 295 S.W.3d at 11.

With respect specifically to LLCs, the Houston First Court held that the question would be determined by looking at cases involving closely held corporations, since they operate much the same way under Texas law. *Allen v. Devon Energy Holdings, LLC*, 367 S.W.3d 355, 386 (Tex. App.–Houston [1st Dist. 2012],

pet. granted, dism'd by agmt). After this review, the Court held: "We therefore decline to recognize such a fiduciary duty between members of an LLC . . .." *Allen v. Devon Energy Holdings, LLC*, 367 S.W.3d at 391. *Accord, Suntech Processing Systems, LLC v. Sun Communications, Inc.*, 2000 WL 1780236 *6 (Tex. App.–Dallas 2000, pet. denied) (unpublished opinion): "The statue governing limited liability companies does not mandate a fiduciary relationship between members."

This is not the end of the analysis, however. The credible evidence shows that Zaidi was not a manager of the Landlord in anything but name only at any material time. The Landlord company agreement allowed full delegation of all duties of the managers, and the evidence shows that Shah assumed control over all management duties and powers of the Landlord from an early date, not later than February 1, 2007. The evidence also shows that Shah delegated certain ministerial duties of the Landlord to Apex TMG. Shah unilaterally made all decisions for the Landlord concerning loans to the Hospital and other financial dealings between the Landlord and the Hospital. He unilaterally prepared and sent the January 2008 memo to the Hospital that set out the loans that he had made in 2007 and wanted repaid, or at least discussed. He unilaterally accepted the Hospital's January 17, 2008 response, asking that he work with the Hospital to arrive at a plan for repayment. He unilaterally ratified the circumstances detailed in the memo and response *for almost two years*. He unilaterally made all decisions about the concessions and

- 63 -

accommodations that were requested by the Hospital in 2007, 2008, and 2009. He unilaterally made the decision to declare the Hospital in default and to institute eviction proceedings.

Shah was the only actual manager of the Landlord during 2007, 2008, and 2009, and Zaidi at those same times was the only actual representative of the general partner of the Hospital in dealings with the Landlord. The division of labor and responsibility, legal and actual, between Shah and Zaidi/Apex TMG was open and obvious and was fully understood by them and by the two entities. Zaidi did not purport to represent or act for the Landlord in any negotiations or transactions between the Hospital and the Landlord, and Shah did not purport to represent or act for the Hospital in any of these negotiations or transactions.

Apex TMG was certainly a fiduciary with respect to the Hospital and its limited partners. *Brazosport Bank of Texas v. Oak Park Townhouses*, 889 S.W.2d 676, 683 (Tex. App–Houston [14th Dist.] 1994, writ denied). Zaidi acted for the general partner as its representative, but he was not the fiduciary. Zaidi was designated co-manager of the Landlord with *and by* Shah, purely as a matter of convenience to Shah. After his usefulness to Shah at the closing was behind them, he neither had *nor exercised* any power or authority as a manager of the Landlord. As Zaidi testified, and Ms. Saqer and Perryman confirmed, Shah took over complete control of the management of the Landlord, and Zaidi took charge of managing the

- 64 -

Hospital, for the general partner and for TMG.

Only if form is elevated over substance could Zaidi be said to have had the type and extent of control that can give rise to a fiduciary duty. *Allen v. Devon Energy Holdings, LLC*, 367 S.W.3d at 395-96 ("We conclude that there is a formal fiduciary duty [in an LLC] when (1) the alleged fiduciary has a legal right of control *and exercises that control* by virtue of his status as the majority owner and sole member-manager of a closely-held LLC and (2) either purchases a minority shareholder's interest or causes the LLC to do so though a redemption when the result of the redemption is an increased ownership interest for the majority owner and sole manager.") Under this analysis, Zaidi is not a fiduciary.

Even when groups actually having overlapping fiduciaries engage in transactions with each other, it is not the law that these transactions are automatically illegal or invalid, even if they are subject to scrutiny and can be presumed fraudulent. No fiduciary relationship arises between the two entities who are doing business. *Brazosport Bank of Texas v. Oak Park Townhouses*, 889 S.W.2d at 684. It is only when the challenged transaction was entered into by two entities who were represented *by the same fiduciary* that the presumption arises. That is not our case.

In *Strebel v. Wimberly*, 371 S.W.3d 267 (Tex. App.–Houston [1st Dist.] 2012, pet. denied), Strebel and Wimberly were involved in both an LLC and a limited partnership, and Wimberly sued claiming that Strebel had caused him damage by

reducing his interests and distributions from the enterprise as a whole. The LLC was governed by Delaware law, which expressly provides that fiduciary duties exist in favor of the members. (As shown above, this is not the case in Texas.) The limited partnership agreement, on the other hand, contained a provision expressly waving any fiduciary duties of the general partner, which Strebel controlled. Strebel contended that Wimberly's claims had to fail because it was actions taken at the general partner level that had caused the injuries of which Wimberly complained, and no fiduciary duties existed at that level.

The First Court agreed that it had to "determine in which capacity Strebel was functioning when performing the specific actions that Wimberly claims gave rise to damages for breach of fiduciary duty." *Strebel v. Wimberly*, 371 S.W.3d at 283. Because the Court concluded that these actions had taken place at the general partnership level, where no fiduciary duties existed, they reversed the judgment for Wimberly.

Non-liability in this case is even more clear, because there were not any transactions between the Hospital the Landlord that involved overlapping fiduciaries or even fiduciaries involved in different capacities. The Hospital engaged in the loan and other transactions with the Landlord, and the general partner, who was represented by Zaidi, as Shah and everyone else knew would be the case from the beginning, was not a fiduciary vis-s-vis the Landlord. Zaidi, who might be called a

fiduciary of the Landlord <u>if</u> form is elevated over substance, *did not function in that capacity* in any single instance involving the operating loans and other transactions between the Landlord and the Hospital.  The actions complained of by Plaintiffs as having given rise to damages for breach of fiduciary duty were <u>not</u> in fact taken by a person with fiduciary duties in the actual, specific transactions involved.  There is no liability of Zaidi for breach of fiduciary duty.

Chagla's case is easier.  There is no evidence in the record of any specific or special relationship with either Plaintiff out of which a fiduciary duty could have arisen.  He cannot be liable for the breach of a fiduciary duty that he did not have.

Causation is an essential element of each cause of action Plaintiffs asserted. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 160-61 (Tex. 1995).  Plaintiffs had the burden of establishing that Defendants's acts or omission were the cause-in-fact of its damages.  *Jefferson Assocs., Ltd.*, 896 S.W.2d at 161 ("[t]he element common to both proximate cause and producing cause is actual causation in fact") (citations omitted).  After the ratification of January 2008, all of the damages claimed by Shah and the Landlord that allegedly occurred after 2009, up to 2012, including loans, interest payments, and the like, are simply too remote to have been proximately caused by Defendants.

10. Defendants cannot be held liable for fraudulent inducement when they did not enter into any contracts with the Plaintiffs as counterparties.

Plaintiffs assert that "Defendants" are liable for fraudulent inducement of unspecified "contracts," but there were no contracts between any Defendant and either Plaintiff in which a Plaintiff and a Defendant were counterparties, that is, principals. There is no liability for fraudulent inducement in this case.

Fraudulent inducement can only exist as a cause of action with respect to a contract between a Plaintiff and a Defendant. "Fraudulent inducement 'is a particular species of fraud' that requires proof of the common law elements of fraud and ***a contract between the parties***." *Haase v. Glazner,* 62 S.W.3d 795, 798–99 (Tex. 2001, emphasis added). The lease in this case was a contract between the Landlord and a party, and that party was the Hospital, which is no longer a party to this case.

There are no contracts in this case in which a Defendant and a Plaintiff are counterparties. Zaidi and Shah were both parties, as members, of the Landlord and Apex TMG, but they were not principals who contracted with each other. After his demand for participation, Shah and TMG were both parties to the 2007 joint venture involving the Hospital management contract, but no harm has been asserted arising from that contract. There are no others. Fraudulent inducement is impossible in this case.

11. Defendants cannot be held jointly and severally liable for civil conspiracy when there was no evidence, or alternatively insufficient evidence, of an agreement by Defendants to accomplish an unlawful purpose, and no evidence, or alternatively insufficient evidence, of an intent to harm Plaintiffs.

The trial court found and concluded that Defendants engaged in a civil conspiracy (FF 17 and CL 9) , at Plaintiffs' urging, yet the record is devoid of evidence meeting all the required elements.

The elements of civil conspiracy are as follows:

1.  The defendant was a member of a combination of two or more persons.

2.  The object of the combination was to accomplish an unlawful purpose, or a lawful purpose by unlawful means.

3.  The members had a meeting of the minds on the object or course of action.

4.  One of the members committed an unlawful, overt act to further the object or course of action.

5.  The plaintiff suffered injury as a proximate result of the wrongful act.

*Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983).

Civil conspiracy requires specific intent to agree to accomplish an unlawful purpose (or a lawful purpose by unlawful means) and the parties must be aware of the harm or wrongful conduct at the inception of the agreement. *Triplex Communications Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995). Merely proving a joint intent to

engage in the conduct that results in an injury is not sufficient to establish a claim for civil conspiracy. *Ghidoni v. Stone Oak, Inc.*, 966 S.W.2d 573, 585 (Tex. App.—San Antonio 1998, pet. denied). Plaintiffs must show that the conspirators not only intended to engage in common conduct, but that they intended the resulting harm. *Id.*

*Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854 (Tex. 1968), is insightful. Nortex sued Schlumberger for damages allegedly resulting from fraud perpetrated by sellers of oil and gas leasehold estates. Schlumberger did not sell the leasehold estates, but Nortex claimed that it was a participant in a "conspiracy" that made the fraud possible. *Id.* at 885. Nortex had purchased certain interests in mineral leasehold estates that were serviced by Schlumberger. *Id.* at 855-856. It was later discovered that the leases were illegally deviated and illegally producing oil. *Id.* at 855. To protect its customers that might have been subject to investigation for illegally deviated wells and production, Schlumberger developed alternate billing procedures, destroyed a library of logs, and advised employees to have poor memories when the investigations began. *Id.* at 856.

Nortex argued that these facts supported Schlumberger's liability for civil conspiracy, but the Supreme Court disagreed. Instead, the Court found that "only by suspicion and speculation can Schlumberger be linked to the conspiracy in two vital respects, e.g., knowledge of the object of the conspiracy and intention to injure others." *Id.* The Court reasoned that a party without knowledge of the object and

- 70 -

purpose of the conspiracy cannot be a co-conspirator, because he cannot agree, either expressly or tacitly, to the commission of the wrong about which he knows nothing. *Id.* at 857.

The Court found that though Schlumberger had good reason to believe that a conspiracy to defraud Nortex existed, there was no evidence to support a reasonable inference that Schlumberger had actual knowledge that the wells were being drilled illegally, or that Schlumberger intended to participate in such a wrong. *Id.*

There is <u>no</u> evidence in this case of the essential elements of civil conspiracy Just as in *Schlumberger*, there is nothing other than "suspicion and speculation" to link any Defendant to any alleged conspiracy of joint conduct.

12. Defendants cannot be held jointly and severally liable on a theory of alter ego when there was no evidence, or alternatively insufficient evidence, that the only corporation they owned was used to commit an actual fraud on Plaintiffs for Defendants' direct personal benefit.

Likewise, the record evidence simply does not support the trial court's conclusion that "the corporate separateness of Prestige, Tenant, US TMG [which was not even a Defendant against which the Judgment was rendered], and Apex TMG (on the one hand) from Mr. Zaidi and Mr. Chagla (on the other hand) are disregarded." (CL 9) The court made <u>no</u> findings and the record reveals no evidence that suggest that these corporate Defendants engaged in fraud sufficient to invoke alter ego liability.

The corporate veil is pierced: (1) when a corporation is the alter ego of its owners or shareholders; (2) when a corporation is used for an illegal purpose, and (3) when a corporation is used as a sham to perpetrate a fraud. *S.E.C. v. Resource Development Intern., LLC,* 487 F.3d 295, 302 (5th Cir. 2007). Examples of when the corporate form has been used as part of a fraudulent device to achieve an inequitable result, so as to warrant disregard of the corporate form to impose liability on its owners, arise when the corporate structure has been abused to perpetrate a fraud, evade an existing obligation, achieve or perpetrate a monopoly, circumvent a statute, protect a crime, or justify a wrong. *SSP Partners v. Gladstrong Investments (USA) Corp.*, 275 S.W.3d 444, 451 (Tex. 2008). Doctrines that support piercing the corporate veil do not create substantive causes of action; piercing the corporate veil merely expands the scope of potential sources of relief by extending to individual shareholders or other business entities what is otherwise only a corporate liability. *In re Texas American Exp., Inc.*, 190 S.W.3d 720, 726 (Tex. App. – Dallas 2005, no pet.).

The Texas limited liability company act, section 101.114 of the Texas Business Organizations Code, provides that "Except as and to the extent the company agreement specifically provides otherwise, a member or manager is not liable for a debt, obligation, or liability of a limited liability company . . ." Case law has created an equitable exception where it is shown that the LLC was used to perpetrate an

actual fraud for the member's *direct personal benefit*. The burden of showing "direct personal benefit" is on the Plaintiff and is heavy. General benefit to the LLC and thereby the member's interest is not sufficient. The member has to receive money directly. The statutory protections afforded to members and managers of an LLC give way only when a plaintiff can show that the LLC was used for the purpose of perpetrating, and did perpetrate, an actual fraud for the member or manager's "direct personal benefit." *Shook v. Walden,* 368 S.W.3d 604, 621 (Tex. App.–Austin 2012, pet. denied) (policies governing piercing veil of corporation also apply to limited liability companies).

Again, there is no direct evidence that either Prestige, a corporation, or Apex TMG, an LLC, committed the kinds of overt frauds required to pierce their corporate veils and impose liability for their acts upon either Zaidi or Chagla. There is only insinuation and a dose of guilt by association. Specifically with respect to Apex TMG, there is absolutely no evidence that Zaidi received a direct personal benefit from its actions, wrong or right, sufficient to allow the piercing of its veil under the LLC statute.

13. Chagla, who affirmatively pleaded the statute of limitations, cannot be held liable for tort claims arising from actions that occurred more than two years prior to his having been added as a defendant in this lawsuit in December 2010.

To avoid burdening this Brief, it is elementary that any cause of action that has a statute of limitations of two years bars any recovery against Chagla for any actions that occurred before December 30, 2008.

14. The trial court committed harmful error when it improperly found all inferences against Chagla simply because he did not appear for trial when the court had previously granted Chagla's motion to quash a subpoena to appear due to his ill health, which prevented him from traveling from his home in Pakistan, and plaintiffs never requested Chagla's deposition.

Again to avoid further burdening this Brief, Appellants believe that this Issue has been dealt with in Appellants' argument on Issue 8 herein.

15. A default judgment cannot be rendered against Apex TMG on the basis that it had forfeited its corporate charter prior to trial when it is clear that Apex TMG appeared and answered and participated in trial only to defend itself and not seek affirmative relief.

The trial court's apparent punitive bent toward Defendants was illustrated well in its conclusion of law on this issue. The law could not be clearer, and it was discussed on the day the trial started, before the evidence began (2RR 29:11–32:14).

Despite the language of section 171.252 of the Texas Tax Code, which by its terms denies a corporate entity the right to "sue or defend in a court of this state" if its charter has been forfeited, it has been the settled law in Texas for years that a corporate entity that has forfeited its charter may indeed nevertheless defend itself. In *Vanscot Concrete Co. v. Bailey*, 853 S.W.2d 525, 526-27 (Tex. 1993), the Texas Supreme Court held that it had been error for the Court of Appeals to dismiss

Vanscot's appeal. A corporate Defendant that has forfeited its charter has the right to defend itself, even to the point of prosecuting an appeal. *Accord*, *Cruse v. O'Quinn*, 273 S.W.3d 766, 770-71 (Tex. App.–Houston [14th Dist. 2008, pet. denied). The rights to defend itself and to appeal an adverse judgment would be hollow indeed if all the entity could appeal was a default judgment granted because its charter had lapsed. If it can defend itself by appealing, it can defend itself by participating in trial and asserting defenses. *See Kyle v. Zepeda*, 2013 WL 2246030 at *3 (Tex. App.–Houston [1st Dist.] 2013, no pet.) ("the statute has historically been limited to prohibit defendants from bringing cross actions, not from merely defending lawsuits.")

This conclusion is so obviously wrong that it begs the question why the trial court even contemplated it unless it simply decided that "Defendants" were wrong about everything, regardless of what any contrary evidence might show.

CONCLUSION AND PRAYER

For all these reasons, the Judgment of the trial court should be reversed, and this case should be remanded for a new trial on all issues of liability and damages.

March 17, 2015                    Respectfully submitted,

                                 LAW OFFICES OF DOUGLAS R. LITTLE

                                 By */s/ Douglas R. Little*
                                    Douglas R. Little
                                    State Bar No. 12416600

- 75 -

The Lyric Centre, Suite 900
440 Louisiana Street
Houston, Texas 77002
713.275.2069
doug@douglasrlittle.com

CAMPBELL, HARRISON & DAGLEY
L.L.P.

By /s/ Robin L. Harrison
　Robin L. Harrison
　State Bar No. 09120700
　909 Fannin Street, 40th Floor
　Houston, Texas 77010
　(713) 752-2332
　(713) 752-2330 Facsimile

COUNSEL FOR APPELLANTS ADEEL
ZAIDI, A. K. CHAGLA, PRESTIGE
CONSULTING, INC., AND APEX KATY
PHYSICIANS – TMG, LLC

CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was produced on a computer using WordPerfect 12 software and contains 18,716 words, as determined by the software's word-count function, excluding those sections of the brief listed in Texas Rule of Appellate Procedure 9.4(i)(1) as being excludable.

/s/ Douglas R. Little
Douglas R. Little

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading has been served upon all counsel listed below via eFileTexas.gov or electronic mail on the 17th day of March, 2015:

Jeremy Gaston
Andrew K. Meade
Hawash Meade, et al.
2118 Smith Street
Houston, Texas 77002

*/s/ Douglas R. Little*
Douglas R. Little

# APPENDIX

# APPENDIX TABLE OF CONTENTS

1. Judgment of July 24, 2014

2. Findings of Fact and Conclusions of Law of October 3, 2014

3. Supplemental Clerk's Record 1

4. Supplemental Clerk's Record 2

5. Supplemental Clerk's Record 3

6. Supplemental Clerk's Record 4

# TAB 1

Cause No. 2009-02578

| APEX KATY PHYSICIANS, L.L.C, | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | HARRIS COUNTY, TEXAS |
| ADEEL ZAIDI, ET AL. | § | |
| Defendants, | § | 61st JUDICIAL DISTRICT |

Consolidated with Cause No. 2009-03055

| STEPHEN M. KOCH, M.D., Individually, | § | IN THE DISTRICT COURT OF |
| et al., | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | HARRIS COUNTY, TEXAS |
| PANKAJ K. SHAH, M.D., et al. | § | |
| Defendants, | § | 11th JUDICIAL DISTRICT |

FILED
Chris Daniel
District Clerk
JUL 24 2014
Harris County, Texas
Time:_____
By_____ Deputy

## FINAL JUDGMENT

On March 17, 2014, this case was called for trial.

Plaintiff, Apex Katy Physicians, LLC (the "Landlord"), appeared through its corporate representative and through its attorney. Plaintiff Pankaj K. Shah ("Dr. Shah"), appeared in person and through his attorney.

Defendant, Adeel Zaidi appeared in person and through his attorney. Defendant, AK Chagla appeared only through his attorney. Defendant, Prestige Consulting, Inc., appeared only through its attorney. Defendant, Apex Long Term Acute Care – Katy, L.P., appeared only through its attorney. Defendant, Apex Katy Physicians – TMG, LLC, appeared only through its attorney. Defendant, US TMG, LLC, appeared only through its attorney.

All parties announced ready for trial.

Plaintiffs sued Defendants asserting causes of action for civil conspiracy; alter ego; common law fraud; statutory fraud under the Texas Securities Act; statutory fraud under

1

section 27.01, TEX. BUS. & COM. CODE; fraudulent inducement; fraudulent transfer; unjust enrichment; constructive trust; money had and received; breach of fiduciary duty; fraud by non-disclosure; preferential transfer; financial fraud and concealment; gross negligence; negligent misrepresentation; breach of contract; tortious interference with contract; violation of the Texas Theft Liability Act; accounting; contribution; and promissory estoppel.

All matters in controversy, legal and factual, were submitted to the court for its determination. The court heard the evidence and arguments of counsel and announced its decision for Plaintiffs.

The court hereby RENDERS judgment for Plaintiffs against Defendants Adeel Zaidi, A.K. Chagla, Prestige Consulting, Inc., Apex Katy Physicians-TMG, LLC, and Apex Long Term Acute Care-Katy, L.P.

1.     The court orders that the Landlord recover damages from defendants, jointly and severally, in the sum of $4,071,584.00, prejudgment interest on that sum at the annual rate of 5% per annum, in the sum of $1,119,684.50, postjudgment interest on the total sum at the annual rate of 5% per annum, and court costs.

2.     The court orders that Dr. Shah recover damages from defendants, jointly and severally, in the sum of $9,336,920.00, prejudgment interest on that sum at the annual rate of 5% per annum, in the sum of $2,567,653.00, postjudgment interest on the total sum at the annual rate of 5% per annum, and court costs.

3.     The Landlord has requested exemplary damages. The court has made the findings required by Chapter 41, TEX. CIV. PRAC. & REM. CODE, as set forth in the court's findings of fact and conclusions of law. The court therefore orders that the Landlord recover exemplary damages as follows:

   a.     from Adeel Zaidi: $8,143,168.00;

   b.     from AK Chagla: $2,035,792.00.

2

4.     Dr. Shah has requested exemplary damages. The court has made the findings required by Chapter 41, TEX. CIV. PRAC. & REM. CODE, as set forth in the court's findings of fact and conclusions of law. The court therefore orders that Dr. Shah recover exemplary damages as follows:

   a.     from Adeel Zaidi: $18,673,840.00;

   b.     from AK Chagla: $4,668,460.00.


5.     Plaintiffs requested attorney fees under the Texas Securities Act, TEX. CIV. REV. STAT. Art. 581-33-1(B)(4); TEX. CIV. PRAC. & REM. CODE §§ 38.001, 134.005; and TEX. BUS. & COMM. CODE § 27.01. The parties stipulated that the Landlord incurred reasonable and necessary attorney fees in the amount of $175,000.00 and that Dr. Shah incurred reasonable and necessary attorney fees in the amount of $175,000.00. The court orders Defendants to pay the Landlord $175,000.00 for attorney fees and to pay Dr. Shah $175,000.00 for attorney fees.

6.     The court FINDS that defendants engaged in a civil conspiracy against plaintiffs and finds that each of the defendants is jointly and severally liable for plaintiffs' damages, except with respect to plaintiffs' exemplary damages.

7.     All relief not granted is expressly denied.

8.     This judgment is final, disposes of all claims and all parties, and is appealable.

9.     The court orders execution to issue for this judgment.

JUL 2 4 2014
_____
DATE SIGNED



_____
JUDGE PRESIDING

3

# TAB 2

Cause No. 2009-02578

| APEX KATY PHYSICIANS, L.L.C, | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | HARRIS COUNTY, TEXAS |
| ADEEL ZAIDI, ET AL. | § | |
| Defendants, | § | 61st JUDICIAL DISTRICT |

Consolidated with Cause No. 2009-03055

| STEPHEN M. KOCH, M.D., Individually, | § | IN THE DISTRICT COURT OF |
| et al., | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | HARRIS COUNTY, TEXAS |
| PANKAJ K. SHAH, M.D., et al. | § | |
| Defendants, | § | 11th JUDICIAL DISTRICT |

FILED
Chris Daniel
District Clerk
OCT 03 2014
Time: _____
Harris County, Texas
By _____

## Findings of Fact and Conclusions of Law

### Stipulations and preliminary findings and elections

The Court takes judicial notice of the docket of this case and the contents thereof, and of the parties' post-trial stipulations, as follow:[1]

i.    Dr. Shah and Landlord respectively incurred reasonable and necessary attorneys' fees in this case of $175,000.00 each.

ii.   AK Chagla founded Prestige Consulting, Inc. and presently owns approximately 29%. Adeel Zaidi owns the remainder.

iii.  The Landlord purchased the real property located at 25660 Kingsland Blvd, in Katy, Texas (the "Property") and closed the transaction on March 22, 2007 (the "Closing").

iv.   The Landlord's members did not unanimously consent nor approve the $9,000,000.00 MetroBank mortgage used to fund the $13,500,000.00 purchase of the Property.

---

[1] The parties approve these stipulations as to form and substance.

1

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

At trial, the Court heard testimony from Adeel Zaidi in his individual capacity and as the representative of Prestige Consulting, Inc, and the Court FINDS that Adeel Zaidi is a sophisticated businessman who understood the transactions at issue and that Adeel Zaidi was not a credible witness.

At trial, the Court heard testimony from Dr. Shah, and the Court FINDS that Dr. Shah was a credible witness.

The Court ELECTS to make all reasonable inferences from the evidence against AK Chagla, except as between AK Chagla and Adeel Zaidi.

## Findings of Fact

At the March 17-20, 2014 trial, the parties presented their respective cases. Considering the evidence at trial, docket and pleadings in this case, and the parties' stipulations, the Court:

1. FINDS that AK Chagla was validly served with notice of this lawsuit in Houston and was validly served with a trial subpoena, but he failed to personally appear for trial.

2. FINDS that Defendants do business, individually and collectively, as the Turnaround Management Group.

3. FINDS that Defendants, individually and collectively, owed fiduciary duties to the Plaintiffs, individually and collectively, including the duties of candor, loyalty, and disclosure.

4. FINDS that Defendants, individually and collectively made material misrepresentations to the Plaintiffs, individually and collectively.

5. FINDS that Defendants, individually and collectively, failed to disclose material facts to the Plaintiffs, individually and collectively.

6. FINDS that Defendants, individually and collectively, had conflicting interests in the transactions at issue in their capacity as fiduciaries to Landlord, Tenant, Apex TMG, Dr. Shah, and Prestige.

7. FINDS that the Defendants, individually and collectively, favored themselves and their affiliates over the Plaintiffs.

8. FINDS that the Defendants understood and could foresee that the Defendants' actions, inactions, guidance, misrepresentations, and lack of disclosures could

2

cause harm to the Plaintiffs, individually and collectively.

9. FINDS that the Defendants knew or recklessly disregarded that the Defendants' actions, inactions, guidance, misrepresentations, and lack of disclosures posed an extreme risk of harm to the Plaintiffs, individually and collectively, but that the Defendants acted without regard to the consequences of their actions, inactions, disclosures, and non-disclosures;

10. FINDS that the Defendants, individually and collectively, in concert and with malice, knowingly and intentionally conspired to secure (a) Dr. Shah's investment in Landlord, (b) the Landlord's purchase of the Property at Closing, (c) and Plaintiffs' execution of all documents related to the investment and Closing, through deception, to their detriment for the benefit of the Defendants.

11. FINDS that the Defendants, individually and collectively, in concert and with malice, amended the Landlord's secure letter of credit that was put in place and intended to secure investment in Landlord, Landlord's purchase of the Property, and the Landlord's lease with Tenant, without consent, authority, or disclosure to Plaintiffs to Plaintiffs' detriment for the Defendants' benefit.

12. FINDS that the Defendants, individually and collectively, in concert and with malice, failed to ever pay the contracted rent in full as owed by the Tenant to the Landlord under the terms and conditions of the Landlord-Tenant lease, which deprived the Landlord of funds necessary for its continued business operations, to the Landlord's detriment but for the Defendants' benefit.

13. FINDS that the Defendants, individually and collectively, in concert and with malice, paid themselves, their officers, and related parties in preference to the Plaintiffs from funds that directly and indirectly belonged to Plaintiffs to their detriment for the Defendants' benefit.

14. FINDS that Defendants, individually and collectively, in concert and with malice took possession of Landlord investor funds intended for the Landlord, but failed to account for all of the funds to the Landlord or to turn over or use all of the funds for the Landlord's benefit, to the Landlord's detriment but for the Defendants' benefit.

15. FINDS that Defendants, individually and collectively, in concert and with malice, took possession of Landlord investor funds intended for the Landlord and paid by Dr. Waseem Peracha and Mac Haik, yet did not turn these funds over to the Landlord to the Plaintiffs' detriment for the benefit of the Defendants.

16. FINDS, with regard to this Court's previous Partial Summary Judgment entered against Dr. Shah, that the Defendants, individually and collectively, in concert and with malice caused Dr. Shah's breach of the Landlord Company Agreement through deceptive inducement of the execution of the relevant documents; that the Defendants had the same standing as Dr. Shah, executed the same documents as Dr. Shah, and induced Dr. Shah to breach the company agreement in question

3

through misrepresentations surrounding Defendants having obtained the necessary consent, which they had not.

17. FINDS that the Defendants engaged in this acts, omissions, representations and non-disclosures individually and collectively in conspiracy.

18. FINDS that the Defendants engaged in these acts, omissions, representations and non-disclosures to the Plaintiffs' detriment but for the Defendants' benefit.

19. FINDS that the Defendants engaged in these acts, omissions, representations, and non-disclosures and that this proximately caused harm and damages to the Plaintiffs, individually and collectively.

**Conclusions of Law**

Plaintiffs sued Defendants on a variety of legal theories. The Court, applying the law to the findings of fact set forth above, has reached the following conclusions of law:

*Preliminary matters.*

The Court concludes that default judgment shall be entered against Apex TMG because Apex TMG forfeited its corporate privileges prior to trial.

The Court concludes that Mr. Zaidi, with malicious intent to deceive the Court and with knowledge of each statement's meaning, made false statements under oath. The Court finds that Adeel Zaidi committed perjury on more than one occasion during his March 17, 18, and 20, 2014 testimony.

The Court concludes that that Mr. Chagla failed to comply with a properly served subpoena to testify at trial and thus enters the following sanctions: (a) the authenticity of Mr. Chagla's signature and notary seal are established for all purposes against him and his co-conspirator; (b) as between Mr. Chagla and Plaintiffs, the Court will resolve all doubts and indulge all reasonable inferences supported by evidence against Mr. Chagla; and (c) as between Mr. Chagla and Mr. Zaidi, the Court will resolve all doubts and indulge all reasonable inferences supported by evidence against Mr. Zaidi.

4

*Defendants' fraud.*

**Common Law Fraud** – The Court concludes that Defendants knowingly made material representations to Dr. Shah and to the Landlord that were false with the intent that Dr. Shah and the Landlord would rely on those false representations. The Court concludes that Dr. Shah and the Landlord in fact relied on those false representations, causing them injury. The Court concludes that Mr. Zaidi and Mr. Chagla are liable for fraud against the Plaintiffs.

**Statutory Fraud (Texas Business & Commerce Code § 27.01** – The Court concludes that the underlying transactions in this lawsuit involved real estate; that Mr. Zaidi with the aid of Mr. Chagla, made false representations of existing material fact and false promises to Plaintiffs, intending that Plaintiffs would rely on those false representations and promises; and that Plaintiffs in fact relied on those false representations and promises in entering into the transactions. The Court concludes that Mr. Zaidi and Mr. Chagla are liable for their statutory fraud under Texas Business & Commerce Code § 27.01.

**Fraudulent Inducement** – The Court concludes that several contracts existed between Plaintiffs and Defendants and, having previously found the elements of fraud, the Court concludes that Plaintiffs were induced to enter into each of those contracts as a result of Defendants' fraud. The Court further finds that the Defendants fraudulently induced the Plaintiffs to enter into several contracts with third parties and that it was foreseeable that the Plaintiffs would suffer damages as a result. The Court concludes that Mr. Zaidi and Mr. Chagla are liable for fraudulently inducing Plaintiffs to enter into those contracts.

**Fraudulent Transfer** – The Court concludes that Defendants, through the Apex TMG, was a debtor with respect to the Landlord under Texas Business & Commerce Code § 24.002; that Apex TMG made transfers in violation of Texas Business & Commerce Code §§ 24.005 and 24.006; and that Landlord's claims against the Apex TMG arose before any of those transfers

5

were made. The Court concludes that the Apex TMG are liable for fraudulent transfers under Texas Business & Commerce Code §§ 24.005 and 24.006.

**Fraud by Non-Disclosure** – The Court concludes that Mr. Zaidi, as fiduciary of the Landlord, concealed material information in violation of his fiduciary duty to the Landlord, which includes, but is not limited to: concealing the Landlord's true financial position; concealing Apex TMG's possession of Landlord's funds; concealing Defendants' real estate commissions; concealing the waiver of the Landlord's lien on Tenant's receivables; and concealing the amendment of the letter of credit that was to secure Landlord's rents. The Court concludes that Mr. Zaidi are liable for fraud by non-disclosure to the Landlord and that Mr. Chagla participated through his notarization of key documents, including his double notarization of the Landlord Waiver to conceal that it was back-dated.

### Civil conspiracy and alter ego.

The Court concludes that Mr. Zaidi, Mr. Chagla, Prestige, Apex TMG, Tenant, and US TMG engaged in a civil conspiracy to defraud the Plaintiffs, to breach fiduciary duties owed to the Plaintiffs, to misappropriate Plaintiffs' funds, to conceal the appropriation of the Plaintiffs' funds, and to invade the Plaintiffs' property rights, thereby causing Plaintiffs' substantial financial injury. The Court finds and concludes that the Defendants are jointly and severally liable for all damages arising as a proximate result of Defendants' conspiracy. The Court further concludes that the corporate separateness of Prestige, Tenant, US TMG, and Apex TMG (on the one hand) from Mr. Zaidi and Mr. Chagla (on the other hand) are disregarded, and that Mr. Zaidi and Mr. Chagla should each be held individually liable, jointly and severally, for the liabilities of Prestige, Tenant, US TMG, and Apex TMG.

### Defendants' breaches of fiduciary duty.

The Court concludes that a fiduciary owes his beneficiaries a strict duty of good faith and

6

candor, as well as the general duty of full disclosure respecting matters affecting the beneficiaries' interests; that all transactions between a fiduciary and his beneficiaries are presumptively fraudulent and void therefore, the burden lies on the fiduciary to establish the validity of any particular transaction in which he is involved; that where a fiduciary relationship exists, the burden is on the fiduciary to show that he acted fairly and informed the other party of all material facts relating to the challenged transaction.

The Court concludes that Mr. Zaidi owed fiduciary duties to the Landlord, to the Tenant, to the Apex TMG, and to Dr. Shah as a member of each. The Court concludes that Mr. Zaidi favored himself and his companies above all others; that he favored the Tenant and Apex TMG over the Landlord and Dr. Shah; that Mr. Zaidi breached his fiduciary duties to the Plaintiffs; and that the breach injured the Plaintiffs while benefitting Mr. Zaidi. The Court concludes that Mr. Zaidi is liable for breach of the fiduciary duties he owed to the Plaintiffs. The Court concludes that Mr. Chagla participated in Mr. Zaidi's breaches of fiduciary duty through his notarization of key documents.

### Defendants' gross negligence.

The Court concludes that Mr. Zaidi's conduct, beginning in the summer of 2006, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Mr. Zaidi, as a sophisticated business man, had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights and welfare of others, including the Plaintiffs.

### Defendants' negligent misrepresentations.

The Court concludes that Mr. Zaidi and Mr. Chagla made misrepresentations in the course of their business and in transactions in which they had a pecuniary interest, for the guidance of Plaintiffs in the course of Plaintiffs' business, without exercising reasonable care or

7

competence in obtaining or communicating the information, and that Plaintiffs suffered pecuniary loss as a result. The Court concludes that the actions of Mr. Zaidi and Mr. Chagla involved an extreme degree of risk and that Mr. Zaidi and Mr. Chagla had actual, subjective awareness of that risk but nevertheless proceeded in conscious indifference of the rights, safety, and welfare of the Plaintiffs. The Court concludes that Defendants be held liable to Plaintiffs for grossly negligent misrepresentation.

*Plaintiffs' contract claims.*

**Breach of Contract** – The Court concludes that several valid contracts existed between Plaintiffs and Defendants, including company agreements, leases, mortgage documents, and sale and purchase agreements; that the Plaintiffs performed their obligations and that the Defendants did not; and that Plaintiffs sustained damages as a result. The Court concludes that Defendants are liable to Plaintiffs for breach of these contracts.

**Tortious Interference with Contract** – The Court concludes that the Landlord's lease with Tenant, as well as the mortgage documents, were contracts subject to interference; that Mr. Zaidi, Mr. Chagla, and all Defendants willfully and intentionally interfered with these contracts by withholding rent and destroying the Landlord's interests securing the payment of rent; that the interference proximately caused Plaintiffs damages; and that Plaintiffs suffered actual damages and loss. The Court concludes that the Defendants are liable for tortious interference.

Any conclusion of law more properly characterized as a finding of fact is hereby adopted as such. Any finding of fact more properly characterized as a conclusion of law is hereby adopted as such.

DATED:___**OCT 0 3 2014**___

_____
JUDGE PRESIDING

8

Unofficial Copy Office of Chris Daniel District Clerk

# TAB 3

NO. 2009-02578

P-3

| | | |
|---|---|---|
| APEX KATY PHYSICIANS, L.L.C., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | HARRIS COUNTY, T E X A S |
| ADEEL ZAIDI, APEX LONG TERM | § | |
| ACUTE CARE – KATY, L.P., APEX | § | |
| KATY PHYSICIANS – TMG, L.L.C., | § | |
| and US TMG, L.L.C., | § | |
| | § | |
| Defendants. | § | 61st JUDICIAL DISTRICT |

### ORDER REGARDING DEPOSITION CUTS FOR GARY PERRYMAN

The Court having considered Defendants' duly proffered excerpts from the deposition of

Gary Perryman, attached hereto as **Exhibit 1**, hereby

ORDERS as follows:

1. The excerpts listed upon the attached **Exhibit 2** are admitted into evidence.

2. The excerpts listed upon the attached **Exhibit 3** are not admitted into evidence but are

made a part of Defendants Bill of Exceptions by this Order.          SEP 2 2 2014

SIGNED at Houston, Harris County, Texas, on _____ SEP 2 2 2014 _____.

HON. ALFRED H. BENNETT
JUDGE PRESIDING

**F I L E D**
Chris Daniel
District Clerk

SEP 2 2 2014

Time:_____
Harris County, Texas

By_____
Deputy

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

NO. 2009-02578

| | | |
|---|---|---|
| APEX KATY PHYSICIANS, L.L.C., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | HARRIS COUNTY, T E X A S |
| ADEEL ZAIDI, APEX LONG TERM | § | |
| ACUTE CARE – KATY, L.P., APEX | § | |
| KATY PHYSICIANS – TMG, L.L.C., | § | |
| and US TMG, L.L.C., | § | |
| | § | |
| Defendants. | § | 61st JUDICIAL DISTRICT |

**DEFENDANTS' OFFER FROM THE
DEPOSITION OF GARY PERRYMAN**

| START | STOP |
|---|---|
| 1:1 | 8:25 |
| 27:15 | 29:21 |
| 29:25 | 32:13 |
| 33:22 | 35:7 |
| 37:3 | 38:17 |
| 40:8 | 45:18 |
| 57:14 | 62:10 |
| 62:15 | 63:18 |
| 69:20 | 70:10 |
| 70:16 | 72:9 |
| 72:18 | 73:9 |
| 80:9 | 83:9 |
| 84:8 | 84:22 |
| 98:13 | 100:25 |
| 105:6 | 108:7 |
| 110:12 | 111:20 |
| 113:9 | 113:13 |
| 139:14 | 140:16 |
| 141:1 | 153:9 |
| 154:8 | 155:12 |
| 158:10 | 162:11 |
| 229:4 | 230:23 |
| 248:6 | 249:12 |
| 250:18 | 250:22 |
| 251:15 | 251:21 |
| 255:6 | 255:24 |
| 272:25 | 273:14 |
| 284:6 | 284:19 |

EXHIBIT 1

NO. 2009-02578

| | | |
|---|---|---|
| APEX KATY PHYSICIANS, L.L.C., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | |
| | § | HARRIS COUNTY, T E X A S |
| ADEEL ZAIDI, APEX LONG TERM | § | |
| ACUTE CARE – KATY, L.P., APEX | § | |
| KATY PHYSICIANS – TMG, L.L.C., | § | |
| and US TMG, L.L.C., | § | |
| | § | |
| Defendants. | § | 61st  JUDICIAL  DISTRICT |

## DEFENDANTS' OFFER FROM THE
## DEPOSITION OF GARY PERRYMAN

| START | STOP |
|---|---|
| 1:1 | 8:25 |
| 27:15 | 29:21 |
| 29:25 | 32:13 |
| 33:22 | 35:7 |
| 37:3 | 38:17 |
| 40:8 | 45:18 |
| 57:14 | 62:10 |
| 62:15 | 63:18 |
| ~~69:20~~ | ~~70:16~~ |
| ~~70:16~~ | ~~72:9~~ |
| ~~72:18~~ | ~~79:9~~ |
| 80:9 | 83:9 |
| 84:8 | 84:22 |
| 98:13 | 100:25 |
| 105:6 | 108:7 |
| 110:12 | 111:20 |
| 113:9 | 113:13 |
| 139:14 | 140:16 |
| 141:1 | 153:9 |
| 154:8 | 155:12 |
| 158:10 | 162:11 |
| 229:4 | 230:23 |
| 248:6 | 249:12 |
| 250:18 | 250:22 |
| 251:15 | 251:21 |
| 255:6 | 255:24 |
| 272:25 | 273:14 |
| 284:6 | 284:19 |

Unofficial Copy Office of Chris Daniel District Clerk

**EXHIBIT  2**

NO. 2009-02578

| APEX KATY PHYSICIANS, L.L.C., | § | IN THE DISTRICT COURT OF |
|---|---|---|
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | |
| | § | HARRIS COUNTY, T E X A S |
| ADEEL ZAIDI, APEX LONG TERM | § | |
| ACUTE CARE – KATY, L.P., APEX | § | |
| KATY PHYSICIANS – TMG, L.L.C., | § | |
| and US TMG, L.L.C., | § | |
| | § | |
| Defendants. | § | 61st JUDICIAL DISTRICT |

## DEFENDANTS' OFFER FROM THE
## DEPOSITION OF GARY PERRYMAN



| START | STOP |
|---|---|
| 69:20 | 70:10 |
| 70:16 | 72:9 |
| 72:18 | 73:9 |

EXHIBIT 3

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS

In re: ) CASE NO. 09-37096-H1-11
APEX Long Term Acute Care )
-- Katy, LP, Debtor. ) CHAPTER 11

-------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

GARY GLEN PERRYMAN

JANUARY 27, 2010

-------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF GARY GLEN PERRYMAN, produced as a witness at the instance of the APEX PHYSICIAN, LLC, and duly sworn, was taken in the above-styled and numbered cause on the 27th day of January, 2010, from 10:09 a.m. to 6:07 p.m., before Mikki R. Sauer, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Kelly Sutter & Kendrick, P.C., 3050 Post Oak Boulevard, Suite 200, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

For APEX PHYSICIANS, LLC:
Mr. Robert R. Burford
BURFORD & MANEY, P.C.
700 Louisiana, 46th Floor
Houston, Texas 77002
713.273.1111

FOR P. K. SHAH, M.D.:
Mr. Fred Wahrlich
MUNSCH HARDT KOPF & HARR, PC
700 Louisiana Street, Suite 4600
Houston, Texas 77002
713.222.1469

FOR BANK OF AMERICA:
MR. RICHARD G. DAFOE
VINCENT LOPEZ SERAFINO JENEVEIN
2001 Bryan Street, Suite 2000
Dallas, Texas 75201
214.979.7427

FOR MEDISTAR CORPORATION:
Mr. J. Douglas Sutter
KELLY, SUTTER & KENDRICK, P.C.
3050 Post Oak Boulevard, Suite 200
Houston, Texas 77056
713.595.6000

ALSO PRESENT:
Mr. Peter Keierlieber, Videographer

---

EXHIBITS (Continued)

NO. DESCRIPTION PAGE

18 Medistar Memo dated 2-15-08        184
19 Memorandum to Monzer Hourani dated     187
20 Lease Agreement              192
21 4-29-09 E-mail from APEX Hospital to   199
   APEX Hospital
22 Medistar Pro Forma Project Cost Analysis 209
   Pin Oak Hospital/MOB/Land
23 7-24-07 E-mail from Abeer Saqer to     219
   Debbie Lightfoot
24 1-17-08 Letter to APEX Katy Physicians,  221
   LLC, from Adeel Zaidi and Steve Koch
25 6-26-08 Letter to Adeel Zaidi and     229
   Abeer Saqer from Monzer Hourani
26 8-25-08 Letter to P. K. Shah and      230
   Adeel Zaidi and Abeer Saqer from
   Paul Tapscott
27 2-27-07 Gmail E-mail to Abeer Saqer    212
   And others from Cameron Smith
28 9-8-08 Gmail E-mail chain printout     234
   ending with E-mail dated 9-8-08 from
   Paul Tapscott to Zaidi, Saqer, Hodge
   and Monzer
29 2-8-07 Gmail E-mail printout from      254
   Cameron Smith to Zaidi, Saqer and others
30 Letter of Agreement, Medistar and TMG    268
31 Medistar Pro Forma Financial Analysis    268
   Pin Oak Hospital/MOB/Land

---

INDEX
                                    PAGE
Appearances.................................. 2
Stipulations.................................. 5
GARY GLEN PERRYMAN
   Examination by Mr. Burford.............. 5
   Examination by Mr. Wahrlich............ 241
   Examination by Sutter.................... 278

Signature and Changes........................ 291

Reporter's Certificate....................... 293


EXHIBITS

NO. DESCRIPTION             PAGE

1  Deposition Notice            7
2  Memorandum of Understanding      38
3  Meeting Notes             48
4  9-7-06 Letter to APEX Physicians from   54
   Monzer Hourani
5  Fax cover sheet from TMG to Mr. Hourani  75
   and attachments
6  Operating Agreement         78
7  Bank of America Deposit Account     86
   Documentation Signature Card
8  10-8-08 E-mail from Stephen Koch to    87
   The Zaidis
9  Delegation of Authority        89
10 Limited Partnership Agreement of    91
   APEX Long Term Acute Care-Katy, LP
11 11-20-06 Memo to Monzer Hourani from   102
   A. K. Chagla and Lease Agreement
12 Lease Agreement           104
13 12-21-06 Letter to Adeel Zaidi and Ali  116
   Physicians from Monzer Hourani
14 Memorial Swap            165
15 Agreement of Purchase and Sale of Real  171
   Property and Improvements
16 Agreement of Purchase and Sale of Real  171
   Property and Improvements
17 Alamo Title Company Settlement Statement 180

---

THE REPORTER: Is the witness going to read and sign?

MR. SUTTER: Yes, please. Send it to me.

THE REPORTER: By the Rules?

MR. BURFORD: Yes, of course.

MR. SUTTER: That would be fine with me.

THE VIDEOGRAPHER: Today's date is the 27th day of January, 2010. The time is 10:09 A.M. We're now on the record. This is the beginning of Tape 1.

GARY GLEN PERRYMAN, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. BURFORD:

Q. Good morning.

A. Good morning.

Q. Would you state your name for the record, please?

A. Gary Glen Perryman.

Q. All right. And do you understand, Mr. Perryman, that my name is Robert Burford and that I'm here today on behalf of Katy Physicians, LLC?

A. Yes.

Q. All right. And for ease of reference, can you and I call Katy Physicians, LLC, the landlord?

---

(Pages 2 to 5)

**Page 6**

A. Yes.

Q. I mean, that's kind of an easy way to refer to it, don't you think?

A. That's good.

Q. Okay. And in connection with kind of getting the names of the parties out, there's a party called APEX Long Term Acute Care - Katy, LP, that's an entity. Do you understand that?

A. Yes.

Q. And can we call that the tenant or the hospital for ease of reference?

A. Yes.

Q. That would be an easy way to refer to it, right?

And then there's a third party we're going to run into, I think, today; and that's APEX Katy Physicians-TMG, LLC. Are you familiar with that entity?

A. Somewhat.

Q. Yes. And that is the general partner of the tenant or the hospital, right?

A. As I understand, that's correct.

Q. Okay. And can we call that the general partner of the tenant or the hospital as we go through today?

A. Yes.

**Page 7**

Q. Okay. Because we've got all these names that sound alike, and I would like to use some vernacular that I think we can understand a little bit easier. Okay? Is that all right with you?

A. That's good.

(Exhibit No. 1 marked.)

Q. (By Mr. Burford) All right. Now, first of all, we're here today to take your deposition in connection with a notice of oral and video deposition that I served on Medistar Corporation's designated representative, and that's -- I will hand you that as Exhibit No. 1. Actually the second notice.

MR. BURFORD: I normally have some more copies, but for this one -- all right?

MR. SUTTER: Okay. Just call this Perryman 1?

MR. BURFORD: Yeah. We'll call this -- we'll call this Medistar 1.

MR. SUTTER: Medistar 1.

Q. (By Mr. Burford) All right, sir. This is the notice of deposition of the 30(B)(6) oral videotaped deposition of Medistar Corporation's designated representative. Do you see that?

A. Yes, I do.

Q. And are you here today to serve in that

**Page 8**

capacity for Medistar?

A. I am.

Q. Now, do you work for Medistar?

A. I'm retired. I do do consulting with Medistar and am in the office a lot more these days than I would be.

Q. Okay. Did you retire from Medistar?

A. Yes, I did.

Q. Okay. How long were you there?

A. Well, I started Medistar in 1993; but I was there way before that with our conglomerate of companies.

Q. Okay. So you've been involved with the Medistar entities for some 17 years or thereabouts?

A. I would say some 35 years or so.

Q. Oh, okay. So it's been a lot longer than that. My math is really off. I thought you said 1993.

A. Medistar started in 1993. There were predecessor companies.

Q. All right. I got you. Now, you understand that the testimony you're giving here today is made under the pains and penalties of perjury, right?

A. I do.

Q. All right. And, now, your current position is that of consulting. Is that a paid arrangement?

**Page 9**

A. It is.

Q. And what is your hourly rate?

A. I'm not charging on an hourly rate.

Q. Okay. What is your compensation with respect to your involvement in Medistar?

A. It's typically around 15,000 a month, plus or minus.

Q. Okay. Plus or minus what? Discretionary bonuses?

A. Correct.

Q. Do you have ownership positions in Medistar properties?

A. No. I elected not to have that many years ago.

Q. All right. Now, do you -- do you have some personal knowledge of Medistar's involvement with the landlord and the tenant and the general partner of the tenant?

A. I do have some personal knowledge.

Q. All right. And in connection, also, did you do anything to prepare today for your deposition? Like, did you interview any employees or officers of Medistar?

A. I have done preparation for this particular case of testifying as a corporate representative. I reviewed corporate documentation. I'm quite familiar

26

was any, could it have been used for other purposes?

A. It depends on the type purpose that you would use it for.

Q. But there were other purposes?

A. Keeping in mind --

MR. SUTTER: Let him finish, please.

A. Keeping in mind, please, that Texas Department of Health regulates hospitals in the state of Texas. So there are certain things that you may not be able to use space for, and there are certain things that are allowable to be used for.

Q. (By Mr. Burford) All right. All right. But there were some -- as far as you know, there were some allowable purposes for vacant space for an LTACH at this point?

A. That there -- they could use space for other purposes within the framework, you know, of the statutes.

Q. Okay. And do you know Mr. Ivan Wood?

A. I do.

Q. And did he consult with Medistar or Turn-Around Management Group with respect to the purposes of the LTACH?

A. I don't know how much involvement that Ivan Wood had on the Katy LTACH out there other than I think

27

meeting with some physicians that he represents.

Q. Okay.

A. But I do know Ivan Wood, a very capable healthcare attorney at Strasburger Price here in town. I have dealt with him on many occasions through many hospital projects and physician ownership projects.

Q. All right. And if he would have given the opinion at the time that he thought that any excess space could be used for other purposes, you wouldn't have any information contrary to Mr. Wood, right?

A. I would not because he is pretty well up on the statutes when he's advising attorneys -- I'm sorry -- advising his clients' decisions as an attorney. Excuse me.

Q. All right. Now, in Bullet Point No. -- 1, 2, 3, 4 -- 5, it says "TMG/Apex Physicians." And APEX Physicians, those are the physicians that were going to actually be associated with the hospital, right? It says, "TMG/Apex Physicians shall have an option to participate in the land and the building 32 to 34 percent, hospital land and building and medical office building plus 8.4 acres, plus 2.9 acres." That's what it says, right?

A. That's the first part of the bullet point. Correct.

28

Q. Yes. And I'm trying to figure out the parties here. TMG, is that -- that's Turn-Around Management Group, right?

A. Yes.

Q. And APEX Katy Physicians, that is a general term for the physicians that could invest in the Katy Project, right?

A. Well, this one reads "APEX Physicians."

Q. Right. Right. So that would mean physicians that were -- at this point in time there wasn't -- the investment hadn't been closed yet, right?

A. That's correct.

Q. So you had to refer, then, generically to the people that were going to invest, right?

A. That would be correct.

Q. I mean, the -- ultimately the tenant that -- the APEX Katy long-term care -- acute care hospital that you and I are calling the tenant or the hospital, that wasn't formed until later, right?

A. That's correct.

Q. Okay. So in your Memorandum of Understanding here in the formation process, you would have to refer to these potential investors in some manner, right?

A. Correct.

Q. And APEX Physicians would probably be a good

29

way of referring to those potential investors, right?

A. That's correct. Now, these -- to make the distinction, though, these would be investors in the real estate.

Q. In the real estate. But it says TMG and APEX physicians shall have an option to participate in the land and the building. Now, as far as you know, were all the physicians that were members or limited partners in the hospital -- were they all given a chance to participate in the landlord?

A. At the -- at the time of this agreement?

Q. Yeah.

A. I don't know who was available on the physician side that wasn't -- we were not negotiating with physicians at that time.

Q. Okay.

A. Only the TMG.

Q. All right. But later on Medistar, for example, sent out letters of intent that were binding upon physicians with respect to the acquisition of their units in the landlord. Do you recall that?

MR. SUTTER: Could you identify what you mean by letters of intent?

MR. BURFORD: Well, I'm going to ask him

Q. (By Mr. Burford) First of all, do you recall

(Pages 26 to 29)

**30**

that Medistar sent out letters of intent that were signed by physicians with respect to potential acquisitions in the landlord?

A. The answer is yes.

Q. Okay.

A. There were some letters sent out.

Q. Okay. And those letters -- and I'm just trying to make sure. Generally, was the investment in the landlord made available to the investors in the hospital? Did you want -- was the plan here to try to get as many physicians in the hospital to also invest in the landlord?

A. I think that may be TMG's -- their method of acquiring a hospital.

Q. Okay.

A. And in this particular agreement, we're saying, yes, that we will allow someone to invest --

Q. Right.

A. -- up to this 32 or 34 percent with this particular document.

Q. Okay. Medistar would not intentionally exclude any of the physicians of the hospital to be an investor in the landlord, also, right?

A. Well, I don't think that ever came about. So I don't know.

**31**

Q. Okay. Medistar, to your knowledge, did not exclude any of the investors -- any of the physicians that invested in the hospital from also investing in the landlord, right?

A. No. But we're real estate owners. We wouldn't be involved in the other side of the operations.

Q. All right. When you were talking about -- for example, Medistar did make projections that it provided to prospective investors, right?

A. On the real estate.

Q. Yes.

A. The real estate.

Q. Right. And what I'm trying to get at is: You didn't try to limit the information that you provided that to to only a few select physicians that were going to be participants in the hospital, right?

A. Not that I recall.

Q. That offering, to your knowledge, would be generally available to all of the physicians in the hospital, right?

A. I think that's correct -- well, all that TMG would want to send out.

Q. Okay.

A. That wasn't our election as to which

**32**

physicians to send this out to.

Q. Okay. That was the -- to your belief, that was Mr. Zaidi and Mr. Sager's responsibility to make sure all the hospital physicians had an opportunity to invest?

A. Well, it would be up to Turn-Around Management Group.

Q. Right. And it was certainly in their best interest to try to get as many physicians to participate as possible, right?

A. Well, I'm -- I don't know that.

Q. Okay.

A. Okay.

Q. Well, ultimately they were not able to get enough --

MR. SUTTER: Have you finished your answer? Okay.

Q. (By Mr. Burford) Ultimately they were not able -- I say "they." Turn-Around Management Group was not able to close a deal on these terms, right?

A. I don't know that, but --

Q. In other words, in other words, ultimately --

MR. SUTTER: Make sure you finish your answers. Okay? Were you finished with that one?

THE WITNESS: Yes.

**33**

Q. (By Mr. Burford) Ultimately Turn-Around Management Group --

MR. SUTTER: Wait a minute. Can we -- anyway, we need to let you finish your question so he can finish his answers, okay, because he starts to answer; and then you cut him off. So --

MR. BURFORD: All right. I apologize to you.

MR. SUTTER: All right.

MR. BURFORD: I'm not trying to do that. I'm just trying to --

MR. SUTTER: I don't want to be a referee. Let's just make sure he gets his answer out.

MR. BURFORD: Yeah.

Q. (By Mr. Burford) And, sir, Mr. Perryman, any time you need to supplement your answer as I go along, if I've cut you off, just let me know; and I'll -- I'll let you finish your answer. All right?

A. I appreciate that.

Q. I'm just trying to speed things along. I'm not trying to, you know, belabor things here. Okay?

Now, ultimately this bullet point here where it says TMG APEX Physicians shall have an option to participate in the land and the building up to an amount of 32 to 34 percent, that had -- that didn't get

34

accomplished, did it? They actually -- the physicians actually bought all the land, right?

A. Well, I think there were -- I think what happened is that this particular agreement was a series of agreements that were entered into --

Q. Right.

A. -- to an ultimate, I guess, understanding or a project agreement.

Q. Right.

A. And this was the start.

Q. Right.

A. And there was a correction. So they actually exceeded, okay, the amount of this 32 to 34 percent; and when they exceeded that amount, then we sent out this letter that you referred to earlier to physicians --

Q. Uh-huh.

A. -- that basically said we'll allow that from the 33 percent up to 50 percent --

Q. Right.

A. -- participation in these -- and as an addition to from this agreement, there were more things that were added into the new agreement.

Q. Right. And I think I'll get to that in a little while.

A. Okay. So -- so when you say this wasn't done,

35

it was actually exceeded.

Q. Right. And then ultimately when the deal closed between the landlord and Medistar, the landlord actually acquired all of the property, right; and Medistar owned an interest in the landlord at that point, at the time of closing in March of 2007?

A. That would be correct.

Q. Okay. Now, in -- now, it says the lease will be guaranteed by the accounts receivable of the hospital and shall start four months after the closing of the deal, right?

A. That's what the document says.

Q. And then the next line in that bullet point says, "The first year lease shall be guaranteed by a letter of credit equivalent to one year rent." And that was an early -- a provision that was put on early in between Medistar on the one hand and Turn-Around Management Group on the other, right?

A. Correct.

Q. Okay. The debtor has -- the debtor in this case, which is the hospital or the tenant --

A. Yes.

Q. -- has criticized that provision as being somewhat onerous. Are you aware of that?

A. Well, I'm sure they have their opinion. It

36

should have been probably substantially more than that.

Q. Okay. All right. So you don't believe that provision was --

A. Well, let me --

Q. -- really onerous?

A. No, I do not. There -- like I say, we own hospital facilities; and in many occasions it's -- those type provisions are greater than one year, much greater than one year, and even to the point of credit tenants.

Q. Okay. The landlord would not be overreaching with respect to the hospital to get terms like that in the lease, right, as far as you're aware?

A. That is correct.

Q. In your extensive experience in the hospital business, right?

A. Correct.

Q. Now, did this agreement essentially envision at this time kind of the joint development of the APEX Katy Project?

A. Could you repeat that, please?

Q. Yeah. Did this agreement, Exhibit No. 1 to the depo notice -- was it envisioning kind of the joint development of what ultimately became the Katy Project?

A. I don't know what you mean by "joint development." This was more of a landlord/tenant

37

relationship with the possibility of physicians being invited in to participate in the real estate.

Q. All right. Well, looking back at Bullet Point No. -- 1, 2, 3, 4 -- 5 where it says TMG physicians shall have an option to participate in the land and the building, do you see that?

A. I do.

Q. It says, "There will be 450 units for the project and 144 to 150 shall be offered to the participating physicians at the rate of 40,000 per unit." All right. "There shall be a time limit of 45 days starting July 28, 2006, to purchase these units."

Did I read that correctly?

A. You read it correctly.

Q. Now, what were -- what were the units that the -- units in what? Units in an entity to be formed for the landlord?

A. That would be correct.

Q. Okay. And at this point --

A. Let me -- let me -- let me state this: In this particular case, early on the "landlord" would not refer to the same landlord that you're referring to --

Q. I understand that.

A. -- in the start of the deposition here.

38

Q. It would be "landlord" without capitalized?

A. Okay. That's correct.

Q. Okay.

A. The landlord would be, you know --

Q. Just generically.

A. -- one of the Medistar corporation entities.

Q. Right. Okay. At this point in time, Medistar was going to own the prospective landlord, not the landlord that ultimately became my client, right?

A. That's correct.

Q. Okay. Now, in effect, this project was kind of in the -- the APEX -- the Katy Project, the landlord and the tenant, was kind of in its infancy at this point, right?

A. Yes. This would be the start of something to -- that would ultimately come about and be, you know, a total different package.

(Exhibit No. 2 marked.)

Q. (By Mr. Burford) Okay. Now, let me show you what I'm going to mark as Exhibit No. 2. It was previously marked to Dr. Noor's deposition. That's 2, Medistar Exhibit 2.

A. Okay. This is not the exhibit that's in the Exhibit 2 that's in the notice for deposition.

Q. No. It's Exhibit 2 to your deposition.

39

A. Okay.

Q. Okay. The Exhibit 2 in your notice is different; but it's also referred to -- it's also referred to as Noor Exhibit No. 3, right? Do you see that?

A. Yes, I do.

Q. When I took Dr. Noor's deposition, I used it with him, also. Okay?

Now -- now --

MR. SUTTER: When did he get deposed?

MR. BURFORD: He got deposed a month ago.

MR. SUTTER: This last month.

MR. BURFORD: It lasted all of an hour before they settled.

MR. SUTTER: We'll talk later. I'm sorry. I didn't mean to interrupt you.

MR. BURFORD: Yeah. Yeah. Anyway, we can talk about it at a break.

Q. (By Mr. Burford) Medistar No. -- No. 2 has been marked to your deposition. Do you -- have you seen this document before?

A. I have.

Q. Now, let's compare it to what was marked as Exhibit 1 to the notice of deposition. Do you see that? Put them side by side, if you can. Let's compare

40

Exhibit 1 to your deposition and Exhibit 2 -- or Exhibit 1 to your notice of deposition and Exhibit 2 to your deposition. Okay?

A. Yes.

Q. Do you understand what we got in front of us here?

A. Yes, I do.

Q. Now, Exhibit 2 to your deposition is also signed July 28th, 2006, down at the bottom, right?

A. Yes, it is.

Q. And it is agreed to by Mr. Monzer on behalf of Medistar, right?

A. Correct.

Q. And Adeel Zaidi and Abeer Saqer on behalf of Turn-Around Management Group, right?

A. Correct.

Q. Now, the -- the Exhibit 1 to your deposition notice, it says at the top Purchase and Lease Agreement. You said you believe that was Monzer Hourani's writing, right?

A. I believe so.

Q. And then this second exhibit to your deposition is also called a Memorandum of Understanding, Medistar & TMG Katy Project. Do you see that at the top?

41

A. I do.

Q. And it's from Turn-Around Management Group to Mr. Monzer Hourani down at the bottom, president of Medistar, who -- and he signed and agreed to it, right?

A. Correct.

Q. Now, what are the differences between Exhibit No. 2 to your deposition and Exhibit No. 1 to the notice of deposition? Why did you -- why did they need these two -- who documents dated the same day, if you know?

A. It appears to me -- and I was not there when this was done.

Q. Okay.

A. Okay? But it does appear to me that one is an expanded version of the other. So one came first. The other came later --

Q. Okay.

A. -- after discussions.

Q. All right. Do you know which one came first?

A. Well, it would appear to me in reading this that the Medistar Exhibit No. 2 would have been the first document; and after discussions, Exhibit No. 1 to my notice would be the second document. That's the way I would interpret it.

Q. Let me show you something. You see the first -- the first document to your deposition notice

11 (Pages 38 to 41)

42

says Purchase and Lease Agreement?

A. I do.

Q. Now, look with me at the first bullet point on Deposition Exhibit No. 2. It says, "Medistar shall furnish" and then it says: Same notes as purchase and sale lease agreement (sic). Do you see that?

A. Yes, I see that.

Q. You see purchase and sale lease agreement referred to in Exhibit 1 to your notice?

A. I do.

Q. So it looks like Exhibit 2 actually came after Exhibit No. 1 to your deposition, right, because Exhibit No. 2 refers to Exhibit No. 1, does it not, to the notice?

A. Well, I'm not for sure that it does, but it could be construed as that.

Q. And then look with me on the side, on the right-hand column. It says, "same notes as Purchase & Lease Agreement." And, again, Exhibit 1 to your deposition notice says Purchase & Lease Agreement," right?

A. Yes.

Q. So does it look like maybe this Exhibit No. 2 is a -- is maybe a supplement in some way to Exhibit 1 to your notice of deposition?

43

A. I can see where you're coming from, but I don't know that that's the case.

Q. Okay. Look with me at the last bullet point.

A. Yes.

Q. It says Medistar shall issue 10 percent shares, cash flow and ownership of the project to TMG at the time of execution of the above contracts. Was that a term that Medistar agreed to?

A. In this particular document, it appears that the discussions, they were -- they were agreed to at that time.

Q. Now, ultimately at the closing of the actual acquisition of the land by the landlord, my client, did Medistar pay TMG or any of its affiliates a fee?

A. There was a fee paid.

Q. Right.

A. But not for this.

Q. Okay. Why was there a fee paid at the closing of the landlord to the affiliates of Turn-Around Management Group?

A. There -- Turn-Around Management Group and others in that group had performed services for months on some of our other projects.

Q. Okay. So they were paid out of the proceeds of the sale for services they had performed on other

44

projects?

A. The dollars that comes into the company, Medistar Corporation being the operating company --

Q. Uh-huh.

A. -- most all of the payments are made out of Medistar Corporation. Even though this was an affiliate company of Medistar --

Q. Uh-huh.

A. -- many other operations --

Q. Okay.

A. -- and other subsidiary companies are paid out of Medistar Corporation.

Q. Okay. It just so happened that Turn-Around Management Group had some other relationships, and they got a fee paid -- some fees paid to them in connection with those other relationships on or about the time of the closing, right?

A. That's correct. Yes.

Q. Okay. And do you remember roughly how much money these affiliates of Turn-Around Management Group got?

A. In this particular case or other cases?

Q. No. In this particular case.

A. Yes. I do remember reviewing that documentation. Some 400-and-something-thousand dollars

45

for two or three of the participants --

Q. Uh-huh.

A. -- and another one a certain other amount of money was paid --

Q. Uh-huh.

A. -- in this particular case at this particular time.

Q. Okay. A certain doctor was paid about $400,000 at the time of closing, too. Do you recall that?

A. Yes. That's correct.

Q. And what was his name?

A. I don't remember.

Q. Peracha maybe?

A. It could be. I'm sure we have documents that's been produced that will --

Q. Okay.

A. -- that will show that.

Q. Okay. And the doctor that Medistar paid at the time of closing, he then turned around and bought units in the landlord, right?

A. I think that is correct. I'm not for sure about what the timing was on that.

Q. Okay. It was about the same time that he received the fee, right?

2 (Pages 42 to 45)

54

Q. Right. And any -- it's true that any potential buyer for the land could have also negotiated the release of those restrictions, right?

A. It's a possibility. Correct.

Q. All right. Now, at this point and at this meeting here, it doesn't appear that Dr. Peracha or Dr. Coch or Dr. Shah was there, right?

A. I don't know that. I wasn't involved in the meeting.

Q. Okay. Now, was Dr. Shah or Dr. Coch or Dr. Peracha involved about the decisions in the development of the landlord and the hospital at this point?

A. I don't -- I don't know. I wasn't involved in that -- in those talks at that particular time.

Q. All right. To your knowledge, did they have any involvement at this point in the development of the hospital, to the best of your knowledge?

A. I don't know that at this particular time, 9-11-06.

(Exhibit No. 4 marked.)

Q. (By Mr. Burford) Okay. Look with me now at Exhibit No. 4.

MR. BURFORD: This is Exhibit 4 to Medistar, Doug. It had been -- previously been marked

55

in a deposition of Abeer Saqer.

MR. SUTTER: Okay.

MR. BURFORD: That's why you see a number on there.

MR. SUTTER: Is that how you say her name?

MR. BURFORD: It think it's Saqer.

THE WITNESS: Saqer.

MR. BURFORD: Saqer. I'm sorry. I'm trying to say it right. Abeer Saqer.

THE WITNESS: That's the way I've heard it pronounced.

MR. BURFORD: It's S-A-Q --

THE WITNESS: -- E-R.

MR. BURFORD: S-A-Q-E-R.

A. Can I supplement something you said a while ago?

Q. (By Mr. Burford) Yes. Any time.

A. In the previous question, you had indicated that, I guess, any buyer could have the possibility to negotiate something.

Q. Okay.

A. That is a true statement as I answered it. However, would those other people have what Memorial Hermann wanted? And the answer is no, they didn't.

56

That's why it gave Medistar, of course, an upper edge on negotiating a better --

Q. Right.

A. -- purchase because we had the land that they wanted. We owned the land in both cases by their hospital and prevented their expansion of their hospital system. So that's probably the better answer.

Q. Okay. So it's your belief that Medistar had a negotiating advantage beyond --

A. Very much so.

Q. Okay. Now, but obviously somebody else could have paid maybe Memorial Hermann a little bit more money or had something else that Memorial Hermann wanted, right?

A. Probably not.

Q. Okay. Memorial Hermann is a big hospital system, isn't it?

A. Yes.

Q. Okay. They've got -- they've got hospitals all over, right?

A. They have several hospitals, but not hospitals all over.

Q. Do you -- I'm sorry, sir. Do you know what their needs are, their land needs?

A. Yes. They came to us and told us, actually.

57

We're -- like I say, we're in the hospital development business. So we're quite attuned as to most of the hospitals in the Houston market area and what their needs and wants are. As a matter of fact, almost all of the systems come and talk to us concerning those needs.

Q. Who from Memorial Hermann told you in the fall of 2006 what their land needs were?

A. Marshall Heins, who was the director of their facilities.

Q. Okay. And you and he had discussions?

A. He -- I'd been in discussions with him concerning that, as well as other members of Medistar Corporation.

Q. Okay. Look with me at Exhibit -- at Exhibit No. 4 of the deposition of Medistar.

A. Yes.

Q. Okay. Do you see -- do you recognize that as one of the binding letters of intent sent out to investor -- potential investors in a landlord for the Katy Project?

A. Yes, I recognize this form.

Q. Okay. And this is from -- sent out from Mr. Monzer Hourani; is that right?

A. This is sent out under Medistar with Monzer executing the letter. That's correct.

58

Q. And it's addressed to APEX Katy Physicians, right?

A. It is.

Q. And those are the potential investors?

A. These are the potential investors for the real estate side, yes.

Q. What ultimately became my client, the landlord, right?

A. Correct.

Q. All right. And it says: To all APEX Katy Physicians?

A. It does.

Q. It says to all of them, right, not just some?

A. Yes. It says: "To All APEX Physicians."

Q. "APEX Physicians," right?

A. Whoever those might be.

Q. All right. It says: This binding letter of intent shall set forth the intended obligations of the physician as it relates to the following project, right?

A. That's what it says.

Q. And it's a binding -- it's a binding letter of intent, if you look on the next page, between Monzer Hourani of Medistar and the particular physician investing in the real estate, right?

A. Again, these are letters of intent with

59

physicians, varying physicians; and there were many --

Q. Uh-huh.

A. -- saying what their intent was to -- to invest.

Q. In the real estate, right?

A. Correct.

Q. And at this point in time, the real estate was going to be held by Medistar, was going to be the owner of that landlord, right?

A. Yes. Medistar would be the landlord. Excuse me. The physicians that this went out to that actually Turn-Around Management Group actually took to the physicians --

Q. Uh-huh.

A. -- and invited those to participate --

Q. Right.

A. Okay. -- that landlord would -- meaning Medistar would be a landlord and landlord was then inviting these physicians in to participate in the real estate.

Q. Right. And the landlord would have been run by Medistar?

A. That is correct, one of Medistar's entities.

Q. Now, at the time that these letters were going out --

60

A. Yes.

Q. -- did -- well, strike that.

Let's just go on down and see what it says here. It says under Real Estate, No. 1, what Mr. Hourani was telling the physicians that were going to invest in the real estate, he said: The Katy Pin Oak Hospital comprising 101,105 square feet of rentable space on six acres of land shall be acquired and minor renovations/abatement performed to allow the facility to operate as a long-term acute care hospital. And then it says "LTACH," right?

A. Correct.

Q. And that was a representation that Mr. Hourani made, right?

A. That was -- I don't know if you would call it a representation. It's basically a statement that he's making.

Q. Right. He's making a statement to the -- to the investing physician, right?

A. Correct.

Q. All right. And then the next statement that Mr. Hourani makes to the investing physicians is that "APEX Hospital-Katy shall lease the entire hospital facility at $20 per square foot and be responsible for all operating costs of the hospital facility (absolute

61

net lease). CPI increases shall apply to the lease rate after the second year of operations. The lease shall be guaranteed by the accounts receivable of the hospital and the first year rents shall also be guaranteed with an equivalent letter of credit," right?

A. That's what it says.

Q. That's what Mr. Hourani was telling these investing physicians that the lease would contain, right?

A. That's correct.

Q. Now, ultimately the landlord, my client, did get a letter of credit from Bank of America, right, that was supposed to be used to secure the first year's rent?

A. Well, at the particular time of September the 7th when this was written, this was under a lease scenario, not a purchase.

Q. I understand that, but ultimately --

MR. SUTTER: Let him finish, please.

A. So if we're jumping to a subject where the business deal actually changed --

Q. Right.

A. -- and then the purchase took place --

Q. Right.

A. -- versus a lease --

Q. Right.

62

A. -- and now you're talking about a different landlord --

Q. Right?

A. -- and a different tenant --

Q. Right.

A. Is that what we're talking about?

Q. Well, it was -- it became a different tenant, also? Did anything change with respect to the tenant?

A. I think that it, perhaps, did; and I'm not for sure of how it changed.

Q. Okay. So you're not sure how the tenant ultimately changed, right? And that's the debtor, right?

A. Correct.

Q. All right. But you say the landlord changed, and that's -- and the landlord changed in that Medistar didn't own and control all of the landlord, right, as it was going to do -- it was going to -- the landlord was going to essentially -- at this point in time, September 7th, 2006, the landlord or the entity owning the property was going to be essentially controlled by Medistar, right?

A. It would be controlled by Medistar.

Q. Okay. And the terms of the lease between that landlord and the tenant was set forth right here in this

63

letter of -- letter to these physicians, right?

A. Part of the terms of the lease.

Q. Yes. And ultimately it became -- the lease that was ultimately executed between my client and the hospital also contained a 20-dollar-per-square-foot provision, right?

A. That's correct. There were certain changes in the lease when that took place.

Q. Okay. And do you also require, though, that the -- that the lease between my client and the hospital or the debtor also required that a letter of credit be put up to secure the first year rents?

A. That's what my -- I had heard. Correct.

Q. All right. Do you know whether my client was ever able -- my client, the, quote, "landlord" was ever able to draw upon that letter of credit?

A. I don't know because that would have been outside of Medistar's involvement at that time.

Q. Okay. Now, this goes on to talk about leasing of the medical office building, right, 36,000 square feet of rentable space in Item No. 2?

A. It does.

Q. In Item No. 3 it says: The project includes approximately 2.9 acres of adjacent land, which can be sold or developed by our venture for additional

64

project -- profit, right?

A. That's essentially what it says.

Q. And the project includes approximately 8.4 acres of land directly across Medical Center Drive which can be sold or developed by our venture for additional profit, right?

A. Correct.

Q. And then it talks about the location of the project. Mr. Hourani is telling the physicians information about the location of the project in this letter, Exhibit -- Exhibit No. 5, right?

A. Correct.

Q. And he says -- for example, Mr. Hourani represents or says -- in the second sentence under Location, he says: The Katy area has seen unprecedented growth in the last year -- years as the area is booming with residential and commercial growth.

That's a real -- a very positive statement, right?

A. Correct.

Q. It says: The Katy area is positioned to access all the business benefits of being located in one of the world's most vibrant economic regions and has merged as one of the hubs of commercial activity on the booming west side.

65

Once again, that's a very positive representation by Mr. Hourani, right?

A. In the letter, correct; but, see, most of these statements were taken from the Katy business development people that's out there. Okay.

MR. BURFORD: Excuse me for just a minute. Let me turn this thing off. I lost it, and then I found it. I had to turn it back on. All right.

Q. (By Mr. Burford) Well, whether or not he got this information -- whether or not -- thank you, sir.

Whether or not he got this information from others, he was certainly passing it on to the investing physicians, right?

A. That would be correct.

Q. All right. And then on the next page, it talks about investment and the amount, 1 unit, 40,000; 150 units, 6 million; 225 units, 9 million, right?

A. It does.

Q. And then it says: Please see attached five-year physicians projected net dollar return for the above ownership levels. Right?

A. Correct.

Q. And if we look on the next page, we see some projections, right?

A. We do.

17 (Pages 62 to 65)

**66**

Q. And those are projections that Medistar prepared and sent to the investing physicians to give them information about their proposed investment in the Katy Project land and building, right?

A. Medistar prepared the letter and also these projections.

Q. Right.

A. And these were given to the folks at the Turn-Around Management Group in order to distribute.

Q. Okay. And, well, they were given for them to distribute; but Mr. Hourani, he signed the document, right?

A. He did.

Q. All right. He certainly wouldn't put anything in here that he believed to be inaccurate, to your knowledge, right?

A. No. That's correct. And I think that's why you find the statement on these projections as Medistar cannot guarantee --

Q. Right.

A. -- the cap rate and the future land sales price will be determined by future market conditions.

Q. Sure. You can't guarantee any rate of return, right, in any deal?

A. Markets change. Economics change.

**67**

Q. Right.

A. People change.

Q. Things change like --

A. The government changes.

Q. Right. For example, in the hospital deal that actually happened, the long-term acute care hospital's license was actually delayed several months, right?

A. That was my understanding.

Q. Yes. And that's not a good thing for the economics of a hospital, is it?

A. It certainly would not be a good thing for the economics of the hospital. I don't know exactly the absolute cause of all the delay.

Q. All right. In any event, the projections -- it says five-year-per-unit return was 104 -- $104,761 in return for a 40,000-unit -- -dollar investment, right?

A. That's what it says.

Q. Okay. And then on the next page -- on the prior page, the second-to-last paragraph, it says: Mr. Hourani says please do not hesitate to contact -- I'll let you get there.

On the second page of the exhibit, Exhibit No. 5, Mr. Hourani says: Please do not hesitate to contact me or the Medistar staff, Cameron Smith or Larry Vaile with any questions related to the Katy Project.

**68**

So he was letting them know that they could call him or the Medistar staff at any time that they wanted to talk to them about this Katy Project, right?

A. That's correct.

Q. And did some of the physicians do that?

A. I wasn't involved with a lot of the discussions with Cameron or Larry concerning this; but this is typical --

Q. Okay.

A. -- in our business and this is typically what happens. We -- as landlords and also as venturers with these people that participate with us in our projects -- and most of our projects are participated out with physicians --

Q. Uh-huh.

A. -- that we open our doors, our books and discuss with them whatever their -- their questions are.

Q. Okay. And do you update them as you go along in these deals for changes?

A. In cases where we have direct contact --

Q. Right.

A. -- yes, we do.

Q. Right.

A. In other cases where, for an example, a

**69**

company like Turn-Around Management Group or, we'll say, a Memorial Hermann or a St. Luke's or a Methodist -- and we've done business with all these folks -- where they're directing what happens in these facilities, then our participation and discussion with some of these folks are limited except in relationship to the real estate.

Q. Okay. And, for example, with respect to the real estate here, as you're sending out these letters of intent --

A. Yes.

Q. -- and these people are investing this money, you understand --

A. Yes.

Q. -- and Mr. Monzer Hourani is giving these projections about this landlord --

A. Yes.

Q. -- as proposed for $40,000 a unit --

A. Yes.

Q. -- do you understand that there were any updated projections provided by Medistar to any of the actual investing physicians in the landlord, my client?

A. I don't know that because the deal changed, the landlord, your client. This was a separate deal that was here. So --

18 (Pages 66 to 69)

70

Q. Uh-huh.

A. -- you know, this started out in an infancy and rose to the occasion of all of a sudden the deal changed.

Q. That's fine.

A. So what took place at a future --

Q. Right.

A. -- thing, you know --

Q. I just --

A. -- is different.

Q. I just want to know if you've seen one single document whereby Medistar sent out a letter to any of the investors in my client whereby it said, "The deal has changed," one single document.

A. I don't -- I don't know that.

Q. Do you know of one single phone call made to any of the doctors in -- the investing doctors that whereby they were told the deal has changed?

A. Oh, I'm sure there were some.

Q. Okay.

A. I mean, because you have people like Dr. Coch that's involved in both the real estate and --

Q. Uh-huh.

A. -- on the other side as a hospital operator, you know, in the operations side.

71

Q. Right. He would know that the deal had changed, right?

A. He would -- he would certainly know that the deal was changed. I think some of the other physicians would, also; but I wasn't involved in those specific contacts.

Q. All right.

A. So I can't answer those questions.

Q. So Dr. Coch, he was one of the people, since he became a managing member of the general partner of the hospital, he would certainly -- and he was also an investor in the landlord. He certainly would have had talks with you guys about how the deal had changed from a lease to an acquisition, right?

A. Well, that would be only one example. I guess a better example would be P. K. Shah.

Q. Right. P. K. Shah might be another example?

A. Yeah. He would --

MR. SUTTER: Let him finish, please.

A. He would certainly be in the upfront of the negotiations, as it turned out --

Q. (By Mr. Burford) Okay.

A. -- from a lease-type project to a purchase.

Q. Now, you say "the upfront of the negotiations."

72

A. Yes.

Q. What negotiations do you know that Mr. Shah did with any of the investing physicians?

A. With the investing physicians? I'm talking about --

Q. In the landlord.

A. Well, that's your landlord.

Q. Yeah.

A. We have to separate these.

Q. All right.

A. Okay.

Q. What -- what --

THE REPORTER: I need you-all to talk one at a time, please.

MR. BURFORD: Yeah. You got that.

MR. SUTTER: You keep interrupting. Finish your answer, please.

A. That's where the separation comes in. I realize it may be confusing for you because you didn't -- you know, you weren't in it and didn't live it. I was there as a corporate representative because there are many projects going on at the same time this project is going on, many, many. So you have to separate out these entities.

At the time when all of this was issued

73

here and it evolved, so to speak, from a lease being Medistar as the landlord to an ultimate purchase as someone else being the landlord and someone else being involved in those things with their investors, then that's when Medistar, you know, didn't participate as much in those talks.

Q. Okay.

A. So I think that's the distinction that needs to be drawn.

Q. Okay. How long -- let me ask you this: During this time period in the fall before the deal changed, okay, were investors actually putting up their money?

A. These letters that we're addressing now --

Q. Yeah.

A. -- that were signed --

Q. Yeah.

A. Okay? -- is the intent of particular physicians to make those investments.

Q. All right.

A. And I think that those -- some of those investments were made as time went on. I do not recall dates when those investments come in because Medistar did not handle those dollars that came in.

Q. Okay.

78

Q. Okay. Let me show you a few more documents related to that group; and when I'm talking about "that group," I'm talking about the affiliate that was --

MR. SUTTER: I think he's getting ready to turn you off.

MR. BURFORD: Yeah. You need to turn me off?

THE VIDEOGRAPHER: Not yet.

MR. BURFORD: Go ahead. How many more minutes do I got?

THE VIDEOGRAPHER: You got about a minute.

MR. BURFORD: Okay. Why don't we change the tape. I don't want to --

THE VIDEOGRAPHER: Going off the record at 11:53.

(Brief recess.)

THE VIDEOGRAPHER: The time is 12:07. Back on the record. Beginning of Tape 2.

(Exhibit No. 6 marked.)

Q. (By Mr. Burford) All right. I'm going to hand you what's been marked as Medistar Exhibit No. 6.

MR. BURFORD: I have a copy.

MR. SUTTER: Thanks.

Q. (By Mr. Burford) Sir, this purports to be an

79

operating agreement of APEX Katy Physicians-TMG, LLC, which you and I have been vernacularly referring to as the general partner of the hospital today. Do you see that?

A. I do see it.

Q. Now, it's -- on the first page, it says effective date October 9th, 2006. And then if you look for the last page, there's no signature pages, although there is a franchise tax certificate attached to the very back page. All right? Do you know -- now, if we look on each of the pages after the first page, there's a little scribble at the bottom right-hand corner. Do you see that scribble?

A. I do.

Q. It looks like some initial. Do you know -- have you seen those initials before?

A. I don't recognize it.

Q. Okay. Do you know who drafted this operating agreement, this version of the operating agreement, of the general partner?

A. No, I don't.

Q. Do you know whether it was ever signed or a version of it was ever signed?

A. I don't know that. I mean, this would be the other parties' agreement. So Medistar wouldn't have had

80

anything to do with that.

Q. Okay. Did Medistar ever ask to see a copy of the operating agreement of the general partner of the hospital?

A. I don't know that.

Q. Okay. To your knowledge -- to your knowledge, it did not?

A. I'm not aware if they did or they didn't.

Q. Okay. That's fair. Have you ever seen before today a copy of the operating agreement of APEX Katy Physicians-TMG, LLC?

A. I've seen this document that had been produced --

Q. Right.

A. -- in production for this case.

Q. Okay. But have you ever seen a signed copy?

A. I've seen a copy just like this one.

Q. Just like this one. You got what I got, right? Okay. Look with me on the second page of this purported operating agreement, all right, of the general partner. It says: The purpose of the company is to engage in the business of the construction, development and operation of a medical care facility to be known as APEX Hospital-Katy.

That's the hospital, right?

81

A. Yes.

Q. That was to be formed as of October 9, 2006, in Katy, the APEX project, right?

A. I believe that to be correct.

Q. Okay. Now, look with me on the fifth page. There's a listing of owners there, and it's just -- under members, this has got ownership interest, Turn-Around Management Group, 50 percent, but nothing else, right? It's blank after that?

A. I do see that; and I do see that, you know, it's blank on page 6.

Q. All right.

A. I also don't see any initial on page 6.

Q. All right. Okay.

MR. SUTTER: There's no page 2 either.

Q. (By Mr. Burford) I'm just giving you what I -- what I got. Okay?

A. Correct. No page 2.

Q. In the version you've seen, have you ever seen a page 2?

A. I haven't. I've only seen, I think, what you have here.

Q. Okay.

A. At least for myself, I have only seen that.

Q. Okay. Look with me on page 7 of the document

82

under 3.01, Management. Do you see that?

A. I do.

Q. It says: The company -- and that's the general partner of the hospital -- shall be managed by two managers. The initial managers of the company shall be -- shall be Adeel Zaidi representing Turn-Around Management Group and Dr. P. K. Shah or Dr. Stephen Coch or Dr. Waseem Peracha on a rotational basis representing APEX Long Term Acute Care-Katy LP.

And that's the hospital, right?

A. I believe that's what they were determining it would be called at that time.

Q. Okay.

A. But, again, I don't have firsthand knowledge of this.

Q. Okay.

A. I only see what's in the document.

Q. Okay. Do you know in your dealings -- or did you have any dealings with the general partner that would allow you to determine, you know, who was running the general partner of the hospital?

A. The -- now, are we talking about --

Q. At any point in time.

A. At any point in time?

Q. Right.

83

A. At any point and period of time, I think earlier on that it appeared to me that Adeel Zaidi would be the person that would be maybe the spokesperson, as it were; but then in the negotiations as -- when this turned into a different type of project than originally planned, at least from Medistar's point of view, then I think two people came up front.

Q. Who was that?

A. And that would be Adeel Zaidi and P. K. Shah.

Q. Okay. And did Mr. Zaidi and Mr. Shah say they represented the general partner, or do you not -- were you not at any of those meetings?

A. I was not personally at any of those meetings.

Q. Okay. Now, this says -- it says the initial manager of the company shall be Adeel Zaidi, and that's consistent with your understanding of who managed the general partner, right?

A. Well, I think that I just indicated what I thought had happened; but not having the direct knowledge --

Q. Right.

A. -- and being inside the working of that company --

Q. You're not quite sure, right?

A. -- I can't tell you --

84

Q. All right.

A. -- for an absolute.

Q. All right. Now, do you know whether Dr. Coch, Peracha or Shah -- at what point in time any of them might have rotated in as the other managing member of the general partner of the hospital?

A. I do not.

Q. Let me show you -- do you know if Dr. Shah ever rotated in as a managing member of the general partner of the hospital?

A. The only thing that I know there was that Dr. Shah was -- had spoken, you know, on behalf of this company.

Q. How do you know that?

A. I've spoken with Dr. Shah. I also sit on a hospital board of which Dr. Shah is a partner in that. And so it's -- I would see Dr. Shah at least -- at least once a month.

Q. All right. So you said he's -- he's spoken for the general partner. What did he say?

A. About ongoing negotiations basically on the setup and moving forward on this Katy facility.

Q. What specifically did he say? Do you recall?

A. I can't recall. I mean, this is back in --

Q. Okay.

85

A. -- late '06 and then early '07.

Q. Okay. So you can't specifically recall what he said, right?

A. Correct.

Q. All right. Now, looking with me at Medistar Exhibit No. 7 --

MR. BURFORD: I gave you mine.

MR. SUTTER: We'll take that one.

MR. BURFORD: That's got all my secrets on it, man.

MR. SUTTER: I know it.

MR. BURFORD: We can re-mark it --

MR. SUTTER: A little short grab and we would have had it.

MR. BURFORD: Yeah. I was quick there. Did you notice that?

MR. SUTTER: I don't give them back once I get them, you know. I had that in a deposition recently --

MR. BURFORD: Really?

MR. SUTTER: -- where a Haynes & Boone lawyer gave me -- went through the whole deposition for about six exhibits until he realized he was giving the witness his own copies.

MR. BURFORD: Yeah.

98

A. Yes, that's what it says.

Q. Are you familiar with this addendum?

A. I have seen it.

Q. The first bullet point says: "TMG shall provide in addition to the written confirmation given to Medistar for 33 percent of the real estate two weeks ago binding letters of intent from the physicians by October 6, 2006," right?

A. That's what it reads.

Q. And you and I have gone over some of those letters of intent, right?

A. Yes. They were an exhibit that you handed me.

Q. Right. And then the next page -- the next bullet point says: "TMG shall provide a down payment of $500,000 towards the purchase of the 33 percent or 50 percent shares of the Katy Project by October 31st, 2006." And that's for the purchase of what would be the entity to acquire the building, right, and land?

A. I'm sorry. What was -- what was the question?

Q. Yeah. At this point that would be for a purchase of the shares of the building and the land that was to be acquired in which the hospital would operate?

A. Well, I would view it as probably a -- like, a good-faith deposit for a business deal?

Q. Well, but it related to -- it related to a

99

down payment toward the purchase of 33 to 50 percent of the shares of the Katy Project; that's what this says, right?

A. I see what it says, but --

Q. All right.

A. But, again, I guess this is written by Turn-Around Management Group --

Q. Uh-huh.

A. -- that probably is not skilled in writing such documentation.

Q. Right. Well, whether or not it was written by Turn-Around Management Group, it was signed by Mr. Monzer Hourani --

A. That's correct.

Q. -- of Medistar, right?

A. Right, with the intent -- okay -- that's involved in all of our projects would typically ask for earnest money-type things --

Q. Okay.

A. -- you know, to hold to people's promises.

Q. All right. Did TMG provide you with $500,000?

A. To my knowledge, the 500,000 was deposited into an escrow account.

Q. All right. And where did the $500,000 come from?

100

A. I don't know. I haven't reviewed that check; but I do know it was in an escrow account and I think it was at the time of the other deal closing, when the purchase took place of the project, it was put in as a credit, I think, toward that purchase.

Q. Okay. So it was ultimately used -- this down payment that we're talking about here was ultimately used at the final -- final deal that was consummated?

A. When there was a purchase of the property.

Q. Okay. In Bullet Point No. 3 it says: "Medistar shall provide a draft lease agreement to TMG by the 22nd reflecting the understanding between TMG and Medistar." Is that correct?

A. That's what it says.

Q. And Medistar provided TMG with a copy of such a lease, right?

A. Yes, they did.

Q. Okay. And Medistar drafted that lease, right?

A. I'm not for sure exactly who drafted that lease --

Q. Uh-huh.

A. -- if it were one of our attorneys or taken from another project.

Q. Do you know a Mr. Chagla?

A. No.

101

Q. In any event, Medistar provided a draft lease to TMG, right?

A. Correct.

Q. Of the terms of the lease that they thought would be acceptable?

A. The terms as had been negotiated, correct.

Q. Okay. Did the draft lease agreement that Medistar provided to TMG -- did that -- did any of the provisions from that draft change when Medistar actually entered into a lease with the hospital prior to the actual closing on the purchase of the land -- of the real estate?

A. The only thing that I've seen in this documentation is a signed lease -- okay?

Q. Okay.

A. -- that was operated under for a very short period of time until the purchase came about.

Q. And that signed -- that initial signed lease was between Medistar on the one hand and the hospital on the other; true?

A. Well, we'll have to look at that document.

Q. Uh-huh.

A. But I think that that may be an incorrect statement as to the relation that you had first indicated to me of who was going to be the hospital.

26  (Pages 98 to 101)

…
GARY GLEN PERRYMAN

## 102

Q. All right. Well, let's take a look.

A. Yes.

Q. I luckily have these documents here.

(Exhibit No. 11 marked.)

Q. (By Mr. Burford) First of all, look with me at Medistar Exhibit No. 11. This is dated November 20th, 2006, from A. K. Chagla at TMG. Is he the chairman of a company called Prestige?

A. I don't know. I'm really not familiar with him. That may be the person that -- that I've heard of that's also operating with TMG.

Q. All right. It's to Monzer Hourani. Now, he is certainly with Medistar, right?

A. Correct.

Q. And it says: With reference to yesterday's discussions with Adeel.

That's Mr. Zaidi, right?

A. Correct.

Q. "Please find enclosed a sample lease which could form the basis of the lease for the subject property."

A. Okay.

Q. And it says: We are asking our attorney to suitably amend the sample lease to bring it in line.

And then up at the top, there's some

## 103

writing, right?

A. Handwritten --

Q. Handwritten.

A. -- notes you're referring to? Yes.

Q. Yes. And on the left-hand side, it says, "not used," right?

A. I see that.

Q. And on the right-hand side, it says "PT," "CS," "FP" and "DL," right?

A. Yes.

Q. "PT" is -- referred to Mr. Paul Tapscott, right?

A. Correct.

Q. "CS" would be Cameron Smith, right?

A. Correct.

Q. "DL" would be Debbie Lightfoot?

A. Correct.

Q. Who was "FP"?

A. Frank Patout.

Q. Okay. Are they all with Medistar?

A. They are.

Q. All right. So this would appear to be a copy of a document that came out of Medistar's files, right?

A. I don't know.

Q. Well, if it's got all these initials on it --

## 104

A. Well --

Q. -- it would certainly look like it was --

A. But the question is: Did this document come out of Medistar's files, meaning did Medistar make the document --

Q. Or did they receive it.

A. Yes, they received it.

Q. Okay. Now -- and then you and I talked about an initial lease that had been entered into between Medistar on the one hand and the hospital on the other, right?

(Exhibit No. 12 marked.)

A. Okay.

Q. (By Mr. Burford) Right? And look with me, sir, at Medistar Exhibit No. 12.

A. Thank you.

Q. This -- this document, Exhibit No. 12, says Lease Agreement -- Lease Agreement. Agreement of lease made and entered into as this 4th day of January, 2007, by and between Medistar Corporation, or assigns -- that's the -- that's -- and it says "a Texas corporation" and then it says "landlord," right?

A. Correct.

Q. So at this point in time, Medistar was the landlord, right?

## 105

A. That's correct.

Q. And then it says "and APEX Long Term Acute Care-Katy, LP." That's the tenant or the hospital, right?

A. Yes.

Q. So even after December 22nd of 2006, Medistar continued to be heavily involved in the APEX Katy Project, right?

A. That's correct.

Q. And, in fact, it was so heavily involved that it entered into an interim lease so that construction could start on the hospital, right?

A. Actually, that's incorrect.

Q. Okay. Why did it enter into the interim lease?

A. The long-term acute care Katy hospital needed to have its license. Okay?

Q. Uh-huh.

A. And so the business deal at that particular junction was to give them the ability to go in and start operating the hospital --

Q. Okay.

A. -- in order to maintain their acute care setting, but go into the prerequisites for getting their long-term acute care license. And so the hospital had

DepoTexas
888.893.3767

106

to be in operations in order for them to do that. And since Medistar owned the hospital at that time, there needed to be an interim lease between the two entities entered into; and that was the purpose for entering into this lease.

Q. Okay. And this is a lease agreement that was executed in the first part of January, if we look on the last page, page 23, between the hospital by Mr. Zaidi, its general partner, right --

A. Correct.

Q. -- and landlord, Medistar Corporation, signed by Mr. Monzer Hourani, right?

A. Correct.

Q. And do you know whether -- when the actual lease was executed between my client, the landlord, and the hospital whether the names were just changed; and the exact same lease was used?

A. That's incorrect.

Q. That's incorrect. Okay.

A. There is a distinct difference --

Q. Okay.

A. -- in the two leases.

Q. All right. And what are the distinct differences in the leases, as you know?

A. Well, in preparation for this case and

107

reviewing the documents, I compared the documents.

Q. Uh-huh.

A. And there's one big difference in those leases besides the name, of course --

Q. Okay.

A. -- and who the landlord was at that particular time --

Q. Sure.

A. -- naturally --

Q. Sure.

A. -- and who, then, was the tenant, who is totally different. So, yeah, two different entities entering into this lease. But one big difference, yes, if they wanted to use our lease, we didn't have an objection to them doing that; but they did make one big distinction. They changed -- from the previous agreements as we have gone over here today, it clearly states that Medistar has a responsibility to do certain things and build out, as you started to say, you know, why this is entered into --

Q. Uh-huh.

A. -- and -- which wasn't the purpose. But -- and the distinction from the lease of your client and the lease that Medistar had was that now the tenant is responsible for all the build-outs and et cetera --

108

Q. Okay.

A. -- where in the other lease with Medistar and the different tenant, Medistar was responsible for those.

Like I say, this was entered into as a -- as a temporary stop for -- to allow the physician groups to get a head start on their LTACH licensing.

Q. Okay.

A. And so when your group or your -- that you represent, the LLC, entered into an agreement with the tenants or the bankrupt entity, then the documents changed to reflect those -- those things --

Q. Okay. Do you know of any --

A. -- which is substantial change.

Q. Do you know of any other changes other than the obligation of build-out?

A. Well, besides the names, as we've discussed --

Q. Okay.

A. -- before.

Q. Now, you said the tenant was different. This says APEX Long Term Acute Care-Katy, LP. That is the hospital.

A. I don't know who was all involved at that particular time.

Q. Right. But that's --

109

A. Okay.

Q. That's the same tenant that the -- that my client signed the lease with, right?

A. Okay.

Q. Isn't that correct?

A. Well, I don't know if all of them are. I mean, if we're going in to name all the tenants or all of the participants in that agreement, I don't know that.

Q. Okay. But the --

A. That -- that was my point.

Q. The entity was the same, though, right?

A. It very well could have been.

Q. All right. You're not suggesting that Medistar entered into a lease with a different party than my client, right?

A. As far as the entity, no; but as far as the participants in the entity, probably so.

Q. But you don't know one way or the other, do you?

A. Well, I'm -- I'm pretty for sure that some of the participants in this group had changed.

Q. Who? Who changed?

A. And there were more -- more participants added, I believe.

110

Q. Okay.

A. But, again, that's what -- that's without having firsthand knowledge.

Q. Okay.

A. And, you know, you're asking me as a corporate representative and reviewing the documents; and that's what I recall.

Q. Okay. That's fair enough. You recall that there may have been more participants in the tenant when my client actually signed the lease, right?

A. I think that's probably correct.

Q. Now, let's talk a little bit about my client, all right --

A. Yes.

Q. -- this -- the APEX Katy Physicians, LLC. All right? It's the landlord, right? It actually owns the building and the associated property, right?

A. As it exists today, that's correct.

Q. Okay. And your client, Medistar, claims an ownership interest in my client, right?

A. We hold units.

Q. Yes. How many units?

A. I think at present time it's, like, 52 units.

Q. Okay. Well, how many units did it originally have at the time of closing?

111

A. I believe there were, like, 70 units that were issued.

Q. Did it later acquire additional units from my client?

A. Not that I'm aware of.

Q. So it's only had 70 units the entire time?

A. I believe that's correct.

Q. Okay. Did you ever hear that Medistar claimed to have 100 units?

A. I reviewed a document one time by a person inside of the Turn-Around Management Group, I guess, or the managing partner --

Q. Right.

A. -- of that entity that there was purported there was a hundred units; but that -- that person was mistaken. It was never -- nothing was ever issued on any of that.

Q. Okay. So only -- Medistar only received 70 units, as far as you know?

A. That's correct.

Q. Okay. And of that 70 units, it has now sold 18 units?

A. Medistar didn't sell anything.

Q. Right.

A. We actually sent a letter because of an

112

inquiry by other physicians --

Q. Right.

A. -- which brings us back to my point --

Q. Well --

A. -- that other physicians wanted to buy in --

Q. Right.

A. -- in the real estate side. And there were others that wanted to participate in the operational side, too. And so I think there were people that were added as time went along.

Q. Right. Well --

A. So Medistar, being a seller, basically --

Q. Right.

A. -- of the real estate actually said that we'll allow the physicians -- we don't want to hold up this operation; we want to make sure it's successful.

Q. Right.

A. So, yes, we would allow, you know, that management company to sell, you know, shares that we have --

Q. Right.

A. -- to other doctors.

Q. And who got the money for those shares?

A. Who received the money?

Q. Yes.

113

A. Since the shares belonged to us --

Q. Right.

A. Okay. -- then the money was turned over to Medistar for their shares that the company had sold for them.

Q. Okay. Were they generally sold at about 40,000 a unit?

A. That's correct.

Q. All right. Now, the 70 units that Medistar acquired, did it pay 70 -- $40,000 a unit for those 70 units?

A. No. What it did is provide services for those units.

MR. SUTTER: Will you tell us when you're at a stopping point? Because we're past the time I wanted to lunch.

MR. BURFORD: Okay. That's fine. Let me finish my question.

MR. SUTTER: Sure.

MR. BURFORD: I'm going to go one question, and we'll go to lunch.

Q. (By Mr. Burford) What were the services that Medistar provided as of the time of closing to receive its 40 -- its 70 units?

A. Well, there were many, many different services

29 (Pages 110 to 113)

## 138

together --

Q. (By Mr. Burford) Right.

A. Okay. -- with -- with your representation of the LLC.

Q. Right.

A. And certain things have come about, you know.

Q. Right.

A. And so --

Q. And I've -- you know, I've just gotten involved a month or two ago. So I'm really just trying to learn all the facts I can learn. You understand that, Mr. Perryman?

A. And I -- I hope we're helping.

Q. Yeah. You agree -- I mean, I wasn't around until, like, a month or two ago, right, as far as you know?

A. Yes.

Q. Okay.

A. You know, we had heard about the involvement before; but it was kind of in reference to P. K. Shah, not to the LLC. And then, of course, I did attend the meetings --

Q. Right.

A. -- at your office concerned with the LLC --

Q. Right.

## 139

A. -- in which you explained that you were, at that time, representing the LLC.

Q. Okay. You understand Mr. Fred Wahrlich here is actually representing --

A. I've never met him. I don't know.

Q. Okay. Looking back with me at Exhibit 3 to the notice of your deposition, now, there's three pages to this document, right, Exhibit No. 3 to your deposition notice which was previously marked as Exhibit No. 1 to your -- to your depo, right?

A. I have it as Exhibit 3 --

Q. Yeah. Exhibit 3 to Exhibit 1.

A. -- to the notice.

Q. Okay. And on Exhibit 3, there's three pages, right?

A. I have three pages here.

Q. Now, what is the first page? Can you explain it to me?

A. It looks like a handwritten document. This is a document that we're saying, you know, exists as -- as a note dated December 22nd of '06.

Q. Does it say "note" anywhere on here?

A. It doesn't say "note" on -- anywhere on the face of this document. However, there is such things in the document that explains, you know, about what is owed

## 140

and how it's to be paid --

Q. Well, I want you to explain to me what is --

A. -- and interest.

Q. -- what is owed and how it's going to be paid. First of all, did you talk to somebody about this document to learn what it meant? Did you talk to somebody?

A. The answer is yes, I have. I've talked to Monzer Hourani about the document. I've reviewed the document and know what it represents.

Q. Okay. So you had to talk to Mr. Hourani, because he was the person that was actually here at this meeting, to know what it meant?

A. That's correct.

Q. In order to know what it meant, right?

A. That's correct.

Q. Okay.

MR. SUTTER: Do you-all have the typed copy here or --

MR. BURFORD: Yeah. We'll get to that.

MR. SUTTER: Oh, okay. I'm sorry.

MR. BURFORD: Yeah. I'll get to that one. I want to start with this one.

MR. SUTTER: All right.

MR. BURFORD: All right?

## 141

Q. (By Mr. Burford) At the top -- and this is -- is this the one Mr. Hourani says was actually signed on December 22nd of '06?

A. Yes. He said it was -- this document was signed, as well as the other documents were signed.

Q. Okay. Work with me down the page.

A. Yes.

Q. What's the 18.5?

A. The 18.5 was the price for the complex.

Q. Okay. And how do you know that?

A. That's -- that's what had been discussed through Medistar. It was -- actually started out much greater than that when these negotiations started out.

Q. Uh-huh.

A. I wasn't involved in the actual negotiations with Mr. Shah and Mr. Zaidi and Monzer concerning this, but I was quite aware of the negotiations going on. It originally started out at about 25 million through the discussions and then had dropped down to this December the 22nd, if you want to call it, deadline.

Q. All right.

A. And so there was a figure that was arrived at, that $18 1/2 million going into the conversations.

Q. Okay. But you would have to be part of the conversations in order to know what that 18.5 meant,

142

right? I mean, just a normal person looking at the four corners of this document wouldn't know what that 18.5 is, right?

A. Well, I think you would if you were involved in the purchase of --

Q. Right.

A. -- of a facility.

Q. Right.

A. I think you would definitely know that.

Q. But if you -- if you're a person like me that just looks in here, looking at this document, there's nothing that says that 18.5 is the purchase price on this document, right?

A. No. And it doesn't say what it is; but, then again, if you've got an 18.5 and you've got interest rates calculated and the amount of payments and, you know, et cetera --

Q. Yeah.

A. -- then you would certainly realize that it would be a document referring to a note, something somebody was going to agree to and pay. So --

Q. It refers to a note. Okay. But --

A. Now --

Q. All right. Was going to agree to --

A. This --

143

MR. SUTTER: Have you finished?

A. Well, what I was going to say is: This is not unusual, especially when -- when you're talking to people at nights and on weekends and et cetera in business deals. This type of thing, through Medistar Corporation's history, you can -- you can very well see that transactions take place like this.

Q. (By Mr. Burford) Okay. And it is contemplated that later on, I guess, that a real note would be signed and executed, right, would be -- the terms and language would be agreed to?

A. Not necessarily. I think that moving forward with a transaction, you could actually use this type of documentation.

Q. Okay.

A. Typically -- typically there are other documents that reference the business deals and et cetera in a lot of transactions. This particular transaction, I think, had gotten to a point and period of time when people were finished negotiating with each other and --

Q. Uh-huh.

A. -- it was either fish or cut bait. And so this is a document that was arrived at.

Q. Okay. Now, this handwritten note, it doesn't

144

say "Katy Project" on it, right?

A. It does not.

Q. Okay. And it doesn't describe any land, right?

A. No.

Q. The legal description, right?

A. It does not.

Q. Okay. In fact, none of the three pages here describe -- have a legal description of any land, right?

A. No. But it does have reference to what they were talking about.

Q. Okay. And you go down -- what's the minus 1.0 there? 18.5 minus 1.0, what's the 1.0?

A. This is in reference to the last day before this deal would go off the table. And in order to help the participants on the other side, Medistar had agreed to discount the selling price of the entire campus by $1 million, but only if this was to happen immediately.

Q. Okay. And did Mr. Hourani tell you that?

A. Mr. Hourani told me that; but in addition to that, there were -- in discussing this business opportunity, you know, in the upper corporate management --

Q. Uh-huh.

A. -- this was something that would be agreed to.

145

Q. Okay. By Medistar?

A. Correct.

Q. And then you have something called 3 million cash. What is that, on the left-hand right under the 1 -- minus 1.0? Is that plus 3 million or minus 3 million?

A. No. This -- this is the cash that would be attributable at the time to the -- to purchase this -- this complex of buildings.

Q. Okay. Where did that --

A. If they bring 3 million cash and then the negotiation was that the 2.9 acres of land, the Goodrich foundation, who had an option on this property --

Q. Uh-huh.

A. -- was ready to exercise their option. And so we at Medistar had agreed that we would give them the benefit -- "them" meaning the purchaser -- the benefit of the 2-million-dollar sale on the 2.9 acres. So you have a total of $5 million.

Q. All right. And how does that $5 million work into this equation?

A. Well, that would -- if, in fact, they brought 3 million cash -- so since I wasn't there at the meeting --

Q. Uh-huh. Uh-huh.

146

A. -- I can only surmise that they said, "Well, look, I can bring 3 million.

Q. Uh-huh.

A. And he is saying, "Okay. You bring 3 million cash," as it says here.

Q. Right.

A. "And then, you know, you're going to get 2 million at closing because we'll exer -- we'll let them exercise the option to buy the 2.9 acres. That gives you $2 million. So you'll have $5 million" --

Q. Right.

A. -- "to put toward this purchase."

Q. Right. Okay. So the total purchase price is 18.5 million, right, or 17.5 million?

A. Going down, just like you said --

Q. Yeah.

A. -- the 18 1/2 minus a million is 17,5.

Q. All right. And then you said minus 5.

A. I'm saying they're talking here this -- if you brought 3 million, then we can give you 2 million. Therefore, you will have 5 million.

Q. 5 million. And 5 million -- and you said minus 1 was the reduction. So that gives you 17,5. And then you said then you're going to have 5 million. So why doesn't that add up to 12.5 million?

147

A. I don't think that's what's being discussed here.

Q. All right. Well, what's being discussed?

A. What's being discussed is that if you brought 3 million --

Q. All right.

A. -- we'll give you 2 million. You would have 5 million.

Q. Right.

A. And if you had 5 million and you were to go out and ask the bank for a 13.5-million loan, as stated here --

Q. Right.

A. -- then if you looked at the loan ratio, that's 37 percent.

Q. All right.

A. So you should be well suited at that point if, in fact, you brought 5 million cash into this deal --

Q. All right.

A. -- and you brought, you know, the 13,5 into this deal, that you should have enough dollars in order to go get a loan at the bank on this 13,5.

Q. Okay.

A. Now --

Q. So Medistar was going to get this 5 million?

148

A. No. It doesn't say that.

Q. Okay. Who gets the 5 million?

A. It doesn't say -- it's not talking about somebody getting 5 million here.

Q. Okay. So this Exhibit 3, the first page, does not talk about anyone getting $5 million due to cash plus acres, right?

A. I don't see it written on there.

Q. Okay. And you don't know of Mr. Hourani telling you that either, right?

A. No. It's simply showing a loan ratio.

Q. Okay. Well, if you're going to ask the bank for 13,5 --

A. Uh-huh.

Q. -- and the purchase price --

A. Uh-huh.

Q. -- is 18,5 --

A. Uh-huh.

Q. -- where does the rest of the money come from?

A. Okay. Well, if you took this literally going down this way --

Q. Right.

A. -- then you would work it to where there is -- 18,5 is the selling price. You have 5 million cash to put down. Then you would go ask the bank for 13,5.

149

Q. Okay.

A. That gives you the 18,5 purchase price. As the discussions went down the line here and everybody signed off on and prior to, I'm sure, signing off they say, "We can't do that deal. We don't have enough money to do that deal" and Monzer comes in and says, "Well, Medistar will give you a million-dollar discount if you do this now."

Q. Okay.

A. And so, you see, in the interpretation of this and how it was explained to me, they came back and gave $1 million off the 18,5 purchase price, bringing it down to 7 point -- 17.5 million.

Q. Okay.

A. So that's how you would interpret this document that was signed and everybody agreeing to this payment schedule and the amount of money to -- for the project.

Q. Okay. So the 13 -- the 18.5, then, is the purchase price --

A. Correct.

Q. -- for the land, right? Is that correct?

A. For all of the facilities.

Q. And was that the deal that was ultimately consummated?

150

A. With a million-dollar discount.

Q. Okay. So the deal that ultimately was consummated was paying $17.5 million for the land, right?

A. Correct. Well, you say "the land." It's not just the land.

Q. Well, it's the land and the buildings, right, fixtures --

A. And fixtures and equipment. This is -- this is a big deal.

Q. Right.

A. This is not just land. This is much greater than land.

Q. Right. It's land plus a lot of other real estate and stuff, right?

A. I mean, the entitlements -- the entitlements that you have there to operate an LTACH unit has extreme value.

Q. All right. And so it says if you pay 13 down, we agree on a total price, 17,5?

A. Correct.

Q. So who is the "we"? Is that Monzer?

A. That would be -- well, Monzer is writing this down. "We" meaning everybody who is in that meeting.

Q. Did he -- did Mr. Monzer tell you that "we"

151

meant everybody in the agreement?

A. Yes.

Q. Okay. And then it says, remainder 4 million. I thought the remainder -- we're talking about they were going to get credit for 5 million up there at the top, 3 million in cash and 2 million in acreage. How do you square that?

A. No. No. No. No. No.

MR. SUTTER: Objection. That doesn't make sense.

A. I'm sorry. You must have misunderstood. If "they," meaning, you know, the purchasers brought 3 million cash, if they did --

Q. Uh-huh.

A. -- and then we would give 2 million cash --

Q. Uh-huh.

A. -- that would give them $5 million.

Q. Okay.

A. Okay.

Q. All right.

A. That's what that meant.

Q. Okay.

A. Why -- I mean, they would have to bring the money. How are we going to give them credit for money they didn't bring?

152

Q. Did they bring that $5 million ultimately?

A. No. This was the agreement that was reached on December 22nd.

Q. Okay. But did that deal happen?

A. What happened on this deal was that this note constituted a 4-million-dollar payment to purchase everything that was in, you know, the land, the buildings, everything that was in the buildings, et cetera --

Q. Uh-huh.

A. -- and that they would go out and get a 13-and-a-half-million-dollar loan or money or however they were going to arrange that.

Q. Okay.

A. So the total amount to Medistar would be $17 1/2 million for this entire complex.

Q. Now, it doesn't say anywhere on here that they're paying $17 1/2 million for a specific piece of real estate and all this other stuff you're describing? It doesn't say that anywhere on this piece of paper, does it?

A. No, it doesn't; but, then again, with -- everybody who is in the meeting that is obligated or obligating theirselves to pay would know that.

Q. Right. They -- those people know, but they

153

might all have different interpretations since it's not spelled out, right?

A. I don't think so.

Q. Okay.

A. I mean, I don't -- I don't know of a prudent investor who wouldn't know.

Q. All right.

A. And I think everyone involved in that meeting was pretty well a prudent investor.

Q. Okay. Well, you know, I'm a lawyer. You know that, right?

A. I do.

Q. And I look at this thing, and I have a difficult time understanding it. I want you to tell me, sir, what these stars are. "Remainder 4 million," what does that mean?

MR. SUTTER: Objection to your argument in that.

MR. BURFORD: I understand.

Q. (By Mr. Burford) I apologize to you.

MR. SUTTER: Just answer the question --

MR. BURFORD: Yeah. Yeah.

MR. SUTTER: -- and ignore all the argument about him understanding.

MR. BURFORD: I apologize. I really

39 (Pages 150 to 153)

154

don't understand it. Okay? All that's sidebar.

MR. SUTTER: That, too. Just answer his questions. What do they mean?

Q. (By Mr. Burford) What do they mean?

THE VIDEOGRAPHER: Five minutes left on this tape.

MR. BURFORD: Okay.

Q. (By Mr. Burford) What do they -- let's try to get through this document here.

A. Okay. Here's what -- here's what the document represents; and you can see it reading, going down it: It says if you pay $13 1/2 million now, we agree on the $17 1/2 million, which would be the purchase price.

Q. All right.

A. Okay. Which the remainder, taking 17,5 -- 13 million, point 5, from 17 million, there's a 4-million-dollar remainder.

Q. All right.

A. And here's how you can pay that to me.

Q. Okay.

A. You can pay me, on June of '08, $500,000. You can pay me, in December of '08, $500,000. And you can pay me, in December 2009, $1 million; and then in December of 2010, $2 million.

Q. Okay.

155

A. That's how the 4 million remainder would be paid, plus interest at 6 percent, which is stated here.

Q. Okay. And who are the -- who is supposed to be paying this $4 million?

A. My indication is that Mr. Shah took the obligation upon himself to pay that.

Q. Only Mr. Shah?

A. That's -- I wasn't in the meeting. I'm telling you what I've been told.

Q. Okay. Who told you that.

A. Mr. Hourani told me that. Adeel Zaidi told me that, and Abeer Saqer told me that.

Q. Well, that would be in Mr. Saqer's and Mr. Zaidi's best interest to tell you that only Mr. Shah was guaranteeing this, right?

MR. SUTTER: How's he supposed to know that?

Q. (By Mr. Burford) Well, if they don't have to pay their part of the $4 million, that's a good thing for them, isn't it?

A. Well, I guess it would depend on who gets to reap the benefit, doesn't it?

Q. All right. Well, who -- where does it say on here that only Mr. Shah is personally guaranteeing the debt?

156

A. Well, I think you have -- like I say, okay, you're an attorney; but you would know that if, in fact, someone was there that did not get a part of something, why would they pay anything?

Q. Right. But I -- looking at the four corners of the document, it doesn't say that Dr. Shah is going to -- is the only one guaranteeing?

A. Nor does this document say I'm purchasing this -- you know, this facility.

Q. Okay.

A. Okay.

Q. All right. And that would be the same thing for Exhibit B, right, the next page?

A. Meaning?

Q. He doesn't describe any property and -- you know, actually the next page doesn't even have any guarantees at all, right?

A. I'm sorry.

Q. Yeah. The -- on the next page --

A. Yes.

Q. -- it says sale price 18,5 and down at closing, eight. Who is going to give the eight?

A. The purchaser.

Q. Who is the purchaser?

A. Whoever the purchaser would be at the time of

157

this closing.

Q. So you don't know who the purchaser would be?

A. Well, the people that was there representing the purchaser.

Q. Who -- was the purchaser in existence at this time?

A. I have no idea about --

Q. Okay.

A. -- that time period.

Q. All right. And it doesn't identify the purchaser, right?

A. Well, I think it identifies people by their signatures.

Q. Well, which one of these people by their signature -- by the way, what signatures are these?

A. I recognize Adeel Zaidi's signature.

Q. Okay. That's "AS"?

A. Right. I recognize P. K. Shah's signature.

Q. That's over all the way to the -- is that in the middle?

A. Under the personal guaranty.

Q. Okay. You're on the first page now?

A. Yes. You want to go to the second page?

Q. Yeah. We can stay on the first page.

THE VIDEOGRAPHER: I'm almost out of

158

tape.

MR. BURFORD: Okay. Let's -- let's change the tape because I'm getting a little confused here. So let's change the tape.

THE VIDEOGRAPHER: 2:32. Going off the record.

(Brief recess.)

THE VIDEOGRAPHER: The time is 2:40. We're back on the record.

Q. (By Mr. Burford) All right. Staying with this Exhibit No. 3, the first page, attached to your depo notice, it says on the left-hand side -- under remainder 4 million, it says the words "personal guaranty," right?

A. Correct.

Q. And then how many signatures are under that?

A. There's -- it appears to be two signatures that's under that personal guaranty line item, if you will.

Q. Who is that?

A. It appears to be who signed the document is Adeel Zaidi and P. K. Shah --

Q. All right.

A. -- there.

Q. And then right under the numbers, under the

159

equals sign, who signed -- whose signature is that?

A. Under the equals signs?

Q. Yeah.

A. Equals signs?

Q. Yeah. Do you see the 2008 -- 2010 equals $2 million?

A. Oh, okay. Below that?

Q. Yeah.

A. Yeah. There's Monzer's signature. There is --

Q. Monzer is all the way to the right, right?

A. No. His is kind of in -- his is third from -- from the left.

Q. Third from the left. Okay. Who is the fourth?

A. And then Adeel's appears to be --

Q. The fourth from the left?

A. -- fourth. And there's --

Q. Fifth, who is that?

A. Well, there's four only there, isn't there?

Q. What's all that scribble all the way to the right?

A. I -- okay. Let's look -- you want to start with the first one?

Q. Let's start with the first one under "personal

160

guaranty."

A. That looks like -- that looks like P. K. Shah's signature and then Abeer Saqer and then Monzer and then Adeel Zaidi.

Q. Okay. And right under --

A. That's kind of what it appears to be.

Q. Right under "personal guaranty" what is that?

A. Okay. Well, there is --

Q. Right under the words "personal guaranty," you got one signature and then another one on the left-hand side of the page.

A. You have two signatures, correct?

Q. Right. Who is that?

A. The first one I thought might have been Adeel's, but I don't know whose that is.

Q. Okay. Who is the second one?

A. And that looks like P. K.'s signature there.

Q. All right. Now, let's go to the middle of the page.

A. But I'm not for sure who this other one is, taking a look at it.

Q. No. 2, you mean?

A. The first one under "personal guaranty" there.

Q. It doesn't look like "Zaidi" to you?

A. You know, I was thinking that it might have;

161

but, then again, I'm looking at this one over here of Zaidi's and it doesn't really look alike.

Q. All right.

A. You see that?

Q. Yeah. Which one is in -- which one is in the middle here under the equals sign? It looks like --

A. That looks like P. K. Shah's.

Q. All right.

A. And that's P. K.'s.

Q. So P. K. signed it twice?

A. Under the personal guaranty, yeah.

Q. And he signed it again over here apparently?

A. Well, I think they all four signed it over here.

Q. Okay. And who signed it under the 2 million? Who is this under the 2-million-dollar note?

A. Well, no. I think it's just on the bottom of the page, is the way I look at it.

Q. Yeah. On the bottom of the page, who signed that?

A. There's P. K., Abeer Saqer, Monzer Hourani and, looks like, Adeel Zaidi.

Q. Okay.

A. That's what it looks like there.

Q. Okay. So how do I know which one is

41 (Pages 158 to 161)

162

personally guaranteeing the 4 million, according to the signatures? It doesn't say --

A. Well, there's P. K. Shah's signature. You know, I'm not for sure what is this first part.

Q. Yeah. There's another signature there, right?

A. I don't know what that is.

Q. So just the fact that the signatures --

A. I don't know who that is under the personal guaranty other than I do know that's P. K.'s --

Q. There's a --

A. -- signature right there.

Q. There's a limited amount of space down there at the bottom of the page under December 2010, right? A limited amount of space under here, right?

A. I'm not for sure what you're getting at.

Q. We're down at the bottom of the page here, right?

A. Yeah, you're at the bottom of the page.

Q. Right. So -- and then everybody is signing, right?

A. The people we've talked about, and we're un-for-sure about that -- this.

Q. All right. There's one signature we don't know whose it is.

A. I don't know if it's a signature. I don't

163

know.

Q. Don't know what it is.

A. It could be --

Q. Okay.

A. -- P. K.'s first name. I don't know.

Q. You don't know?

A. I don't know.

Q. So you don't even know who signed the thing?

A. No.

Q. Okay.

A. But I do know these signatures here.

Q. All right.

A. And I know P. K.'s because, like I say, we're partners -- we sit on the same board.

Q. What board is that?

A. A Nova Hospital.

Q. Oh, okay. Now -- all right. Look with me at the next page.

A. Sure.

Q. And that's -- it says Scenario B. Was Scenario B -- that was an option? That was another option that was offered at the time?

A. It may be something that was discussed, but that's not -- that's a scenario. It doesn't say on the first one it's a scenario.

164

Q. Okay. Under the second one, it says Scenario B; and they all sign it, also, right?

A. Correct.

Q. Okay. And then on the next page is a lease, the third page. Why -- why was it necessary to have this document?

A. Well, I don't know what took place in that conversation that was there. I don't even know if this document was done at the same time the other documents were done.

Q. Okay. I'd need to ask Mr. Hourani?

A. Yeah, because I wouldn't -- I wouldn't know.

Q. Okay. So you don't know. You don't know why this third document is here or whether it was even talked about at that night or that day, whatever, December 22nd?

A. I don't, no.

Q. Okay.

A. I do know that in investigation of all the documents, that under this December 22nd, '06, A Scenario, the 18 million down to 17 1/2, was -- was later documented in a little better format, I guess, a typed format.

Q. Uh-huh.

A. And everybody had signed it.

165

Q. Well, we're going to go through this.

All right. Now, was A, Option A on the first page you see under -- by December 22nd --

A. I don't see an option. I don't know what you mean.

Q. It just says "A" over to the -- over to the left at the top, "A"?

A. It says "A," yes.

Q. And then the next page it says "B." Both of them are signed, right?

A. Well, this one says Scenario B, and then --

Q. The first one just has an "A"?

A. Correct. And this second one says Scenario B.

Q. Right.

A. And then "B."

Q. So which one was in effect, "A" or "B"? They're both signed.

A. Well, it's proven out by the consequences that happened and as it was portrayed out through the purchase, it was this December 22nd, '06, "A" that was signed and agreed to and followed through on.

(Exhibit No. 14 marked.)

Q. (By Mr. Burford) Okay. Look with me at Medistar 14.

MR. BURFORD: I've only got one -- one

42 (Pages 162 to 165)

226

Q. Okay. And then it says: Used at closing, 1.2 million. We agree.

So another 1.2 million that looks like was used by the hospital.

A. Okay.

Q. And it says: Deposit to Metro, $150,000.

A. Well, I do know in looking at some of the documentation like "used in closing," the $1.2 million, I've seen something in the document production that was -- Mr. Shah, when he purchased or made a down payment on his units, that money went into a company that was put into the escrow agreement and was utilized to close the facility, if I remember correctly --

Q. Okay.

A. -- when the facility was purchased. So that -- that part, you know, would ring a bell on things that I've seen in this document production.

Q. This doesn't refer to Dr. Shah; this refers to --

A. No. But I'm saying if this is what we're talking about and you're utilizing the deductions that we're talking about now as if -- and basically I'm saying to you I have seen that figure.

Q. Uh-huh.

A. And if it were used at closing, that figure,

227

along with other monies, was produced to pay for the additional money at closing.

Q. Pay for hospital?

A. To purchase the land.

Q. No. Well, this says "used at closing" by the hospital. Do you understand that?

A. The purchase of the hospital.

Q. Not -- not the land, not the land.

A. Okay.

Q. It's used by the hospital, itself. In other words, this is money that was loaned to the hospital --

A. But what does "closing" mean?

Q. -- owed to the landlord.

That's right, closing money.

A. Closing of what?

Q. Closing of the land deal.

A. Okay. That's what I'm talking about.

Q. Yeah. But it's money that was -- that did not go to the landlord. Did you understand that? Did you understand that there were certain monies that the general partner was holding for the hospital and the landlord?

MR. SUTTER: Just a second. I don't want to interrupt and I've tried not to interrupt today --

MR. BURFORD: Right. Right.

228

MR. SUTTER: -- and be very patient; but at the same time, we have a corporate representative here.

MR. BURFORD: I understand.

MR. SUTTER: And you're asking him to look at third-party documents --

MR. BURFORD: Fair enough.

MR. SUTTER: -- and try to guess or interpret them. We've done it numerous times, and I don't --

MR. BURFORD: Fair enough.

MR. SUTTER: I think it's a waste of our time.

MR. BURFORD: Let's move -- let's move on.

MR. SUTTER: It doesn't --

MR. BURFORD: Let's move --

MR. SUTTER: -- mean anything, what he thinks it means.

MR. BURFORD: Let's move on. Okay?

THE WITNESS: Thank you.

MR. BURFORD: Let's move on.

Q. (By Mr. Burford) You don't know anything about the dollars owed by the managing -- GP to the landlord or to the hospital, right?

229

A. I didn't review the third-party documents that are out there.

(Exhibit No. 25 marked.)

Q. Yeah. Okay. Look with me at Medistar 25. This is a document you should know something about. This is --

MR. SUTTER: 25?

MR. BURFORD: 25.

Q. (By Mr. Burford) This is a document from Mr. Paul Tapscott to Mr. Adeel Zaidi and Ms. Abeer Saqer. This says: The undersigned attorney represents Medistar Corporation and Monzer Hourani.

And the undersigned attorney is Paul Tapscott, right?

A. Correct.

Q. And it says: Please refer to the sale of Pin Oak -- that's the Katy Hospital -- from Medistar Corporation to the landlord. Right?

A. Yes.

Q. It says: In sale of the Pin Oak Hospital each of you signed and personally guaranteed an amount to pay $4 million plus 6 percent in interest per annum. Right?

A. That's what it's reading.

Q. Now, that's completely contrary to your prior testimony to me that Exhibit No. 3 to your notice of

230

deposition meant that only Shah was obligated for the $4 million, right?

A. It would purport to be; and I'm saying on this one here, I think that Paul Tapscott is incorrect.

Q. Okay. So just like Mr. Hodge was incorrect a while ago, you're saying that the general counsel --

A. I'm sorry. Mr. Hodge was incorrect on what?

Q. He was incorrect on some information that he had provided to Monzer Hourani. He sent him an E-mail talking about the hundred units.

A. Oh, yeah. And I think that he took that off of a document, the same document that we reviewed here, that's been --

Q. Okay.

A. -- reversed by the person that sent it in.

Q. In any event, Mr. Tapscott sent a demand letter for the, quote, "purported default" under the 4-million-dollar loan --

A. Yes, I see that.

Q. -- to Zaidi and Saqer, right?

A. Yes. I see that.

Q. And you believe it's wrong, right?

A. I do.

Q. And look with me at Medistar 25.

(Exhibit No. 26 marked.)

231

Q. (By Mr. Burford) 26, I guess, is what we're on. And now I've filled in the gap to 27.

MR. WAHRLICH: You already had a 26.

MR. BURFORD: Well --

MR. SUTTER: No, we don't have a 26 in that.

THE WITNESS: We have a 26 now, just now.

MR. BURFORD: We have a 26 now. Yeah. There you go. I'll look and see.

THE VIDEOGRAPHER: You got about eight minutes left on this tape.

MR. BURFORD: Okay.

Q. (By Mr. Burford) All right. Are you looking at 26?

A. Yes.

Q. And this particular 26 we're looking at, in case there's another one in the record, is a Medistar document from Paul Tapscott, dated August 25th, 2008, to Dr. Shah, Adeel Zaidi and Abeer Saqer, right?

A. Correct.

Q. And it's similar to the prior letter except that it adds Dr. Shah, right?

A. That's correct.

Q. And it says: "In the sale of Pin Oak Hospital each of you signed and personally guaranteed an

232

agreement to pay $4 million plus 6 percent interest." So, once again -- and then down at the bottom it says, "Monzer demands this interest obligation be paid immediately." Then it's copied to Mr. Monzer. Do you see that?

A. Yes.

Q. All right. And then the prior exhibit dated June 26, 2008, all right, that was also copied -- that -- that document, that demand letter to Mr. Zaidi and Ms. Saqer, that was also copied to Monzer Hourani, right?

A. It was.

Q. So Mr. Hourani, who had been there at the December 22nd meeting who told you that only Dr. Shah guaranteed the 4 million, apparently was getting copies of demand letters being sent out by his counsel to Shah, Zaidi and Saqer, all three, that they guaranteed the $4 million, right?

A. Correct.

Q. And did -- to your knowledge, did Medistar ever correct these letters and tell Mr. Zaidi and Ms. Saqer that they weren't personally liable on the 4-million-dollar debt?

A. To my recollection, the answer was yes. And I think that, as you can see from the documents that were

233

written, June 26, 2008, and August 25th of 2008, that obviously, you know, Mr. Tapscott was looking at documents and interpreted it maybe for himself and sending out these agreements. However, let's address the point of --

Q. Right.

A. -- Mr. Hourani. As you know, he has been pretty much in and out for some time.

Q. All right.

A. Now, whether -- because this company operates probably half a billion dollars' worth of projects a year --

Q. Right.

A. -- there's a lot that goes on.

Q. Right.

A. And he is not privy to reading every document that's sent out. I think that it probably was corrected internally.

Q. Right.

A. And that's my explanation for it.

Q. Do you know of a specific letter -- can you identify it for me by date -- that was sent to Zaidi and Saqer saying, "You don't owe us any money under the personal guaranty"?

A. I don't recall reviewing any of that.

## 246

have talked to either Adeel Zaidi or --

A. P. K. Shah.

Q. -- or --

A. And --

Q. Well, wait a minute. Let me finish. You're telling me this based on conversations with Adeel Zaidi, Abeer Saqer or Monzer Hourani, correct?

A. In addition to P. K. Shah.

Q. Okay. But, see, the questions -- I'm not talking to you about your conversations with P. K. Shah that you had with him during the Nova board meetings. That's not what I'm talking about. Right now I'm talking about during the setup, during when Medistar was trying to promote this project.

A. Yes.

Q. Okay. And what time period was that?

A. Well, let me correct your statement. It's not that Medistar was trying to promote a -- you know, this project with all these people. Medistar was acquiring this facility. And P. K. Shah, Adeel Zaidi, the Turn-Around Management people had come to Monzer because they had heard that we were going to purchase this facility and wanted to be a part of that.

Q. Okay.

A. Now, my conversations --

## 247

Q. But I need to be specific because I want to know when P. K. Shah came to you at Medistar -- didn't come to you specifically, but came to Medistar and said, "We want to purchase," you know, this Memorial Hermann from Medistar.

A. Okay. Those questions you'll have to ask to the people that he met with.

Q. Okay.

A. I didn't meet with him on that purchase. I simply had conversations with him that he was setting up meetings and please help him set up meetings with Monzer.

Q. And so when was -- when were these discussions that you had with P. K. Shah?

A. It was prior to the purchase.

Q. Do you know when?

A. No, I don't. It would -- I could look back and see when those board meetings were.

Q. Was it at every board meeting that you had that discussion with P. K. Shah?

A. No, because P. K. wasn't at every board meeting.

Q. Uh-huh. So sometime before the purchase, you had a discussion with Mr. Shah -- Dr. Shah in which he asked you to set up a meeting with Monzer Hourani? Is

## 248

that what you're saying?

A. Yes, that's correct, in discussion for an LTAC unit in the Katy facility.

Q. Okay. And we know that Mr. Shah -- excuse me. You've got me doing that.

We know that Dr. Shah met with Monzer Hourani in December of 2006, correct?

A. Yes.

Q. We have looked at some documents that show that.

A. Yes.

Q. Okay. Before that December meeting, do you know of any other meetings that Dr. P. K. Shah asked you to set up with Monzer Hourani?

A. Oh, yes.

Q. What meetings were those?

A. I don't remember when the dates were there, but it was prior to those dates. But what you have to remember is that we've known P. K. Shah for a very long time.

Q. Okay.

A. Okay. And that when this came about, in other words, our purchase or our swap, so to speak, P. K. Shah got word of that; and then that's when he had asked to set up these meetings. And obviously we know, because

## 249

of that, he got involved; and you see what's happened. He is involved.

Q. And, you know, as a matter of fact, you know, the documents we've been looking at show they were from either Adeel Zaidi or Abeer Saqer before the December meeting; and Dr. Shah is not even mentioned in a lot of those documents until December of 2006, correct?

A. That's the only thing you see here --

Q. Right.

A. -- in these documents.

Q. Do you have other documents?

A. Oh, there are many meetings before that.

Q. Do you have other documents that show that Dr. Shah was at --

A. No. I -- no. I can tell you from seeing Dr. Shah in the Medistar offices on other projects where Adeel was in there and where P. K. Shah was in there and deals that we've turned down between the two of them prior to this particular deal.

Q. Okay.

A. One of them in point was the -- the Pearland.

Q. I'm -- I understand. I understand, sir, that you would talk --

A. There were many meetings.

Q. Right. There were many times that you were

250

talking to other -- lots of other individuals about lots of other deals before this; but I'm just focusing in right now on the Katy hospital project.

A. Okay.

Q. Okay. That's all I'm focusing in on. And so before the December meeting that Dr. Shah participated with Monzer Hourani, there were no other meetings that Dr. Shah had with Monzer Hourani, correct?

A. No. I don't -- I don't think that's true. I think that's an incorrect statement that you're making.

Q. Okay. Well, then, tell me --

A. And that comes from my knowledge as a corporate representative. I was not involved in those meetings.

Q. Okay.

A. But I do know that there were other meetings that Monzer had with P. K. Shah.

Q. And tell me when, as the corporate representative, that Dr. Shah met with Monzer Hourani on the Katy hospital deal before December of 2006.

A. I don't have those dates.

Q. Okay. So you don't know?

A. No, I didn't say that. You heard what I said when I said it. I said that I do know that he was in those offices of Medistar. I don't know those specific

251

dates, is what I referred to --

Q. You said he was in the offices --

MR. SUTTER: Let him finish, please.

Q. (By Mr. Wahrlich) You said that he was --

MR. SUTTER: Wait a minute. Wait a minute. Let him finish. You're talking over him.

Q. (By Mr. Wahrlich) You said that you --

MR. SUTTER: Are you finished?

Q. (By Mr. Wahrlich) -- knew that he was in the offices?

A. You haven't -- okay.

MR. SUTTER: Can you let him finish, please? You can't stop him. You can make an objection if you want, but let him finish.

A. My point to you was the fact that Mr. Shah -- Dr. Shah was in many meetings at Medistar. And do I remember the specific time periods when he was there? I do not remember time periods. Do I think that it was concerning the Katy Project or do I know it was concerning the Katy Project? The answer is yes, I do. I don't remember those dates.

MR. WAHRLICH: I object to the response as nonresponsive.

Q. (By Mr. Wahrlich) Specifically, sir, what I'm talking about is -- I understand that you're saying that

252

Dr. Shah met with Monzer Hourani after December. That's not my -- that's not my point. Right now I'm asking about times that Monzer Hourani met with Dr. Shah about the Katy hospital before the December 22nd meeting. And that's all I'm talking about right now. Okay?

A. Okay. So you must have misunderstood me.

Q. So let me finish. I'm just trying to set the stage right now.

MR. SUTTER: Is that a question?

MR. WAHRLICH: Yes, it was.

MR. SUTTER: Okay. Then I object. It's not a question unless you're going to let him answer it.

Q. (By Mr. Wahrlich) So the point -- the question that I'm asking you is: Based upon that, you don't know the dates when Monzer Hourani met with Dr. Shah before the December 22nd, correct?

A. I don't know the specific dates.

Q. Right.

A. I do know that he did meet with him.

Q. Okay. And -- but in terms of you don't know what he met with him on, what topics, though, do you?

A. Oh, yes, I do.

Q. Okay. Tell us those topics.

A. Those topics were specifically the Katy Project.

253

Q. Anything else?

A. No, not at that time --

Q. What about --

A. -- other -- other than prior to the Katy Project, okay, was the other one that I talked to you about; and that's the Pearland project.

Q. On the Katy Project, what did Monzer Hourani and Dr. Shah meet about?

A. I wasn't involved in the meetings.

Q. Okay. Was Dr. Shah the only person meeting with Monzer Hourani at those times?

A. No. On occasion there would be Adeel Zaidi meeting with Monzer and with P. K. Shah, and in some instances so was Abeer Saqer.

Q. And you don't know how many occasions those were, do you?

A. No, I don't.

Q. And you don't know the -- what they discussed in those meetings either, do you?

A. I wasn't involved in the meetings.

Q. Was Adeel Zaidi also involved in the Pearland project?

A. My understanding was that Adeel Zaidi and P. K. Shah brought to Medistar a possibility of doing an LTAC facility in Pearland. Medistar turned that

254

facility down.

Q. And that deal never happened, right?

A. Not that I'm aware of.

Q. Okay. You have Exhibit No. 27 in front of you, don't you?

A. That's the one that was out of order?

MR. SUTTER: Yeah.

A. Okay. I'll have to search for it.

Q. (By Mr. Wahrlich) I think it came after 22.

A. After 22?

MR. SUTTER: 27. Here, you want to look at mine? 27. Here, just look at mine.

THE WITNESS: I would like to find it.

MR. SUTTER: All right. If you want, I'll take a look for it. You want me to find it?

A. Okay. There's 22. So it would be --

Q. (By Mr. Wahrlich) It's the Gmail.

A. Let me see if it's this next one. I have it.

Q. Let me also give you Exhibit No. 29.

(Exhibit No. 29 marked.)

MR. SUTTER: Thanks.

Q. (By Mr. Wahrlich) Do you have those two documents in front of you?

A. I do.

Q. These are E-mails from Medistar to Abeer Saqer

255

and Adeel Zaidi, correct?

A. They are.

Q. And they're about the APEX Katy Hospital sale, right?

A. Yes.

Q. Is the Pin Oak closing the same thing as the APEX Katy Hospital sale?

A. Yes, it would be.

Q. Okay. So Medistar is sending its correspondence to, you know, Saqer and Zaidi; but Dr. Shah is not included in these E-mails, is he?

A. His name doesn't appear on these documents.

Q. And do you know whether -- but you -- and in terms of the deal points and the deal -- the people doing the business points, those were being handled by Saqer and Zaidi, correct, with Medistar?

A. At this particular time?

Q. Yes, at this particular time.

A. No, they weren't. And we already know that from the facts that have already been presented that P. K. Shah --

Q. What document do you have in front of you --

A. -- that P. K. Shah was involved in the whole purchase.

Q. What document do you have in front of you that

256

you're relying upon, sir, as a Medistar representative?

A. How about the -- the note that was signed --

Q. Okay.

A. -- December 22nd?

Q. Okay.

A. I mean --

Q. Other than that?

A. That's his signature.

Q. Is that --

A. So we know that he was involved in all of this.

Q. Other than the December 22nd document, is there any other document that you have?

A. Well, there's the leases that are signed that's in here that shows his signature on it. There were --

Q. Those were after the closing, though, weren't they?

A. No. I think it was January, wasn't it? That's before the closing.

Q. Well, we've already established that the January date is probably wrong because -- because you're not suggesting that the LLC was trying to lease the property when it didn't own it, right?

A. You heard my testimony from before.

257

Q. Uh-huh.

A. I think probably so, and there was a purpose in it.

Q. So -- so as far -- Medistar would sign a lease with the hospital on January 4th and, at the same time, negotiate a deal with the LLC so that they could lease the hospital to the tenant at the same time? Is that what you're saying?

A. I'm saying it was set up probably because of the fact that it needed to move forward. I've got P. K. Shah's signature with his writing on the date January the 4th that's here on this document and --

Q. What's the document number you're referring to?

A. This is -- this is the lease document.

Q. Yeah. What's the lease -- what's the exhibit, sir?

A. The signature to the lease.

Q. What's the exhibit number in your hand?

A. Exhibit Medistar 20.

Q. Okay. And so -- but we're not suggesting -- you're not trying to suggest that Medistar negotiated a lease with the hospital on the same day that it's authorizing the LLC, Mr. Burford's client, to negotiate with the hospital for that same lease property, are you

270

A. -- other than typically when we produce documents like this -- and I can answer this as a corporate representative -- we do produce documents and we do work with our clients even after a sale or when sales are inked. The things that they need to move forward with a successful project, we try to accommodate them.

Q. This Exhibit No. 31, it actually has two preliminary discussion and budget proposals here, correct, sir? Excuse me. I should say two financial analyses. One is page 1 and 2 and then page 3 and 4. They're two separate financial analyses, aren't they? What makes me say that is, look at the loan request line.

A. Yes, I saw that. I saw a loan amount on the first one here at 9 million, 8 and the second one at 8, million, 8.

Q. You see the loan --

A. Do you want me to tie in the correlation of those?

Q. Do you know what the correlation is?

A. Well, if you remember correctly, there's documents inside of here that was produced earlier that was a million-dollar difference.

Q. Uh-huh. You think that's what this is, sir?

271

A. Yeah.

Q. Okay. You see the loan-to-cost ratio, 64 percent on the first analysis and 65 percent on the second analysis?

A. Yes.

Q. Did that have anything to do with the loan-to-cost ratio in the December 22nd document?

A. I think that loan-to-cost -- it's calculated very similarly; but this has to do specifically with this particular run and each run that it's done on.

Q. So it's --

A. In our format, that's an automatic production with the formulas in this format. So when you plug in these numbers and the amount of loan that's requested and the lease rates that are there, et cetera, then it comes up with a loan-to-cost.

Q. So these loan-to-cost ratios probably have nothing to do with the ones that were mentioned on, I think it was, Medistar Exhibit 1, which is the notice of deposition and there was an attachment, Exhibit No. 3, is that -- which had, also --

A. That's correct. These would be -- these would be according to the calculations that's on this pro forma.

Q. Okay. So you don't think these were done as

272

part of the December 22nd Exhibit "A" or Scenario "B"?

A. It's the same type of calculation, but it's based upon these particular numbers that's plugged into the pro forma.

Q. And I guess so -- but this doesn't represent either Scenario "A" or Scenario "B," does it?

A. It doesn't purport to be. It represents what a loan to ratio (sic) would be as to the amount of money that the project is valued at and the cost of the project versus the amount of loan to the project.

Q. And if you look at the --

A. It's a value, a valuation.

MR. WAHRLICH: Okay. Sir, I think I'm just about done, if you'll just give me a moment.

THE WITNESS: Certainly.

MR. WAHRLICH: Why don't we just go off the --

THE VIDEOGRAPHER: The time is 5:40. Going off the video.

(Brief recess.)

THE VIDEOGRAPHER: The time is 5:45. We're back on the record.

Q. (By Mr. Wahrlich) Sir, I just have a few more questions in a different area of conversation now. In terms of Dr. Shah, you personally

273

weren't involved in bringing him into the Katy hospital deal, were you?

A. I was not.

Q. Okay. In terms of Medistar -- and I'm asking you now as the corporate representative of Medistar -- was Medistar involved in bringing Dr. Shah into the Katy Project?

A. No.

Q. Okay. Do you know who brought Dr. Shah into the Katy Project?

A. I think that probably Dr. Shah -- this may sound funny -- may have brought himself into the project. I think that he heard about the project and contacted people in order to be a part of the project.

Q. And what makes you say that, sir?

A. When things were first talked about on this particular project back in -- very, very early on in, we'll say, June of -- what was it -- '05 or '06 -- '06, I guess, or '05 maybe, is when -- no, '06. I'm sorry -- that this was starting to come about. We met -- Medistar met Adeel Zaidi.

Now, I think prior to that time that Adeel Zaidi and P. K. Shah were in other business ventures or perhaps not in a venture but were participating and trying to bring about another project. When this came

**282**

would be in their face, holding them up on their expansion if, in fact, they didn't achieve the purchase or we didn't purchase or do the exchange, I guess you would call it, do the exchange on the real estate for the old Katy hospital.

Q. And how did --

A. So we had a substantial advantage.

Q. How did that assist the buyer to have that equipment when they opened the doors and bought it?

A. Well, let me just give you an example as to what values that are out there. And everybody -- we've talked about these documents here being, you know, $20 a square foot rent on the hospital and that sort of thing that's in these leases, the Sugar Land hospital, just the hospital itself, only the hospital itself, is a net, net lease of over $34-and-some-odd cents per square foot. This was a $20-a-square-foot lease but also included all the furniture, fixtures and equipment that was in there, which is multimillions of dollars' worth of equipment and furniture.

Q. Okay. Now, with regard to the $20 a square foot, in your capacity as a representative of Medistar Corporation, did you ever note in any of your review of documents whether or not the appraisal for Metro Bank opined on whether the $20 a square foot was market rate

**283**

or not?

A. As a matter of fact, it did; and it opined in the appraisal that -- that it was at a market value.

Q. Now, if you would very briefly, look at Exhibit No. 1 to your deposition. I just want to go to 1. It's at the very top.

A. Okay.

Q. Yeah, right there. If you would go to the attached Exhibit 1, which is the MOU, or Memorandum of Understanding, dated July 28, 2006. Are you there, sir?

A. I am there.

Q. Okay. And -- let me see. I got the wrong one. Excuse me. I have the wrong one. Just a second. What I'm looking for is the letter. It is Exhibit No. 4. Excuse me.

A. Medistar Exhibit 4?

Q. The September 7th, 2006, letter. It went to physicians. And this is an exhibit -- or example of one signed by a doctor. Are you there, sir?

A. I have it. I have it.

Q. Okay. And if you look at the second page right above the signature, it says, "I intend on investing in the Katy Project." Do you see that?

A. I do.

Q. What is your understanding as representative

**284**

as to when that person is ever going to be bound? Is it when he signs this document or when he actually pays the money and signs the documents?

A. Well, of course, when he -- when he purchases the unit. That's the only time he's bound.

Q. And also, there was some discussion with you with regard to the fees that had been paid to Abeer and Adeel and their companies and, I think, also a Dr. Peracha. Do you recall that?

A. I do.

Q. Okay. Now, was that paid at closing; or was it simply paid after the closing, utilizing those monies for services previously rendered?

A. It was paid after the closing and everybody is trying to draw a correlation between the closing and the payment and that's just incorrect to do that. They're separate documentations, separate services that were rendered, et cetera. It has no -- does not have to do with this particular closing.

Q. And with regard to the 70 units that Medistar owns, have you been involved in any meetings with any of the physicians that are in the limited partnership from time to time?

A. I have been.

Q. Okay. And have discussions about the 70 units

**285**

been brought up?

A. It has.

Q. Has anybody ever objected or said that they did not know about that in those meetings?

A. No, they never have. As a matter of fact, just to the contrary, they indicated that they knew all the way through.

Q. Now, with regard to your testimony about saying the corporate resolution wasn't necessary with regard to the 4-million-dollar note, do you recall that, sir?

A. Yes.

Q. Okay. And, now, on that one, there was no corporate resolution, correct?

A. No.

Q. Was there any title company --

A. No need for it.

Q. -- that required it?

A. No.

Q. Okay. And was that a recourse only as to Dr. Shah and not to the land?

A. Of course. It was only to an individual person and has nothing to do with tying up or putting any type of lien-type situation on the land.

Q. So none of that land out there in the rent and

12 (Pages 282 to 285)

TAB 4

NO. 2009-02578

| | | |
|---|---|---|
| APEX KATY PHYSICIANS, L.L.C., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | HARRIS COUNTY, T E X A S |
| ADEEL ZAIDI, APEX LONG TERM | § | |
| ACUTE CARE – KATY, L.P., APEX | § | |
| KATY PHYSICIANS – TMG, L.L.C., | § | |
| and US TMG, L.L.C., | § | |
| | § | |
| Defendants. | § | 61st JUDICIAL DISTRICT |

**DEFENDANTS' AMENDED RESPONSE TO PLAINTIFFS'
POST-TRIAL BRIEF ON "FABRICATED EVIDENCE"
AND MOTION FOR DEATH PENALTY SANCTIONS**

TO THE HONORABLE AL BENNETT, DISTRICT JUDGE:

Defendants respond as follows to Plaintiffs' filing ("Brief") seeking to have certain of the

Defendants' pleadings struck and for enhanced punitive damages:

I.    THE COURT'S QUESTION AND PLAINTIFF'S BRIEF:

At the close of the evidence, the Court made several general comments and then asked a

more specific question:

> THE COURT: To award exemplary damages, there is an intent
> element associated with that. And I'm not saying this is
> the case; *but what if the intent necessary for the cause
> of action that is pled has not been proven to my
> satisfaction* but I have determined that there was *intent
> in testimony presented to me that was intended to either
> deceive the Court* or to directly and intentionally
> testify contrary to the facts as I have found them based
> upon the documents. Two separate things.
>
> So, there's intent of -- for instance – and I'm -- this
> is part of the question, not part of me reciting what I
> believe to be a finding of fact or conclusion of law.
> *That's different from saying that someone, at the time*

> *that this transaction was going through, intended a fraud*
> *or intended to deceive someone at that time;* but now that
> this case has been tried, sworn testimony has been
> presented to me, and I find that testimony wholly
> incredible based upon what the documents say and/or that
> there was intent to deceive this Court into believing
> that the document that I'm looking at did not represent
> the facts as I've determined them to be.
>
> Do you follow me?
>
> All right. How do I resolve that? How am I to deal with
> that?

(Reporter's Record 4 [4RR] 140:15-141:20; Emphasis added.) Defendants heard the Court trying to deal with the fact that, although it did not seem that any intent to deceive or defraud in the transactions *as they happened* had been sufficiently proved, it seemed that someone was trying to misrepresent *to the Court* what certain documents meant or intended.

Plaintiffs candidly answer the Court's question by recognizing that there is NO precedent in Texas to award punitive damages for courtroom perjury – assuming it actually to have occurred – when the predicate facts necessary to support the causes of action giving rise to those damages are not otherwise proven.

That precedent having been established, Plaintiffs then ask and answer a different question: They *assume* that they have proven intentional fraud sufficient to support an award of punitive damages and then ask whether perjury, under those circumstances, would support enhanced punitive damages. They attack Mr. Zaidi and three separate entities with which he was then affiliated, Prestige Consulting, Inc. (d/b/a TMG), Apex Katy Physicians – TMG, LLC ("Apex TMG"), and US TMG, asserting that Mr. Zaidi perjured himself in Court and, apparently vicariously, perjured these entities as well. Based upon their underlying assumption of guilt, Plaintiffs conclude that punitive damages should be amplified as a consequence of Mr. Zaidi's asserted "perjury."

- 2 -

Defendants believe quite strongly that (a) Mr. Zaidi did not in fact perjure himself by the fabrication of evidence or the giving of deliberately false testimony under oath, and that (b) there was no proof that Mr. Zaidi intended to defraud or deceive anyone, including Dr. Shah. There is absolutely NO evidence that Mr. Zaidi fabricated any evidence in this case. As we will discuss below, he did testify inconsistently about the Metro Bank mortgage, and we acknowledge that. But as we also know, because Plaintiffs mentioned it repeatedly, Mr. Zaidi's testimony about how that all happened was the same at trial as it was in 2009, particularly at the Steering Committee meeting on January 19 at which the non-Shah affiliated landlord owners were told that the mortgage had been discovered AND that Dr. Shah and his colleagues had not paid for their units. (PX 67; Saqer, 4RR 89:18-91:21.) He did not try to hide, alter, or otherwise deny the existence of the mortgage documents. One could conclude that his statement was wrong, but it remained essentially the same. *Mr. Zaidi did not manufacture a story to tell in Court in order to deceive this Court.* The cases Plaintiffs rely upon in the Brief to support their positions involve far more egregious situations, however, in which each of the accused parties engaged in pervasive deceit and actually manufactured new, or physically tampered with existing, evidence. That simply did not happen here.

Moreover, Plaintiffs proved, and everyone acknowledged, that Mr. Zaidi had zero financial interest in the landlord, and therefore no upside. (E.g., Shah, 3RR 244:4-18; Zaidi, 4RR 101:16-102:10.) The hospital and the landlord were in a symbiotic relationship; anything that hurt the landlord hurt the hospital, and vice versa. Mr. Zaidi testified without contradiction that his sole goal was to try to save the hospital (4RR 114-115) and that he never did *anything* with an intent to harm Dr. Shah. (4RR 116:4-13.) If Mr. Zaidi was a defrauder, he was one of the worst in history, because he could not earn one cent in profit or gain from the landlord. Apex TMG even gave Dr. Shah, the "mark," $240,000 of his investment back. (3RR 76.) Not a good plan for a thief and defrauder.

- 3 -

On the other hand, Defendants strongly believe that Dr. Shah, with an overt intent to gain benefit for himself at every turn, practiced deceit in the real estate deal as it unfolded and in the courtroom. Dr. Shah deceived Mr. Zaidi and all of the Apex LLC owners who were not affiliated with Dr. Shah by setting up and perpetrating his scheme to take control of the landlord and the real estate without paying for it. Dr. Shah also attempted to deceive this Court as to the nature and extent of his involvement and control over the real estate investment, which Dr. Shah controlled in fact after the fateful meeting with Medistar on the evening of December 22, 2006. At that meeting, Dr. Shah and Monzer Hourani straightened out – "changed" – the deal into the one in which Dr. Shah would take control of the real estate. (PX 15, DX 10; Shah, 3RR153-54, 159:9, 166:8-14: "I don't know if I'm in control or not," 168:23; Zaidi, 4RR 66:2-69:21, 77:4-75:22; Saqer, 80:11-81:23.) Numerous material things that Dr. Shah told the Court in his heavily scripted testimony were untrue.

## II. CREDIBILITY AND THE MOTIVES OF THE PARTIES:

The Court also made the following statement immediately after the close of the evidence:

*What I find myself faced with more than anything else in this case is determining the credibility of the witnesses that have been presented, more than anything else. And in that regard, I have found the credibility of certain witnesses that were presented -- I have found some of the statements made by some of the witnesses in this case clearly contradicted by the documents which are now in evidence and before me in this case.*

(4RR139:21-140:4; Emphasis added.) In weighing the credibility of the "certain witnesses" the Court speaks of, Defendants contend that the relative motives of those witnesses are key.

    *A.    Plaintiff Shah's story was contrived after the fact.*

Unlike Mr. Zaidi, Defendants strongly believe that Dr. Shah did in fact manufacture a story to tell in Court in order to deceive this Court.

 ZAIDI/Response to Brief/5/05/14

1.      At the time, in 2007, 2008, and 2009, this was just a normal, albeit occasionally contentious, business relationship between a landlord and a tenant.

As the Court heard at length at trial, the disputes between Dr. Shah's real estate company, and make no mistake, it was Dr. Shah's company (see, e.g., 3RR 61: "my company"), as the landlord, and the hospital, as the tenant, arose in earnest in November 2008, with default notices, and then seemingly reached a boiling point with eviction notices and court proceedings in January and February 2009. (See, e.g., PX 55, PX 56, 3RR 96.) But then, nothing until the hospital declared its no-asset Chapter 7 bankruptcy in September 2009. No fighting, no allegations of fraud or wrongdoing, no anything.

To be sure, there had first been controversy in January of 2008, when Dr. Shah and the hospital's Steering Committee exchanged stern but not hostile letters concerning the financial dealings that had occurred between them since March 2007. (PX 40, DX 40.) Dr. Shah recounted his positions on what the hospital owed him, and the hospital replied, for the most part agreeing with Dr. Shah's positions and promising to try to pay him back. (3RR 272:22-278:24.) Far from concealing anything from Dr. Shah, Mr. Zaidi and the hospital Steering Committee freely disclosed all pertinent financial information that existed at the time. Dr. Shah agreed on cross that he had no evidence to suggest that the hospital was not in fact trying to repay the amounts they conceded were due. (3RR 281:13-282:7.)

More importantly, the memo (PX 40) that Dr. Shah had sent to the hospital, setting out in detail all of the loans he had made to the hospital (Shah, 3RR 281:13-282:7) and all of the funds he contended that the general partner and the hospital had not yet accounted for, proves, as both Dr. Odhav and Ms. Saqer said, that everyone, including Dr. Shah, had complete information about the

- 5 -

hospital's finances and financial conditions at all times; no one kept or tried to keep Dr. Shah in the dark about *anything*. (Odhav, 3RR 182:6-184:2; Saqer, 4RR 83:6-18)

The very next day after the hospital sent its reply to Dr. Shah's memo, on January 18, 2008, Dr. Shah claims that he tried to draw $638,000.00, the exact amount allowed under the *amended* letter of credit securing his rent (that Plaintiffs pretended not to know about), but was unable to do so because Mr. Zaidi had the document and refused to give it to him. (PX 43; 3RR 72-74.) And then, nothing until the default letters were sent to the hospital in November 2008. No fighting, no allegations of fraud or wrongdoing, no anything. I asked Dr. Shah if there was some kind of peace that had existed in this period between January 2008 and November 2008, and he replied, "There was no fight. So, why should we have peace? But there was a maybe the good period of time, probably." (3RR 289:15-22.)

The contrast between Dr. Shah's actual behavior in 2008 and his story at trial is both stark and impossible to believe.

- Dr. Shah said at trial that Mr. Zaidi stole the $700,000 that he claimed Apex LLC had "borrowed" to and from itself to give to Apex TMG (the check was not given to Mr. Zaidi) to open a new landlord account, for reasons unknown, for unknown signatories. Yet in his January 2008 memo he called it money "borrowed" from Metro Bank by the hospital and to be repaid. Indeed, in perhaps a weak moment when he had strayed from his script on cross, he agreed that all of the sums he listed as due in his January 2008 memo were *loans he had made to the hospital.* (3RR 281:13-282:7.) He also admitted that he never asked anyone about or even mentioned the "missing" money or the "new" account for over three and a half years. This was even though he knew the money had been debited from the landlord's Metro Bank account in September 2007, and even though Dr. Shah received monthly statements for the entire time. (3RR 264:18-272:21.)

- 6 -

Others did mention the $700,000 during this time, of course, and they completely corroborated Mr. Zaidi's description of the check as a loan for hospital operations at a time when it needed the funds. (Zaidi, 4RR 108:9-109:1.) Dr. Odhav, who was an independent witness, knew about this loan and others from many discussions at the Steering Committee meetings. (3RR 184:18-185:12.) Ms. Saqer likewise attended those meetings and heard much discussion about the loan, and she also heard the Steering Committee thank Dr. Shah for having made it. (4RR 83:19-84:12; "Q: Do you now believe after some of the things that we've been through that [Mr. Zaidi's] an honest person? A. Yes." Saqer, 4RR 89:10-13.)

Are we really to believe, if the claims he made at trial are true, that Dr. Shah said and did nothing at all about Mr. Zaidi's now alleged malicious theft of $700,000 for three and a half years? Nothing, that is, except attend numerous meetings and receive thanks for making the loan?

• Dr. Shah claimed at trial that in January 2008 he tried to draw upon the letter of credit issued by Bank of America, but that Mr. Zaidi had effectively destroyed it by amending it in 2007. In fact, the amendment was a ministerial non-event that only revised the letter of credit to reflect draws that had already happened, and Dr. Shah's January 18 letter, which obviously was never sent, purported to draw the exact amount allowable under the very amended letter of credit that Dr. Shah pretended not to know about. (See PX 43, PX 44.) His Exhibit 94 shows, however, that over *a month later*, on February 25, 2008, his then lawyer Jeffrey Kaiser sent him an email telling Dr. Shah that he needed to get the document so a draw could be made before February 27. Dr. Shah said he asked for it, and Mr. Zaidi said Dr. Shah didn't and that he didn't have it. Then, nothing. No proof of any actual draw attempt at any time, no correspondence from Bank of America about any such draw attempt, no correspondence refusing to honor any draw, no correspondence or *anything* with Mr. Zaidi about the "missing" letter of credit, no allegations of fraud or wrongdoing, no anything.

- 7 -

Are we really to believe, if the claims he made at trial are true, that Dr. Shah did nothing at all about Mr. Zaidi's alleged malicious destruction of his right to draw over $600,000 under the letter of credit in January 2008? Nothing until 2010? This is simply not credible.

2. Plaintiffs' claims at trial were developed in 2010 and first revealed in Plaintiff's Second Amended Petition of December 30, 2010, and Third Amended Petition of December 31, 2010.

Dr. Shah's behavior in 2008 and 2009, including the examples cited above, when the transactions involved here were unfolding and heading for their unfortunate demise in September 2009 (when the hospital gave up the fight and declared bankruptcy), is completely inconsistent with the claims of malice, intentional fraud, and deliberate breaches of fiduciary duty that were made at trial. Why? Because they are not true.

Dr. Shah and Apex LLC started the process of getting the hospital out of the real estate by declaring defaults in November and December 2008, and then appeared to continue that process in earnest in January and February 2009 (PX 55, 55a, 56), when formal eviction proceedings were commenced. *But then all such proceedings were dropped and never reasserted before the hospital declared bankruptcy in September 2009.* Does this sound like the behavior of someone who has been defrauded or robbed or cheated by his adversary, or does this sound like a business deal that everyone was trying to save until they simply couldn't do it? (Saqer, 4RR 89:16-17: "Everyone was an honest people trying to do the best on this project, as far as I know.")

During the contentious months of November 2008 through February 2009, when Dr. Shah and Apex LLC had lawyers who wrote to and met with Defendants' lawyers repeatedly, no mention was ever made in any conference, letter, memo, email, or meeting, about anyone stealing $700,000, or anyone destroying a letter of credit, or anyone receiving illegal real estate commissions or kick-backs. Dr. Shah admitted this. (3RR 265:15-272:21.)

- 8 -

Even when Dr. Shah saw fit for Apex LLC to file this suit, in January 2009, *after* he claims to have had knowledge of the theft of his $700,000 (3RR 86), and *after* he claims to have been made aware of the allegedly surreptitious landlord waiver (DX 17; see PX 45), and certainly *after* the alleged destruction of his letter of credit in January 2008, he filed a basic garden variety fraud case alleging, among other things, that *Medistar* and Zaidi had misrepresented the potential of the real estate and the hospital to induce him to invest in the real estate and that certain of the Defendants had misappropriated funds. Absolutely no mention was made of any of the malefactions of which he now complains. No $700,000 check theft, no secret lien waiver, no amended and destroyed letter of credit, and no so-called illegal real estate commissions.

Dr. Shah and Medistar settled the 2008 case that Medistar had filed against Dr. Shah, for the $4,000,000 in purchase money that Dr. Shah had not paid, with a dismissal on April 30, 2010, so, from that point on, Dr. Shah had to eliminate Medistar as a villain in his story.

Additionally, as the Court also knows, certain of the Apex LLC investors sued Dr. Shah, but not Mr. Zaidi, alleging that Dr. Shah had breached the Apex LLC Company Agreement by entering into the Metro Bank loan and mortgage. Dr. Shah admitted that he had not obtained the unanimous consent of the members, and Mr. Zaidi, as co-manager, likewise did not. The difference is that Dr. Shah testified in August 2009 in the Medistar case, before Dr. Shah's new story about how much he had relied upon Mr. Zaidi's representations that consent had been obtained, that he had had the authority to sign the loan and mortgage documents *without* the members' unanimous consent. (3RR 248:16-251:7.) The Court granted summary judgment against Dr. Shah, as Mr. Meade mentioned several times and Dr. Shah admitted (3RR 101-02). Dr. Shah settled those claims with the then-existing investor/members of Apex LLC for the payment of $512,500.00, over time,

- 9 -

effective <u>December 1, 2010</u>. Thus the Koch plaintiffs, and the troubling issues they presented to Dr. Shah, were also now dealt with and out of the picture.

Twenty-nine days later, on December 30, Plaintiff's Second Amended Petition was filed, and a day after that, on December 31, Plaintiff's Third Amended Petition was filed. For the first time, Dr. Shah's story had morphed into what was testified to at trial: That Dr. Shah was a poor innocent passive investor – a "whale" in counsel's terms – who had been fleeced by the "promoters" of the real estate deal, including most centrally Mr. Zaidi. For the very first time, the allegation was made that the $700,000 had been stolen, three and a half years after the fact. For the very first time, the allegation was made that the landlord lien waiver had been fraudulently provided to Bank of America, in secret, now over two years after the fact. For the very first time, the allegation was made that the letter of credit had been fraudulently destroyed by Mr. Zaidi, almost three years after the fact. For the very first time, the allegation was made that the consulting payments Medistar had made from the profit it had collected from the real estate closing had really been illegal real estate commissions.

Defendants contend strongly that all these allegations were contrived and manufactured out of whole cloth. They are false. Dr. Shah's story is completely uncorroborated by any documents or testimony one would have expected to see or hear, were the allegations true. Dr. Shah's motive for telling it is obvious: Mr. Zaidi had told the other real estate members that Dr. Shah and his colleagues Vora and Suneja had caused the real estate to be mortgaged because they had not paid for their interests. They sued Dr. Shah, and they won. Mr. Zaidi now had to pay.

The inconsistencies in Dr. Shah's story and their lack of inherent credibility, when compared to the facts that were laid out, came out in his testimony. Some examples:

- 10 -

• Dr. Shah twice said that he was merely a passive investor (e.g., 3RR 56) who had little if any involvement in the development of the real estate project. He also said that he was made co-manager <u>by</u> Mr. Zaidi, who promised to "run everything." To the contrary, Mr. Zaidi testified that he only agreed to Dr. Shah's request that he be a co-manager after Dr. Shah's colleagues, Dr. Suneja and Mr. Vora, declined to serve.

What are the facts? Gary Perryman, Medistar's President[1], said what we all know, that the deal "changed" in December 2006, and that this was known certainly by Dr. Shah. (Perryman 70:16-73:9.) In fact, Dr. Shah had been "in the upfront of the negotiations, as it turned out . . . from a lease-type project to a purchase." (Perryman 71:20-21.) Dr. Shah was intimately involved from the very beginning, and he helped set the deal up. In fact, he "brought himself into the deal." (Perryman 248:6-249:12, 256:6-24, 272:25-273:14.)

Dr. Shah also originally insisted that he did not know about the real estate deal until near the end of the process in late 2006 (3RR 111-12), but then admitted that he had attended the Medistar presentation in September, at which he made his subscription for 125 units at $40,000 per unit. (3RR 136-37.) Dr. Shah originally said that the Medistar meeting on December 22, 2006, had been set up by Mr. Zaidi. (3RR 59.) He admitted on cross, however, that he had instructed Mr. Zaidi to set up the meeting so that he and Mr. Hourani could straighten the problem out. (3RR 159.) He also admitted on cross that the reason for Medistar's December 21 ultimatum (PX 15) – the failure of the investing group to have raised $6,000,000 by then – which led to the December 22

---

[1] As of May 5, no ruling on the admission of Mr. Perryman's testimony under Texas Evidence Rule 804 has been seen in the Clerk's file. As Defendants argued at trial, they have clearly satisfied the Rule 804 predicate for the admission of the prior testimony, and they re-urge its admission now as a matter of right. Since it is technically hearsay, because taken in a different case, the Court has some latitude to admit it because its probative value greatly outweighs any possible prejudice. After reading Mr. Perryman's testimony, Defendants believe that the Court will agree that the probative value is very clear. Refusing it could be reversible error; admitting it cannot be. Defendants respectfully suggest that the interests of substantial justice between the parties compel its admission.

meeting, was <u>his</u> failure to have paid <u>any</u> of the amount he owed – $5,000,000 – for the 125 units for which he had subscribed in September. (3RR 156:19- 157:25.)

Dr. Shah also admitted that he told Mr. Zaidi, and it was NOT the other way around, on December 22 that he wanted to own the majority of the real estate, 55%. (3RR 153:10-154:5.) As of December 22, the deal changed, and, with himself in charge, Dr. Shah would have his 55% with only a nominal cash investment. (3RR 154-55, 247:22.) He was also forced to admit that there were never any other documents signed by the investors that presented any different proposal than the cash subscription offer that they had all signed up for (3RR 145). He was then forced to admit that he had <u>never</u> told <u>any</u> of them that <u>his</u> deal, and the deal he made for his two colleagues, where they could get all their units for a very reduced amount of cash and then a bank guaranty, was different than everyone else's deal, which was to pay 100% cash. (3RR 163:1-166:7, 239:20-240:21.) His admission of what he had done was in fact very direct:

> Q. Did you, as the manager – comanager with Mr. Zaidi, I recognize – did you ever tell any of your other partners at any time that your deal was "I only pay a little bit and I guarantee, you pay it all in cash"? Did you ever tell anybody that, sir?
>
> A. The partners –
>
> Q. Did you ever tell anybody that?
>
> A. Yes, sir. Those partners who sign with me, the few of the partner I brung it them, I told them, sir.
>
> Q. Okay. You told Vora and Suneja?
>
> A. Vora, Suneja, yes, sir.
>
> Q. You didn't tell anybody else?
>
> A. And Medistar knows about that when they sign the paper with me, sir.

- 12 -

Q. They weren't one of your – well, *they were a partner in the sense that they had 70 units that they didn't pay anything for*?

A. *That's true, sir.* I was thinking about a different – a deal for different – for other people. Sorry, sir.

Q. So, we have two classes of people. We have Medistar and the three of you that are in this class; and all the other poor schmucks that are in this class, they are paying cash, right?

A. *Yes, sir.*

(3RR 165:7-166:7; Emphasis added.) Dr. Shah simply structured the deal to benefit himself and his friends at the expense of his fellow investors, and he knew it. What he also knew, but continues indignantly to deny to this day, was that his friends at Medistar in fact did have a 70 unit interest that they didn't pay for either.

As to who would be the co-managers, what makes sense? That, after the December 22 change when Dr. Shah took complete control of the real estate side (Zaidi, 4RR74:4-75:22; Saqer, 4RR 81:17-23), it would be Mr. Zaidi, who had absolutely no financial interest in Apex LLC and no real estate experience, who would run things and *direct* Dr. Shah to be a co-manager? Or that Dr. Shah, who had been involved from the beginning, who had personally effected the change of the structure of the deal with Medistar so that he would become the majority owner (Perryman 71:20-21; Saqer 80:21-81:6), and who intended to quietly procure that majority interest without paying full price for it, would direct Mr. Zaidi to be co-manager so he could keep an eye on him and use him for ministerial duties when needed, as he did? The answer is obvious, but it is not consistent with Dr. Shah's story.

• Plaintiffs repeatedly stressed that if the hospital did well, Mr. Zaidi (actually TMG) would do well. Plaintiffs ignored that fact that, under the joint Venture Agreement with TMG, Saqer, and Peracha, Dr. Shah would also do just as well. When Dr. Shah was confronted with the

- 13 -

Joint Venture Agreement (DX 5, pp. 3 and 4) that he had demanded from Mr. Zaidi when he learned that Saqer and his friend Peracha were involved in it, and which gave him the exact same 25% interest as the others had in the management fees to be earned by TMG from running the hospital, he looked at it and calmly declared, totally against its plain and clear terms, that it was for "future" projects. He also said, however, that this was just something that he was offered, out of the blue (3RR 96-97), and that, if people offer him money, "I will take it." (3RR 149.)

These claims are false. Dr. Shah was an owner of or had a financial stake in every entity involved: TMG, Apex TMG, the hospital, and the landlord. He leveraged himself into this 25% interest in TMG's fee because he wanted the money. *No other person* had this level of pervasive involvement.

• Dr. Shah pretended that he had no idea what the $4,000,000 in "additional" purchase money for the real estate was (DX 10) on direct examination. (3RR 60-64.) On cross, of course, he was forced to admit that he had signed the guaranty and that Medistar had sued him, and only him, for that very $4,000,000 (3RR 152), seeking to enforce that guaranty. (3RR 160:2-162:25, 166:15-168:22.)

• Dr. Shah, on direct, tried to pretend that the structure of Apex LLC "set up by Mr. Zaidi" – who we know had *nothing* to do with that structure – was the same as that for the hospital investment. (3RR 57-58.) This is also completely false, and the quoted testimony above shows that Dr. Shah knew it was false. Each of the hospital investors paid a small amount down, which was all fully disclosed, and each signed a bank guaranty for a larger sum, also fully disclosed. The guarantees were required by Bank of America, which was setting up a line of credit and the attendant letter of credit to secure the hospital's rent payments. Everyone, including Dr. Shah, knew all of this. (3RR 207:23-209:3.)

- 14 -

There were no documents signed by everyone and fully disclosed to everyone in the real estate deal that provided for everyone to have a small cash payment and a guarantee, of course, as Dr. Shah was forced to admit. (3RR 142-44, 155:1-24, 163:1-166:7.) Only Dr. Shah and his special "class" had that option.

- Dr. Shah insisted that he would not have invested in Apex LLC had he known that the landlord's lien had been waived, yet the facts are that the letter of credit was important to him and he "understood" that Bank of America had to have collateral for the Letter of Credit it issued for Apex LLC's benefit. He also acknowledged that the landlord lien waiver was in fact listed as part of the original credit deal that was done in January 2007, before he signed the closing papers in March. (3RR 207:1-209:3, 210:8-214:19.) Every one of the hospital investors knew all of this. (4RR 72:15-73:15.) Even his banker friend, Mr. Tariq, who handled the loan for Metro Bank, after first saying that Metro Bank would not have made the loan if the lien on accounts receivable had been waived (2RR 106-07), agreed on cross that is was not at all abnormal for a lender in Bank of America's position, with a start-up venture, to get as much collateral as possible, including such a waiver, and that Dr. Shah had to know about the landlord lien waiver at the time. (2RR 121:8-16.)

*B. Mr. Zaidi's admitted inconsistencies about the mortgage do not prove fraud.*

Defendants acknowledge, as they must, that Mr. Zaidi had a great deal of difficulty explaining what and when he knew about the Metro Bank mortgage and loan. He admitted he knew about the loan, but he said he was not sure what the mortgage was all about. His explanation was that Dr. Shah had told him several times that he and his colleagues would be borrowing money to buy their units, not as a company debt, and that he trusted Dr. Shah. (4RR 76-77.) The Court may not find that explanation credible, but as noted, it was not made up recently to deceive the Court.

ZAIDI/Response to Brief/5/05/14

But what does it prove? Dr. Shah said that he would not have signed the closing papers if he had known that Mr. Zaidi did not have the authority of all the real estate members to do the deal. This is preposterous and untrue. As discussed above, Dr. Shah had taken control of the real estate part of the deal after December 22, leaving the hospital operation to Mr. Zaidi. Mr. Zaidi agreed that this was in fact how things operated on a daily basis in 2007, and that he was very busy after January 1, 2007, with the hospital's staffing and opening. (4RR 74:4-75:22.) When he testified in 2009 in the Medistar case, before the new story had come out, Dr. Shah said, as he admitted at trial, that on March 22 he considered that he had the full authority to sign the closing papers as a manager. Period. He would have gone forward with the closing if Mr. Zaidi – who said he was there with authority from the hospital partners (Schulte, 2RR 147-48; Zaidi, 4RR 77:23-78:18) – had not been there at all. There simply was no other way to get his deal done and obtain the real estate for the small cash price he had arranged using the loan from his personal bank. So how did he rely upon Mr. Zaidi? And why ask Mr. Zaidi anything at all if you already felt, as Dr. Shah admitted he did, that you have full authority as a manager anyway?

What Mr. Zaidi knew or didn't know about the mortgage simply had no affect on Dr. Shah, although it might have mattered to the then-members of Apex LLC who were beneficiaries of the Company Agreement. Defendants in this regard would only remind the Court that these members, who sued Dr. Shah – but not Mr. Zaidi, even after they knew he had attended the closing with Dr. Shah – and prevailed for breach of contract, are no longer part of Apex LLC. They are gone, as Dr. Shah declared under penalty of perjury in Apex LLC's Bankruptcy Schedules filed in 2012. (DX 67, pp. 36 and 37; ownership of Apex LLC is now Indus Associates [Shah], Suneja, and Vora.)

There are two things about the closing that Dr. Shah and Mr. Zaidi agreed upon.

First, it had to happen when it did, come hell or high water, because Medistar had issued another ultimatum, and all the doctors' money (including Dr. Shah's, as he acknowledged, 3RR 232:9-16), would have been lost to Medistar if the closing had not happened. (Shah, 3RR 230:22-232:19; Zaidi, 4RR 99:8-101:15.) It seems very likely that this intense pressure explains a lot of what happened. Dr. Shah knew this was the situation when he arrived at the closing, and since he had absolutely no intention of allowing his money to be lost, he arrived at the closing knowing that it was going forward. Mr. Zaidi says that he had not seen the Apex LLC documents before the closing, and there is no credible evidence to prove that he had. Confronted with Medistar's ultimatum, however, Mr. Zaidi believed that he was doing the best for the investors that he could by insuring that they did not lose their investments before the project even got off the ground.

Second, there was a four-month period in which the loan could have been paid and the mortgage cancelled, and at least Mr. Vora fully intended that this option should be exercised. (Shah, 3RR 255:19-257:17; Zaidi, 4RR 98-101.) And Dr. Shah also admitted that *if* he and his colleagues had paid even the smaller cash amount due for Dr. Shah's 125 units and his colleagues' 90 units, there would <u>never</u> have been any need for either a loan or a mortgage. (3RR 259:8-21, 260:20-261:23.)

CONCLUSION

This case is really about a business deal that started with promise and then went bad, mostly because of circumstances involving the certifications and licenses for the fledgling hospital that took far longer to come in than anyone could have imagined. Dr. Shah cannot be faulted for finally giving up and demanding his due, although in retrospect it would probably have been better for everyone if he could have waited longer. None of that converts this case into a massive fraud,

ZAIDI/Response to Brief/5/05/14

however, as Plaintiffs have portrayed and pitched it. It would be the height – or depth – of irony if Dr. Shah recovered the millions of dollars in damages he seeks, because he will in fact have profited in the end from his selfish plan to take advantage of his fellow real estate owners.

Plaintiffs filed their Brief in their continuing attempt to demonize Mr. Zaidi. Thus they seek both death penalty sanctions <u>and</u> enhanced punitive damages for the fraud claims they assume they have proved. Substantial justice between these parties will not allow either result. Mr. Zaidi testified about one thing inconsistently. He never denied the effect or meaning of the documents; he just insisted that he didn't understand them that way at the time. Dr. Shah, on the other hand, testified in a number of instances to "facts" that were directly contrary to the documents he was confronted with. His conduct is more reprehensible and should not be rewarded.

DATED: May 7, 2014                    Respectfully submitted,

                                      LAW OFFICES OF DOUGLAS R. LITTLE

                                      By_____
                                      Douglas R. Little
                                      State Bar No. 12416600
                                      Wedge International Tower
                                      1415 Louisiana, 37th Floor
                                      Houston, Texas 77002
                                      713.275.2069
                                      713.843.7901 (Fax)
                                      doug@douglasrlittle.com

                                      ATTORNEY FOR DEFENDANTS

ZAIDI/Response to Brief/5/05/14

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served upon counsel

listed below via eFileTexas.gov on the 7th day of May, 2014:

Andrew K. Meade
Hawash Meade Gaston Neese
 & Cicak LLP
2118 Smith Street
Houston, Texas 77002

Douglas R. Little

# TAB 5

Filed 09 August 10 P1:04
Loren Jackson - District Clerk
Harris County
ED101J015480113
By: Charleta Johnson

CAUSE NO. 2009-02578

| | | |
|---|---|---|
| APEX KATY PHYSICIANS, LLC | § | IN THE DISTRICT COURT OF |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ADEEL ZAIDI, ET AL. | § | 61ST JUDICIAL DISTRICT |

CONSOLIDATED WITH

CAUSE NO. 2009-03055

| | | |
|---|---|---|
| STEPHEN M. KOCH, M.D., | § | IN THE DISTRICT COURT |
| VICTOR ANKOMA-SEY, M.D., | § | |
| TERRY SCARBOROUGH, M.D., | § | |
| HATEM SAQR, et al. | § | |
| | § | |
| V. | § | 11TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| PANKAJ K. SHAH, et al. | § | HARRIS COUNTY, TEXAS |

### PANKAJ K. SHAH, M.D.'S SUR-REPLY TO PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE TO MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND FOR CONTINUANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, PANKAJ K.SHAH, M.D. (Dr. Shah), Defendant in the above styled and numbered cause, and files his Sur-Reply to *Plaintiffs' Reply to Defendant's Response to Motions for Partial Summary Judgment and for Continuance.*

### Motion for Continuance

1.     The Defendant, P. K. Shah, M. D.'s *Motion for Continuance* of the submission of the Plaintiffs' *Motions for Partial Summary Judgment* (the "Motion") was precipitated by the objection made by Plaintiffs' counsel to his own evidence, the Affidavit of Defendant

1 | P a g e

P. K. Shah, M. D. (attached to Plaintiffs' *Motions* as Ex. C). By offering the affidavit as summary judgment evidence, Plaintiff vouched for the evidence and sought to have the Court rely on it, and Defendant was also entitled to rely on it to prove elements of his defense. The relevant portion of the Affidavit states that the Members of the Company were given notice of the $9 Million loan by either Dr. Shah or his Co-Manager, Mr. Zaidi. This evidence shows a question of fact exists as to whether the Plaintiffs consented to closing on the MetroBank Loan Commitment[1] that was in place when they signed the Company Agreement[2]. The Company Agreement contains two blanket ratifications and approvals of the prior acts of the Organizers and Managers of the Company, as discussed more fully below.

2.      Plaintiffs' counsel created a question of fact by attaching the affidavit of Dr. Shah. Plaintiffs now seek to withdraw their evidentiary offer by asking that the objected to portions (those relied on by Defendant) be stricken as self-serving and conclusory. If evidence provided by Movant on which Non-Movant relied is stricken, Defendant should be allowed a continuance in order to supplement the summary judgment record with other evidence on the subject matter relating to the disclosure and approval of the members to the proposed $9,000,000 loan from MetroBank by their signatures on the Company Agreement. The deposition of Dr. Shah's Co-Manager, Mr. Zaidi, has yet to be taken, which would be relevant to these dealings of the parties. For example, on March 12, 2007, prior to signing the Promissory Note on March 22, Mr. Zaidi signed a

---

[1] The MetroBank Loan Commitment Letter signed February 8, 2007 is Ex. E to Shah's *Response to Motions for Partial Summary Judgment.*
[2] Ex. B to Koch's *Motion for Partial Summary Judgment* is the Apex Katy Physicians, LLC Company Agreement dated February 9, 2007, signed by all members.

Tenant Subordination Agreement[3] on behalf of the LTAC (of which all Plaintiffs are Members), acknowledging the loan from MetroBank and subordinating the LTAC's interests to the Bank. Plaintiffs have not sued Mr. Zaidi or claimed that he breached the contract by taking out the loan. As Co-Manager, Mr. Zaidi's duty to plaintiffs was exactly the same as Dr. Shah's. Mr. Zaidi certified to MetroBank that all required actions needed to authorize the loan had been taken, and this certification constitutes evidence that the consent requirement is satisfied as to Dr. Shah as well. Mr. Zaidi certified that:

> "The Members and Managers of the Company have adopted such resolutions and taken such other actions as are necessary to authorize the Company and its Managers/Members, acting on the Company's behalf, to: (a) execute and deliver the Note as a binding obligation of the Company enforceable in accordance with its terms;"[4]

### Plaintiffs' Withheld Discovery Prejudices Defendant's Presentation of Summary Judgment Defenses

3.     Defendant requests, on additional grounds, that the Court refuse to allow Plaintiffs' Motions for Summary Judgment **motion to be heard or re-set** until certain discovery abuse practiced by plaintiffs has been remedied. Defendant sent interrogatories to each of the plaintiffs requesting information as to when and how each came to the knowledge that the hospital facilities had been purchased by use of the $9,000,000 loan from MetroBank. (See Interrogatories Nos. 14 and 15[5]). Dr. Koch responded that he first learned of the MetroBank loan in January **2009** from Mr. Zaidi. This response is incorrect, as shown by the following:

---

[3] Ex. 1 is the *Tenant Subordination and Attornment Agreement* dated March 12, 2007.
[4] Ex.7, the *Borrowing Certificate* executed by Mr. Zaidi and Dr. Shah at paragraph 22.
[5] Defendant's Interrogatories and Plaintiff Koch's responses are attached to *Plaintiffs' Response to Defendant Shah's Motion for Continuance.*

- Dr. Shah received a letter signed by Dr. Koch dated January **2008** (Ex. 2), a full year earlier, in which he acknowledged the MetroBank loan, and made a statement inferring that all the members had knowledge of it. An essential basis of plaintiffs' case is that this $9,000,000 loan on the hospital property was somehow kept "secret" by Dr. Shah.

- Dr. Shah also received a letter dated December 21, 2006 (Ex. 6) from Medistar addressed to "All Physicians" (referring to the movant/plaintiffs who were part of the hospital deal), advising about the necessity of a loan to close the Pin-Oak Hospital purchase.

- Neither (1) the letter of January 2008, discussing the MetroBank loan, nor (2) the December, 2006 Medistar letter, was produced by plaintiffs in response to proper discovery requests (See Request for Production No. 16).

- Dr. Koch has not amended or supplemented his incomplete response to Request for Production No. 16 to search for and produce the letters, emails and other documents referring to the financing for the deal that are in his possession or control.

- Dr. Koch has not amended or supplemented his false answer to Interrogatory No. 14 to state the correct information as to when, and under what circumstances, he was advised about the MetroBank loan.

4.     Texas Rule of Civil Procedure 193.5 sets out the discovery amendment/supplementation requirements. Generally, under Rule 193.5(a), when a party learns that a response to written discovery was incomplete or incorrect when made, or that it is no longer complete and correct, the party must amend or supplement the response at least 30 days before trial. The required supplementation has not been done with regard to the Summary Judgment trial and prejudices defendant's presentation.

5.     *Prappas v. Entezami*, 2009 WL 331898 (Tex.App.–San Antonio 2009, no pet. h.) (mem. op.).This case arose from a foreclosure sale. GM granted a lien on property to MetroBank, which transferred the lien to Froseni. Prappas, the substitute trustee, posted the property for foreclosure, and Entezami was the highest bid at the foreclosure sale. Allegedly Prappas refused to accept Entezami's cashier's check, and Entezami sued Prappas, Froseni, and GMB. Entezami filed motions to compel Prappas to produce the

Unofficial Copy Office of Chris Daniel District Clerk

foreclosure file. Prappas had asserted he was not properly appointed as substitute trustee, but failed to produce the foreclosure file that would have contained evidence of the appointment. The trial court granted sanctions prohibiting the defendants from introducing evidence that Prappas was not properly appointed, and also permitted to the jury to receive a spoliation instruction concerning the file. On appeal, the court of appeals upheld the trial judge's sanctions order, concluding that it met the standards established in *Cire v. Cummings*, 134 S.W.3d 835 (Tex. 2004). The court concluded that the sanction was directed at the abuse — failure to produce the foreclosure file. The court also held that the sanctions bore a direct relationship to the offensive conduct; **and that the record reflected the trial court had considered a lesser sanction in prohibiting Prappas's summary judgment motion to be heard or re-set until the foreclosure file was produced.**

6.      Defendant seeks this same relief as a "lesser sanction" with regard to the summary judgment proceeding because of the withheld discovery and untruthful responses to Interrogatories.

7.      In *Plaintiffs' Response to Defendant P. K. Shah's Motion for Continuance* plaintiffs argue that because Dr. Shah knows about the January 2008 letter (and therefore the falsity of the Koch responses to Interrogatories Nos. 14 and 15), that it is immaterial. This implies that no effort is to be made to correct the false Interrogatory answers and provide a true and correct answer, or to produce the correspondence and email files reflecting the MetroBank loan as its subject matter.  Defendant requests that the Court decline to consider plaintiffs' *Motions for Partial Summary Judgment* while plaintiffs are

in default of their discovery obligations.

8.     The Court should grant defendant's motion for continuance, and require plaintiffs to amend and supplement the discovery before considering their requests for summary relief, and grant leave to defendant to file additional evidence following the completion of the supplementation, including the evidence attached hereto.

### Summary of the Argument

9.     Dr. Shah and Mr. Zaidi, as Co-Managers of Apex, accepted the Loan Commitment for $9 Million from MetroBank on February 8, 2007, as discussed more fully below.  On February 9, 2007, before actually incurring the debt by executing the Promissory Note on March 22, 2007, all Members of Apex signed the Company Agreement, which ratified and confirmed all prior disclosed actions taken by Dr. Shah and Mr. Zaidi on behalf of the Company.  **This authorized and consented to the Managers going forward with the purchase of the hospital property by use of the MetroBank loan.**

10.    Plaintiffs object that no further consent was obtained from the Members after the Company Agreement was signed.  They argue that plaintiffs "could not ratify on February 9, 200[7] an action that had not yet occurred."  This ignores the fact that Dr. Shah and Mr. Zaidi had already obtained the consent to go forward with the MetroBank Loan Commitment signed February 8, 2007 when the members ratified and confirmed the proposed loan on February 9, 2007, by signing the Company Agreement.  The Company Agreement only requires that the Co-Managers obtain the "consent" in writing of the members to any debt over $500,000, whether before or after the fact.  They did: (1) the written approval and ratification of the mandatory language of the Agreement for

Purchase and Sale[6] of the hospital facilities constitutes that "consent" in writing; and (2) the written ratification and confirmation of the terms of the accepted MetroBank Loan Commitment for the $9,000,000 loan constitutes that "consent" in writing. No further consents (or post-loan ratifications) are required by the Company Agreement. Plaintiffs' breach of contract claims fail.

11.    In addition to the approval and confirmation by all members of the above contracts requiring the $9,000,000 MetroBank loan, Dr. Shah points to other evidences of member consents to the loan:

- Medistar assisted in obtaining the MetroBank loan with its letter dated January 22, 2007 to Mr. Taurig, the MetroBank officer, in order to strengthen the Company's loan application, stated that Medistar would participate as a consultant in the management of the Company.[7]

- Suneja signed the loan as a guarantor, proving his consent.

- Vora also consented by signing the loan as a guarantor.

- Zaidi, as Co-Manager, applied for and obtained a loan commitment (which was not accepted) from Texas State Bank[8] on behalf of the Company, in addition to signing the MetroBank loan documents.

- Zaidi's execution of the Tenant Subordination Agreement on behalf of the

---

[6] Ex. A to Defendant Shah's *Response to Motions for Partial Summary Judgment,* the Agreement for Purchase and Sale, at Paragraph 2.1.5, entitled *Loan,* refers to the $9,000,000 loan (the balance of the Purchase Price) and reads as follows:

> The balance of the Purchase Price other than the cash due at Closing and the Note to Seller shall be obtained **by a first lien upon the Property** to be held by a lender of Buyer's selection. Buyer shall **use all efforts to obtain the loan** from such selected lender.

[7] Ex. 9 is the January 22, 2007 Medistar letter to Tarig.

[8] Ex. 8 is the Texas State Bank Loan Commitment dated January 21, 2007, addressed to Mr. Zaidi.

Unofficial Copy Office of Chris Daniel District Clerk

Tenant/LTAC, as its General Partner co-managing it with Dr. Koch.

## Discussion of the Evidence Regarding
## Plaintiffs' Consent to the Loan

12. <u>The affidavits of the plaintiffs say nothing about whether the loan commitment was disclosed to them at the time they signed the Company Agreement.</u> There is no evidence that any of these transactions were concealed from the plaintiffs, or that they were not disclosed in the Company's books and records. The objected to evidence in Dr. Shah's affidavit shows there is a question of fact, and supports Dr. Shah's position that the Loan Commitment as well as the Agreement for Purchase and Sale of the Pin Oak Hospital and related properties (the "Property"), containing the requirement that a loan in the amount of $9,000,000 be obtained in order to purchase the Property, were disclosed to, and ratified and approved by, the members. No further consent by the members is required by the Company Agreement.

13. <u>All these Agreements were disclosed to the Members as a matter of law.</u> The operative documents are:

(1) Agreement for Purchase and Sale, at Paragraph 2.1.5, entitled *Loan,* refers to the $9,000,000 loan (the balance of the Purchase Price) and reads as follows:

> The balance of the Purchase Price other than the cash due at Closing and the Note to Seller shall be obtained **by a first lien upon the Property** to be held by a lender of Buyer's selection. Buyer shall **use all efforts to obtain the loan** from such selected lender.

(2) The MetroBank Loan Commitment for $9 Million necessary to effectuate the purchase, and

(3) The Lease Agreement of the hospital to the LTAC, all of which were executed

prior to the signing of the Company Agreement on February 9, 2008.

This raises questions of fact that prevent summary judgment, because these agreements were all "disclosed" in the company books and records, which each Plaintiff warranted they had examined to their satisfaction prior to executing the Company Agreement. (See §2.06, Representations and Warranties of Members.) Plaintiffs have not submitted any summary judgment evidence to contradict their own warranties that they were familiar with the Company's business, or to show why Dr. Shah was not entitled to rely on their own warranty and representation that they were advised of these transactions when the members approved, ratified and confirmed the transactions.

14. The Purchase Agreement was a promotional contract entered into by the organizers prior to incorporation. Execution of the Agreement for Purchase and Sale with Medistar Corporation was the only business in which Apex Katy Physicians, LLC (the "Company") was intended to engage – acquisition of the Pin Oak Hospital properties. Prior to incorporation, Dr. Shah and Mr. Zaidi executed the Purchase Agreement as the act and deed of an organizer (they had no other capacity on that date). Contracts entered into on behalf of yet-to-be-formed corporation are referred to as "promotional contracts" or, in the new nomenclature of LLC's, "Organizer contracts." Companies are free to adopt pre-organization contracts made on its behalf by its Organizers (or promoters), but are not bound by them absent ratification. A company lacks authority to contract prior to formation, as discussed in Defendant's Reply to the Motions for Summary Judgment. In this respect, Plaintiffs' argument that "organizers" are only persons who sign incorporation papers is incorrect. (See Paragraph 9 of

Defendant's *Response* and the cases there cited.) The acts of "organizers" go beyond the ministerial preparation of organizational documents where the company adopts and ratifies the organizers' pre-incorporation contracts.

15. The Loan Commitment was a post-incorporation contract entered into by the Co-Managers. The Apex LLC was incorporated on January 10, 2007. After incorporation, in early February, Dr. Shah and Mr. Zaidi received a Loan Commitment from MetroBank for the $9 Million loan, which was necessary to carry out the Purchase Agreement. At this time, they were acting as Co-Managers. The Company Agreement, §3.07, ratified and confirmed all disclosed actions taken by the Managers prior to the effective date of the Company Agreement.

16. The Members signing the Company Agreement, ratified and approved the organizational contracts necessary for the purchase and lease of the hospital. These Agreements were fully performed by the Company at the closing on March 22 when Apex made the loan and acquired title to the hospital. The Members consented to these actions by the organizers and Managers in writing when they each signed the Company Agreement. See §§ 3.07 and 9.05. The Agreement for Purchase and Sale expressly mandated the Managers to "use all efforts to obtain the loan from such selected lender." See Agreement, ¶ 2.1.5 (Ex. A to Shah's *Response.*)

17. Dr. Shah and Mr. Zaidi, as Co-Managers, acted pursuant to that requirement that they obtain a loan when, on February 6, 2007, Zaidi issued a check for the MetroBank Loan Commitment Fee in the amount of $56,000, and Dr. Shah executed the Loan

Commitment Letter on February 8, 2007[9] with MetroBank for the terms and conditions of the $9,000,000 loan.

18.     The Members then "ratified and confirmed" those disclosed acts of the Managers, in writing, when the next day they each signed the Company Agreement §3.07.  These actions by the Members gave consent to the Managers to enter into the loan on the terms stated and placing a first lien on the Property, exactly as called for in the Agreement for Purchase and Sale, and as agreed to in the MetroBank Loan Commitment Letter.

**Questions of Fact Exist as to the Effect of the Approval and Confirmation of the (1) Loan Commitment and (2) Agreement for Purchase and Sale in the Company Agreement.**

19.     As noted in Paragraph 5 of the *Plaintiffs' Reply to the Response to the Motions for Summary Judgment,* the Court is to give effect to all provisions of a contract.  *Forbau v. Aetna Life Insurance Co.,* 876 S.W. 2d 132 (Tex. 1994).   Following this rule of construction, questions of fact exist as to what the Members did "ratify and approve" that the organizers had done on behalf of the Company.  Similarly, the Court must give effect to that which the Members "ratified and confirmed" that was performed by the Managers on behalf of the Company.  The Managers obtained the written consent of the Members to the loan and purchase of the hospital facilities *before* the loan was made.  Plaintiffs argue that the Court should ignore the consents given, and require additional consent. They mask this by arguing that the specific provision controls over the general.  (See Paragraph 5 of Plaintiffs' Reply.)  They then argue that the broad authorizations could not include authorization for a loan, because the broad authorizations do not specifically

---

[9] Ex. E to Defendant Shah's *Response to Motions for Partial Summary Judgment.*

say "loan". What they ask the Court to do is ignore the express ratification sections of the Company Agreement and render them meaningless.

20. The organizers and the Managers, Dr. Shah and Mr. Zaidi, did but one thing: they followed and carried out precisely the ratified and approved Agreement for Purchase and Sale by securing the title to the Pin Oak Hospital properties with cash and a $9,000,000 loan, which acquisition was the sole object of the Company's existence. The following issues of fact emerge:

    a. Did the Members approve the organizers' act and deed of entering into the Agreement for Purchase and Sale, containing the requirement for obtaining a loan secured by a first lien on the Property?

    b. Did the Members confirm the Managers' act of entering into the Loan Commitment with MetroBank for the funds necessary to make the purchase of the Pin Oak Hospital property possible?

    c. Did the Managers act with the prior written consent of the Members when they entered into the $9,000,000 loan secured by a first lien on the Property?

    d. Did the blanket ratification and approval in the Company Agreement of the organizers and managers' prior actions include the Loan Commitment signed February 8, 2007 and authorize the managers to go forward with the closing?

    e. Are the Plaintiffs estopped from claiming the Loan was not approved by their laches and by accepting the benefits of the Loan, namely by buying the hospital and operating the hospital through the LTAC, which leases the hospital from Apex?

### Unreliability of the Koch Interrogatory Responses as Contradicted by the Koch Letter and Tenant Subordination Agreement

21. The affidavits of plaintiff Koch (Ex. A to his *Motion* and his sworn discovery responses) are interested party affidavits, and are inherently unreliable for summary

judgment purposes, and raise no more than an issue of fact regarding notice of the $9,000,000 loan agreements at the time of the confirmation and approvals set out in the Company Agreement. The Koch interrogatory responses[10] claim no knowledge of the $9,000,000 until January, 2009, when suit was filed. The falsity of the affidavit is demonstrated by the January 17, 2008 letter, signed by Koch and Zaidi, which inconvertibly proves that "all people involved (members partners & Bank)" were familiar with the $9,000,000 loan and in particular, the "recollection" that the lending bank, MetroBank, understood that the Zaidi-Koch tenant, Apex Hospital, would have "4-Months No rent."

22.     The Koch Letter shows that Dr. Koch was aware of the loan in January 2008, and not in January 2009 as stated in his discovery responses. The significance of the Koch letter is two-fold: (1) Koch withheld this letter from his production of documents four days before the Defendant's Response to the *Motion for Partial Summary Judgment* was due, not leaving enough time to do additional discovery to root out other documents which may have been withheld on the same subject matter; and (2) the letter raises the reasonable inference (which must be accorded non-movant) that all the "parties (partners & Bank)" were aware of the terms of the loan.

23.     The Koch letter is signed by Koch, as General Partner Apex Katy Hospital and Zaidi, as General Partner Apex Katy Hospital. It further conclusively proves the Koch plaintiffs' knowledge of the MetroBank loan and agreement with the Apex Physicians'

---

[10] Plaintiff's Responses to Interrogatories are attached to *Plaintiffs' Response to Defendant's Motion for Continuance. See* Response to Interrogatory No. 14.

"Deposit to metro - $150,000" and "Used at closing - $1,200,000". The terms of the closing arrangements were well known, and Koch and Zaidi were both General Partners of the Tenant, as well as organizer members of the Landlord, concurrently handling the financial arrangements of both Apex Katy Physicians – TMG, LP, and the Tenant—Apex Katy Long Term Acute Care Hospital, LP, related to the Bank.

24.    This knowledge is even more specifically demonstrated by the <u>Tenant Subordination and Attornment Agreement</u> executed by Koch's partner, Zaidi, and delivered to MetroBank on March 18, 2007, in connection with the closing of the $9,000,000 loan on March 22, 2007.[11] This document recites that:

> Apex Long Term Acute Care-Katy, L.P., a Texas limited partnership (hereinafter referred to as the "Tenant"), understands that <u>Apex Katy Physicians, LLC</u> (the "Borrower"), desire to obtain a loan (the "Loan") from METROBANK, N. A. ("Lender"). The Tenant further understands that payment of such Loan will be secured by liens and security interests encumbering that certain tract of real property and all improvements thereon (the "Mortgaged Property") situated in Fort Bend County, Texas, commonly known as 5602 Medical Center Drive, Katy, Texas 77494.

25.    Dr. Koch, as General Partner of LTAC, accepted the benefits of the loan with full knowledge of the burdens, and the recognition that the loan was an integral part of the transaction for the acquisition of the hospital properties by Apex Katy Physicians, LLC. Dr. Koch is bound by the knowledge of his partner, Mr. Zaidi, and his own management as General Partner of the Tenant as a participant in the closing of the $9,000,000 MetroBank loan by Apex Katy Physicians, LLC. He cannot now be heard to disclaim the burdens of the financial arrangements which he accepted the benefits of, and pretend no

---

[11] Ex. 1 is the Tenant Subordination and Attornment Agreement dated March 12, 2007, signed March 18, 2007.

knowledge of those arrangements. Each of the plaintiffs suing Dr. Shah in this claim is a member of the LTAC, and Dr. Koch and Mr. Zaidi are their General Managers and agents.

26.     The LTAC gave its written authorization and approval of the loan on behalf of its partners, which include the plaintiffs in this claim.  Since they approved the loan via this Tenant Subordination Agreement, as well as by the Company Agreement, the request for summary judgment should be denied.

27.     This documentary evidence supports Dr. Shah's affidavit testimony as correct in its assertion that the terms of the loan were "far from secret" and that the Members "were made aware of the terms of the loan" by himself or Mr. Zaidi.  Indeed, full information about the loan appeared in the books of the Tenant (of which Koch was General Partner), the books of Apex Katy Physicians, LLC (which Koch and each plaintiff warranted in the Company Agreement that he had satisfied himself as to the terms of financial arrangements), the December 21, 2006 Medistar letter[12] addressed to "All Physicians" outlining the proposals for financing the hospital purchase, and the Tenant Subordination Agreement signed by Zaidi as Co-General Partner with Dr. Koch for all plaintiffs/members of the Tenant LTAC.

**Koch was a Manager of Apex Katy Physicians – TMG, LP which Handled the Financial Arrangements for the Agreement for Purchase and Sale, and the Organization of Apex Katy Physicians, LLC**

28.     The reliability of Dr. Koch's affidavit in support of his *Motion for Partial*

---

[12] Ex. 6 is the Medistar letter to Mr. Zaidi and "All Physicians" regarding the need for financing dated December 21, 2006.

*Summary Judgment* is completely eroded by the fact that Dr. Koch was a Manager of Apex Katy Physicians – TMG, LP (hereafter "Apex - TMG"). This company was formed in October 2006 and functioned as the corporate shell for the organizers (including Dr. Koch and Mr. Zaidi) for the Pin Oak Hospital purchase by Apex Katy Physicians, LLC. Dr. Koch was instrumental in the formative stages of the overall arrangements for this major purchase from inception to post-closing management (as proven by the January 17, 2008 Koch Letter regarding the MetroBank loan). Dr. Koch even paid his $240,000 to Apex – TMG[13] and has paid nothing to Apex Katy Physicians, LLC.

29.     The Apex – TMG Operating Agreement[14] provides for its management in Article 3.01 as follows:

> 3.01. **Managers.** The Company shall be managed by two Managers. The initial Managers of the Company shall be **Adeel Zaidi** representing Turn-Around Management Group and Dr. P. K. Shah or Mr. **Stephen Koch** or Dr. Waseem Peracha (on a rotational basis) representing Apex Long Term Acute Care-Katy, L.P.

30.     Questions of fact are raised by the evidence that Dr. Koch appears in the transaction for the purchase of the Pin Oak Hospital and related properties from Medistar through (1) his organizational efforts as a Manager of Apex – TMG with Zaidi, Peracha, and Shah; (2) as the General Manager of Apex LTAC, the Tenant of the hospital and its acceptance of the benefits of the Lease of the facilities; (3) his participation in the closing as Manager with Zaidi of the Tenant in the Tenant's management decision to subordinate and attorn to the MetroBank loan; and (4) his participation in negotiations with Zaidi for

---

[13] Dr. Koch's $240,000 check is attached as Ex. 3.
[14] Ex. 5 is the Apex Katy Physicians – TMG, LLC Operating Agreement.

additional benefits from the loan agreement as Manager of the Tenant shown by his letter of January 2008. These actions by Dr. Koch raise issues of fact regarding ratification (apart from the express ratification of the Company Agreement), written consent in the Company Agreement to the Managers' actions to be taken to close the $9,000,000 loan placing liens on the hospital facility by MetroBank, and the approval expressly set out for the organizers' acts (including his own as Manager of Apex – TMG, an organizer) in entering the Agreement for Purchase and Sale of the hospital facility, calling for the $9,000,000 loan secured by the Property being purchased. Dr. Koch's false testimony in his interrogatory response alone would require denial of his request for summary relief because it casts doubt on the veracity of his interested witness affidavit. The extent of the involvement of all the members/partners/plaintiffs in the management of the LTAC/Tenant in the acceptance and retention of benefits from the closing of the Agreement for Purchase and Sale of the hospital facilities is proven by the Koch letter of January 2008, as well as by the Affidavit of Dr. Shah which is subject to the plaintiffs' objections and motion to strike.

### Conclusion

31. This case is not ready for summary disposition. The incomplete production by Dr. Koch of his correspondence regarding the loan, the scant summary judgment evidence provided by plaintiffs to attempt to prove that the Company Agreement did not constitute written consent to the closing of the Agreement for Purchase and Sale and the loan which was required to make it possible. At a minimum the deposition of Mr. Zaidi is required in order to ascertain the relationship between him and the plaintiffs, the degree of actual

notice regarding the dealings of the Company, and to confirm that the members signed the ratifications and approvals in broad form as a result of information given to them by Mr. Zaidi or Dr. Shah, as warranted by the Plaintiffs in the Company Agreement. Mr. Zaidi's deposition is necessary to shed further light on Dr. Koch's involvement in these transactions, as well as those of the other plaintiffs.

32.     Wherefore, premises considered, the plaintiffs' *Motion for Partial Summary Judgment* must be in all things denied, or in the alternative, Defendant's *Motion for Continuance* should be granted, pending completion of discovery as requested herein. Defendant further requests the Court admit the evidence attached hereto as part of the summary judgment proceeding, deny the objections to the Shah Affidavit tendered by plaintiffs, and for general relief as may be required, at law or in equity.

Respectfully submitted,

Tom F. Coleman
State Bar No. 04572000
402 Main Street, Suite 3 North
Houston, Texas 77002
(713) 225-6900
(713) 225-0264 - *fax*
*Attorney for Defendants,*
*Pankaj K. Shah, M.D., Bharati P. Shah,*
*and Indus Associates, L.L.C.*

# CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of Defendant's *Sur-Reply to Plaintiff's Reply to Defendant's Response to Motions for Partial Summary Judgment and for Continuance* was delivered to the following counsel of record on this 10th day of August, 2009, by U.S. Mail, postage prepaid, hand-delivery, or facsimile:

John W. Havins, Esq.                     *Via Facsimile:* 713-650-3301
Havins & Associates, P.C.
2211 Norfold, Suite 525
Houston, Texas 77098

*Attorneys for Plaintiffs,*
*Stephen M. Koch, M.D., Victor Ankoma-Sey, M.D.,*
*Ankoma-Sey PPSC, Ltd., Terry Scarborough, M.D.,*
*Hatem Saqr, Erik B. Wilson, M.D.,*
*Waseem Peracha, M.D., and G. Thomas Keith, M.D.*

Jerry C. von Sternberg, Esq.             *Via Facsimile:* 713-856-7268
Heather S. von Sternberg
The von Sternberg Law Firm
820 Gessner, Suite 1720
Houston, Texas 77024

*Attorneys for Defendants,*
*Apex Long Term Acute Care-Katy, L.P.*
*Apex Katy Physicians TMG, L.L.C.*
*and US TMG, L.L.C.*

Robert D. Remy, Esq.                     *Via Facsimile:* 713-465-8018
Robert D. Remy Law Offices
Two Memorial City Plaza
820 Gessner, Suite 1720
Houston, Texas 77024

*Attorneys for Defendant,*
*Adeel Zaidi.*

Jeffery B. Kaiser, Esq.  
Kaiser & Conrad, L.L.P.  
1911 Bagby, Suite 200  
Houston, Texas 77002

*Via Facsimile:* 713-571-8002

*Attorneys for Plaintiff,*  
*Apex Katy Physicians, L.L.C.*

W. Ashton Randall III  
Greenberg Traurig, L.L.P.  
2200 Ross Avenue, Suite 5200  
Dallas, Texas 75201

*Via Facsimile:* 214-665-3601

*Attorneys for Defendants,*  
*Katy Project, L.L.C., Upendra Vora,*  
*and Randeep Suneja.*

Matias Androgue  
Lyric Center  
440 Louisiana Street, Suite 715  
Houston, Texas 77002

*Via Facsimile:* 713-425-7271

*Attorneys for Plaintiff,*  
*Sammy E. Khoury, M.D.*

_____  
Tom F. Coleman

Unofficial Copy Office of Chris Daniel District Clerk

## TENANT SUBORDINATION AND ATTORNMENT AGREEMENT

March 12, 2007

MetroBank, N.A.
9600 Bellaire Boulevard, Suite 252
Houston, Texas 77036

Ladies and Gentlemen:

APEX LONG TERM ACUTE CARE-KATY, L.P., a Texas limited partnership (hereinafter referred to as the "Tenant"), understands that APEX KATY PHYSICIANS, LLC, (the "Borrower"), desire to obtain a loan (the "Loan") from METROBANK, N.A. ("Lender"). The Tenant further understands that payment of such Loan will be secured by liens and security interests encumbering that certain tract of real property and all improvements thereon (the "Mortgaged Property") situated in Fort Bend County, Texas, commonly known as 5602 Medical Center Drive, Katy, Texas 77494, and more fully described in Exhibit "A" attached hereto and incorporated herein by reference for all purposes. Tenant further understands that the Loan must be secured by a first and prior lien and security interests encumbering the Mortgaged Property.

Tenant has heretofore entered into that certain lease agreement (the "Lease"), a copy of which is attached hereto as Exhibit "B" and incorporated herein by reference for all purposes by which Tenant now occupies all or a portion of the Mortgaged Property. The Borrower is obtaining the Loan from the Lender to purchase the Mortgaged Property from the current owner thereof. As a prerequisite to making the Loan to Borrower, Lender has required that Tenant make the hereinafter set out covenants, agreements and warranties with and to Lender. Tenant understands that Lender would not be making the Loan to Borrower but for the covenants, agreements and warranties of Tenant hereinafter set out. In consideration of the foregoing premises and the sum of ten dollars and other good and valuable consideration paid to the Tenant, the receipt and sufficiency of which is hereby acknowledged, Tenant hereby covenants and agrees with Lender and warrants to Lender as follows:

1.      All rights and interests of Tenant in and to the Mortgaged Property, whether now existing or hereafter arising and whether arising under the Lease or otherwise, are and shall remain secondary, subordinate and inferior to all liens and security interests now or hereafter encumbering all or any portion of the Mortgaged Property to secure payment of all or any portion of the Loan.

2.      A true, correct and complete copy of the Lease is attached hereto as Exhibit "B" and such Lease has not been cancelled, modified, amended or rescinded in whole or in part. There are no other agreements or understandings by and between Borrower and Tenant relating to Tenant's occupancy of the Mortgaged Property except as set out in the Lease.

3.      Tenant shall not hereafter agree to any cancellation or termination of the Lease or any modification of the Lease which would either shorten the term of the Lease or reduce or change the terms of payment of the rentals payable under the Lease without the prior written consent of Lender. Tenant shall not hereafter repay more than one months rental under the Lease without the prior written consent of Lender.



**EXHIBIT**

**1**

4.     Tenant, upon being notified in writing by Lender that Borrower has defaulted under the terms of any document or instrument evidencing or securing the Loan, will immediately make all rental payments thereafter becoming due under the Lease directly to Lender at its address shown above.

5.     In the event that either: (a) Lender shall hereafter obtain possession and/or control of the Mortgaged Property by virtue of an order of a court, or (b) the liens in favor of Lender encumbering the Mortgaged Property are foreclosed then, Tenant shall attorn under the Lease to Lender or any other party that acquires legal title to the Mortgaged Property as a result of any such foreclosure sale as if the Lender or such other party had originally been named as the Landlord in the Lease, but provided further that neither Lender nor any such other party acquiring title to the Mortgaged Property shall have any liability to Tenant for any obligations, liabilities, or duties of Borrower to Tenant which arise or accrue prior to the date that Lender or such other party acquires legal title to the Mortgaged Property.

6.     The terms and provisions hereof shall be binding upon Tenant and Tenant's successors and assigns and any sublessees under the Lease and shall inure to the benefit of Lender and Lender's successors and assigns.

Tenant: *Apex Long Term Acute Care Katy / Apex Hospital Katy*

By: _____

Name: *Adeel Zaidi*

Title: *G. Partner*

THE STATE OF TEXAS    §
                           §
COUNTY OF _____   §

This instrument was acknowledged before me on the *18th* day of *March*, 200*7* by *Adeel Zaidi*, as *General Partner* of *Apex Long Term Acute Care Katy*, a _____, on behalf of said _____.

A. K. CHAGLA
MY COMMISSION EXPIRES
JUNE 3, 2007

Notary Public -- State of Texas

2


**APEX**HOSPITAL

January 17, 2008

Apex Katy Physicians, LLC
5608 Medical Center Drive
Katy, TX

Dear Dr. Shah:

Based on your calculations provided to us on January 13th, 2008, we have concerns about the following areas and would like to speak with you upon your return:

- Expense for the POB needs to be deducted.
- Late Charges & the Rate of late Charges -- Why penalize your partners in operation so much?
- Starting Date of the Rent -- All people involved (partners & Bank) have recollection of 4-Months No rent. Starting first month rent in August of 2007

Calculations as per your letter:

Partners capitals 40 units * $ 40,000 = $1,600,000 (we agree)
Used at closing - $ 1,200,000 (we agree)
Deposit to metro- $150,000 (we agree)

Balance = $250,000 (we agree)

Borrowed from metro on 08/21/07 = $700,000 (we agree)

Professional building rental income after expense = $100,000 (needs verification)

Subtotal = $1,050,000

Rent and penalties due to Apex Katy physicians, LLC as of 1/6/2008 = 1,482,642

Total due from Bank of America account = $2,532,642

Lease Payment

Terms of lease:
- Rent starts (a) -4 months after completion date
- (b) -90 days after certificate of occupancy (page 24)

*Unofficial Copy Office of Christopher Daniel District Clerk*

5602 Medical Center Dr.
Katy, Texas 77494
Phone: 281.392.5700
Fax: 281.392.5795
~o.apexhospital.com

By:
TURN-AROUND
MANAGEMENT GROUP
www.tmigroupusa.com

*Delivering Patient Satisfaction*

**EXHIBIT**

2

- Certificate of Occupancy received on March 5th
- First Patient admitted on March 15th

<u>Late payment charge</u>

(a) 4% of the amount of each payment, if rent is not paid within 10 days.
(b) 18% per annum, 30 days after due date until rent is paid.

Rent / P.S.F $20.

Rental Sq Ft -101105

Total rent due as of 01-07-08- With late payment and penalties $1,482,642.50

We, the General Partners of Apex Hospital, are doing a second offering to the Northwest Physicians to raise funds to make the real estate partners whole at our earliest convenience. You are well aware of the fact that there has been a large delay due to regulations changing in the middle of our project.

We appreciate your patience and professionalism to allow us to meet our operational obligations by loaning money at the time when we needed the funds.

Once again, we agree with the basic numbers and would like to sit with you upon your return to resolve the minor details with our accountants.

Sincerely,

Adeel Zaidi
General Partner
Apex Katy Hospital

Steve Koch, M.D
General Partner
Apex Katy Hospital

C: IMG Board Members

Rent Matrix: Attached per Dr. Shah

Unofficial Copy Office of Chris Daniel District Clerk

Unofficial Copy Office of Chris Daniel District Clerk

STEPHEN M KOCH
ANGELA KOCH
3207 AMHERST
HOUSTON, TX 77005-3331

SMITH BARNEY
citigroup

2852

55-7265/212

Date

Pay to the
Order of _Upper Katy Physicians - TMG - LLC_  $ _249,000.00_

_Two Hundred Forty Thousand and ————— XX/100_ Dollars

SIGNATURE CLIENT FMA ACCOUNT
866-983-2964
Citibank F.S.B. Englewood Cliffs, N.J.

For _Katy MEX property_

⑆021272655⑆ 100⑈713488⑈ 2852

EXHIBIT
3
tabbles

KOCH

| Amount: | $500,000.00 | Sequence Number: | 6130806812 |
|---|---|---|---|
| Account: | 5781917967 | Capture Date: | 11/08/2006 |
| Bank Number: | 11300002 | Check Number: | 991 |



Unofficial Copy Office of Chris Daniel District Clerk

**EXHIBIT**
4

ITAC000390

1008

# OPERATING AGREEMENT

# OF

# APEX KATY PHYSICIANS-TMG, LLC

A Texas Limited Liability Company

Effective 9th October, 2006

Unofficial Copy Office of Chris Daniel District Clerk

**EXHIBIT**

_5_

VAS00029

OPERATING AGREEMENT
OF
APEX KATY PHYSICIANS-TMG, LLC

**THIS OPERATING AGREEMENT** is dated and adopted this 9th day of October 2006, by the persons whose names are subscribed below, who constitute the members of APEX KATY PHYSICIANS-TMG, LLC, a Texas Limited Liability Company.

The members agree as follows:

## ARTICLE 1
## Organization of Company

1.01. **Name.** The name of the limited liability company that has been formed and will be operated pursuant to this Operating Agreement is APEX KATY PHYSICIANS-TMG, LLC, (hereinafter "the Company"), which is a limited liability company organized under the Limited Liability Company Act of the State of Texas.

1.02. **Registered Agent and Office.** The Company's registered agent in Texas is Adeel Zaidi, whose business address is 6161 Savoy, Suite 1214, Houston, Texas 77036. The Company may designate other registered agents or offices at any time in this state or, if necessary, in other states.

1.03. **Principal Place of Business.** The Company's principal place of business is located at 6161 Savoy, Suite 1214, Houston, Texas 77036. The Company may establish additional offices at any time.

1.04. **Term.** The term of existence of the Company shall begin with the filing or acceptance of its articles of organization and shall continue until the dissolution and termination of the Company as provided in Article 8 of this Operating Agreement.

1.05. **Purpose.** The purpose of the Company is to engage in the business of the construction, development and operation of a medical care facility to be known as Apex Hospital-Katy and to engage in any lawful business or activity for which a limited liability company may be organized under the Texas Limited Liability Company Act.

## ARTICLE 2
## Membership and Capital

2.01. **Initial Members.** The names and addresses of the initial members of the Company are:

1



Unofficial Copy Office of Chris Daniel District Clerk

## REPRESENTATIONS AND WARRANTIES OF MEMBERS PARTNERS:

By signing this Agreement, each Member warrants and represents the following:

(a) That he recognizes that Section 4(2) of the Securities Act of 1933, as amended, (the "Act") exempts the issue and sale of securities from registration under the Act in transactions not involving any public offering, and that he is purchasing his Partnership interest for his own account, for investment, and with no present intention of distributing, reselling, pledging, or otherwise disposing of that interest.

(b) That he is a resident of the State of Texas and that he is the beneficial owner of the interest standing in his name, and that he has no intention of reselling that interest to any residents of states other than Texas.

(c) That he is a sophisticated investor and the nature and amount of the capital contributions he agrees to make under this Agreement are consistent with his investment program and that he has sufficient liquid assets to meet promptly all calls for additional contributions and to absorb the loss of his entire investment in the Partnership.

(d) That he has been furnished with sufficient written and oral information about the Partnership, the General Partner, and the Property to be purchased and developed to allow him to make an informed investment decision prior to purchasing an interest in the Partnership, and has been furnished access to any additional information that he may require.

(e) That he is fully familiar with the business proposed to be conducted by the Partnership and with the Partnership's use and proposed use of the proceeds of the sale of the Partnership interests.

(f) That the offer and purchase of his interest in the Partnership have been made in the course of a negotiated transaction involving direct communication between himself and the General Partner on behalf of the Partnership.

(g) That he has either had experience in business enterprises or investments entailing risk of a type or to a degree substantially similar to those entailed in an investment in the Limited Partnership or has obtained independent financial advice with respect to investment in the Partnership.

(h) That he has been advised that his partnership interest may not be sold, transferred, or otherwise disposed of in the absence of either an effective registration statement covering that interest under the Securities Act of 1933 or an opinion of counsel satisfactory to the Partnership and its counsel that registration is not required under the Securities Act of 1933, and that he will have no rights to require registration of his interest under the Securities Act of 1933, and, in view

3

Unofficial Copy Office of Chris Daniel District Clerk

of the nature of the transaction, registration is neither contemplated nor likely.

(i) That he agrees to hold the General Partner and the Limited Partnership or any person controlling the Limited Partnership and the respective successors, assigns, or other controlling persons harmless and to indemnify them against all liabilities, costs, and expenses incurred by them as a result of any sale or distribution by him in violation of the Securities Act of 1933. All representations, warranties, and indemnities made by him with reference to the Securities Act of 1933 shall be deemed to be equally applicable in connection with the securities law of Texas or any other state.

(j) That he is an "accredited investor" who meets at least one of the fiollowing criteria:

1. A bank, whether acting in its individual or fiduciary capacity; insurance company, investment company registered under Section 2(a)(48) of Investment Company Act of 1940 or business development company as defined in Investment Company Act of 1940, small business investment company licensed by the Small Business Administration under Small Business Act of 1958, employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary (as defined in Section 3(21) of ERISA) that is either a bank, insurance company, or investment adviser registered under the Investment Advisers Act of 1940, or an employee benefit plan, if the plan has total assets in excess of $ 5 million.

2. A private business development company, as defined in Section 202(a)(20) of the Investment Advisers Act of 1940.

3. A tax-exempt non-profit organization with total assets in excess of $ 5 million.

4. A director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of the issuer of securities being offered or sold.

5. A person who purchases at least $ 150,000 of the securities being offered, if the purchaser's total purchase price does not exceed 20 percent of the purchaser's net worth at the time of sale, or joint net worth with that person's spouse, for one or any combination of the following:

a. Cash.

b. Securities for which market quotations are readily available.

c. Any unconditional obligation to pay cash or securities for which market quotations are readily available, if the obligation is to be discharged within five years of the sale of securities to the purchaser.

d. Cancellation of any indebtedness owed by the issuer to the purchaser.

6. Any natural person whose individual net worth, or joint net worth with that person's spouse, at

4



VAS00033

the time of the sale exceeds $ 1 million.

7. A natural person (1) who has had an individual income with that person's spouse in excess of $200,000 in each of the two most recent years and (2) who reasonably expects income in excess of $200,000 in the current year.

8. An entity in which all of the equity owners are accredited investors under items (1) through (4), (6), or (7), above

2.02. **New or Substituted Members.** New members shall be admitted to the Company only upon the written consent of sixty-seven (67.0%) per cent in interest, not in number, of the existing members. An assignee of a member's ownership interest in the Company shall be admitted to the Company as a substituted member only upon the written consent of sixty-seven (67.0%) per cent in interest, not in number, of the members. A new or substituted member, as a condition of being admitted to membership in the Company, shall be fully bound by the terms and provisions of this Operating Agreement and all amendments thereto, whether or not the new or substituted member actually signs this agreement or an addendum thereto.

2.03. **Ownership Interests.** The ownership interest of each member of the Company shall be expressed in terms of a percentage. The total ownership interests of all members shall always equal 100 percent. The ownership interests of new members shall be determined prior to admission by the existing members. The ownership interests of the initial members are set forth in section 2.04 of this Operating Agreement.

2.04. **Capital Contributions.** A member's capital contributions to the Company may consist of cash, property, services rendered, or a written promise to contribute cash, property or services in the future. The value of all capital contributions shall be determined by the members. A member shall not be entitled to withdraw a capital contribution without the consent of all other members. A member shall not be entitled to interest on or with respect to any capital contribution. Additional capital contributions may be made by a member only with the consent of all other members. The capital contributions required of new members shall be determined by the existing members. The initial ownership interests of the initial members of the Company are set forth below:

| Member | Ownership Interest |
|---|---|
| TURN-AROUND MANAGEMENT GROUP | 50.0% |

5



VAS00033

Unofficial Copy Office of Chris Daniel District Clerk

2.05.   **Capital Accounts.**   The Company shall maintain a capital account for each member.  A member's capital account shall consist of the total amount of the member's capital contributions to the Company, plus any net income or gain allocated to the member by the Company, plus the amount of

6

VAS00034

any Company liability assumed or secured by the member, less the value of any money or property distributed to the member by the Company, less any net losses allocated to the member by the Company, less the amount of any liabilities of the member assumed or secured by the Company.

## ARTICLE 3
### Management

3.01. **Managers.** The Company shall be managed by two Managers. The initial Managers of the Company shall be Adeel Zaidi representing Turn-Around Management Group and Dr. P. K. Shah or Mr. Stephen Koch or Dr. Waseem Peracha (on a rotational basis) representing Apex Long Term Acute Care-Katy, L.P.

3.02. **Number, Election and Removal of Manager.** The Company shall have two (2) Managers. Any managers after the initial Managers shall be elected by the Members at a regular or special meeting of the Members in the manner set forth in this Agreement.

Any Managers selected after the initial Managers shall be elected with one (1) Manager being selected by Prestige Consulting, Inc. and with one (1) Manager being selected by the remaining Members.

The first such election shall be held during the second calendar year after the effective date of this Agreement. Each Manager shall be elected for a term of one year. A Manager may be removed by a vote of eighty (80.0%) per cent in interest, not in number, of the Members at a special meeting of the Members called for that purpose.

3.03. **Powers and Authority of Managers.** Except as otherwise provided in this Agreement or in the Act, the Managers shall have the exclusive authority to manage the Company and its business, and to make all decisions regarding the business of the Company, or to delegate these functions to employees or agents of the Company. The Managers shall have the right, power and authority to do, on behalf of and in the name of the Company, all functions, acts and things as are, in the judgment of the Managers, reasonably necessary to carry on the business and purposes of the Company, including the appointment of such officers of the Company as the Managers deem appropriate. The Managers shall have all of the rights and powers which may be granted to Managers under the Act. Any person dealing with the Company may rely on the authority of the Managers to perform any act or function on behalf of the Company that is authorized by this Agreement or by the Act.

3.04. **Decisions of Managers.** Differences between the Managers as to any matter within the authority of the Managers shall be decided by vote of the Managers, or, if this is not feasible, by a vote of sixty seven (67.0%) percent Investment Interest, not in number, of the Members.

3.05. **Restrictions on Authority of Managers.** The Managers shall not, without the written consent of all Members, have the authority to:

    (1)    perform any act or function in contravention of this Agreement;

7

Unofficial Copy Office of Chris Daniel District Clerk

(2)    perform any act or function that would make it impossible to carry on the business of the Company, except as otherwise provided in this Agreement;

(3)    cause the Company to possess property for other than a Company purpose;

(4)    sell or transfer all or a significant part of the Company assets;

(5)    dissolve or terminate the Company;

(6)    merge or consolidate the Company with another entity; or

(7)    incur a Company liability in excess of $500,000.00.

Notwithstanding the above, it is agreed and acknowledged that the management of the hospital and the business associated with its operations shall be contracted to Prestige Consultants, Inc. under a management contract which shall provide in part that said management company shall be for a term of twenty years.

## 3.06. Indemnification of Managers.

(1)  The Company shall indemnify, hold harmless, and pay all judgments and claims against a Manager that are related to any liability or damage incurred by reason of any act performed or omitted to be performed by the Manager in connection with the business of the Company, including attorneys' fees incurred by the Manager in connection with the defense of any action based on any such act or omission.

(2)  In the event of any action by a Member against a Manager, the Company shall indemnify, hold harmless, and pay all expenses of the Manager, including attorneys' fees, incurred in the defense of such action, if the Manager is successful in the action.

(3)  The Company shall indemnify, hold harmless, and pay all expenses, costs or liabilities of a Manager who for the benefit of the Company makes a deposit, acquires an option, or makes any other similar payment or assumes any obligation in connection with any property proposed to be acquired by the Company and who suffers any financial loss as the result of such action.

(4)  Notwithstanding the above provisions in this section, no Manager shall be indemnified from any liability for acts or omissions that constitute willful or reckless misconduct.

3.07.  **Ratification of Actions.**  All disclosed actions taken by the Managers on behalf of the Company prior to the effective date of this Agreement are hereby ratified and confirmed by the Members.

3.08.  **Voting Requirements.** Except as otherwise provided in this Operating Agreement or in the Texas Business Organizations Code, Chapter 101 (Limited Liability Company Act), all matters

8

Unofficial Copy Office of Chris Daniel District Clerk

requiring the vote, consent or approval of the members shall require the vote, consent or approval of a majority of the members.

3.09. **Membership Meetings.** The members may hold regular or special meetings either in the State of Texas or elsewhere. Regular meetings of the members may be held without notice at such time and place as may be determined by the members. A special meeting of the members may be called by any member by giving ten (10) days prior written notice of the time, place and purpose of the meeting to the other members. Notice shall be as provided in section 9.03 of this Operating Agreement. Notice of any meeting may be waived by any member.

3.10. **Action Without Meeting.** Action may be taken by the members without meeting if all members sign a written consent to the action taken or in any other manner provided for in the "Action Without Meeting" provisions of the Texas Limited Liability Company Act.

3.11. **Telephonic Meetings.** Members may participate in a meeting by means of conference telephone or other video or audio communications equipment whereby all persons participating in the meeting can simultaneously hear each other. Participation in such a meeting by a member shall constitute the presence of the member at the meeting.

## ARTICLE 4
## Allocations and Distributions

4.01. **Allocation of Income and Loss.** It is agreed that 4% of the earnings shall be retained as a reserve for unanticipated expenses and debt reduction.

4.02. **Company Tax Provision.** The members expect and intend that the Company shall be treated as a Company for federal income tax purposes. The members agree individually that they will do nothing with respect to their individual income tax returns that is inconsistent with or that will otherwise jeopardize the Company's Company tax status.

4.03. **Special Tax Provision.** The income, gain, loss or deduction with respect to an asset contributed to the capital of the Company by a member shall, in accordance with Section 704(c) of the Internal Revenue Code and solely for tax purposes, be allocated between the members so as to take into account any variation between the adjusted income tax basis of the property to the Company and its actual value when contributed.

4.04. **Allocations Upon Transfer.** If, during an accounting period, a member transfers the member's rights to Company profits, losses and other income tax items to another person, the profits, losses and other tax items that would otherwise have been allocated to the transferring member for the accounting period shall be allocated between the transferor and the transferee pursuant to any method chosen by the member that is permitted under Section 706 of the Internal Revenue Code.

4.05. **Distributions.** All distributions by the Company shall be made to the members in proportion to their respective ownership interests as shown in the books and records of the Company. However, Section 4.01 shall apply to create a capital reserve account and debt reduction prior to any

9

Unofficial Copy Official Records of Chris Daniel District Clerk



VAS00037

distribution to the Members other than for payment of dividends and compensation for management, as provided under this agreement.

4.06. **Restriction on Distribution.** The Company shall not make a distribution to the members unless immediately after giving effect to the distribution, all liabilities of the Company, other than liabilities to the members on account of their interest in the Company and liabilities as to which recourse of creditors is limited to specified property of the Company, do not exceed the fair value of the Company assets, provided that the fair value of any property that is subject to a liability as to which recourse of creditors is so limited shall be included in the Company assets only to the extent that the fair value of the property exceeds such liability.

4.07. **Additional Capital Contributions.** In the event the Managers determine that additional capital contributions become necessary in order to maintain, operate, preserve or protect the operation of the building, then additional capital contributions may be required of the Members in the proportion of ownership as stated in Section 2.04 of this Agreement. In the event a member is unable or unwilling to make said additional capital contribution, then the remaining Members shall have the option to make an additional capital contribution any such shortfall and the ownership interests under Section 2.04 shall be modified to reflect the percentage of additional capital contribution by the Members.

## ARTICLE 5
## Accounting, Books and Records

5.01. **Accounting Practices and Tax Year.** The Company shall keep its books and records and prepare its financial statements in accordance with generally accepted accounting principles and shall prepare its income tax returns using such methods of accounting. The Company tax year shall be the calendar year.

5.02. **Location and Inspection.** Proper and complete books of account and records of the business of the Company shall be kept at the Company's principal office and at such other places as may be designated by the members. Notice shall be given to each member of any changes in the location of the Company books and records. The Company books and records shall be open to inspection, audit and copying by any member, or the designated representative of a member, upon reasonable notice at any time during business hours for any purpose reasonably related to the member's interest in the Company. Any information so obtained or copied shall be kept and maintained in strict confidence except as otherwise required by law.

5.03. **Reliance on Books and Records.** A member shall be fully protected in relying in good faith upon the records and books of account of the Company and upon such information, opinions, reports or statements presented to the member, by the Company or any of its other members, officers, or employees, or by any other person selected by the Company, as to matters which the member reasonably believes are within such other person's field of expertise, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to members might properly be paid.

10



VAS00038

5.04.  **Reports and Tax Returns.** A financial statement for the Company shall be made and reported on as of the end of each calendar year. A copy of the annual financial statement and report shall be transmitted to the members within ninety days after the end of each year. The Company shall, within ninety days after the end of each fiscal year, file a federal income tax informational return and transmit to each member a schedule showing the member's distributive share of the Company's income, losses, deductions, credits, and other information necessary to enable the members to timely file their federal income tax returns. The Company shall also file, and provide information to the members regarding, all applicable state and local income tax returns. The Company's "Tax Matter Partner" shall be Adeel Zaidi, who shall have the authority to exercise the functions provided in Sections 6221-6223 of the Internal Revenue Code and the authority to delegate those functions to another person.

## ARTICLE 6
### Distribution Upon Sale of Primary Assets

6.01.  **Distribution Upon Sale of Primary Assets.** Notwithstanding any provision to the contrary regarding the ownership interests of the Members in the company, upon the termination of the business of Apex Acute Long Term Care, LP., the net proceeds, after payment of expenses of sale, outstanding mortgages, taxes, and outstanding bills owed by the Company shall be distributed as follows:

## ARTICLE 7
### Indemnification and Limitation of Liability

7.01.  **Indemnification.** A member shall be indemnified for all damages and expenses, including attorneys' fees, and held harmless by the Company from any liability resulting from any act or omission committed by the member on behalf of the Company to the fullest extent permitted under the Limited Liability Company Act and other laws of the state of Texas.

7.02.  **Exculpation.** A member shall not be liable to the Company or to any other member for any act, omission or error committed by the member while acting on behalf of the Company in accordance with the standards of conduct, if any, established in the Texas Limited Liability Company Act.

7.03.  **Limitation of Liability.** No member shall be personally liable for any debt, liability or obligation of the Company solely by reason of being a member of the Company.

## ARTICLE 8
### Dissolution and Termination

8.01.  **Dissolution.** The Company shall be dissolved upon the first to occur of the following events:
        (1) The expiration of the term or period of existence, if any, set forth in its Articles of Organization.
        (2) The unanimous written consent of the members to dissolve the Company.

11



VAS00039

(3) The entry of a decree of judicial dissolution as provided in the Texas Limited Liability Company Act.

8.02.     **Winding Up.** The members shall have the power and authority necessary to marshal the Company assets, pay the Company creditors, distribute the Company assets, and otherwise wind up the business and affairs of the Company upon dissolution. The members shall also have the authority to continue to conduct the business and affairs of the Company after dissolution to the extent reasonably necessary to effect an orderly and profitable winding up of the Company's business and affairs.

## ARTICLE 9
### Miscellaneous

9.01.   **Amendment.** This Operating Agreement, or any provision thereof, may be amended at any time by a majority vote of the members at a special meeting duly called for that purpose, except that any provision of this Operating Agreement that provides for a membership vote, approval or consent of greater than a majority may be amended only by a membership vote that is equal to that specified in the provision sought to be amended.

9.02.   **Governing Law.** This Operating Agreement shall be governed by the Limited Liability Company Act and other laws of the state of Texas, as such Act and laws may from time to time be amended.

9.03.   **Notices.** Any notice given by a member to another member or to the Company, or given by the Company to a member, shall be in writing and shall be deemed effectively given upon personal delivery or upon deposit in the U.S. Mail by registered or certified mail, return receipt requested, or upon confirmed facsimile transmission for delivery to the company or to such member, at the address or facsimile number shown in the records of the Company.

9.04.   **Definition.** The term "members" as it appears in this Operating Agreement includes those persons who are members of the Company under the terms of this Operating Agreement at the time in question.

9.05.   **Ratification of Organizer.** The acts and deeds of the organizer or organizers performed in the course of organizing the Company are hereby approved and ratified by the members.

9.06. **Entire Agreement.** This Operating Agreement and the amendments thereto, if any, constitute the entire agreement among the parties with respect to the Company and the operation of its business.

9.07. **Binding Effect.** This Operating Agreement and the amendments thereto, if any, shall be binding on, and shall inure to the benefit of, the Company, the members, and their respective transferees, successors, assigns and legal representatives.

9.08. **Covenant Not to Compete.** All members agree and covenant that for a period of five (5)

12



Unofficial Copy Office of Chris Daniel District Clerk

years from the date hereof and in the event of sale/transfer of their membership interests for a period of two years from the date of such sale/transfer neither they or any of their immediate family members shall directly or indirectly own, lease, manage or be directors of any long term acute care hospital within a radius of ten (10) miles of Apex Hospital.

IN WITNESS WHEREOF, the members have subscribed their names to this Operating Agreement on or as of the day and year first above written.

Unofficial Copy Office of Chris Daniel District Clerk



Medical Real Estate Development

December 21, 2006

Mr. Adeel Zaidi and All Physicians
Turn Around Management Group
616 Savoy, Suite 1214
Houston, Texas 77036

**Re:   Final Proposals**

Dear Adeel and Doctors:

The purpose of this letter is to explain to you once and for all Medistar's position and what Medistar and its Trust is willing to do.

At this time, I need you to know that Medistar did not change the deal. You have changed the deal and tried to use our property that is free and clear to assist you and your partners. This situation is very unfair, demanding and non-workable.

Medistar has spent a lot of time on this deal, which I am personally ready to cancel by tomorrow at 12:00 noon and return your earnest money if we do not resolve all issues now. In the meantime, we have told you that Medistar now has much better offers than yours, but out of loyalty and good faith dealing, we have put these three (3) offers on the side, contingent on a resolution of our situation and our deal.

Let me remind you that you changed our original deal, either because you do not have the investor in real estate, or you did not sell enough shares, or you are trying to have a free ride on Medistar's experience and take advantage of our free and clear assets. **With total respect to you, Medistar does not change deals.** You should also be aware that APEX is a start-up company without a strong background in LTACHs and no strong backing or strong financial position to take on such a deal. Medistar and I have tried every way humanly possible to assist you and your physicians by exploring other avenues of making this project achievable, by introducing you to banks that have rejected loan requests because there is no financial strength and no history of operating and managing an LTAC.

We have negotiated and pressured Memorial Hermann to provide you and your physicians with furniture, equipment and other assets. We have promoted you to other healthcare companies, and we have spent a tremendous amount of time, efforts and money to assist you and work with you.

Medistar has recently experienced tremendous financial losses on a start-up company, Innova, which left us liable on a $25 Million building in Houston and an $18 Million building in San Antonio, in addition to the loss of millions of dollars.

Medistar resigned from the Town and Country project, because it was a start-up company run by smoke and mirrors and false promises, and now that hospital is a disaster for everyone. Medistar lost money on that project but Medistar was wise not to work with the Town and Country dishonest management.

7670 Woodway  • Suite 160 • Houston, Texas 77063 • Phone: (713) 266-8990 • Fax (713) 952-7177

Unofficial Copy of Chris Daniel District Clerk

024

**EXHIBIT**

6

Page 2
Mr. Adeel Zaidi
December 21, 2006

I am giving you and all of your partners and physicians until 12:00 noon, Friday, December 22, 2006, to give us your final response on the following proposals.

A.    Original Scenario as agreed to by APEX:
APEX/Physician partners to invest between $6,000,000 to $9,000,000
- Ownership interest would be between 33% and 50% based upon amount provided.
- Partnership gets between 33% to 50% of net cash flow and net sales profits.
- APEX/Physicians to put down $500,000 Earnest Money.
- APEX/Physicians to provide remainder of funds to Medistar two (2) weeks prior to closing.
- APEX/Physicians get preferred return of 7% on investment.
- Medistar gets preferred return of 7% on its investment.

APEX – Lease
- 20-year term
- $20.00 psf absolute net (NNN)
- CPI increases (estimate 2.0%) after year two
- 4 months free base rent (tenant still pays taxes and all other operating expenses of the building)
- $2,000,000 LOC for Lease Guaranty for 16 months

**Medistar is willing to close and honor this proposal and agreement.**

After the original scenario, you came with the idea of financing and placing a loan on our property. I presented this concept to some banks, but, as you know, the banks rejected APEX. The Trust and I also rejected your idea of using our free and clear assets for the benefit of you and your physicians, **without at least providing security for our assets that you are using**, which is not fair from you or your partners. Therefore, Medistar presented the following proposal:

B.    Second Proposal – $2,700,000 cash and Letters of Credit
- APEX/Physicians to provide $2,700,000 cash
- APEX/Physicians to provide $2,000,000 LOC for 16 months to secure the rents.
- APEX/Physicians to provide $6,300,000 LOC until sale of the project or until the project is refinanced with a non-recourse loan.
- Lease – Same terms as Original Scenario
- APEX/Physicians get preferred return of 8% on $2,700,000.
- Medistar gets preferred return of 8% on $9,000,000
- Net cash flow after preferred returns and debt to be split 50/50.
- Net profits on sale to be split 50/50.
- Medistar, APEX and its investors to obtain $15,546,000 loan.
- LOCs will both be assigned to Lender as additional collateral for loan.
- LOCs to be drawn on first in case of default.
- Both LOCs to be drawn on by Medistar in event of lease default.

**Medistar is willing to close and honor this proposal and agreement.**

025

Unofficial Copy Office of Chris Daniel District Clerk

Page 3
Mr. Adeel Zaidi
December 21, 2006

In a further effort to assist you and the physicians, I gave you a proposal to buy the Hospital, MOB, 2.9 acres and 8 acres for $25 Million on a four (4) year payout with a 7% interest rate. Then, to assist all of you, I reduced my price to $19.5 Million for a 4-year pay-out, in which Medistar and I would retain 5% of ownership in the net profits of the hospital operations and hospital real estate. **Medistar is also willing to close on this proposal.**

The bottom line is that you and your partners cannot use our assets that are already paid for free and clear from any debt for you and your partners' advantage **without at least securing a part of our assets**. Simply stated, it will not work. You also told me numerous times that you had already raised the $6 Million, and you wanted to put the $9 Million in to own 50% of our project. Under the original scenario, these funds were to have been provided to Medistar two (2) weeks prior to closing on the properties. My question is what happened?

Medistar is giving you until 12:00 Noon, December 22, to chose and live with any of these three (3) proposals; otherwise, consider all agreements between us null and void, and we will return your earnest money and go our separate ways.

Sincerely,

Monzer Hourani

MH/dl

cc:    Bob Hodge
       Larry Vaile
       David Steidley
       Cameron Smith
       Paul Tapscott
       The Manfred Trust
       Abeer Saqer

Unofficial Copy Office of Chris Daniel District Clerk

026

## BORROWING CERTIFICATE
### (Limited Liability Company)

This Borrowing Certificate ("Certificate") is made and given this _22_ day of _March_, 2007 by APEX KATY PHYSICIANS, LLC., a Texas limited liability company (the "Company") to METROBANK, N.A (the "Lender") in connection with Lender's loan (the "Loan") evidenced by the promissory note (the "Note") dated of even date herewith executed by the Company payable to the order of Lender in the principal amount of NINE MILLION DOLLARS ($9,000,000.00) and secured by various liens and security interest including, but not limited to, the liens and security interests of the Deed of Trust and Security Agreement (the "Deed of Trust") encumbering the real property described in Exhibit "A" attached hereto and improvements thereon (collectively, the "Mortgaged Property"). The Note, the Deed of Trust and the other documents evidencing, securing or guaranteeing the Loan or executed at Lender's request regarding the Loan are herein referred to as the "Loan Documents". The Company and its members ("Members") each have acknowledged and agreed that Lender may rely upon the contents and accuracy of this Certificate in making the Loan. The Company executes and delivers this Certificate as a material inducement to Lender to close and fund the Loan. The Company represents and warrants to Lender, its successors and assigns and any subsequent holder of the Note as follows:

1.      No consent of any other party, and no consent, license, approval of authorization of, or registration or declaration with, any federal, state, municipal or other governmental authority is required in connection with the execution, delivery, performance, validity or enforceability of the transactions contemplated by the Loan Documents.

2.      The Company understands that the closing of this Loan, including the execution of this Certificate, the Note and other documents evidencing and/or securing the Loan, does not obligate Lender to make or fund the Loan. Likewise, a partial funding of this Loan shall not obligate the Lender to fund subsequent portions of the Loan. The Lender may require that other and additional documents be executed and delivered to the Lender by the Company or by other parties before any or subsequent funding of the Loan occurs.

3.      To the best of the Company's knowledge, the Company is not in violation of or in default in any material respect of any term or provision of any mortgage, indenture, contract, agreement, license, instrument, judgment, writ or decree applicable to the Company. To the best of the Company's knowledge, the Company is not in violation or default of any law, ordinance, statute, rule or regulation applicable to the Company.

4.      As of the date hereof, all federal, state, city and other taxes payable by the Company, including but not limited to, income taxes, payroll taxes, real estate taxes and sales taxes which have heretofore become due, have been paid and all such future taxes will be paid on or before the date that such taxes are due.

5.      All warranties, representations and certifications previously made, and all information and/or materials previously submitted or caused to be submitted, to Lender in connection with the Loan are to the best of the Company's knowledge, true and correct in all material respects. There have been no material changes in or conditions affecting any of such warranties, representations, certifications, materials or information prior to the date hereof. The financial statements and other financial information heretofore furnished to the Lender regarding the Company are true, correct and complete and no adverse change in the financial condition of the Company has occurred since the date for which such financial information was furnished.

EXHIBIT

7

120

6. The proceeds of the Loan are to be used solely for commercial purposes excluding agricultural purposes.

7. The Company's execution and delivery of the Loan Documents will not (a) violate any provision of any agreement or other instrument applicable to the Company or any of its property; or (b) conflict with, or constitute a breach or (with notice or lapse of time) a default under, any such agreement or other instrument; or (c) result in any lien, charge or encumbrance of any nature whatsoever upon any of the Company's property or assets, other than those created by the Loan Documents.

8. There is no judgment, claim, action, suit or proceeding or investigation, pending or, to the best of the Company's knowledge, threatened, affecting the Company or any Member, which may (a) result in any material adverse change in the Mortgaged Property, in the intended use of the Mortgaged Property, or in the business, operations or condition, financial or otherwise, of the Company or any Member, or (b) result in any material impairment of the right or ability of the Company or any Member to carry on its business substantially as now conducted, or (c) result in any material liability on the part of the Company or any Member, or (d) be likely to impair materially the ability of the Company to perform under the terms of the Loan Documents.

9. The Company has no knowledge of, or information about, any circumstances or conditions whatsoever, including, without limitation, with respect to the Deed of Trust, the Mortgaged Property, the Company, any Member or otherwise at material variance with any of the representations and warranties set forth in this Certificate or in the other Loan Documents or in any documentation or information provided by the Company, or any Member that could adversely affect the current value or marketability of the Mortgaged Property or the Loan. The Company has no knowledge of any fact which would make the appraisal of the Mortgaged Property delivered to Lender with respect to the Loan inaccurate.

10. The Company shall notify Lender immediately if the Company discovers that any representation made by the Company to Lender in this Certificate or in the other Loan Documents or any documentation or information that the Company or any Member has furnished to Lender or any other party pursuant hereto or with respect to the Loan or the Loan Documents is or has become incorrect or incomplete in any material respect.

11. No material adverse change, financial or otherwise, has occurred in (i) the condition of the Company or any Member, (ii) the actual or pro forma operating statements for the Mortgaged Property from the financial statements most recently submitted to Lender by the Company or any Member or any supporting data submitted therewith, and all such information is complete and correct, or (iii) any feature of the Loan from that disclosed to Lender.

12. None of the Company or any Member, is or has ever been, incapacitated or a debtor in any state or federal bankruptcy, reorganization or insolvency proceeding or any other debtor-creditor proceeding or otherwise the subject of any such proceeding, or has ever made an assignment for the benefit of creditors, and the Company knows of no pending or threatened claim or litigation that might result in the incapacity or insolvency or bankruptcy of the Company or any Member.

13. None of the Company, any Member, or any person or entity directly or indirectly exercising any authority over the management of the Company or the Mortgaged Property, is, or has ever been, accused or convicted of a crime or, to the best knowledge of the Company, is, or has any such person ever been, the subject of any investigation relating to the commission of a crime.

2

121

14.     All inspections, licenses, permits, consents, permissions, approvals, authorizations and certificates required, whether by law, regulation or insurance standards (collectively, "Applicable Law") to be made or issued with respect to the conduct of the Company's business, the operation of the Mortgaged Property and the use and occupancy of the same, including, but not limited to, certificates of occupancy, sewer permits, building permits and fire underwriter certificates (collectively, "Licenses"), have been made by or issued by all necessary authorities or other authorities having jurisdiction over the Mortgaged Property and/or the Company, are in full force and effect, and the Company and the Mortgaged Property are in compliance with all such Applicable Laws including zoning, building, parking ratio and environmental laws.   The Company has not received notice of any violation or failure to conform with any such Applicable Law or License.  No major improvements or structural alterations have been made to any of the Mortgaged Property after the issuance of a certificate of occupancy or the like with respect thereto.

15.     The Company is a limited liability company duly organized, presently existing and in good standing under the laws of the State of Texas.  The Company is duly authorized to transact business in the State of Texas.

16.     All of the Members of the Company, and each Member's percentage of ownership interest in the Company is set forth on Exhibit B attached hereto.

17.     The present Managers of the Company are:

Pankaj K. Shah

Adeel Zaidi

18.     Attached hereto as Exhibit "C" is a true, correct and complete copy of the Articles of Organization of the Company including any and all amendments thereto.

19.     Attached hereto as Exhibit "D" is a true, correct and complete copy of the Certificate of Organization of the Company.

20.     Attached hereto as Exhibit "E" is a true, correct and complete copy of the Regulations of the Company including any and all amendments thereto.

21.     Attached hereto as Exhibit "F" is a Certificate of Good Standing for the Company issued by the Texas Comptroller of Public Accounts.

22.     The Members and Managers of the Company have adopted such resolutions and taken such other actions as are necessary to authorize the Company and its Members/Managers, acting on the Company's behalf, to:

(a)     execute and deliver the Note as a binding obligation of the Company enforceable in accordance with its terms;

3

122

(b)     execute and deliver the Deed of Trust and Security Agreement encumbering the Mortgaged Property to secure payment of the Loan as a binding obligation of the Company enforceable in accordance with its terms;

(c)     execute and deliver each and all of the other Loan Documents to which the Company is a party.

Executed and dated this _____ day of _____, 2007

COMPANY:

APEX KATY PHYSICIANS, LLC.,
a Texas limited liability company

By:_____
        Pankaj C. Shah, Manager

By:_____
        Adeel Zaidi, Manager

Unofficial Copy Office of Chris Daniel District Clerk

4

123



**TEXAS STATE BANK**

January 31, 2007

Mr. Adeel Zaidi
APEX Katy Physicians, Ltd.
c/o Turn-Around Management Group
6161 Savoy, Suite 1214
Houston, Texas 77036

RE:   New Real Estate Term Loan for $8,800,000—
      To acquire an 80 bed Long-Term Acute Care Facility and Medical Office Building
      in Katy, Texas.

Dear Mr. Zaidi:

Texas State Bank-Riverway is very pleased with the opportunity to provide financing to APEX Katy Physicians, Ltd. The new real estate loan was approved at the Bank's Loan Committee meeting on January 31, 2007. The proposed terms of the loans are as follows:

**Borrower:**   APEX Katy Physicians, Ltd.

**Purpose:**   To acquire an 80 bed LTAC facility and Medical Office Building in Katy, Texas.

**Amount:**   $8,800,000 (65% advance rate on total project cost of $13,500,000
Borrower's equity contribution of 35% = $4,700,000 contributed at closing).

**Rate:**   90 day LIBOR + 220 bps. Adjusted 1st business day every 90 days.

**Term:**   3 years.

**Repayment:** Monthly interest only for first 12 months then converts to Principal and Interest payments based on a 20 year amortization with a balloon at maturity. Annual recast of principal payment to maintain a 20 year amortization schedule.

**Fee:**   ½ of 1% = $44,000.

**Collateral:**   1st lien deed of trust on 20.76 acres of land and (2) buildings totaling 140,006 gross s.f. Assignment of Rents and Leases. (*) Assignment of Letter of Credit in the amount of $2,000,000 to Texas State Bank (issuing bank subject to Texas State Bank acceptance) or pledge a Texas State Bank interest bearing deposit account of $2,000,000.

(*) **Release Clause:** Release of the Letter of Credit or Texas State Bank interest bearing account will be conditioned on APEX Long-Term Acute Care-Katy (Lessor) meets

1



EXHIBIT

8

specific net income performance benchmarks in year 2. (To be mutually agreed upon before loan closing).

**Guarantors:** Dr. Pankaj Shah, Dr. Randeep Suneja, Mr. Upendra Vora, jointly and severally.

**Loan Agreement—**
**Financial Reporting Covenants:**

- Quarterly operating statements on the borrower.
- Annual financial statement on the borrower due within 30 days.
- Annual tax return on the borrower due within 60 days of filing.
- Annual financial statements and tax returns on the guarantors.
- Quarterly operating statements on the hospital and MOB due within 30 days.

**Closing requirements:** Subject to the Bank obtaining:

- Current Appraisal "As Stabilized" market value with a minimum value of $13,500,000.
- Title Policy
- Clean Phase 1 Environmental report.
- Survey
- Entiry documents on borrower.
- Closing Fees to be paid by the Borrower.
- Open and maintain a Texas State Bank Depository Account.
- Copy of executed Lease Agreements on Hospital and Medical Office Building.

This commitment will remain valid until February 14, 2007. The loan must close by February 28, 2007. If these terms are agreeable, please sign below and return prior to February 14, 2007.

Sincerely,                                    Agreed and Accepted by:

Scott M. Stevens                              APEX Katy Physicians, Ltd.
Senior Vice President

By: Adeel Zaidi                    Date
Title: _____

Guarantors:

Dr. Pankaj                         Date

Dr. Randeep Suneja                 Date

Mr. Upendra Vora                   Date

2

Unofficial Copy Office of Chris Daniel District Clerk



Medical Real Estate Development

January 22, 2007

Mr. Mohammad Tariq
Senior Vice President
Area Business Development Manager 1
15144 S.W. Freeway
Sugar Land, Texas 77478

Re:     Pin Oak Hospital and Medical Office Building

Dear Tariq:

This letter is to confirm our discussion today in our meeting regarding the referenced project. Medistar is selling the Pin Oak assets to Turn-Around Management Group/Apex Hospitals. Medistar purchased Pin Oak from Memorial Hermann through a major swap of properties, and the deal was closed a few weeks ago at Alamo Title Company. The purchaser was Medistar Westside Houston Medical Center, Ltd.

As Medistar is experienced in the development of long-term acute care hospitals, we have agreed with Apex to remain as their consultant on the hospital and MOB and to work with Apex and the physicians to make this project a success. We have already met with Christus and with other hospitals and physician groups, the City of Katy Economic Development people, and this Wednesday we will meet with the Mayor of Katy. Apex was successful in bringing around 67 physicians, whom I personally know some of these doctors. For Medistar's involvement, Medistar will charge Apex a fee of 3 ½% of gross profits for the buildings and operations. Medistar is working hard for the ultimate success of the hospital and MOB and the 8.2 acres of land.

Please call me if you have any questions.

Sincerely,

Monzar Hourani
CEO

MH/4l

cc:     Adeel Zaidi
        Abeer Sagar

Unofficial Copy of Official Records of Harris County District Clerk

7670 Woodway • Suite 160 • Houston, Texas 77063 • Phone (713) 266-8990 • Fax (713) 977-7177

**EXHIBIT**

tabbies

9

CAUSE NO. 2009-02578

| APEX KATY PHYSICIANS, LLC | § | IN THE DISTRICT COURT OF |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ADEEL ZAIDI, ET AL. | § | 61ST JUDICIAL DISTRICT |

CONSOLIDATED WITH

CAUSE NO. 2009-03055

| STEPHEN M. KOCH, M.D., | § | IN THE DISTRICT COURT |
| VICTOR ANKOMA-SEY, M.D., | § | |
| TERRY SCARBOROUGH, M.D., | § | |
| HATEM SAQR, et al. | § | |
| | § | |
| V. | § | 11TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| PANKAJ K. SHAH, et al. | § | HARRIS COUNTY, TEXAS |

## PANKAJ K. SHAH, M.D.'S RESPONSE TO
## MOTIONS FOR PARTIAL SUMMARY JUDGMENT

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, PANKAJ K. SHAH, M.D. (Dr. Shah), Defendant in the above styled and numbered cause, and, subject to the Motion for Continuance, files his Response to Motions for Partial Summary Judgment filed by some of the remaining Plaintiffs Stephen M. Koch, M.D., Terry Scarborough, M.D., Erik B. Wilson, M.D. and Sammy Khoury, M.D. (the "Koch Plaintiffs") pursuant to Rule 166a(c) of the Texas Rules of Civil Procedure.

### SUMMARY OF ARGUMENT

1. Koch Plaintiffs in this Partial Summary Judgment proceeding are four individuals claiming to be members of Apex Katy Physicians, LLC ("Physicians LLC"), which claims are being questioned by the Company. Physicians LLC purchased the Pin Oak Hospital facilities and leased it to a related entity. Plaintiffs seek partial summary judgment only against Dr. Shah,

1

in his individual capacity, for breach of contract. The contract alleged to have been breached was the Company Agreement of Apex Katy Physicians, LLC. Mr. Zaidi and Dr. Shah were Organizers and Co-Managers of Physicians LLC. Plaintiffs allege that Dr. Shah, as Co-Manager, caused Physicians LLC to execute a note which was not authorized. The Koch Plaintiffs do not sue Mr. Zaidi, a Co-Manager of Physicians LLC, who signed the note with Dr. Shah. Moreover, the conduct of the Co-Managers in entering into the Loan Commitment was ratified and approved by Plaintiffs when they signed the Company Agreement. The Company Agreement also ratified both the pre-incorporation agreement to purchase the hospital facilities, which required the loan, and the lease agreement with LTAC, which form the foundation of the company's business. In the partial summary judgment motions, Koch Plaintiffs do not allege bad faith or willful or malicious misconduct, which are required for Dr. Shah to be individually liable for his actions as Co-Manager. Significantly, no summary relief has been requested against or on behalf of Physicians LLC for breach of contract.

## STATEMENT OF FACTS

2.     The dates of the operative agreements which Zaidi or Dr. Shah executed on behalf of Physicians LLC, all of which were ratified, approved and confirmed by Plaintiffs in the Company Agreement[1], are:

a.   January 3, 2007 – Zaidi and Shah, on behalf of Physicians LLC, executed the Agreement for Purchase and Sale[2] of the hospital properties with Medistar for $13,500,000, approximately $8.8M to be paid by a loan. (Paragraph 2.1.5)

b.   January 4, 2007 – Shah, as Organizer and Co-Manager on behalf of Physicians, executes the Lease Agreement[3] between Physicians LLC and LTAC leasing the hospital facilities to be purchased to LTAC. Zaidi, as General Manager of LTAC, executes the lease for LTAC.

---

[1] The Apex Katy Physicians, LLC Company Agreement is attached as Ex. A-2 to Ex C to each *Plaintiffs' Motion for Partial Summary Judgment on Claim for Breach of Contract.*

[2] Ex. A – Agreement for Purchase and Sale of Pin Oak Hospital, medical office building and related properties.

[3] Ex. B – Lease Agreement dated January 4, 2007.

2

c.   January 10, 2007 – Certificate of Formation[4] of Physicians LLC filed with Secretary of State, listing Zaidi and Dr. Shah as Co-Managers.

d.   January 31, 2007 - Texas State Bank issues a Loan Commitment[5] to Zaidi.

e.   February 1, 2007 – MetroBank issues Commitment Letter[6] for a $9,000,000 loan to Physicians LLC, requiring guarantee by Shah and others, for the purchase of the hospital facility pursuant to the Agreement for Purchase and Sale.

f.   February 6, 2007 – Zaidi issues TMG's check[7] for MetroBank Loan Commitment fee.

g.   February 8, 2007 –Zaidi and Dr. Shah, as Co-Managers for Physicians, LLC, execute MetroBank's Commitment Letter accepting the loan.

h.   February 9, 2007 – Plaintiffs execute the Company Agreement ratifying all pre-incorporation agreements by the Organizers and all actions taken by the Managers prior to February 9.

i.   March 22, 2007 – Zaidi and Dr. Shah execute Promissory Note[8] with MetroBank in accordance with the terms of the Commitment Letter of February 8, 2007.

**Plaintiffs Gave their Written Consent by Execution of the Company Agreement which ratified the Loan Commitment Executed the Previous Day.**

3.   The Company Agreement of Apex Katy Physicians, LLC, signed by all the plaintiff Members, is dated February 9, 2007, one day after the Loan Commitment and one month after the Agreement for Purchase and Sale of the hospital, were signed by the Co-Managers. The Company Agreement is the contract plaintiffs allege was breached but actually contains the Plaintiffs' consent to the Organizers' actions. Dr. Shah signed the Loan Commitment Letter on February 8, 2007 and on February 9, 2007, obtained approval and ratification of all members before executing the Loan Agreement and associated Promissory Note on March 22, 2007.

4.   The Company Agreement, as executed on February 9, 2007, contains the **Ratification of**

---

[4] Ex. C - Certificate of Formation of Apex Katy Physicians, LLC and Certificate of Filing dated January 10, 2007.
[5] Ex. D – Texas State Bank Loan Commitment dated January 31, 2007.
[6] Ex. E – MetroBank Commitment Letter dated February 1, 2007, accepted by Dr. Shah February 8, 2007.
[7] Ex. F – Check for MetroBank Commitment fee.
[8] Exhibit D to Plaintiffs' Motion.

3

**Organizer** provision, reading as follows:

> **Section 9.05. Ratification of Organizer. The acts and deeds of the organizer or organizers performed in the course of organizing the Company are hereby *approved and ratified* by the members.**

5. The Company Agreement, as executed on February 9, 2007, contains the **Ratification of Actions** provision, reading as follows:

> **Section 3.07. Ratification of Actions. All disclosed actions taken by the Managers on behalf of the Company prior to the effective date of this Agreement are hereby *ratified and confirmed* by the Members."**

6. All these actions taken by the Organizers were essential to the performance of the business plan of the Company to purchase the Pin Oak Hospital and related properties because the funds committed by the investors, including Dr. Shah, were insufficient to pay for the properties. *Affidavit of Dr. Shah attached to Plaintiffs' Motions, Ex. C, ¶2.*

7. In the Company Agreement, Paragraph 2.06, Representations and Warranties of Members, each plaintiff warranted that they were "fully familiar with the business proposed to be conducted [by the LLC] and with the Company's use and proposed use of the proceeds of the sale of the Company interests" (Section 2.06(e)); and that "he has been furnished with sufficient written and oral information.... to make an informed investment decision...and has been furnished access to any additional information that he may require."(Section 2.06(d)).

8. The Physicians LLC's books and records were available for inspection by the members. *Tex. Bux. Orgs. Code §§ 3.252(a), 101.109, 101.501, and Company Agreement, Article 5.* Plaintiffs' *carte blanche* affirmation and ratification of the Organizers' prior agreements and the actions of the Co-Managers necessary to fulfill those agreements estop any claim that Dr. Shah was not authorized.

4

## ARGUMENT AND AUTHORITIES

### The general rule is that a corporation may adopt any agreement that is within its power to perform.

9.      "That a corporation may adopt a contract and assume a debt made by its promoters and organizers prior to its incorporation is not an open question." *Farrell v. Drumm Floral Co., 125 S.W. 2d 606, 614 (Tex. Civ. App. – Ft. Worth 1939, writ of error dism'd).* A corporation is not liable for a contract made for its benefit by an organizer unless it is ratified after the completion of the formation of the Company. *Wenzel v. Brooks-Asbeck, Inc., 211 S.W. 2d 611, 613 (Tex. Civ. App. - Galveston 1948, writ ref'd, n.r.e.).* Here the members ratified the pre-incorporation agreements for purchase and sale, the lease of the hospital facilities and the post-incorporation loan commitment and loan approval, all of which were the foundation for the very existence of Physicians LLC.

10.     Plaintiffs offered Shah's affidavit as evidence in this proceeding which states that his personal guarantee for the $9M loan and the over $1.2M cash he invested was necessary, and without which "Physicians would not have secured the loan and would not have purchased the real property. The terms of the $9M loan were far from a secret. Members were made aware of the loan and its terms by me or by Mr. Zaidi." *Affidavit of Shah attached to Plaintiffs' Motions, Ex. C, paragraph 2.*

11.     By offering this evidence, coupled with their warranties in the Company Agreement, Plaintiffs' own evidence demonstrates that the Co-Managers were authorized to incur the debt.

5

**Under the summary judgment evidence, Dr. Shah signed the Loan Agreement with MetroBank as a Co-Manager of Physicians LLC, and is not personally liable for his actions as a Co-Manager of the LLC.**

12. Managers of LLC's are statutorily protected from liability for corporate debts, obligations and liabilities, except to the extent the company agreement specifically provides otherwise. *Tex. Bus. Orgs. Code § 101.114.* Plaintiffs have not alleged any grounds for ignoring this well-established rule of law. Simply put, Plaintiffs may not recover from Dr. Shah for any breach of agreement by the corporation. The corporate form shields Dr. Shah from liability for corporate obligations. See also, *Tex. Bus. Orgs. Code §§7.001, 21.223; Willis v. Donnelly,* 199 S.W.3d 262, 271-72 (Tex. 2006).

13. The recent *Willis, supra,* opinion by the Supreme Court, states the rule flowing from Tex. Bus. Orgs. Code §21.223(a) as follows:

> Under current law, by statute, a shareholder "may not be held liable to the corporation or its obligees with respect to . . . any contractual obligation of the corporation . . . on the basis that the holder . . . is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, *or other similar theory.* . . ."(fn13) The liability of a shareholder for a contractual corporate debt under this statute "is exclusive and preempts any other liability imposed for that obligation under common law or otherwise."(fn14)[9]

14. The sole case cited by Plaintiffs in support of their motions for the principle that they have established the necessary elements for breach of contract is *Winchek v. American Express*

---

[9] *See Farr v. Sun World Sav. Ass'n,* 810 S.W.2d 294, 296 (Tex.App.- El Paso 1991, no writ) ("Largely because of the uproar in the business community over the ramifications of *Castleberry* on stockholder liability, the 71st Texas Legislature amended Article 2.21A. . . ."). The 1996 Bar Committee Comment to Article 2.21 of the Business Corporation Act states:

> *Castleberry,* in particular its use of constructive fraud as a basis of piercing the corporate veil, was considered by many practitioners to be incorrectly decided. Further, while questionable in the context of tort claims, the use of constructive fraud as a means of piercing the corporate veil created a cloud on the sanctity of contract and the public policy of recognizing corporations as separate entities apart from their shareholders. In response to *Castleberry,* Article 2.21 of the TBCA was amended in 1989 to establish a clear legislative standard under which the liability of a shareholder for the obligations of a corporation is to be determined in the context of contractual obligations and all matters relating thereto.

6

*Travel Related Services*, 232 S.W.3d 197, 202 (Tex. App. – Houston [1st Dist.] 2007, no pet.), which involved breach by a cardholder's failure to pay under a credit card agreement, a collection case. It does not stand for the proposition that individual members of a LLC may sue a Manager and hold him personally liable for conduct that exceeds corporate authority. Plaintiffs as members lack standing or capacity to sue Shah for an *ultra vires* act of entering into the MetroBank loan agreement without authority.[10] Under *Tex. Bus. Orgs. Code § 20.002(c)*, the remedy for any supposed action by the corporation that exceeded the corporation's authority is either (a) a suit to enjoin the action brought by a member; (b) an action by the corporation brought directly or through members *in a representative capacity*; or (3) suit by the attorney general. Here, rather than sue on behalf of the corporation, the plaintiffs seek a judgment for themselves individually, which is not authorized.

### Dr. Shah is not personally liable for breach of Physicians' contract absent proof of bad faith.

15.     Physicians LLC is a Limited Liability Corporation for which the same principles for piercing the corporate veil apply as in corporations generally. *Sanchez v. Mulvaney, 274 S.W.3d 708, 712 (Tex. App. – San Antonio, 2008, no writ)*. Absent evidence of fraud, Dr. Shah is not individually liable for breach of contract. *Id.*

16.     An essential element of a cause of action to hold a manager personally liable for misconduct is to show that he acted in "bad faith". In each of their Motions, Plaintiffs admit: "Shah signed the Note as the manager of Apex. (Ex. D, at 6)." [Paragraph 4 of Plaintiffs'

---

[10] Plaintiffs' Motions did not even accurately recite the elements for a breach of contract claim. The plaintiffs entirely omit the requirement to prove damages. **No evidence of damages has been submitted** and the motions must be denied on that ground alone. The quote from *Winchek* actually reads as follows:

> To be entitled to summary judgment on its breach of contract claim, Amex was required to prove, as a matter of law, the essential elements of a breach of contract claim: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; (4) **damages sustained as a result of the breach**. *Prime Products, Inc. v. S.S.I. Plastics, Inc.,* 97 S.W.3d 631, 636 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).

7

*Motions.*] Shah would not be personally liable for any "breach" by the company so long as he acted in good faith on the corporation's behalf. A corporate officer's acts are considered acts of the corporation itself, and a "governing person", i.e. a Manager, is not liable for breach of contract, even when wrongfully inducing a breach of contract. *ACS Investors, Inc. v. McLaughlin, 943 S.W2d 426, 423 (Tex. 1997); Holloway v. Skinner, 898 S.W.2d 793, 795-6 (Tex. 1995).* Plaintiffs produced no summary judgment evidence, or any mention, of bad faith, which is necessary to impose personal liability on Shah for his conduct as a Co-Manager.

### Plaintiffs' claims seek damages common to Unit holders and constitute a derivative action.

17. The Company's remedy for an unauthorized or *ultra vires* act is to either set aside the transaction or to affirm it and assume the benefits. In fact, since the inception of Physicians LLC in 2007, no alleged member, including the Koch Plaintiffs, have taken any steps against the lender Metro Bank, the hospital tenant (Apex LTAC) or the other organizers of Physicians LLC (Zaidi, Medistar and Mr. Hourani) to set aside the very acquisition loan agreement they now complain of. Instead, the Koch Plaintiffs benefitted while Physicians LLC enforced the terms of the Loan and Lease Agreement by instituting two eviction lawsuits against the non-paying tenant and the companion lawsuit for fraud and an accounting against the former co-manager and Organizer, Mr. Zaidi, and the other Organizers at Medistar, including Mr. Hourani.

18. No personal liability for damages is visited on the Manager. Individual Unit holders have no standing to recover damages belonging to Physicians, LLC.[11] The plaintiffs' *Motions* fail to

---

[11] A cause of action for injury to the property of a corporation or for impairment or destruction of its business is vested in the corporation, as distinguished from its shareholders. *Redmon v. Griffith,* 202 S.W.3d 225, 236 (Tex. App.-Tyler 2006, pet. denied) (citing *Davis v. Sheerin,* 754 S.W.2d 375, 381 (Tex. App.-Houston [1st Dist.] 1988, writ denied)); *see Murphy v. Campbell,* 964 S.W.2d 265, 268 (Tex. 1997); *Hajdik v. Wingate,* 753 S.W.2d 199, 201 (Tex. App.-Houston [1st Dist.] 1988), *aff'd,* 795 S.W.2d 717 (Tex. 1990). To recover for wrongs done to the

8

prove the fact of damages, and must be denied for that reason, and because the managers are not liable personally to the members for any such damages.

19.     Plaintiffs do not ask for judgment against Physicians LLC. Plaintiffs attempt to gain an independent personal recovery for themselves alone. This is not permitted.

### Objections to Plaintiffs' summary judgment evidence.

20.     Defendant objects to plaintiffs' statements in paragraph 9 of their Motions, that there is evidence that "Shah did not want the other members to know" of the transaction whereby he was guaranteeing the loan and substituted the guarantee for payment in cash. Plaintiffs do not support this summary judgment claim with any evidence. Defendant objects to plaintiffs' bald assertion in paragraph 9 of their Motions that Dr. Shah was supposed to pay only cash for Units in Physicians. There is no evidence of any such requirement in the summary judgment record. A contribution by an organizer to an LLC in exchange for Units does not have to be in cash, but may include a guarantee of debt. *Tex Bus Orgs. Code Sec. 1.002(9)*. See also the Company Agreement at Article 5. Plaintiffs have wholly failed to support this argument with any evidence. Defendant requests the Court sustain the objections and strike the unsupported portions of the *Plaintiffs' Motions for Partial Summary Judgment*.

### Conclusion

The motions for partial summary judgment seek judgment solely on the ground that Dr. Shah, as Co-Manager, breached the Company Agreement by entering into the loan transaction with MetroBank for the acquisition of the hospital facilities without authorization. This is factually inaccurate as Dr. Shah received the consents in the Company Agreement, which

---

corporation, the shareholder must bring the suit derivatively in the name of the corporation so that each shareholder will be made whole if the corporation obtains compensation from the wrongdoer. *Redmon,* 202 S.W.3d at 236-37 (citing *Faour v. Faour,* 789 S.W.2d 620, 621-22 (Tex. App.-Texarkana 1990, writ denied)).

contains the express ratifications of the organizers and Managers with regard to the pre-incorporation agreements for borrowing $9 million with which to purchase hospital facilities. Dr. Shah, as Manager, cannot be held personally liable for actions taken as Co-Manager in the absence of the showing of bad faith; so that the purported individual actions on which the partial summary judgment is based must be dismissed, and finally Plaintiffs have failed to submit any evidence of damages as required.

WHEREFORE, PREMISES CONSIDERED, Defendant P. K. Shah requests the court deny the Plaintiff's motions for partial summary judgment and grant such relief as Defendant may be justly entitled within the premises.

Respectfully submitted,

By _____

Tom F. Coleman
Texas Bar No. 04572000
817 Westheimer, 1st Floor
Houston, Texas 77006
Tel. (713)523-2800
Fax. (713)523-2804
*Attorney for Defendant Pankaj K. Shah, M.D.*

10

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct of the foregoing was sent to the parties listed below by U.S. Mail and /or Facsimile on the 17th day of July, 2009, as follows:

John W. Havins, Esq.                    *Via Facsimile:* 713-650-3301
Havins & Associates, P.C.
2211 Norfolk, Suite 525
Houston, Texas 77098

Attorneys for Plaintiffs,
Stephen M. Koch, M.D., Victor Ankoma-Sey, M.D.,
Ankoma-Sey PPSC, Ltd., Terry Scarborough, M.D.,
Hatem Saqr, Erik B. Wilson, M.D.,
Waseem Peracha, M.D., and G. Thomas Keith, M.D.

Jerry C. von Sternberg, Esq.            *Via Facsimile:* 713-856-7268
Heather S. von Sternberg
The von Sternberg Law Firm
820 Gessner, Suite 1720
Houston, Texas 77024

Attorneys for Defendants,
Apex Long Term Acute Care-Katy, L.P.
Apex Katy Physicians-TMG, L.L.C.
and US TMG, L.L.C.

Robert D. Remy, Esq.                    *Via Facsimile:* 713-465-8018
Robert D. Remy Law Offices
Two Memorial City Plaza
820 Gessner, Suite 1720
Houston, Texas 77024

Attorneys for Defendant,
Adeel Zaidi.

Jeffery B. Kaiser, Esq.                 *Via Hand Delivery*
Kaiser & Conrad, L.L.P.
1911 Bagby, Suite 200
Houston, Texas 77002

Attorneys for Plaintiff,
Apex Katy Physicians, L.L.C.

11

W. Ashton Randall III  
Greenberg Traurig, L.L.P.  
2200 Ross Avenue, Suite 5200  
Dallas, Texas 75201  

*Via Facsimile:* 214-665-3601

Attorneys for Defendants,  
Katy Project, L.L.C., Upendra Vora,  
and Randeep Suneja.

Matias Androgue  
Lyric Center  
440 Louisiana Street, Suite 715  
Houston, Texas 77002  

*Via Facsimile:* 713-425-7271

Attorneys for Plaintiff,  
Sammy E. Khoury, M.D.


Tom F. Coleman  
_____  
Tom F. Coleman

Unofficial Copy Office of Chris Daniel District Clerk

12

# CAUSE NO. 2009-02578

| APEX KATY PHYSICIANS, LLC | § | IN THE DISTRICT COURT OF |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ADEEL ZAIDI, ET AL. | § | 61ST JUDICIAL DISTRICT |

## CONSOLIDATED WITH

## CAUSE NO. 2009-03055

| STEPHEN M. KOCH, M.D., | § | IN THE DISTRICT COURT |
| VICTOR ANKOMA-SEY, M.D., | § | |
| TERRY SCARBOROUGH, M.D., | § | |
| HATEM SAQR, et al. | § | |
| | § | |
| V. | § | 11TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| PANKAJ K. SHAH, et al. | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT OF TOM F. COLEMAN

BEFORE ME, the undersigned notary, on this day personally appeared TOM F. COLEMAN, a person whose identity is known to me. After I administered an oath to him, upon his oath he stated as follows:

1. "My name is Tom F. Coleman and I am a resident of the State of Texas. I am the attorney for the Defendant Pankaj K. Shah in the above numbered and styled lawsuit. I have personal knowledge of all the facts in this affidavit, which are true, and am in all respects competent to make this affidavit.

2. Attached hereto as Exhibit A is a true copy of the Agreement of Purchase and Sale of Real Property and Improvements as produced in discovery in this case by plaintiff.

3. Attached hereto as Exhibit B is a true copy of the Lease Agreement as produced in discovery in this case by plaintiff.

4. Attached hereto as Exhibit C is a true copy of the Certificate of Formation of Apex Katy Physicians, LLC as produced in discovery in this case by plaintiff.

5. Attached hereto as Exhibit D is a true copy of the Texas State Bank Commitment Letter as it appears in files of P.K. Shah.

## AGREEMENT FOR PURCHASE AND SALE
## OF REAL PROPERTY AND IMPROVEMENTS

THIS AGREEMENT FOR PURCHASE AND SALE OF REAL PROPERTY ("Agreement") is made and entered into as of this ___ day of January, 2007, by and between MEDISTAR CORPORATION, a Texas Corporation, its successors and assigns ("Seller") and APEX KATY PHYSICIANS, LTD., a Texas Limited Partnership ("Buyer"), with reference to the following facts:

A.     Seller owns or will own certain real property located in Harris County, Texas, and more specifically described in Exhibit "A" attached hereto (the "Land"), commonly known as Katy Pin Oak Hospital ("Hospital") and Katy Pin Oak Medical Office Building ("MOB"), and such other improvements and assets, as the same are herein described, together with other vacant tracts of raw land.

B.     Seller desires to sell to Buyer and Buyer desires to purchase from Seller the Land and the associated assets.

NOW, THEREFORE, in consideration of the mutual covenants, premises and agreements herein contained, the parties hereto do hereby agree as follows:

1.    Purchase and Sale.

    1.1.    The purchase and sale includes, and at Close of Escrow (hereinafter defined) Seller shall sell, transfer, grant and assign to Buyer, Seller's entire right and interest in and to all of the following (hereinafter sometimes collectively, the "Property"):

        1.1.1.    The Land, together with all structures, buildings, improvements, machinery, fixtures, and equipment affixed or attached to the Land and all easements, development rights, rights of way, and other rights appurtenant to the Land (all of the foregoing being collectively referred to herein as the "Real Property");

        1.1.2.    All leases (the "Leases"), including associated amendments, with all persons ("Tenants") leasing the Real Property or any part thereof or hereafter entered into in accordance with the terms hereof prior to Close of Escrow, together with all security deposits, other deposits held in connection with the Leases, Lease guarantees and other similar credit enhancements providing additional security for such Leases;

        1.1.3.    All tangible and intangible personal property owned by Seller located on or used in connection with the Real Property, including, specifically, without limitation, equipment, furniture, tools and supplies (the "Personal Property");



EXHIBIT

A

KOCH00613

1.1.4. All service contracts, agreements, warranties and guaranties relating to the operation, use or maintenance of the Property, which Seller may have in its possession (the "Contracts"); and

1.1.5. To the extent transferable, all building permits, certificates of occupancy and other certificates, permits, licenses and approvals relating to the Property (the "Permits").

1.1.6. The Personal Property being transferred in this sale shall include furniture, fixtures and equipment worth approx. $130,000 and a phone system worth approx. $79,000, as more particularly listed on Exhibit "B". It is expressly stated that Seller is making no representations or warranties about such Personal Property.

2. Purchase Price.

The total Purchase Price of the Property shall be **Thirteen Million Five Hundred Thousand and No/100 Dollars ($13,500,000) ("Purchase Price")**. The Purchase Price shall be payable as follows:

2.1. Deposit/Credits/Further Payments.

2.1.1. Deposit. Simultaneously with the execution of this Agreement, which is intended to be following the date a fully executed original of this Agreement is delivered to the "Title Company", which is Alamo Title Company, 5599 San Felipe, Suite 1400, Houston, Texas 77056 Attn: Carol Warner (such delivery date hereinafter the "Effective Date"), Buyer shall deposit with the Title Company the amount of **Two Million Two Hundred Thousand and No/100 Dollars ($2,200,000)** (the "Deposit"). If the transaction closes, then the Deposit shall be credited to Buyer as a portion of the Purchase Price. Upon the conveyance of the Hospital and MOB to the Seller by Memorial Hermann Hospital System ("MHHS"), then the Title Company shall transfer the Deposit to the Seller. Upon transfer of the Deposit to the Seller by the Title Company, then this Deposit shall become non-refundable to the Buyer in all events, except for the default by Seller of the non-conveyance of the Property to the Buyer at the Closing when Buyer is ready, willing and able to close. *$700,000 of this amount may be transferred to Title Company within 5 calendar days of execution.*

2.1.2 Prior Escrow with Seller. Buyer has already deposited Five Hundred Thousand Dollars ($500,000) with Seller. At Closing, Seller shall credit Buyer the sum of the $500,000 as a portion of the Purchase Price. If the transaction does not close, then such money, shall become the sole property of Seller.

2

KOCH00614

2.1.3. Goodrich Option Tract Credit. At Closing, Seller shall credit Buyer the sum of Two Million Dollars ($2,000,000) which shall be a credit derived from the sale of a piece of the Property which is under an Option known as the Goodrich Option Tract. The Goodrich Option Tract contains 2.90 acres, and it is located adjacent to Pin Oak Road and Medical Center Drive in Katy, Texas. Seller is to receive Two Million Dollars ($2,000,000) for the sale of the Goodrich Option Tract from MHHS, and Seller shall credit Buyer with the total $2,000,000 at Closing.

2.1.4 Balance of Purchase Price. On or before Close of Escrow, Buyer shall deposit with the Title Company to be held in Escrow the balance of the Purchase Price, in immediately available funds by wire transfer made payable to Title Company.

2.1.5. Loan. The balance of the Purchase Price other than the cash due at Closing and the Note to Seller shall be obtained by a first lien upon the Property to be held by a lender of Buyer's selection. Buyer shall use all efforts to obtain the loan from such selected lender.

2.1.6. Return of Deposit. In the event that this Agreement is terminated by Seller, the Deposit shall be immediately and automatically paid over to Buyer without the need for any further action by either party hereto.

3. Title to Property.

3.1. Title Insurance.

Seller will, at Seller's sole expense, cause the Title Company to issue an Owner's Policy of Title Insurance (the "Title Policy") for and on behalf of Buyer in the total amount of the Purchase Price and obtainable at standard rates insuring good, marketable and insurable title in and to the Real Property. The Title Policy shall be free and clear of exceptions except as follows:

3.1.1. Real property taxes and assessments, which are a lien not yet due;

3.1.2. The Permitted Exceptions (hereinafter defined) included in such policy and approved by Buyer as herein described.

3.2. Procedure for Approval of Title.

Seller shall, no later than three (3) business days following the Effective Date, provide to Buyer a current title insurance commitment and/or preliminary title report for the Real Property, including legible copies of all items identified as

3

KOCH00615

exceptions therein (the "Title Documents"). Buyer shall have ten (10) days following the later of (a) the Effective Date; and (b) the receipt of the later of the Title Documents and the Survey (hereinafter defined) to review and approve, in writing, the condition of the title to the Real Property (**"Title Review Period"**). If the Title Documents or the Survey reflect or disclose any defect, exception or other matter affecting the Real Property ("Title Defects") that is unacceptable to Buyer, then Buyer shall provide Seller with written notice of Buyer's objections no later than the conclusion of the Title Review Period; provided, however, if Buyer shall fail to notify Seller in writing within the Title Review Period either that the condition of title is acceptable or of any specific objections to the state of title to the Real Property, then Buyer shall be deemed to have objected to none of the exceptions to title or other conditions or matters which are shown on the Survey or described in the Title Documents. Buyer agrees that Buyer cannot object to any and all restrictions placed upon the Land by Memorial Hermann Hospital System. Seller may, at its sole option, elect, by written notice given to Buyer within three (3) days following the conclusion of the Title Review Period ("Seller's Notice Period"), to cure or remove the objections made or deemed to have been made by Buyer; provided, however, Seller shall in all events have the obligation to (i) act in good faith in making such election and curing any Title Defects that Seller elects to cure, (ii) specifically remove any monetary encumbrances affecting the Real Property, and (iii) remove any Title Defect that attaches to the Real Property subsequent to the conclusion of the Title Review Period. The failure of Seller to deliver written notice electing to cure any or all such objected to exceptions during the Seller's Notice Period shall be deemed an election by Seller not to cure such exceptions. Should Seller elect to attempt to cure or remove any objection, Seller shall have five (5) days from the conclusion of the Title Review Period ("Cure Period") in which to accomplish the cure. In the event Seller elects (or is deemed to have elected) not to cure or remove any objection, then Buyer shall be entitled, as Buyer's sole and exclusive remedies, either to (i) terminate this Agreement and obtain a refund of the Deposit or (ii) waive any objections that Seller has not elected to cure and close this transaction as otherwise contemplated herein. The failure of Buyer to provide written notice to Seller within three (3) days following the expiration of the Seller's Notice Period waiving any objections Seller has not elected to cure shall be deemed an election by Buyer to terminate this Agreement. Any exceptions to title accepted by Buyer pursuant to the terms of this paragraph shall be deemed "Permitted Exceptions."

4.    Due Diligence Items.

4.1.    Omitted

4

KOCH00616

5. Inspections/AS IS Warranty.

5.1 Occupation and Use of Property and Premises. It is understood that Buyer is to occupy the Land and Property on or before January 5, 2007. Buyer shall solely be in possession of the Land and Property at that time, and Seller shall not be in possession of the Land and Property. Buyer shall solely be responsible for all operations, expenses, insurance, use, utilities, and all other aspects of the Land and Property from the date of Buyer's occupation until the date of Closing.

5.2. Procedure; Indemnity.

Buyer, at its sole expense, has already conducted feasibility, environmental, engineering and physical studies of the Real Property.

5.2. Approval.

5.2.1. Notwithstanding anything to the contrary contained herein, Buyer hereby agrees that in the event this Agreement is terminated for any reason, then Buyer shall promptly and at its sole expense return to Seller all Due Diligence Items which have been delivered by Seller to Buyer in connection with Buyer's inspection of the Real Property.

5.2.2. Buyer hereby acknowledges that Seller has made Buyer aware that there are portions of the Property which contain asbestos and asbestos related products. The presence of asbestos shall not be a basis for Buyer to object to all or any portion of the Property.

5.3 Warranty. **AS IS, WHERE IS:** Notwithstanding anything to the contrary herein, Buyer acknowledges and agrees that neither Seller nor any of it agents or employees has made any written or oral representations or warranties to Buyer relating to the condition of any of the Property, Land or Personal Property. BUYER FURTHER EXPRESSLY AGREES THAT THIS CONTRACT IS MADE WITHOUT RECOURSE, REPRESENTATION OR WARRANTY (EXCEPT AS TO THE REPRESENTATIONS EXPRESSLY MADE HEREIN AND AS TO TITLE IN THE DEED) OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, AND SELLER IS TRANSFERRING THE PROPERTY COVERED HEREBY "AS IS, WHERE IS," AND WITH ALL FAULTS, AND WITHOUT REPRESENTATIONS OR WARRANTY (ALL OF WHICH SELLER HEREBY DISCLAIMS) AS TO FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, DESIGN, QUALITY, LAYOUT, FOOTAGE, PHYSICAL CONDITION, OPERATION, COMPLIANCE WITH SPECIFICATIONS, ABSENCE OF LATENT DEFECTS, OR COMPLIANCE WITH LAWS AND REGULATIONS (INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO HEALTH, SAFETY AND THE ENVIRONMENT) OR ANY OTHER MATTER AFFECTING OR RELATED TO THE PROPERTY. BUYER HEREBY FURTHER ACKNOWLEDGES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY

5

KOCH00617

DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES AS TO WATER, SOIL OR GEOLOGY OF THE PROPERTY AND AS TO INCOME TO BE DERIVED FROM THE PROPERTY. WITHOUT LIMITING THE FOREGOING, SELLER DOES NOT AND HAS NOT MADE ANY REPRESENTATION OR WARRANTY REGARDING THE PRESENCE OR ABSENCE OF ANY HAZARDOUS SUBSTANCES (AS HEREINAFTER DEFINED) ON, UNDER OR ABOUT THE PROPERTY OR THE COMPLIANCE OR NON-COMPLIANCE OF THE PROPERTY WITH THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT, THE SUPERFUND AMENDMENT AND REAUTHORIZATION ACT, THE RESOURCE CONSERVATION RECOVERY ACT, THE FEDERAL WATER POLLUTION CONTROL ACT, THE FEDERAL ENVIRONMENTAL PESTICIDES ACT, THE CLEAN WATER ACT, THE CLEAN AIR ACT, ANY TEXAS STATUTE OR CODE REGULATING NATURAL RESOURCES, SOLID WASTE, WATER OR HAZARDOUS SUBSTANCES, ANY SO-CALLED FEDERAL, STATE OR LOCAL "SUPERFUND" OR "SUPERLIEN" STATUTE, OR ANY OTHER STATUTE, LAW, ORDINANCE, CODE, RULE, REGULATION, ORDER OR DECREE REGULATING, RELATING TO OR IMPOSING LIABILITY (INCLUDING STRICT LIABILITY) OR STANDARDS OF CONDUCT CONCERNING ANY HAZARDOUS SUBSTANCES (COLLECTIVELY, THE "HAZARDOUS SUBSTANCE LAWS"). FOR PURPOSES OF THIS CONTRACT, THE TERM "HAZARDOUS SUBSTANCES" SHALL MEAN AND INCLUDE THOSE ELEMENTS OR COMPOUNDS WHICH ARE CONTAINED ON THE LIST OF HAZARDOUS SUBSTANCES ADOPTED BY THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY AND THE LIST OF TOXIC POLLUTANTS DESIGNATED BY CONGRESS OR THE ENVIRONMENTAL PROTECTION AGENCY OR UNDER ANY HAZARDOUS SUBSTANCE LAWS. BUYER HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT BUYER IS RELYING SOLELY UPON ITS OWN INSPECTION, EXAMINATION, AND EVALUATION OF THE PROPERTY AND THAT PRIOR TO THE CLOSING DATE WILL HAVE INSPECTED THE PROPERTY TO ITS SATISFACTION (OR HAD REPRESENTATIVES MAKE SUCH INSPECTIONS) AND BUYER IS FULLY RELYING ON SUCH INSPECTIONS OF THE PROPERTY AND NOT UPON ANY STATEMENTS (ORAL OR WRITTEN) WHICH MAY HAVE BEEN MADE OR MAY BE MADE (OR PURPORTEDLY MADE) BY SELLER OR ANY OF ITS REPRESENTATIVES. BUYER HEREBY EXPRESSLY ASSUMES ALL RISKS, LIABILITIES, CLAIMS, DAMAGES, AND COSTS (AND AGREES THAT SELLER SHALL NOT BE LIABLE FOR ANY SPECIAL, DIRECT, INDIRECT, CONSEQUENTIAL, OR OTHER DAMAGES) RESULTING OR ARISING FROM OR RELATED TO THE OWNERSHIP, USE, CONDITION, LOCATION, MAINTENANCE, REPAIR OR OPERATION OF THE PROPERTY. BUYER ACKNOWLEDGES THAT ANY CONDITION OF THE PROPERTY WHICH BUYER DISCOVERS OR DESIRES TO CORRECT OR IMPROVE PRIOR TO OR AFTER THE CLOSING DATE SHALL BE AT BUYER'S SOLE EXPENSE. BUYER EXPRESSLY WAIVES (TO THE EXTENT ALLOWED BY APPLICABLE LAW) ANY CLAIMS UNDER FEDERAL LAW, STATE OR OTHER LAW THAT BUYER

6

KOCH00618

MIGHT OTHERWISE HAVE AGAINST SELLER RELATING TO THE USE, CHARACTERISTICS OR CONDITION OF THE PROPERTY. THE SALES PRICE IS A DISCOUNTED PURCHASE PRICE REPRESENTING THE FACT THAT THE PROPERTY IS BEING PURCHASED BY BUYER ON AN "AS IS," "WHERE IS" AND "WITH ALL FAULTS" BASIS. IN THIS REGARD, SELLER HEREBY REPRESENTS THAT THERE IS ON OR UNDER THE PROPERTY POLYCHLORINATED BIPHENYLS (PCB's), AND/OR OTHER HAZARDOUS MATERIALS, WHICH DO EXIST IN CONJUNCTION WITH ATTENDANT SOIL OR GROUND WATER CONTAMINATION AND TO SELLER'S ACTUAL KNOWLEDGE, SELLER HAS PROVIDED TO OR SHARED WITH BUYER ENVIRONMENTAL REPORTS OR SURVEYS COVERING THE PROPERTY AND BUYER CONFIRMS THAT BUYER'S INVESTIGATIONS HAVE REVEALED SUCH SUBSTANCES AND BUYER IS PREPARED TO REMEDIATE SAME AT BUYER'S EXPENSE. BUYER CONFIRMS THAT ANY SUCH INFORMATION FURNISHED BY SELLER AND ACCEPTED BY BUYER WAS PREPARED BY A THIRD PARTY AND SELLER CAN NOT BE HELD LIABLE FOR THE TRUTH OR INACCURACY OF ANY SUCH INFORMATION. The provisions of this Section shall survive the conveyance of the Property to Buyer or any termination of this Contract notwithstanding any contrary provisions hereof. Seller may enter this contract in any proceeding involving the Property.

6.  Escrow.

    6.1.  Opening.

        Purchase and sale of the Property shall be consummated through an escrow ("Escrow") to be opened with Title Company within two (2) business days after the execution of this Agreement by Seller and Buyer. This Agreement shall be considered as the Escrow instructions between the parties, with such further consistent instructions as Title Company shall require in order to clarify its duties and responsibilities. If Title Company shall require further Escrow instructions, Title Company may prepare such instructions on its usual form. Such further instructions shall, so long as not inconsistent with the terms of this Agreement, be promptly signed by Buyer and Seller and returned to Title Company within three (3) business days of receipt thereof. In the event of any conflict between the terms and conditions of this Agreement and any further Escrow instructions, the terms and conditions of this Agreement shall control.

    6.2.  Close of Escrow.

        Escrow shall close at a mutually agreeable date ("Close of Escrow"), but in all events on or before forty-five (45) days from the date that Seller acquires the Property from Memorial Hermann Hospital System. If the Buyer's lender requires an extension of closing, then a Closing extension shall be granted in order to assist the lender.

7

KOCH00619

6.3.    Buyer Required to Deliver.

Buyer shall deliver to Escrow the following:

6.3.1.    In accordance with Paragraph 2, the Deposit;

6.3.2.    On or before Close of Escrow, the balance of the Purchase Price; provided, however that Buyer shall not be required to deposit the balance of the Purchase Price into Escrow until Buyer has been notified by Title Company that (i) Seller has delivered to Escrow each of the documents and instruments to be delivered by Seller in connection with Buyer's purchase of the Property, (ii) Title Company has committed to issue and deliver the Title Policy to Buyer, and (iii) the only impediment to Close of Escrow is delivery of such amount by or on behalf of Buyer;

6.3.3.    On or before Close of Escrow, such other documents as Title Company may require from Buyer in order to issue the Title Policy; and

6.3.4.    A counterpart original of an Assignment and Assumption Agreement in the form attached hereto as Exhibit C (the "Assignment Agreement"), duly executed by Buyer assigning all of Seller's right, title and interest in and to the Leases, Contracts and Permits from and after the Close of Escrow.

6.4.    Seller Required to Deliver.

On or before Close of Escrow, Seller shall deliver to Escrow or Buyer, as applicable, the following:

6.4.1.    A duly executed and acknowledged Special Warranty Deed, conveying fee title to the Real Property in favor of Buyer;

6.4.2.    A completed Certificate of Non-Foreign Status, duly executed by Seller under penalty of perjury;

6.4.3.    A Bill of Sale, for the Personal Property, if any, in favor of Buyer and duly executed by Seller;

6.4.4.    Such other documents as Title Company may require from Seller in order to issue the Title Policy;

6.4.5.    A counterpart original of the Assignment Agreement duly executed by Seller, assigning all of Seller's right, title and interest in and to the Leases, Contracts and Permits to Buyer from and after the Close of Escrow;

8

KOCH00620

6.4.6.   To Buyer, all keys to all buildings and other improvements located on the Real Property, combinations to any safes thereon, and security devices therein in Seller's possession;

6.4.7.   To Buyer, the original Leases; and

6.4.8.   To Buyer, all records and files relating to the management or operation of the Real Property, including, without limitation, all insurance policies, all service contracts, all tenant files (including correspondence), property tax bills, and all calculations used to prepare statements of rental increases under the Leases and statements of common area charges, insurance, property taxes and other charges which are paid by Tenants of the Real Property.

6.5.   Buyer's Costs.

Buyer shall pay the following:

6.5.1.   One-half (1/2) of Title Company's fee, costs and expenses; and

6.5.2.   All other costs customarily borne by purchasers of real property in Harris County, Texas.

6.6.   Seller's Costs.

Seller shall pay the following:

6.6.1.   One-half (1/2) of Title Company's fees, costs and expenses;

6.6.2.   The cost of recording the Deed and any transfer tax;

6.6.3.   Title Company premium for the Title Policy; and

6.6.4.   All other costs customarily borne by sellers of real property in Harris County, Texas.

6.7.   Prorations.

6.7.1   Items to be Prorated. The following shall be prorated between Seller and Buyer as of the Close of Escrow with the Buyer being deemed the owner of the Property as of the Close of Escrow:

(a)   Taxes and Assessments. Buyer is responsible for all real property taxes, assessments and other governmental impositions of

9

KOCH00621

any kind or nature, including, without limitation, any special assessments or similar charges (collectively, "Taxes"), which relate to the Property from the date of Buyer's occupation of the Property. With respect to any portion of the Taxes which are payable by any Tenant directly to the authorities, no proration or adjustment shall be made. The proration for Taxes shall be based upon the most recently issued tax bill for the Property. If the most recent tax bill is not for the current tax year, then the parties shall reprorate within thirty (30) days of the receipt of the tax bill for the current tax year. Upon the Close of Escrow and subject to the adjustment provided above, Buyer shall be responsible for real estate taxes and assessments on the Property payable from and after the Close of Escrow. In no event shall Seller be charged with or be responsible for any increase in the taxes or assessments on the Property resulting from the sale of the Property or from any improvements made or leases entered into after the Close of Escrow. With respect to all periods for which Seller has paid Taxes, Seller hereby reserves the right to institute or continue any proceeding or proceedings for the reduction of the assessed valuation of the Property, and, in its sole discretion, to settle the same. Seller shall have sole authority to control the progress of, and to make all decisions with respect to, such proceedings but shall provide Buyer with copies of all communications with the taxing authorities. All net tax refunds and credits attributable to any period prior to the Close of Escrow which Seller has paid or for which Seller has given a credit to Buyer shall belong to and be the property of Seller, provided, however, that any such refunds and credits that are the property of Tenants under Leases shall be promptly remitted by Seller directly to such Tenants or to Buyer for the credit of such Tenants. All net tax refunds and credits attributable to any period subsequent to the Close of Escrow shall belong to and be the property of Buyer. Buyer agrees to cooperate with Seller in connection with the prosecution of any such proceedings and to take all steps, whether before or after the Close of Escrow, as may be necessary to carry out the intention of this subparagraph, including the delivery to Seller, upon demand, of any relevant books and records, including receipted tax bills and cancelled checks used in payment of such taxes, the execution of any and all consent or other documents, and the undertaking of any acts necessary for the collection of such refund by Seller. Buyer agrees that, as a condition to the transfer of the Property by Buyer, Buyer will cause any transferee to assume the obligations set forth herein.

(b)    Rents. Buyer will receive a credit at closing for all monthly rents collected by Seller from the time Seller buys the Property to the date that Buyer buys the Property. Buyer shall cooperate with Seller after Closing to collect any rent under the Tenant

10

KOCH00622

Leases which has accrued as of the Closing; provided, however, Buyer shall not be obligated to sue any Tenants or exercise any legal remedies under the Tenant Leases or to incur any expense over and above its own regular collection expenses. All payments collected from Tenants after Closing shall first be applied to any rent due to Seller for the period prior to Closing; second it is to be applied to the month in which the Closing occurs, then to any rent due to Buyer for the period after Closing; provided, however, notwithstanding the foregoing, if Seller collects any payments from Tenants after Closing through its own collection efforts, Seller may first apply such payments to rent due the Seller for the period prior to Closing.

(c)　　CAM Expenses. To the extent that Seller is in possession of any CAM charges and Tenants are reimbursing the landlord for common area maintenance and other operating expenses (collectively, "CAM Charges"), CAM Charges shall be prorated at Closing and again subsequent to Closing, as of the date of Closing on a lease-by-lease basis with each party being entitled to receive a portion of the CAM Charges payable under each Lease for the CAM Lease Year in which Closing occurs, which portion shall be equal to the actual CAM Charges incurred during the party's respective periods of ownership of the Property during the CAM Lease Year. As used herein, the term "CAM Lease Year" means the twelve (12) month period as to which annual CAM Charges are owed under each Lease. Five (5) days prior to Closing the Seller shall submit to Buyer an itemization of its actual CAM Charges operating expenses through such date and the amount of CAM Charges received by the Seller as of such date, together with an estimate of CAM Charges to be incurred to, but not including, the Close of Escrow. In the event that the Seller has received CAM Charges payments in excess of its actual CAM Charges operating expenses, the Buyer shall be entitled to receive a credit against the Purchase Price for the excess. In the event that the Seller has received CAM Charges payments less than its actual CAM Charges operating expenses, to the extent that the Leases provide for a "true up" at the end of the CAM Lease Year, the Seller shall be entitled to receive any deficit but only after the Buyer has received any true up payment from the Tenant. Upon receipt by either party of any CAM Charge true up payment from a Tenant, the party receiving the same shall provide to the other party its allocable share of the "true up" payment within five (5) days of the receipt thereof.

To assist the Buyer in preparing "true up" reconciliation at the end of the CAM Lease Year, the Seller shall deliver to the Buyer at Closing records of all of the Seller's CAM Charge expenditures, but only to the extent that such are in Seller's actual possession.

11

KOCH00623

(d)    Operating Expenses. All operating expenses shall be borne, be the responsibility of and paid for by Buyer after the date on which Buyer occupies the Property.

(e)    Security Deposits. Security deposits under Tenant Leases, if and to the extent that such deposits are in Seller's actual possession or control and have not been otherwise applied by Seller to any obligations of any Tenants under the Tenant Leases, shall be credited against the Purchase Price, and upon the Closing, Buyer shall assume full responsibility for all security deposits to be refunded to the Tenants under the Tenant Leases (to the extent the same are required to be refunded by the terms of such Tenant Leases or applicable). In the event that any security deposits are in the form of letters of credit or other financial instruments (the "Non-Cash Security Deposits"), Seller will, at Closing cause Buyer to be named as beneficiary under the Non-Cash Security Deposits. Buyer will not receive a credit against the Purchase Price for such security deposits. In the event that the Buyer cannot be named the beneficiary under the Non-Cash Security Deposits as of the Close of Escrow, an escrow shall be established at Closing in an amount equal to all Non-Cash Security Deposits under which Buyer is not the beneficiary as of the Close of Escrow.

(f)    Leasing Costs. Seller shall receive a credit at the Closing for all leasing costs, including tenant improvement costs and allowances, and its pro-rata leasing commissions, previously paid by Seller in connection with any Lease or modification to an existing Lease which was entered into after the Effective Date and which is approved or deemed approved by Buyer pursuant to this Agreement, which approval included approval of the tenant improvement costs. The Seller's pro-rata share shall be equal to a fraction which has as its numerator the number of months left in the base term of the Lease after the Close of Escrow and which has as its denominator the number of months in the base term of the Lease. Seller shall pay for all tenant improvement allowances and leasing commissions with respect to the premises leased as of the Effective Date by the Tenants pursuant to the Tenant Leases in effect as of the Effective Date, to the extent that such improvement allowances and leasing commissions are unpaid as of the Close of Escrow.

(g)    Insurance. Buyer shall solely be responsible to provide any and all insurance needed for the Property and Improvements for the Hospital and MOB. Buyer shall provide Seller at the time of occupation of the Property copies of any and all insurance showing that the insurance coverage exists and that Seller is an additional named insured on such insurance policies. If Seller has to pay for the

12

KOCH00624

insurance because Buyer does not provide the insurance, then Buyer shall reimburse at Closing the Seller for all costs which Seller incurs in acquiring such insurance.

6.7.2    <u>Calculation; Reproration</u>. Seller shall prepare and deliver to Buyer no later than two (2) days prior to the Close of Escrow an estimated closing statement which shall set forth the costs payable under subsection (d) and the prorations and credits provided for in this section and subsection (e) and elsewhere in this Agreement. Any item which cannot be finally prorated because of the unavailability of information shall be tentatively prorated on the basis of the best data then available and adjusted when the information is available in accordance with this subparagraph. Buyer shall notify Seller within one (1) day after its receipt of such estimated closing statement of any items which Buyer disputes, and the parties shall attempt in good faith to reconcile any differences not later than one (1) day before the Close of Escrow. The estimated closing statement as adjusted as aforesaid and approved in writing by the parties (which shall not be withheld if prepared in accordance with this Agreement) shall be referred to herein as the "Closing Statement". If the prorations and credits made under the Closing Statement shall prove to be incorrect or incomplete for any reason, then either party shall be entitled to an adjustment to correct the same; provided, however, that any adjustment shall be made, if at all, within sixty (60) days after the Close of Escrow (except with respect to CAM Charges and Taxes, in which case such adjustment shall be made within thirty (30) days after the information necessary to perform such adjustment is available), and if a party fails to request an adjustment to the Closing Statement by a written notice delivered to the other party within the applicable period set forth above (such notice to specify in reasonable detail the items within the Closing Statement that such party desires to adjust and the reasons for such adjustment), then the prorations and credits set forth in the Closing Statement shall be binding and conclusive against such party.

6.7.3    <u>Items Not Prorated</u>. Seller and Buyer agree that none of the insurance policies relating to the Property will be assigned to Buyer and Buyer shall responsible for arranging for its own insurance as of the Close of Escrow; and utilities, including telephone, electricity, water and gas, shall be read on the Close of Escrow, and Buyer shall be responsible to pay for all such utilities from Buyer's date of occupation of the Property. If there are any refunds or overpayments to the extent applicable to the period prior to the Close of Escrow, and any utility deposits which it or its predecessors may have posted, then Seller shall be entitled to such refunds or overpayments.

13

KOCH00625

6.7.4 <u>Indemnification</u>. Buyer and Seller shall each indemnify, protect, defend and hold the other harmless from and against any claim in any way arising from the matters for which the other receives a credit or otherwise assumes responsibility pursuant to this Section.

6.7.5 <u>Survival</u>. This Paragraph shall survive the Close of Escrow.

7. <u>Seller Representations, Warranties, and Covenants</u>.

7.1. <u>Representations and Warranties</u>.

Seller hereby represents and warrants as of the date hereof and as of the Close of Escrow by appropriate certificate to Buyer as follows:

7.1.1. Seller is a Texas Corporation duly formed and validly existing under the laws of the State of Texas. Seller has full power and authority to enter into this Agreement, to perform this Agreement and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and all documents contemplated hereby by Seller have been duly and validly authorized by all necessary action on the part of Seller and all required consents and approvals have been duly obtained and will not result in a breach of any of the terms or provisions of, or constitute a default under, any indenture, agreement or instrument to which Seller is a party or otherwise bound. This Agreement is a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to the effect of applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws affecting the rights of creditors generally.

7.1.2. Seller has good and marketable title to the Real Property, subject to the Permitted Exceptions. There are no outstanding rights of first refusal, rights of reverter or options relating to the Real Property or any interest therein, except the Goodrich Option Tract for 2.90 acres which is conveyed hereunder subject to an Option Right for $2,000,000. To Seller's knowledge, there are no unrecorded or undisclosed documents or other matters which affect title to the Real Property. Subject to the Leases, Seller has enjoyed the continuous and uninterrupted quiet possession, use and operation of the Real Property, without material complaint or objection by any person.

7.1.3. Seller is not a "foreign person" within the meaning of Section 1445(f) of the Internal Revenue Code of 1986, as amended (the "Code").

14

Unofficial Copy Office of Chris Daniel District Clerk

KOCH00626

7.1.4. There are no on-site employees of Seller at the Real Property, and following the Close of Escrow, Buyer shall have no obligation to employ or continue to employ any individual employed by Seller or its affiliates in connection with the Real Property.

7.1.5. Except as set forth on any schedule of litigation delivered pursuant to Paragraph 4.1.9, there are no actions, suits or proceedings pending, or to the best of Seller's knowledge, threatened against Seller and affecting any portion of the Real Property, at law or in equity, or before or by any federal, state, municipal, or other governmental court, department, commission, board, bureau, agency, or instrumentality, domestic or foreign.

7.1.6. Seller has not received any notice of any violations of any ordinance, regulation, law, or statute of any governmental agency pertaining to the Real Property or any portion thereof.

7.1.7. There are no unpaid bills, claims, or liens in connection with any construction or repair of the Real Property except for those that will be paid in the ordinary course of business prior to Close of Escrow or which have been bonded over or the payment of which has otherwise been adequately provided for to the satisfaction of Buyer.

7.1.8. Seller is unaware of any material physical or mechanical defects in the buildings or any material settlement or earth movement affecting the Real Property, but Buyer should be aware that Seller has not occupied the Property.

7.1.9. To Seller's knowledge, the zoning of the Real Property permits the current building and use of the Real Property, and to Seller's knowledge there is no pending, or contemplated, rezoning. To Seller's knowledge, the Real Property complies with all applicable subdivision laws and all local ordinances enacted thereunder and no subdivision or parcel map not already obtained is required to transfer the Real Property to Buyer.

7.1.10. To the best of Seller's knowledge and belief, the information in the Rent Roll is true, correct, and complete. Seller has or will pursuant to Paragraph 4 and Paragraph 7.3 deliver to Buyer true, accurate and complete copies of all of the Leases and there are no leases, subleases, licenses, occupancies or tenancies in effect pertaining to any portion of the Real Property, and no persons, tenants or entities occupy space in the Real Property, except as stated in the Rent Roll. There are no options or rights to renew, extend or terminate the Leases or expand any Lease premises, except as shown in the Rent Roll and the Leases, to the best of Seller's knowledge and belief. No brokerage commission or similar fee

15

KOCH00627

is due or unpaid by Seller with respect to any Lease, and there are no written or oral agreements that will obligate Buyer, as Seller's assignee, to pay any such commission or fee under any Lease or extension, expansion or renewal thereof, t o the best of Seller's knowledge and belief. The Leases and any guaranties thereof are in full force and effect, and are subject to no defenses, setoffs or counterclaims for the benefit of the Tenants thereunder, to the best of Seller's knowledge and belief. To the best of Seller's knowledge and belief, neither Seller nor, to Seller's knowledge, any Tenant is in default under its Lease, and Seller is in full compliance with all of the landlord's obligations under the Leases, and Seller has no obligation to any Tenant under the Leases to further improve such Tenant's premises or to grant or allow any rent or other concessions. To the best of Seller's knowledge and belief, no rent or other payments have been collected in advance for more than one (1) month and no rents or other deposits are held by Seller, except the security deposits described on the Rent Roll and rent for the current month.

7.1.11. To Seller's knowledge, there are no presently pending or contemplated proceedings to condemn the Real Property or any part of it.

7.1.12. To Seller's knowledge, all water, sewer, gas, electric, telephone and drainage facilities, and all other utilities required by law or by the normal operation of the Real Property are connected to the Real Property and are adequate to service the Real Property in its present use and normal usage by the Tenants and occupants of the Real Property and are in good working order and repair.

7.1.13. To Seller's knowledge, Seller has all easements and rights-of-way which are required in order to continue the present use of the Real Property and ensure adequate vehicular and pedestrian ingress and egress to the Real Property.

7.1.14. Except for the Leases and the Contracts, there are no agreements or other obligations which may affect the current use of the Real Property, except for the restrictions of Memorial Hermann Hospital System. Seller has fully performed all of the obligations required to be performed by Seller under the Contracts, and to Seller's knowledge, the other parties to the same are not in default thereunder.

7.1.15. To the best of Seller's knowledge and belief, the operating statements furnished to Buyer in connection with or pursuant to this Agreement (a) accurately reflect the financial condition of the Real Property as of the date thereof and (b) do not fail to state any material liability, contingent

16

KOCH00628

or otherwise, or any other facts the omission of which would be misleading.

7.1.16. Seller has no knowledge of nor received any written notice of violation issued pursuant to any environmental law with respect to the Real Property or any use or condition thereof, except for the asbestos on the Property which Buyer is aware of.

7.2. Indemnity; Survival.

The foregoing representations and warranties of Seller are made by Seller as of the date hereof and again as of Close of Escrow and shall survive the Close of Escrow for a period of one year and shall not be merged as of the date of the Close of Escrow hereunder. Seller shall indemnify and defend Buyer against and hold Buyer harmless from, and shall be responsible for all claims, demands, liabilities, losses, damages, costs and expenses, including reasonable attorney's fees, that may be suffered or incurred by Buyer, including any third party due diligence expenses incurred by Buyer, if any representation or warranty made by Seller is untrue or incorrect in any material respect when made. The terms of Seller's indemnity set forth above with respect to the representations and warranties made herein shall survive for a period of one year following the Close of Escrow.

7.3. Covenants of Seller. Seller hereby covenants from and after the Effective Date as follows:

7.3.1. To cause Buyer to have in force fire and extended coverage insurance upon the Real Property, and public liability insurance with respect to damage or injury to persons or property occurring on the Real Property in at least such amounts as are acceptable to Seller. If Buyer does not pay for such insurance, then Seller shall pay for such coverage and the cost of such insurance shall be added to the Purchase Price at Closing.

7.3.2. To cause Buyer to maintain any building constituting an improvement on the Real Property in the same physical condition as it was at the date of Buyer's inspection, reasonable wear and tear excepted, and to cause Buyer to perform all normal maintenance from and after the Effective Date in the same fashion as prior to the Effective Date.

7.3.3. To not enter into any new lease with respect to the Real Property, without Buyer's prior written consent, which shall not be unreasonably withheld. Exercise of a mandatory renewal option shall not be considered a new lease. To the extent specifically disclosed to Buyer in connection with any request for approval, any brokerage commission and the cost of Tenant improvements or other allowances payable with respect to a new Lease shall be prorated between Buyer and Seller in

17

KOCH00629

accordance with their respective periods of ownership as it bears to the primary term of the new Lease. Buyer shall have five (5) business days following receipt of a request for any consent pursuant to this paragraph in which to approve or disapprove of any new Lease or any modification or cancellation of any existing Lease. Failure to respond in writing within said time period shall be deemed to be consent. Seller's execution of a new lease or modification or cancellation of an existing Lease following Buyer's reasonable refusal to consent thereto shall constitute a default hereunder.

7.3.4. To not sell, assign, or convey any right, title, or interest whatsoever in or to the Real Property, or create or permit to attach any lien, security interest, easement, encumbrance, charge, or condition affecting the Real Property (other than the Permitted Exceptions).

7.3.5. To not, without Buyer's written approval, (a) amend or waive any right under any Contract, or (b) enter into any service, operating or maintenance agreement affecting the Real Property that would survive the Close of Escrow.

7.3.6. To fully and timely comply with all obligations to be performed by it under the Leases and Contracts, and all Permits, licenses, approvals and laws, regulations and orders applicable to the Real Property.

7.3.7. To provide Buyer with copies of (a) any default letters sent to or received from Tenants and, (b) any copies of correspondence received from a Tenant that it is discontinuing operations at the Property or seeking to re-negotiate its lease and (c) notices of bankruptcy filings received with respect to any Tenant.

7.3.8 To operate or cause others to operate the Real Property from and after the date hereof in substantially the same manner as prior thereto.

8. Buyer Representations and Warranties.

Buyer hereby represents and warrants to Seller as of the date hereof and as of the Close of Escrow by appropriate certificate that:

Buyer is a limited partnership duly organized and validly existing under the laws of the State of Texas. Buyer has full power and authority to enter into this Agreement, to perform this Agreement and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and all documents contemplated hereby by Buyer have been duly and validly authorized by all necessary action on the part of Buyer and all required consents and approvals have been duly obtained and will not result in a breach of any of the terms or provisions of, or constitute a default under, any

18

Unofficial copy office of Chris Daniel District Clerk

KOCH00630

indenture, agreement or instrument to which Buyer is a party or otherwise bound. This Agreement is a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to the effect of applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws affecting the rights of creditors generally.

9.   Conditions Precedent to Close of Escrow.

9.1.   Conditions Precedent.

The obligations of Buyer to purchase the Property pursuant to this Agreement shall, at the option of Buyer, be subject to the following conditions precedent:

9.1.1.   All of the representations, warranties and agreements of Seller set forth in this Agreement shall be true and correct in all material respects as of the date hereof and as of the Close of Escrow, and Seller shall not have on or prior to the Close of Escrow, failed to meet, comply with or perform in any material respect any covenants or agreements on Seller's part as required by the terms of this Agreement.

9.1.2.   There shall be no change in the matters reflected in the Title Documents, and there shall not exist any encumbrance or title defect affecting the Real Property not described in the Title Documents except for the Permitted Exceptions or matters to be satisfied at the Close of Escrow.

9.1.3.   Seller believes that any management agreement affecting the Real Property shall have already been terminated.

9.2.   Effect of Failure.

If Buyer notifies Seller of a failure to satisfy the conditions precedent set forth in this Paragraph 9, Seller may, within five (5) days after receipt of Buyer's notice, agree to satisfy the condition by written notice to Buyer.

19

KOCH00631

10. <u>Damage or Destruction Prior to Close of Escrow.</u>

Since the Buyer shall be in total possession of the Property and shall have the sole responsibility for obtaining insurance for the Property and improvements thereon, Buyer shall be solely responsible for the repair for any and all damage or destruction to the Property and improvements.

11. <u>Eminent Domain.</u>

If, before the Close of Escrow, proceedings are commenced for the taking by exercise of the power of eminent domain of all or a material part of the Real Property which, as reasonably determined by Buyer, would render the Real Property unacceptable to Buyer or unsuitable for Buyer's intended use, Buyer shall have the right, by giving written notice to Seller within thirty (30) days after Seller gives notice of the commencement of such proceedings to Buyer, to terminate this Agreement, in which event this Agreement shall automatically terminate, the Deposit shall be returned to Buyer without any further action required from either party and neither party shall have any continuing obligations hereunder. If, before the Close of Escrow, proceedings are commenced for the taking by exercise of the power of eminent domain of less than a material part of the Real Property, or if Buyer has the right to terminate this Agreement pursuant to the preceding sentence but Buyer does not exercise such right, then this Agreement shall remain in full force and effect and, on the Close of Escrow, the condemnation award (or, if not theretofore received, the right to receive such portion of the award) payable on account of the taking shall be assigned, or paid to, Buyer. Seller shall give written notice to Buyer within three (3) business days after Seller's receiving notice of the commencement of any proceedings for the taking by exercise of the power of eminent domain of all or any part of the Real Property. The foregoing notwithstanding, in the event the taking results in the cancellation of, or rent abatement under, any Lease, Buyer shall have the option to terminate this Agreement.

12. <u>Notices.</u>

All notices, demands, or other communications of any type given by any party hereunder, whether required by this Agreement or in any way related to the transaction contracted for herein, shall be void and of no effect unless given in accordance with the provisions of this Paragraph. All notices shall be in writing and delivered to the person to whom the notice is directed, either (a) in person, (b) by United States Mail, as a registered or certified item, return receipt requested, (c) by telecopy or (d) by a nationally recognized overnight delivery courier. Notices delivered by telecopy or overnight courier shall be deemed received on the business day following transmission. Notices delivered by certified or registered mail shall be deemed delivered three (3) days following posting. Notices shall be given to the following addresses:

20

KOCH00632

Seller:                         Mr. Monzer Hourani
                                Mr. Robert M. Hodge
                                Medistar Corporation
                                7670 Woodway, Suite 160
                                Houston, TX 77063

With Required Copy to:          _____
                                _____
                                _____
                                _____

Buyer:                          APEX Katy Physicians, Ltd.
                                _____
                                _____
                                _____

With Required Copy to:          _____
                                _____
                                _____
                                _____

13.     Remedies.

    13.1.   Defaults by Seller. If there is any material substantial default by Seller under this
            Agreement, following notice to Seller and three (3) days thereafter during which
            period Seller may cure the default, Buyer may terminate this Agreement but the
            Deposit and $500,000 shall still remain the property of Seller. The foregoing
            notwithstanding, no right to cure shall extend the Close of Escrow.

    13.2.   Defaults by Buyer. If there is any default by Buyer under this Agreement,
            following notice to Buyer and three (3) days, during which period Buyer may cure
            the default, Seller may, as its sole remedy, declare this Agreement terminated, in
            which case the Deposit shall be paid to Seller as liquidated damages and each
            party shall thereupon be relieved of all further obligations and liabilities, except
            any which survive termination. The foregoing notwithstanding, no right to cure
            shall extend the Close of Escrow.

In the event this Agreement is terminated due to the default of Buyer hereunder, Buyer
shall, in addition, deliver to Seller, at no cost to Seller, the Due Diligence Items.

14.     Assignment.

Buyer may not assign any or all of its rights and obligations under this Agreement to any
one or more persons or entities.

21

KOCH00633

15. Interpretation and Applicable Law.

This Agreement shall be construed and interpreted in accordance with the laws of the State where the Real Property is located. Where required for proper interpretation, words in the singular shall include the plural; the masculine gender shall include the neuter and the feminine, and vice versa. The terms "successors and assigns" shall include the heirs, administrators, executors, successors, and assigns, as applicable, of any party hereto.

16. Amendment.

This Agreement may not be modified or amended, except by an agreement in writing signed by the parties. The parties may waive any of the conditions contained herein or any of the obligations of the other party hereunder, but any such waiver shall be effective only if in writing and signed by the party waiving such conditions and obligations.

17. Attorney's Fees.

In the event it becomes necessary for either party to file a suit to enforce this Agreement or any provisions contained herein, the prevailing party shall be entitled to recover, in addition to all other remedies or damages, reasonable attorneys' fees and costs of court incurred in such suit.

18. Entire Agreement; Survival.

This Agreement (and the items to be furnished in accordance herewith) constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith. No representation, warranty, covenant, agreement, or condition not expressed in this Agreement shall be binding upon the parties hereto nor shall affect or be effective to interpret, change, or restrict the provisions of this Agreement. The obligations of the parties hereunder and all other provisions of this Agreement shall survive the Close of Escrow or earlier termination of this Agreement, except as expressly limited herein.

19. Counterparts.

This Agreement may be executed in any number of counterparts, all of which when taken together shall constitute the entire agreement of the parties.

20. Acceptance.

Time is of the essence of this Agreement. If the final date of any period falls upon a Saturday, Sunday, or legal holiday under the Federal law or laws of the State of Texas, then in such event the expiration date of such period shall be extended to the next day

22

KOCH00634

which is not a Saturday, Sunday, or legal holiday under Federal law or the laws of the State of Texas.

21. Real Estate Commission.

Seller and Buyer each represent and warrant to the other that neither Seller nor Buyer has contacted or entered into any agreement with any real estate broker, agent, finder or any other party in connection with this transaction, and that neither party has taken any action which would result in any real estate broker's, finder's or other fees or commissions being due and payable to any party with respect to the transaction contemplated hereby. Each party hereby indemnifies and agrees to hold the other party harmless from any loss, liability, damage, cost, or expense (including reasonable attorneys' fees) resulting to the other party by reason of a breach of the representation and warranty made by such party in this Paragraph.

**SIGNATURE PAGE FOR AGREEMENT FOR PURCHASE AND SALE OF REAL PROPERTY AND ESCROW INSTRUCTIONS**

EXECUTED on this 3RD day of January, 2007.

SELLER:

MEDISTAR CORPORATION,
a Texas Corporation

By: _____
Name: _____ MONZER HOURANI
Title: _____ C.E.O.

Witness:

Conard L. Smith

23

KOCH00635

EXECUTED on this 2nd day of January, 2007.

BUYER:

APEX KATY PHYSICIANS, LTD.,
a Texas Limited Partnership

By: _____
Name: _____ Pankaj K. Sha 1/3/07
Title: _____

Abeer Zaki

General Partner.

Witness:

Cameron L. Smith

Unofficial Copy Office of Chris Daniel District Clerk

24

KOCH00636

# EXHIBIT A

## Legal Description of the Real Property

Unofficial Copy Office of Chris Daniel District Clerk

KOCH00637

## EXHIBIT B

## Description of the Personal Property

Unofficial Copy Office of Chris Daniel District Clerk

26

KOCH00638

Exhibit "C"

## Assignment and Assumption Agreement

This Assignment and Assumption Agreement (the "Assignment") is made on _____ ___, 20__, by and between _____, a _____ (the "Assignor"), in favor of _____, a _____ ("Assignee").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby grants, conveys, transfers and assigns to Assignee all of Assignor's rights, title and interest in, to and under any and all of the following to the extent they are related to that certain real property located in the County of _____, _____, commonly known as _____ and more particularly described in Exhibit A attached hereto (the "Real Property"):

    a.    all leases (the "Leases"), including associated amendments, with all persons leasing the Real Property or any part thereof, except for certain payments for tenant improvements previously advanced by Assignor, as set forth on Exhibit B, together with all security deposits, other deposits held in connection with the Leases, Lease guarantees and other similar credit enhancements providing additional security for the Leases;

    b.    all tangible and intangible personal property owned by Seller located on and used in connection with the Real Property, including, specifically, without limitation, equipment, furniture, tools and supplies, any website maintained by Assignor, and all related intangibles including Seller's interest in the name "Katy Pin Oak Hospital";

    c.    all service contracts, agreements, warranties and guaranties relating to the operation, use or maintenance of the Real Property (the "Contracts"); and

    d.    to the extent transferable, all building permits, certificates of occupancy and other certificates, permits, licenses and approvals relating to the Real Property.

Assignor hereby agrees to indemnify, protect, defend and hold Assignee harmless from and against any and all claims, demands, liabilities, losses, costs, damages or expenses (including, without limitation, reasonable attorneys' fees and costs) arising out of or resulting from any breach or default by Assignor under the terms of the Leases and the Contracts arising prior to the date hereof.

Assignor hereby covenants that it will, at any time and from time to time upon written request therefor, at Assignee's sole expense and without the assumption of any additional liability thereby, execute and deliver to Assignee, its successors and assigns, any new or confirmatory instruments and take such further acts as Assignee may reasonably request to fully evidence the

Unofficial Copy Office of Chris Daniel District Clerk

KOCH00639

assignment contained herein and to enable Assignee, its successors and assigns to fully realize and enjoy the rights and interests assigned hereby.

Assignee hereby accepts the foregoing assignment and agrees to assume, pay, perform and discharge, as and when due, all of the agreements and obligations of Assignor under the Leases and Contracts and agrees to be bound by all of the terms and conditions of the Leases and the Contracts.

Assignee hereby agrees to indemnify, protect, defend and hold Assignor harmless from and against and any all claims, demands, liabilities, losses, costs, damages or expenses (including, without limitation, reasonable attorneys' fees and costs) arising out of or resulting from any breach or default by Assignee under the terms of the Leases and Contracts arising on or after the date hereof.

The provisions of this Assignment shall be binding upon, and shall inure to the benefit of, the successors and assigns of Assignor and Assignee, respectively.

This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor and Assignee have caused their duly authorized representatives to execute this Assignment as of the date first above written.

ASSIGNOR: _____,

a_____

By:_____
Its:_____

ASSIGNEE: _____

By:_____
Its:_____

Exhibits:
Exhibit A: Legal Description of Real Property
Exhibit B: Excluded Payments

2

Unofficial Copy Office of Chris Daniel District Clerk

KOCH00640

## PROMISSORY NOTE

Houston, Texas

$9,000,000.00

*March 22nd*, 2007

FOR VALUE RECEIVED, after date, without grace, in the manner, on the dates, and in the amounts so herein stipulated APEX KATY PHYSICIANS, LLC., a Texas limited liability company hereinafter called "Maker," hereby promises to pay to the order of METROBANK, N.A., a national banking association, hereinafter called "Lender," at 9600 Bellaire Boulevard, Suite 252, Houston, Texas 77036, in Harris County, Texas, or at such other address as Lender may hereafter designate to Maker in writing, the principal sum of NINE MILLION DOLLARS ($9,000,000.00), in lawful money of the United States of America, which shall be legal tender, in payment of all debts and dues, public and private, at the time of payment, and to pay interest on the whole of the principal amount hereof from time to time outstanding prior to the maturity of this Note at a rate per annum equal to the lesser of the Contract Rate (as hereinafter defined) or the Maximum Lawful Rate (as hereinafter defined). All past-due principal and all accrued and past-due interest on this Note shall bear interest until paid at the "Default Rate" as hereinafter defined.

### Payment Terms.

Accrued and unpaid interest, computed on the outstanding unpaid principal balance of this Note, shall be due and payable on April 25, 2007 and on the same day of each succeeding month to and including July 25, 2007.

A portion of the principal and interest of this Note shall be due and payable in consecutive monthly installments of SEVENTY ONE THOUSAND SEVEN HUNDRED TWENTY SIX and 71/100 DOLLARS ($71,726.71) each, commencing on August 25, 2007 and continuing regularly thereafter on the same day of each succeeding month to and including June 25_, 2012. This payment is based on a twenty (20) year amortization.

ALL UNPAID INDEBTEDNESS EVIDENCED BY THIS NOTE, INCLUDING UNPAID PRINCIPAL AND ACCRUED AND UNPAID INTEREST AND ALL FEES AND OTHER CHARGES, IF ANY, PAYABLE HEREUNDER, SHALL BE DUE AND PAYABLE ON JULY 25 2012.

If any payment shall become due on this Note on a Saturday, Sunday, or public holiday on which the Lender is not open for business, such payment shall be made on the next succeeding day on which Lender is open for business and such extension of time shall in such case be included in computing interest in connection with such payment.

Unless otherwise agreed or required by applicable law, all payments made on this Note will be applied first to accrued and unpaid interest, then, to the extent of any excess, to outstanding unpaid principal and then, to the extent of any excess, to other unpaid charges on this Note.

For the purposes of this Note, periods of one or more months shall end on the day of the month which is the same as the day of the month on which this Note is dated; provided that any month thereby ending on the 29th, 30th or 31st day and which does not contain such day, shall end on the last day of such month.

**Loan Agreement.** This Note is the promissory note referred to as the "Note" in that certain Loan Agreement (the "Loan Agreement") of even date herewith between Maker, Pankaj K. Shah, Randeep Suneja, Upendra N. Vora and Lender. If for any reason the principal of this Note is not funded in full on the date hereof but is funded by one or more advances made by Lender to or for the benefit of any Maker subsequently, then the date and amount of each such advance shall be entered in the records of Lender and such records shall be rebuttably presumptive of the date and amount of each such advance. Notwithstanding any other term or

Page 1 of 6

Initialed for Identification

KOCH00641

provision hereof, interest shall commence to accrue on each portion of the principal advanced on this Note on, and not before, the date that such principal portion is advanced.

**Contract Rate.** The term "Contract Rate" as used in this Note shall mean a rate of interest equal to seven and one quarter percent (7.25%).

**Maximum Lawful Rate.** For the purposes of this Note the term "Maximum Lawful Rate" shall mean the maximum rate of interest which the Lender may charge any Maker on the loan evidenced by this Note without thereby charging interest which is usurious or unlawful under the state or federal laws applicable for the purpose of determining the maximum lawful rate of interest which may be charged on such loan and this Note; and provided that all fees, "points", and other charges which constitute interest shall be included and taken into account in determining such Maximum Lawful Rate. It is expressly provided and stipulated that, notwithstanding any other provision of this Note, any document evidencing, securing, guaranteeing, or otherwise governing the loan evidenced by this Note, in no event shall the aggregate of (i) the aggregate interest which has accrued on this Note from the date hereof through the date of such calculation, and (ii) the aggregate of any other amounts accrued or paid which, under applicable laws, are deemed to constitute interest upon the loan evidenced hereby from the date hereof through the date of such calculation, ever exceed the Maximum Lawful Rate on the principal balance of the loan evidenced by this Note from time to time remaining unpaid. In this connection, it is expressly stipulated and agreed that it is the intent of the Lender and each Maker in the execution and delivery of this Note to contract in strict compliance with the usury laws, if any, applicable to this Note. None of the terms of this Note or the security instruments securing same shall ever be construed to create a contract to pay interest for the use, forbearance or detention of money, at a rate in excess of the Maximum Lawful Rate. Each Maker, and any guarantors, endorsers or other parties now or hereafter becoming liable for the payment of this Note, shall never be liable for interest in excess of the Maximum Lawful Rate, and the provisions of this paragraph shall control over all other provisions of this Note and the security instruments securing same which may be in apparent conflict herewith. For the purpose of determining the Maximum Lawful Rate permitted by the applicable laws of the State of Texas, the "weekly ceiling" from time to time in effect as defined in Chapter 303, as amended, of the Texas Finance Code shall be the ceiling applicable to this transaction. Notwithstanding the foregoing sentence, to the extent United States federal law permits a greater amount of interest than is permitted under Texas law, Lender will rely on United States federal law instead of such Chapter 303, as amended, for the purpose of determining the Maximum Lawful Rate. Additionally, to the extent permitted by applicable law now or hereafter in effect, Lender may, at its option and from time to time, implement any other method of computing the Maximum Lawful Rate under such Chapter 303, as amended, or under other applicable law by giving notice, if required, to Maker as provided by applicable law now or hereafter in effect. In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to the indebtedness evidenced hereby. All sums paid or agreed to be paid to the holder of this Note for the use, forbearance or detention of money shall, to the extent required to avoid or minimize usury and to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this note, so that the interest rate does not exceed the Maximum Lawful Rate. The provisions of this Paragraph shall control over all other provisions of this Note and other agreements, whether now or hereafter existing and whether written or oral, between Maker and Lender.

Notwithstanding any term or provision of this Note to the contrary, each Maker confirms to Lender that neither Maker nor its legal counsel, if any, is aware that this Note, or the transaction in connection with which this Note was issued, is or may be usurious in any respect. To induce Lender to make the loan evidenced by this Note, each Maker agrees with and covenants to Lender that if at any time Maker believes or discovers that any term or provision of this Note or any action taken by Lender in connection with this Note is or may be in violation of the usury laws or any other applicable law, Maker will immediately give notice to Lender specifying with particularity the nature and extent of any such potential violation of the usury laws or any other applicable law, and afford to Lender a reasonable period (of not less than 60 days) within which to cure same. Each Maker agrees with and

Page 2 of 6

Initialed for Identification

KOCH00642

covenants to Lender that in no instance will Maker make any claim, bring any suit, prosecute or otherwise assert any cause of action, claim, counterclaim, or defense in respect of any violation of the usury laws or any other applicable law, unless, as a condition precedent thereto, Maker has given to Lender such notice and afforded to Lender such opportunity to cure as provided in this paragraph. No term or provision of this Note shall ever be construed to require any Maker to pay any unearned interest.

**Default Rate.** The term "Default Rate" as used in this Note shall mean the Maximum Lawful Rate or if there is no Maximum Lawful Rate then a rate per annum equal to the Contract Rate plus five percent (5.00%).

**360 Day Year.** Except as hereinafter specifically provided in this paragraph to the contrary, accrued interest on this Note will be calculated on the basis of a 360-day year. The interest accruing on this Note will be calculated on the outstanding principal balance of this Note by dividing the rate of interest per annum provided for in this Note by 360 and then multiplying the result first by the outstanding principal balance of this Note and then by the actual number of calendar days for which interest is being accrued under this Note on such principal balance. Notwithstanding the foregoing, however, calculations of the Maximum Lawful Rate under this Note will be based on the actual number of days (365 or 366) contained in each year involved in such calculations.

**Security.** The payment of the entire indebtedness evidenced by this Note, including principal, interest, fees, and other charges, if any, is secured by various liens and security interest including but not limited to: (a) the liens of that certain Deed of Trust and Security Agreement (the "Deed of Trust") dated of even date herewith, executed by Maker, encumbering certain real property consisting of all that certain 8.4388 acres of land being that same tract described in Deed dated October 1, 1999, from Katy Medical Center, Inc. to Memorial Hermann Hospital System, recorded at Film Code No. 1999086283, of the Official Records of Fort Bend County, Texas, being a portion of Reserve "E", Lifemark Medical Center, according to the plat thereof recorded at Volume 28, Page 21, of the Plat Records of Fort Bend County, Texas; and all that certain 9.5782 acres of land being all of reserves "B" & "C", Lifemark Medical Center, according to the plat thereof recorded at Volume 28, Page 21, of the Plat Records of Fort Bend County, Texas and any improvements and other properties and interests therein and thereon all as more fully described in said Deed of Trust; and (b) a vendor's lien retained in the deed of even date herewith conveying such real property and improvements to Maker.

As additional security for this Note and all other indebtedness which may at any time be owed by any Maker to the Lender, whether such indebtedness is incurred directly or acquired from third parties, each Maker gives to the Lender a security interest and contractual right of setoff in and to all money and property of any Maker now or at any time hereafter coming within the Lender's custody or control, including without limitation, all certificates of deposit and other deposits and accounts, whether such certificates of deposit or accounts have matured or not and whether exercise of such right of setoff results in loss of interest or other penalty under the terms of the certificates of deposit or other account agreement.

**Good Funds.** Any check, draft, money order or other instrument given in payment of all or any portion of this Note may be accepted by the Lender or any other holder hereof and handled for collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of the Lender or any other holder hereof, except to the extent that actual cash proceeds of such instrument are unconditionally received by the Lender or any other holder hereof and applied to this indebtedness as herein provided.

**No Lender Waiver.** Any failure by Lender to insist, or any election by Lender not to insist, upon strict performance by Maker of any of the terms or provisions of this Note shall not be deemed to be a waiver of same or of any other term or provision or condition hereof, and Lender shall have the right at any time or times thereafter to insist upon strict performance by Maker of any and all of such terms and provisions of this Note. Each Maker agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Lender and each Maker consents to any indulgences

Page 3 of 6                                                                                    Initialed for Identification

KOCH00643

and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions of this Note, and to any substitution, exchange or release of the collateral, or any part thereof, with or without substitution, and agrees to the addition or release of any makers, endorsers, guarantors, or sureties, all whether primarily or secondarily liable, without notice to any Maker and without affecting its liability hereunder.

**Joint and Several Liability.** Should this Note be signed or endorsed by more than one person and/or entity, then all of the obligations herein contained shall be the joint and several obligations of all Makers and endorsers hereof.

**Time of Essence.** Time is of the essence of this Note and as to all dates set forth herein.

**Late Charge.** If any payment on this Note is not received in full by Lender within ten (10) calendar days after the date when due, then in addition to interest accruing at the Default Rate on such overdue payment as in this Note provided, Maker shall also pay to Lender, upon demand, as a late charge a reasonable amount not exceeding five percent (5.00%) of the amount of such overdue payment. Maker acknowledges that it would be extremely difficult or impracticable to determine Lender's actual costs and damages resulting from any late payment, and such late charges are reasonable estimates of those costs and damages and do not constitute a penalty.

**Waivers by Maker.** Each Maker and all sureties, endorsers and guarantors of this Note, and each party hereafter assuming or otherwise becoming liable hereon, (i) waive demand, presentment for payment, notice of intention to accelerate the maturity of this Note and to declare the entire balance of the indebtedness evidenced hereby due and payable, notice that the entire balance of the indebtedness evidenced hereby has been declared due and payable, notice of nonpayment, protest, notice of protest and all other notices, filings of suit and diligence in collecting this Note or enforcing any of the security herefor, (ii) agree to any substitution, exchange or release of any such security or the release of any party primarily or secondarily liable hereon, (iii) agree that Lender or other holder hereof shall not be required first to institute suit or exhaust its remedies hereon against any Maker or others liable or to become liable hereon or enforce its rights against any security herefor in order to enforce payment of this Note by it, (iv) consent to any extensions or postponement of time of payment of this Note and to any other indulgence with respect hereto without notice thereof to any of them; and (v) to the full extend permitted by law, waives and renounces for itself, its successors and assigns, all rights to the benefits of any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, or exemption and homestead laws now provided, or which may hereafter be provided, by the laws of the United States and of any state thereof against the enforcement and collection of the obligations evidenced by this Note.

**Default and Remedies.** It is especially agreed that if default shall be made in any payment due hereon, either principal or interest, or if there is a default in any of the terms, covenants, agreements, conditions or provisions set forth in any deed of trust, security agreement or other instrument or document given to secure this Note or executed simultaneously with this Note or hereafter, or if any certificate, affidavit and/or financial statement furnished to Lender in connection with the loan evidenced by this Note is false or misleading or omits to state any material fact, or should any Maker, endorser, surety or guarantor hereof become insolvent or commit an act of bankruptcy or make an assignment for the benefit of creditors or authorize the filing of a voluntary petition in bankruptcy, or should a receiver of any of their property be appointed, or should involuntary bankruptcy proceedings be filed or threatened against any Maker, endorser, surety or guarantor hereof, or should Lender reasonably believe that the prospect for payment hereof is impaired or deems itself insecure, or should any event occur which results in the acceleration of the maturity of any indebtedness of any Maker, endorser, surety or guarantor hereof to Lender under any mortgage, deed of trust, security or loan agreement, indenture, note or other undertaking, or should any other Event of Default (as defined in the Loan Agreement) occur then in any such event, at the option of the holder hereof at any time thereafter, without demand or notice, the unpaid principal

Page 4 of 6

Initialed for Identification

KOCH00644

balance of this Note, and all accrued interest shall immediately become due and payable and shall thereafter bear interest until paid at the "Default Rate".

**Costs of Collection.** If this Note is not paid at maturity, however such maturity may be brought about, and the same is placed in the hands of an attorney for collection or if collected by suit or through bankruptcy, probate, receivership or other legal or judicial proceedings, all Makers hereof agree to pay an additional amount as Lender's costs of collection and reasonable attorney's fees.

**Prepayment.** Any Maker hereof may at any time and from time to time pay and prepay the full amount or any part of this Note; provided that any such prepayment shall be accompanied by a payment to the Lender of a fee (the "Prepayment Fee") equal to a percentage of the principal of this Note being prepaid which shall vary depending on the month following the date of this Note in which prepayment occurs and which shall be determined as follows:

| Period in which Prepayment Occurs | Prepayment Fee as a Percentage of Principal being Prepaid |
|---|---|
| 1-4 months | None |
| 5-16 months | 2.00% |
| 17-28 months | 1.00% |
| 29-40 months | 0.50% |
| Thereafter | None |

Any prepayment made shall be credited first to any required Prepayment Fee, and the remainder shall be applied as provided for herein. Such Prepayment Fee shall be paid without prejudice to the right of Lender to collect any other amounts to be paid hereunder or under any document securing payment of this Note.

Notwithstanding the foregoing, if Maker establishes, to Lender's satisfaction, that any prepayment is being made without anyone (including Maker or any purchaser of the property encumbered by the Deed of Trust) obtaining financing from a bank, savings bank, credit union or other financial institution, then no Prepayment Fee shall be payable regarding such prepayment.

EACH MAKER ACKNOWLEDGES AND AGREES THAT SUCH PREPAYMENT FEE REPRESENTS A REASONABLE AND FAIR ESTIMATE OF COMPENSATION FOR THE LOSS THAT LENDER MAY SUSTAIN FROM THE PREPAYMENT OF THIS NOTE. EACH MAKER ACKNOWLEDGES AND AGREES THAT MAKER HAS NO RIGHT TO PREPAY THIS NOTE WITHOUT PAYING THE PREPAYMENT FEE EXCEPT AS SPECIFICALLY PROVIDED HEREIN.

**Headings.** The paragraph entitlements hereof are inserted for convenience of reference only and shall in no way alter, modify or define, or be used in construing, the text of such paragraphs.

**Governing Law.** THIS NOTE SHALL BE PAID AND PERFORMED IN THE STATE OF TEXAS, AND THE LAWS OF THE STATE OF TEXAS SHALL GOVERN THE CONSTRUCTION, VALIDITY, ENFORCEMENT, AND INTERPRETATION HEREOF, EXCEPT TO THE EXTENT THE LAWS OF THE UNITED STATES OF AMERICA OTHERWISE GOVERN THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION HEREOF. If any additional rights or remedies are hereafter granted to creditors under the laws of the State of Texas or under the laws of the United States of America, the Lender shall also have and may exercise any such additional rights or remedies. Venue for any action brought on this Note shall be proper in any Texas or federal court sitting in Texas, and having jurisdiction of such action.

Initialed for Identification

KOCH00645

**Successors and Assigns.** This Note and all provisions hereof shall be binding upon each Maker and all persons claiming under or through any Maker, and shall inure to the benefit of Lender together with its successors and assigns, including each owner and holder from time to time of this Note.

**Final Agreement.** THIS NOTE AND ALL OTHER LOAN DOCUMENTS (AS DEFINED IN THE LOAN AGREEMENT) EMBODY THE FINAL, ENTIRE AGREEMENT OF MAKERS AND LENDER AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF MAKER AND LENDER. THERE ARE NO ORAL AGREEMENTS BETWEEN ANY MAKER AND LENDER. The provisions of this Note and the Loan Documents may be amended or revised only by an instrument in writing signed by all Makers and Payee.

IN WITNESS WHEREOF, the undersigned Maker has duly executed this Note as of the day and year above first written.

APEX KATY PHYSICIANS, LLC.,
a Texas limited liability company

By: _____
Pankaj K. Shah, Manager

By: _____
Adeel Zaidi, Manager

Unofficial Copy Office of Chris Daniel District Clerk

Initialed for Identification

KOCH00646

p27

## LEASE AGREEMENT

AGREEMENT OF LEASE (this "Lease") made and entered into as of the 4th day of January 2007, by and between APEX KATY PHYSICIANS, LTD., or Assigns, a Texas corporation ("Landlord") and APEX LONG TERM ACUTE CARE-KATY, L.P., a Texas limited partnership ("Tenant" or "Hospital")

### WITNESSETH:

WHEREAS, Tenant desires to lease and Landlord desires to rent the property identified in Schedule A

Upon and subject to the terms and conditions hereinafter set forth, Landlord leases to Tenant and Tenant rents from Landlord all of Landlord's rights and interest in and to the following real property (collectively, the "Premises"):

(a) the real property more particularly described on Schedule A attached hereto together with all covenants, licenses, privileges and benefits thereto belonging, any and all easements, rights-of-way, rights of ingress and egress or other interests of Landlord in, on or to any land, highway, street, road or avenue, open or proposed, in, on, across, in front of, abutting or adjoining such real property including, all strips and gores adjacent to or lying between such real property and any adjacent real property (the "Land");

(b) all buildings, structures, Fixtures (as hereinafter defined) and other improvements of every kind including all alleyways and connecting tunnels, crosswalks, sidewalks, landscaping, parking lots and structures and roadways appurtenant to such buildings and structures presently or hereafter situated upon the Land, and Capital Additions financed by Landlord (but specifically excluding Capital Additions financed by Tenant), drainage and all above-ground and underground utility structures (collectively, the "Leased Improvements");

(c) all permanently affixed equipment, machinery, fixtures and other items of real and/or personal property, including all components thereof, now and hereafter located in, on or used in connection with, and permanently affixed to or incorporated into the Leased Improvements, including all furnaces, boilers, heaters, electrical equipment, heating, plumbing, lighting, ventilating, refrigerating, incineration, air and water pollution control, waste disposal, air-cooling and air conditioning systems and apparatus, sprinkler systems and fire and theft protection equipment, carpet, moveable or immoveable walls or partitions and built-in oxygen and vacuum systems, all of which are hereby deemed by the parties hereto to constitute real estate, together with all replacements, modifications, alterations and additions thereto, but specifically excluding all items included within the category of Personal Property (collectively, the "Fixtures"); and





SCAR00148

(d)   to the extent permitted by law, all permits, approvals and other intangible property or any interest therein now or hereafter owned or held by Landlord in connection with the Leased Property or any business or businesses now or hereafter conducted by Tenant or with the use thereof, including all contract rights, agreements, trade names, water rights and reservations, zoning rights, business licenses and warranties (including those relating to construction or fabrication) related to the Leased Property or any part thereof, but specifically excluding the general corporate trademarks, service marks, logos or insignia or books and records of Tenant; and

all site plans, surveys, soil and substrata studies, architectural drawings, plans and specifications, engineering plans and studies, floor plans, landscape plans, and other plans and studies that relate to the Land or the Leased Improvements and are in Tenant's possession or control.

NOW, THEREFORE, it is mutually agreed by and between Landlord and Tenant as follows:

## 1.   TERM OF LEASE

Landlord, in exchange for the payment of rent and the performance of the obligations and promises made by Tenant in this Lease, leases to Tenant, and Tenant agrees to rent from Landlord the Premises for a period of twenty (20) years and four (4) months ("Initial Term") effective upon the Commencement Date (hereafter defined) of the Lease  The "Commencement Date" of this Lease shall be the date that the Premises shall be deemed substantially complete of the changes, modifications, and upgrades needed to be performed on the Premises which is anticipated to be no later than March 9, 2007 ("Completion Date")  The Completion Date shall be the date upon which the Landlord has (i) delivered to Tenant the Landlord's architect's certificate of Final Completion; (ii) obtained a Certificate of Occupancy from the City of Katy; and (iii) received approval from the State Architect of the Texas Department of Health, Health Facilities Licensing and Compliance Division  Not withstanding the above, the outside date that Rent will commence under the Hospital Lease will be no later than four (4) months after the Certificate of Occupancy is received  As soon as possible after the execution of this Lease, the Tenant and Landlord shall prepare a list of the changes, modifications and upgrades needed in the Premises in order to obtain licensing from the Texas Department of Health, Health Facilities Licensing and Compliance Division

## 2   LEASE RENEWAL

As set forth in this Article 2 hereof, Tenant shall have two (2) consecutive five (5) year renewal options under this Lease  Each renewal option may be exercised by Tenant's written notice to Landlord, not less than one hundred twenty (120) days prior to expiration of the then current Initial Term or Renewal Term, of Tenant's exercise of its option to occupy the Premises for a Renewal Term  Except as hereafter provided in this Article 2, Tenant's occupancy of the Premises for any Renewal Term shall be under the terms and conditions of this Lease, except that the Tenant shall accept the Premises in its "AS IS" condition, after the completion and acceptance of the improvements to be made by landlord under this Lease Agreement and those improvements to be

417761.3 /SPH/73798/0117/010307

2

SCAR00149

made by Landlord as stipulated in the Memorandum of Understanding between Landlord and IMG dated July 28, 2006, a copy of which is attached hereto as Exhibit "_" to his Lease Agreement and except for the asbestos conditions which are present on the Premises

In the event Tenant and Landlord agree to renew this Lease at the end of the Initial Term or any Renewal Term of this Lease, and if Tenant chooses to be represented by a Real Estate Agent in the lease renewal negotiations, Tenant agrees that such representation shall be at its sole cost and not a point of negotiation in the Lease renewal process

## 3. AMOUNT OF RENT

In exchange for Landlord giving Tenant the right to use and occupy the Premises, Tenant promises to pay rent to Landlord which shall be payable as set forth in the Lease Addendum attached hereto and made a part hereof for all purposes Lease Rental Payments shall be made monthly Within five (5) days after the execution of this Lease by both Landlord and Tenant, Tenant shall pay Landlord One Thousand Dollars ($1,000) which shall be applied to the first rent due hereunder Rent shall commence on the Commencement Date and shall be prorated on a daily basis if the Commencement Date is not the first day of a month for the remainder of that month Rent shall be payable without notice, set-off or abatement, except as contemplated by Article 2, at such address as Landlord may from time to time notify Tenant of in writing. Notwithstanding the terms of this Lease, the Tenant shall have the first four (4) months of the Term of this Lease at no base or minimum rental cost to Tenant

This Lease is what is commonly called a "Net Lease," it being understood that Landlord shall receive the Rent set forth in Article 3 free of any Real Estate Taxes, Insurance Premiums, Utilities, Repairs, Common Area Maintenance and all other operating expenses, all as set forth herein Tenant shall be responsible to pay any and all operating expenses for the Premises Tenant shall also pay for all of the listed operating expenses during the period of the four (4) months of free base or minimum rent

## 4. HOLDING OVER

If Landlord allows Tenant to continue to occupy the Premises after the expiration of the Initial Term or any Renewal Term, without any express agreement as to such occupancy, then such holding over shall be considered as a month-to-month tenancy subject to all terms and conditions of this Lease, as long as Tenant continues to pay rent on or before the first day of each month in advance and in an amount equal to one hundred and fifty percent (150%) of the last monthly Base Rent paid for the Lease year immediately prior to the holding over However, none of the terms in this Article or the fact that Tenant is allowed to hold over shall be considered an assurance to Tenant that it may continue occupancy of the Premises after the expiration of the term of this Lease, or as an extension of the term of this Lease by Landlord on any basis, nor as a waiver of any of Landlord's rights to terminate this Lease and re-enter the Premises

## 5. PAYMENTS AFTER NOTICE TO TERMINATE

427761.3 /SPH/23758/0117/012307

3

No payment of money by Tenant to Landlord under this Lease for any reason, or after the giving of any notice (other than a demand for payment of money) by Landlord to Tenant, shall reinstate, continue or extend the terms of this Lease or affect any notice given to Tenant prior to the payment of such money. Landlord shall have the right to receive and collect any sum of rent or other sums due under the terms of this Lease without waiving, changing or affecting in any manner the effect of a notice previously given, any pending suit or judgment previously entered.

## 6. SECURITY FOR LEASE

Upon execution of this Lease, Tenant shall guarantee one year lease payment. The Guarantee shall expire at the end of the sixteenth (16ᵗʰ) month of the Lease.

General Partners of Apex Katy Physicians, LLC shall have authority to call on Line of Credit from Apex Hospital-Katy, should the lease payment goes in default. This option shall be limited to 16 months from January 4ᵗʰ, 2007.

Tenant shall pledge all of the accounts receivable of the Hospital as security for payments of the rent due under the Lease. This accounts receivable pledge shall exist for the full Term of the Lease and any renewals thereof.

## 7. LATE PAYMENT CHARGE AND INTEREST

In the event of any payment of Rent that is not paid within ten (10) business days of the due date, Tenant shall pay to Landlord as additional Rent a late payment fee of two percent (4%) of the amount of such late payment. In addition to such payment, interest will accrue at the lesser of (i) the maximum non-usurious rate of interest or (ii) eighteen percent (18%) per annum calculated from thirty (30) days after the due date until paid. The payment of such late charge shall not excuse or cure any default by Tenant under this Lease. The late payment charge is to compensate Landlord for the additional costs incurred in collecting the Rent and is not a penalty.

Any amounts due under this Lease from Landlord to Tenant will bear interest at the lesser of (i) the maximum non-usurious rate of interest or (ii) eighteen percent (18%) per annum from the due date until paid.

## 8. IMPROVEMENTS AND ALTERATIONS

8.1 Except as provided in Article 12 hereof relating to certain Tenant Improvements, the responsibility for which is the obligation of Landlord, Tenant shall accept the Premises in "as is" condition. Any construction, alterations, renovations, additions, or repairs to the Premises (the "Improvements") requested by Tenant, except for those Tenant Improvements provided for within Article 12 which are the obligation of the Landlord, shall be made at the sole cost of Tenant. Tenant shall submit for Landlord's approval, complete and appropriate plans, drawings and specifications regarding any and all Improvements which Tenant desires for the Premises. In the event Landlord

417761.3 /SPH/83796/01 11/010/107                    4

Unofficial Copy Office of Harris District Clerk

by Tenant or Tenant's agents or contractors who shall be approved by Landlord prior to commencement of work on the Improvements Landlord's approval of plans, drawings and specifications or performance of work in accordance with such plans, drawings and specifications shall create no responsibility or liability on the part of Landlord for their completeness, design, sufficiency, or compliance with any laws, rules, orders, ordinances, directions, regulations, or requirements of any federal, state, county, or municipal authorities.

8.2    With the written consent of Landlord first being obtained, which consent shall not be unreasonably withheld, Tenant may remove any medical trade fixture and fixed equipment purchased or acquired by Tenant and installed in the Premises, the cost of which removal shall be paid by Tenant    Tenant shall fully repair damage of any kind or character occasioned by the removal of any such fixtures or equipment and shall leave the Premises in good, clean, sanitary and tenantable condition, reasonable wear and tear excluded   The foregoing notwithstanding, all property of Tenant remaining within the Premises more than sixty (60) days beyond the termination of the Lease, whether by lapse of time or otherwise, shall be deemed abandoned by Tenant and may be removed and sold or disposed of by Landlord   Any reasonable costs and damage actually incurred by the Landlord caused or made necessary by reason of removal or disposal of abandoned property shall be paid by Tenant within thirty (30) days of receipt of invoice from Landlord

8.3    Within five (5) days after notifying Landlord of the commencement of any planned erection, construction, alteration, removal, addition, repair or other improvements, Tenant shall post and keep posted until completion of such work, in a conspicuous place, and shall personally serve upon all contractors or subcontractors performing such work, any required or permitted notice advising them that Landlord's interests in the Premises shall not be subject to any lien for such work

## 9.    ACCEPTANCE OF THE PREMISES

9.1    The taking possession of the Premises by Tenant shall be conclusive evidence as against Tenant that the Premises, as to those things patent and not latent, were in good and satisfactory condition when possession was taken, except for the asbestos condition on the Premises for which Landlord shall remain responsible   Prior to the taking of possession, the Tenant and Landlord will prepare a punch list of work to be completed or corrected and such work shall be completed (1) at the expense of Landlord, if the punch list items are part of the Tenant Improvements for which Landlord shall pay pursuant to Article 12 hereof, or (2) at the expense of Tenant, if such punch list items are in addition to the Tenant Improvements for which Landlord shall pay pursuant to Article 12   The Tenant's taking of possession shall not relieve Landlord from any obligation to complete any work to be performed by Landlord under the terms of this Lease

9.2    Landlord acknowledges that Tenant must be licensed by the applicable government and professional entities in order to conduct its business upon the Premises   In the event Tenant is initially prevented from receiving any necessary licensing or accreditation because of a condition or issue relating to the Premises, Tenant will not take possession of the Premises until the Premises are modified so that Tenant may obtain the requisite license, certification or accreditation   In the event of a delay in securing the accreditation by Tenant, the Commencement Date of this Lease Agreement

417761 3 /SPH/13798/011701/0307                    5

SCAR00152

shall be adjusted to reflect any delay in the commencement of hospital activities on the Premises  Landlord and Tenant contemplate that the Tenant Improvements will allow for such licensing or accreditation  Once licensing or accreditation is obtained, Tenant is responsible to sustain such license and accreditation

9.3    Except for Tenant Improvements pursuant to Article 12 to be made by Landlord prior to Tenant's occupancy of the Premises, any other Improvements within the Premises necessary to obtain the required license, certification or accreditation shall be at Tenant's expense

9.4    To Landlord's best knowledge which knowledge is based solely upon the environmental report prepared by _____ , the Premises have not been used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, or process any regulatory quantities of hazardous substances  For purposes hereof, "Hazardous Substances" means any substance, waste, contaminant, pollutant or material that has been determined by any local, state or federal government authority to be capable of posing a risk of injury or damage to health, safety, property, or the environment, and includes, without limitation, all substances, wastes, contaminants, pollutants and materials defined or designated as hazardous, extremely or imminently hazardous, dangerous or toxic pursuant to (i) any applicable statute, code, ordinance, rule, regulations, or policy of any local or state governmental authority within the State of Texas; (ii) Section 307 and 311 of the Clean Water Act, as amended, 33 U S C  Section 1317, 1321; (iii) Section 1004 of the Resource Conservation and Recovery Act, as amended, 42 U S C  Section 6903; (iv) Section 101 of the Comprehensive Environmental Response and Liability Act, as amended, 42 U.S C  Section 9601; (v) Section 112 of the Clean Air Act, as amended, 42 U.S C  Section 7412; (vi) Section 7 of the Toxic Substances Control Act, as amended, 15 U S C  Section 2606; (vii) Section 103 and 104 of the Hazardous Materials Transportation Act, as amended, 49 U S C  Section 1802, 1803; or (viii) regulations promulgated pursuant to any of the foregoing, as well as all substances, wastes, contaminants, pollutants and materials defined, designated or identified as, or containing polychlorinated biphenyls ("PCBs"), , or petroleum, all of which as currently exists or may be amended from time to time shall be defined as "Environmental Laws, " except for the disclosure of asbestos on the Premises as set forth under Paragraph 9 5 herein

9.5    Landlord represents and warrants to Tenant that to Landlord's best knowledge, which knowledge is based solely upon the environmental report prepared by Associated Testing Laboratories, Inc , there are no Hazardous Substances located upon the Premises as of the date of this Lease in violation of Environmental Laws except for asbestos in the Premises which has already been disclosed to Tenant by the Landlord  Landlord represents that all asbestos locations have been remediate and comply with all federal, state, and local health, safety and environmental laws, regulations, and ordinances  All locations in which asbestos is present on the Premises have been disclosed in writing to Tenant  Notwithstanding anything to the contrary in this Lease Agreement, Landlord and its successors in interest shall remain fully responsible for the remediation or any required removal of asbestos located on the premises during the term of this Lease Agreement and shall hold Tenant harmless from any claims made by any third party arising out of the existence of asbestos on the Premises and shall upon demand from Tenant do all things necessary to bring the Premises into compliance with any health, safety, or environmental law, regulation, or ordinance

4177613 /SPT/V83758/01/110/M327                    6

SCAR00153

during the term of this Lease Agreement

9.6    At all times during the term of this Lease, Tenant covenants and agrees that, at Tenant's sole cost, expense and liability, Tenant shall comply with all laws, rules, orders, court decrees, ordinances, directions, regulations and requirements of all federal, state, county, municipal and other authorities pertaining to the Premises, Tenant's use of the Premises and Tenant's business conducted in or from the Premises, and with all recorded covenants, conditions and restrictions affecting or relating to the Premises, the Building or the Project regardless of when they become effective, including, without limitation, all applicable federal, state and local laws, regulations or ordinances pertaining to air and water quality, Hazardous Materials (as herein defined), waste and medical waste disposal, air emissions and other environmental matters, all zoning and other land use matters, utility availability and with any direction of any public officer or officers, pursuant to law, which shall impose any duty upon Landlord or Tenant with respect to use or occupancy of Premises, except that Landlord shall remain liable for the condition caused by the existence of asbestos on the Premises, as provided otherwise under this Lease.

9.6.1    Hazardous Materials. At all times during the term of this Lease, Tenant covenants and agrees that Tenant shall not cause or permit any Hazardous Material to be brought upon, kept or used in or about the Premises by Tenant, Tenant's agents, employees, customers, clients, invitees, licensees or contractors except for such Hazardous Materials as are necessary or useful to Tenant's business and will be used, kept and stored in a manner that complies with all laws regulating any such Hazardous Material so brought upon or used or kept in or about the Premises  Upon request and at least annually, Tenant will acknowledge and confirm to Landlord that Tenant is in compliance with the provisions of this paragraph

9.6.2    Disposal of Infectious Materials. Tenant shall, at its sole cost, expense, risk and liability, remove or cause to be removed from the Premises, the Building and the Project all infectious waste material, including, but without limitation, all syringes, needles and any materials contaminated with bodily fluids of any type, character or description of whatsoever nature in accordance with all applicable law  Tenant shall not dispose of any such infectious waste materials in any receptacles provided by Landlord for disposal of normal refuse, and Tenant specifically recognizes and acknowledges that the janitorial service provided by Landlord, if any, shall not be responsible for removal or disposal of any such infectious waste materials.

10    USE OF PREMISES

10.1    Tenant agrees to occupy the Premises for purposes of providing services as a twenty-four (24) hour per day acute rehabilitation care or long term acute care inpatient hospital ("LTAC Hospital") and all activities incidental to said use and Tenant agrees to use its best efforts to occupy the Premises in a careful, safe and proper manner  Tenant further agrees that it will use the Premises for purposes substantially in accordance with applicable laws, rules, orders, ordinances, directions, regulations, regulations or requirements of any federal, state, county or municipal authorities.

417761 3 /SP21/23758/05/170210307

7

SCAR00154

10.2    Tenant agrees not to commit or allow to be committed any nuisance or other act against public policy, deface or damage the Premises in any manner or overload the floors of the Premises

10.3    Tenant agrees not to knowingly use or keep any substance or material in or about the Premises which may impair the insurance of the Premises or increase the hazard of the insurance risk or which is offensive or annoying, in the reasonable judgment of Landlord

10.4    It is contemplated that Tenant will install radiological and/or other potentially hazardous machinery or equipment related to a LTAC Hospital on the Premises  Tenant shall notify Landlord of Tenant's intent to install such machinery or equipment prior to such installation, and Landlord consents to such installation provided that the installation and maintenance of such machinery and/or equipment must comply with the minimum protective safety standards as prescribed by the Board of Health of the State of Texas, and all expenses for such compliance shall be paid by Tenant

10.5    Tenant, at Tenant's expense, shall comply with all laws, rules, orders, ordinances, directions, regulations, and requirements of federal, state, county, and municipal authorities now in force or which may hereinafter be in force, which shall impose any material duty upon Landlord or Tenant with respect to Tenant's use, occupancy of, or improvements to the Premises in excess of the duties of Landlord under this Lease

10.6    Tenant, at Tenant's sole cost and expense may place and maintain in and about the Premises, including on the exterior of the building, in the lobby areas and at elevators, signs clearly identifying Tenant and its business  Landlord shall have no right to signage in and about the Premises without the prior consent of Tenant which shall not be unreasonably withheld, except as expressly provided in Article 14  Upon the expiration or earlier termination of this Lease, Tenant shall remove all signs and repair or provide for the repair of any damage to the Premises or appurtenant areas caused by the erection, maintenance or removal of the signs

10.7    Landlord, pursuant to Occupational Safety and Health Administration regulations, hereby discloses that the Premises contains Asbestos Containing Materials ("ACMs") and has disclosed to Tenant the location of each known area in which asbestos is present and the nature of remediation of said asbestos performed by Landlord

10.8    At its own cost and expense, Tenant shall employ or enter into services contracts with such clinical, clerical and administrative personnel as may be required for proper operation of the LTAC Hospital (for the purposes of this Lease all such personnel and contractors shall be referred to as the "Tenant Employees")  Tenant shall supervise, control and direct all Tenant Employees and ensure that Tenant Employees comply with Landlord's policies and procedures regarding employee conduct in Landlord's hospital.  Tenant shall be solely responsible for all employment or employment-related decisions with respect to Tenant Employees and such persons shall not for any purpose be, be deemed to be, or be considered to be employees of Landlord

417763 3 /SPB/73758/03 17/06/0307                        8

SCAR00155

10.9    Tenant shall be solely responsible for the satisfaction of any and all obligations it assumes with respect to Tenant Employees, including without limitation, payment of wages and salaries, withholding of federal, state and local taxes, employee benefits, wage and hour obligations (including overtime), workers' compensation, Social Security and unemployment insurance. Tenant shall comply with all federal, state and local laws, rules and regulations respecting the employment and the provision of equal employment opportunities to Tenant Employees working in the LTAC Hospital and those respecting occupational health and safety of hospital workers

## 11.    REPAIRS

11.1    At its expense, Tenant shall make all repairs and replacements necessary or desirable to keep in good order, repair and appearance the exterior of the Premises. Tenant agrees to promptly notify Landlord of the necessity for any repairs of which Tenant may have knowledge and for which Tenant may be responsible under the provisions of this Article

11.2    Tenant agrees to keep the Premises in as good order, condition and repair as when the Tenant entered possession, ordinary wear expected. All damage or injury to the Premises and to its fixtures, glass appurtenances and equipment caused by Tenant moving property in or out of the Premises, or by installation or removal of furniture, fixtures or other property, or carelessness, omission, neglect, or improper conduct of Tenant, its agents, employees, patients, guests, invitees, or licensees shall be repaired, restored or replaced promptly by Tenant at its sole cost and expense to the reasonable satisfaction of Landlord All such repairs, restorations and replacements shall be of a quality and class equal, or to the extent said restoration or replacement is not restorable, comparable to the original work or installation and shall be done in a good and workmanlike manner

## 12.    TENANT IMPROVEMENTS

12.1    Landlord agrees that subsequent to execution of this Lease Landlord shall expend for Tenant Improvements (hereinafter defined) all funds as may be necessary to complete the improvements to the Premises as specified in Landlord's and Landlord's architect's drawings, plans and specifications as referenced in this Article 12 and those improvements as stipulated in the Memorandum of Understanding between Landlord and TMG dated July 28, 2006, a copy of which is attached hereto as Exhibit "_" and incorporated herein by reference as though quoted verbatim, said work to include the renovations to the front lobby and family waiting areas, patient rooms and rest rooms to the satisfaction of Tenant and also including all measures necessary to bring said facilities into compliance with the Americans with Disabilities Act and with all federal, state, and local health, safety and environmental ordinances

12.2    Within thirty (30) days after the execution of this Lease, Landlord shall deliver to Tenant for approval, its drawings, plans and specifications for modification of the Premises ("Tenant Improvements") All work shall be performed by Landlord, its agents, or approved contractors Landlord shall contract for the Tenant Improvements so that the cost will not exceed the Allowance without the prior written consent of the Tenant Tenant shall be responsible to pay for any Tenant

417763 3 /SPH/33752 01/19/10307                                9

SCAR00156

allowance which is greater than the Allowance

12 3   The changes, modifications and upgrades referred to in Paragraph 1 and 12 1 herein shall be at the sole cost of Landlord.- *term* -

### 13.   QUIET ENJOYMENT OF PREMISES

Landlord agrees that, as long as Tenant keeps and performs each and every promise and obligation required of it under the terms of this Lease, Landlord will warrant and defend Tenant's right to quietly enjoy the Premises without hindrance or molestation by Landlord or by any other person lawfully claiming the Premises, subject to the promises, agreements, terms, provisions and conditions of this Lease and of all mortgage loan security instruments and underlying leases to which this Lease may be or may become subject and subordinate in the future

### 14.   LANDLORD ACCESS TO PREMISES

Landlord and its representatives shall have the right to enter the Premises at all reasonable times to inspect the same, and if notice has been sent to Tenant to make repairs which have not been made, to make repairs and to maintain the Premises, to post such reasonable notices as Landlord may desire to re-lease the Premises during the one hundred twenty (120) days prior to the expiration of the Initial Term or any Renewal Term

### 15.   LICENSURE AND ACCREDITATION

Tenant has, and shall maintain in good standing, all federal, state and local licenses and certificates required by law and shall maintain accreditation by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") (or an equivalent organization) and certification as a Medicare provider throughout the term of this Lease   Upon Tenant's request, Landlord shall assist Tenant in the preparation of materials required so that the LTAC Hospital is able to obtain and maintain state licensing, accreditation by the JCAHO and certification as a long term acute care hospital under the Medicare program guidelines

### 16   UTILITIES AND TAXES

Tenant shall pay for all utilities service to the Premises and shall be responsible for any additional services required by Tenant during the Term of this Lease   Tenant shall pay all ad valorem taxes and assessments levied against the Property during the Term of this Lease   The provisions of this section shall survive the termination date of this Lease

### 17.   INDEMNIFICATION

17 1   Tenant agrees that it will not hold or attempt to hold Landlord or its agents or employees liable for, and Tenant will indemnify and hold harmless Landlord, its agents, employees, partners, members and owners from and against any and all costs actually incurred for demands,

427761 3 /SPH/83 798/D33780)0307                    10

SCAR00157

claims, causes of action, fines, penalties and damages (including consequential damages), liabilities, and judgments including, without limitation, except for the continuing responsibility of Landlord for the presence of asbestos on the Premises, reasonable attorneys fees to the extent arising from:

    (a)    the use or occupancy or manner of use or occupancy of the Premises by Tenant or any person claiming under Tenant;

    (b)    any activity, work or thing done, permitted or suffered by Tenant in or about the Premises;

    (c)    any acts, omissions or negligence of Tenant or any person claiming under Tenant, or the agents, employees, patients, guests, invitees or licensees of Tenant or any such person;

    (d)    any breach, violation or non-performance by Tenant or any person claiming under Tenant or the agents, employees, patients, guests, invitees or licensees of Tenant or of any such person of any term, obligation or promise under this Lease or any law, ordinance or governmental requirement of any kind; or

    (e)    any injury or damage to the person, property or business of Tenant, its agents, employees, patients, guests, invitees or licensees or any other person entering the Premises under the express or implied invitation of Tenant, except for injury or damage to persons or property to the extent covered by Landlord's insurance.

    17.2    THE INDEMNITIES IN THIS ARTICLE 17 WILL BE ENFORCED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW FOR THE BENEFIT OF THE APPLICABLE BENEFICIARY THEREOF, EVEN IF THE APPLICABLE CLAIM IS CAUSED BY THE ACTIVE OR PASSIVE NEGLIGENCE OR SOLE, JOINT, CONCURRENT OR COMPARATIVE NEGLIGENCE OF SUCH BENEFICIARY, AND REGARDLESS OF WHETHER LIABILITY WITHOUT FAULT OR STRICT LIABILITY IS IMPOSED UPON OR ALLEGED AGAINST SUCH BENEFICIARY, BUT WILL NOT BE ENFORCED TO THE EXTENT THAT A CLAIM IS CAUSED BY THE WILFUL MISCONDUCT OR GROSS NEGLIGENCE OF SUCH BENEFICIARY

    17.3    If any action or proceeding is brought against Landlord or its agents or employees by reason of any such claim for which Tenant has indemnified Landlord, Tenant, upon notice from Landlord, will defend the same, at Tenant's expense, with counsel reasonably satisfactory to Landlord

## 18.    INSURANCE

    18.1    Tenant shall, at Tenant's expense, obtain and keep in force at all times the following insurance and, upon the request of Landlord, Tenant shall periodically provide Landlord with certificates of insurance evidencing compliance with the requirements of this Article 18  Tenant's insurance shall include a waiver of subrogation favoring Landlord on the Premises Insurance policy

417161 3 /SPE/83798/0117030567

11

Unofficial Copy Office of Chris Daniel District Clerk

required below and shall provide or cause its insurer to provide Landlord notice at least thirty (30) days in advance of any termination, reduction or other material change in Tenant's or Landlord's coverage on the following policies:

18.1.1 <u>Premises Insurance</u>  A cause of loss special form (all risks) policy insuring the Premises and all improvements thereon, business interruption insurance and Tenant's contents and equipment, for the full replacement cost thereof, with deductibles and the form and endorsements of such coverage as reasonably selected by Tenant and reasonably approved by Landlord  Such property insurance policy shall be the initial property insurance policy and shall name Landlord as the primary insured as to the improvements.  Such coverage will provide coverage for debris removal and an ordinance or law coverage endorsement.  Tenant also may carry such other insurance as Tenant may reasonably deem prudent or advisable.

18.1.2 <u>Liability and Professional Liability Insurance</u>  A combined policy of commercial · general public liability insurance including broad form comprehensive commercial liability and professional liability insurance in the amount of not less than One Million Dollars ($1,000,000.00) per occurrence and Three Million Dollars ($3,000,000.00) aggregate  The insurance required by this subsection shall be on a "claims made" basis and Tenant shall maintain coverage for events occurring during the period of this Lease without regard to when the claim is asserted  Tenant shall provide or cause its insurer to provide Landlord notice at least thirty (30) days in advance of any termination, reduction or other material change in Tenant's coverage  Landlord will be named as an additional insured on said policy.

18.1.3 <u>Worker's Compensation Insurance</u>  Worker's compensation insurance insuring against and satisfying Tenant's obligations and liabilities under the workmen's compensation laws of the State of Texas.

18.1.4 <u>Umbrella Liability Policy</u>  An umbrella liability policy providing insurance coverage of not less than Three Million Dollars ($3,000,000.00)

18.2  Tenant acknowledges that Landlord or Landlord's mortgagee may reasonably require increases in Tenant's above-described coverage from time to time in which event Tenant shall obtain the same and pay the costs thereof.  Tenant's Insurance shall be issued by an insurance company of recognized standing, authorized to do business in the State of Texas with a Best's rating of A or better, and a Best's Financial Size Category of VIII, or better

19.  LIENS

Tenant shall promptly pay all debts incurred and satisfy all liens in respect to any Improvements made by Tenant in and on the Premises and shall indemnify and hold Landlord harmless against all claims and charges, including reasonable attorneys fees, incurred by Landlord in connection therewith  Tenant shall have no authority to create liens for labor or

417761 3 /SPEP/23798/0117/010307                    12

Unofficial Copy, Confirmed on Office of Chris Daniel, District Clerk

SCAR00159

material on or against Landlord's interest in the Premises. Tenant shall notify any materialmen, supplier, contractor or laborer involved with work performed for Tenant in or around the Premises that they must look only to Tenant for payment and that Tenant has no authority whatsoever to obligate Landlord, create liability on Landlord's behalf or create a lien against any interest in the Premises.

## 20. DAMAGE BY FIRE OR OTHER CASUALTY

20.1    If the Premises shall be damaged by fire or other casualty, and if such damage shall be so great that a competent architect, in good standing in the Houston Metropolitan area and selected by Landlord, shall certify in writing to Landlord and Tenant that the Premises, with the exercise of reasonable diligence, cannot be made fit for occupancy for the purposes of Article 10 of this Lease within one hundred fifty (150) days from the date of the occurrence of the damage, then, at the option of Tenant exercised within ten (10) business days from the notice from the architect, this Lease shall cease and terminate as of the date of occurrence of the damage. At such termination of Lease, Tenant shall pay all delinquent rents or other payments (excluding payments for unamortized leasehold improvements) owned by Tenant to Landlord. In the event this Lease is so terminated and there are no other delinquent rents or other payments owing to Landlord at the time of such termination, the unused portion of the security deposit, if any, shall be returned and no further liability shall exist between Landlord and Tenant. In the event of such termination, Tenant shall surrender possession of the Premises to Landlord, and Landlord may re-enter and take possession of the Premises and remove Tenant there from.

20.2    Landlord shall give written notice to Tenant of the identity of the architect selected by Landlord pursuant to this Article 20 which notice shall seek Tenant's approval of Landlord's selection. Tenant's failure to respond in writing within five (5) working days shall be deemed Tenant's approval of the architect selected by Landlord.

20.3    If the damage to the Premises shall be of such a degree that the architect so selected shall certify that the Premises can be fit for occupancy within one hundred fifty (150) days from the date of the occurrence of the damage by fire or other casualty or Tenant does not elect to terminate this Lease as provided above, the Landlord shall repair the damage with all reasonable speed. In the event the insurance proceeds are not sufficient to restore the Premises, Landlord shall be responsible to provide the excess funds required.

20.4    If the Premises shall be damaged by fire or other casualty but, not sufficiently to render the same unfit for occupancy, Landlord, after receiving notice of the occurrence thereof, shall repair the damage within ten (10) days of the date of written notice to Landlord of such damage. If Landlord does not repair the damage within ten (10) days of the date of written notice to Landlord of such damage, the rent shall abate in the proportion of the amount of unusable space of the Premises because of the damage to the total space of the Premises.

## 21. EMINENT DOMAIN

417761 3 /SPE/83798011 /...

13

SCAR00160

If any part of the Premises shall be taken for a public or quasi-public use by right of eminent domain, or transferred by agreement in connection with such public or quasi-public use, with or without any condemnation action or proceeding being instituted such that Tenant cannot, in Tenant's reasonable opinion, continue to operate a LTAC Hospital in the remaining Premises, this Lease shall terminate as of the date title shall vest in the condemnor. In the event of any condemnation or taking as aforesaid, whether in whole or in part, Tenant shall not be entitled to any part of the award paid for such condemnation, and Landlord shall receive the full amount of such award, Tenant hereby expressly waiving any right or claim to any part thereof, except for any claim for, all damages as compensation for diminution in value of the leasehold, reversion, and fee. Tenant shall have the right to claim and recover from the condemning authority, but not from Landlord, such compensation, if any, as may be separately awarded to Tenant in Tenant's own right, in a separate proceeding, on account of any and all damages to Tenant's business by reason of the condemnation and for or on account of any cost or loss which Tenant might incur in removing Tenant's furniture, fixtures, and equipment

## 22    SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT

22.1    Landlord shall have the right to sell, pledge, assign or transfer (herein called "Transfer") this Lease upon the condition that in such event this Lease shall remain in full force and effect, subject to the performance by Tenant of all the terms, obligations and promises which Tenant is obligated to perform. Upon any such sale, assignment or transfer, other than merely as a security, Tenant agrees to look to the transferee with respect to all matters in connection with this Lease provided that the transferee acknowledges and accepts in writing all of the obligations of Landlord under this Lease. Thereafter, Landlord shall be released from any further liability or obligation under this Lease

22.2    This Lease is and shall be subject and subordinate to: (a) any reciprocal easement agreement or other easements, and (b) the lien of any deed of trust which may now or hereafter encumber the real property of which the Premises is a part and to all terms, conditions and provisions thereof, all advances made, and may renewals, extensions, modifications or replacements thereof

22.3    Notwithstanding the provisions of Article 20.2, if this Lease is in full force and effect, Tenant's right of possession to the Premises and other rights arising out of this Lease shall not be affected or disturbed by any mortgagee in the exercise of any of its rights under any deed of trust of the note secured thereby

22.4    In the event that any mortgagee shall agree to the sale of the real property of which the Premises is a part pursuant to the exercise of any rights and remedies under any deed of trust, or otherwise, such sale shall be made subject to this Lease and the rights of Tenant hereunder. Tenant agrees to attorn to the mortgagee or such person who may acquire title as its new Landlord, and the Lease shall continue in full force and effect as a direct lease between Tenant and mortgagee or such other person, upon all the terms, covenants and agreements set forth in this Lease

22.5    Landlord agrees that Tenant may record a Memorandum of Lease in a form

4177613 /SPH/83794/0117/032007                            14

Unofficial Copy Office of Chris Daniel District Clerk

acceptable to Landlord, in the real property records of Harris County, Texas

22.6   If Landlord defaults in making payment under any mortgage loan or any installment of taxes or assessments affecting the Premises, or if Landlord is in breach or in default of any mortgage loans or deeds of trust in any respect, Tenant shall have the right but not the duty, to make all such payments thereafter becoming due or take other steps to cure or prevent default by Landlord. Any payments, to the extent so made, shall discharge the obligations of Tenant hereunder respecting the payment of rent. Should Landlord, in connection with the mortgaging of real property of which the Premises is a part, execute a conditional assignment of rentals, Tenant will execute an acceptance of such assignment, provided the assignment recognizes Tenant's rights hereunder. Tenant agrees to execute an agreement of subordination, non-disturbance and attornment in form submitted by the mortgagee and reasonably satisfactory to Tenant in connection with any such mortgage.

## 23.   ASSIGNMENT AND SUBLETTING

Tenant shall not assign this Lease, nor sublet all or any portion of the Premises or permit the use of all or any part of the Premises by the persons other than Tenant; or its affiliates and/or joint venture partners, without the prior written consent of Landlord. Tenant shall be permitted to sublease portions of the Premises to customary providers of services within a hospital such as by way of example, pharmacy, physical therapy, and food or cafeteria service providers. Affiliates and/or joint venture partners of Tenant shall use the Premises for only those purposes set forth in Article 9. In the event Tenant desires to assign or sublease the Premises, Tenant shall so notify Landlord in writing and thereafter Landlord shall provide Tenant with written information or any prohibited or limited uses of the Premises to the assignee or sublessee. Except for assignment or sublease to Tenant's affiliates or joint venture partners, Tenant acknowledges that any such assignment or sublease without Landlord's consent shall be void and, at the option of Landlord, shall terminate this Lease. Landlord will not unreasonably withhold its consent on any assignment or sublease provided, as a condition precedent to such consent, the assignee or subtenant establishes to Landlord's complete and sole satisfaction its financial ability to consistently perform the terms, obligations and promises of this Lease which financial ability should at least be equal to Tenant and Guarantor's financial ability as of the date hereof. In the event of the assignment or sublease of the Premises, Tenant shall be relieved of its obligations under this Lease only if Landlord releases Tenant of such obligations in writing. For the purposes of this Lease, the term "affiliates" shall include any entity in which the Tenant or the general partner of Tenant control or own over fifty percent (50%) of such entity.

## 24.   INSOLVENCY OR BANKRUPTCY

24.1   Any assignment by Tenant for the benefit of creditors or operation of law shall not be effective to transfer any rights under this Lease to the assignee, without the prior written consent of Landlord.

24.2   If at any time during the term of this Lease, there shall be filed by or against Tenant in any court, pursuant to any statute either of the United States or any state a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion

417761 3 /SPU/33 791/01 17/01/0307                                         15

SCAR00162

of Tenant's property, or if Tenant makes an assignment for the benefit of creditors, Tenant shall have breached this Lease. In such an event, Landlord shall have the option to cancel and terminate this Lease with or without notice. If Landlord exercises its option to cancel and terminate this Lease, neither Tenant nor any person claiming through or under Tenant by virtue of any statute or of any order of any court shall be entitled to possession or to remain in possession of the Premises, but shall forthwith quit and surrender the Premises.

## 25.  TERMINATION DUE TO DEFAULT OR BREACH

25.1  If Tenant shall fail to pay any part of the rent or any other sum required to be paid to Landlord pursuant to the terms of this Lease, or if Tenant breaks any of its promises or fails to perform any of its obligations required under this Lease, Landlord shall serve Tenant with a written notice specifying the nature of the default and giving Tenant ten (10) business days (or such shorter time as may be necessary in order to protect the health and welfare of patients, employees and invitees or other people present on the Premises) in which to correct or remedy any default, or if the default or omission complained of is of a nature which cannot be completely cured or remedied within ten (10) business days (or the above described shorter time period), giving Tenant ten (10) business days to commence curing such default and staying termination as long as Tenant shall diligently pursue the curing of the default and shall cure the default within a reasonable period of time. In the event Tenant has not cured the default within the ten (10) business day period (or the above described shorter time period) or diligently commenced action to remedy such default, Landlord may cancel this Lease by mailing a written notice of termination to Tenant, and this Lease and the term hereunder shall end and expire upon the date fixed in the notice of termination the same as if the date of termination were the day definitely fixed by this Lease for the expiration of the Lease and term thereof. Tenant shall vacate and surrender the Premises to Landlord on or before the termination date, without further notice or demand. Tenant shall remain liable after termination for the payment of any past due rent or any amounts which may be due or become due pursuant to the term of this Lease.

25.2  If Tenant fails to vacate the premises after receiving notice of cancellation, and continues to be delinquent in the payment of rent and/or other sums due under the terms of this Lease, permits execution or attachment to be issued upon it or any of its property whereupon the Premises shall be taken or occupied or attempted to be occupied or taken by someone other than Tenant, or if Tenant shall abandon or vacate the Premises before expiration of the then current term of this Lease, then Landlord, upon the occurrence of any of these events, shall have the right to re-enter and repossess itself of the Premises without further notice or demand and with or without legal proceedings using such action or means as may be necessary to secure possession and to remove therefrom any personal property belonging to Tenant, all without prejudice to any claim for rent and/or other sums due and for damages on account of the breach of this Lease by Tenant and without being guilty of any manner of trespass or forcible entry or detained or incurring any other liability. Tenant hereby waives the right to service of notice of Landlord's intentions to re-enter or to institute legal proceedings to secure possession for Landlord.

25.3  In the event of termination of this Lease based upon default by Tenant and re-entry of

4177613/SP3/13754/0117/010307

16

the Premises by Landlord through summary proceedings or otherwise, Tenant shall remain liable for damages equal to all rent and other sums due under the terms of this Lease plus the reasonable cost of obtaining possession and of reletting the Premises and of any repairs and reasonable alterations necessary to prepare the Premises for reletting, less the rents received from such reletting, if any Landlord shall make reasonable efforts to relet the Premises. If Landlord does relet the Premises, Tenant shall continue to be liable and shall pay Landlord as liquidated damages for the failure of Tenant to observe and perform Tenant's promises and obligations under this Lease, the difference between all rents and other sums due from Tenant under this Lease and the net amount, if any, of the rents collected as a result of the reletting of the Premises for each month of the period which would otherwise have constituted the balance of the term of this Lease. The failure of Landlord to relet the Premises or any part or parts thereof shall not release or affect Tenant's liability for damages. Any such damage shall be paid in monthly installments by Tenant and any suit brought to collect the amount of the deficiency for any month or months shall not prejudice in any way the right of Landlord to collect the deficiency for any subsequent month or months by any similar proceeding. Rentals received by Landlord from such reletting shall be applied first to the payment of any indebtedness, other than rent, due hereunder from Tenant to Landlord, second to the payment of any costs of such reletting, third to the payment of the cost of any alterations and repairs to the Premises, and fourth to the payment of Tenant's rent due and unpaid hereunder. The re-entry, taking of possession, alteration or repair of the Premises by Landlord shall not be construed or operate to release Tenant from liability as set forth herein.

25.4    In the event of a breach by Tenant of any of its terms, obligations or promises under this Lease, Landlord shall have the right to seek injunctive relief and the right to invoke any remedy allowed by law or equity as if re-entry, summary proceedings and other remedies were not provided for in this Lease. The provision in this Lease of any particular remedy shall not preclude Landlord from any other remedy available to it, either in law or in equity. The foregoing remedies and rights of Landlord are cumulative. If either party to this Lease shall require any attorney to enforce its rights or obligations hereunder, the prevailing party shall be entitled to receive from the other party the reasonable attorney's fees incurred in enforcing its rights hereunder.

25.5    Tenant hereby expressly waives any and all rights of redemption (except those granted by statute) it may have in the event Tenant is evicted by reason of the breach by Tenant of any of its terms, obligations or promises under this Lease.

25.6    Landlord shall be in default of its obligations under this Lease if Landlord shall fail to observe or perform any term, covenant or condition of this Lease on its part to be performed, and such failure shall continue for a period of ten (10) business days after written notice thereof from Tenant (or such shorter time as may be necessary in order to protect the health or welfare of any patient or other resident of the Premises), unless such failure cannot be cured with due diligence within a period of ten (10) business days (or the above described shorter time period), in which case, such failure shall not be deemed to continue if Landlord, within such ten (10) business day time period, (or the above described shorter time period), promptly commences its attempt to cure the failure and diligently attempts to complete the curing thereof. If Landlord fails to cure any such default as provided herein, Tenant, upon written notice to Landlord, may cure such default, and so

417761 3 /SPE/83798/0117610307

17

SCAR00164

long as Tenant continues to pay rent, Tenant shall be entitled to reimbursement for the actual and reasonable out-of-pocket costs thereof to Tenant

25 7  If Landlord fails to cure or fails to diligently attempt to cure any Landlord default which results in the interruption of Tenant's business use of all or any portion of the Premises, Tenant, upon three (3) business days written notice to Landlord, may pursue the cure of such default, and so long as Tenant continues to pay rent, Tenant shall be entitled to reimbursement for the actual and reasonable out-of-pocket costs thereof to Tenant.  Thereafter, if Landlord fails to reimburse Tenant within ten (10) business days after written notice thereof, which notice itemizes the actual and reasonable out-of-pocket costs to Tenant, Tenant shall have the right to deduct and set-off from rent the unpaid amount  However, this right of set-off shall apply only to circumstances under which Landlord's uncured default results in an interruption of Tenant's business use of all or any portion of the Premises and not to any other default of Landlord.  As for reimbursement of actual costs to Tenant in connection with any other Landlord default, Tenant must first obtain a judgment against Landlord for such amounts due and only then shall Tenant have the right to deduct and set-off the unpaid amount of the judgment from rent due under this Lease

## 26.  NO IMPLIED SURRENDER OR WAIVER

No act or thing done by Landlord or its agents or employees during the term of this Lease shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless made in writing and signed by Landlord.  The receipt by Landlord of rent or the payment by Tenant of rent with knowledge of a breach of this Lease shall not be deemed waiver of such breach  The receipt by Landlord of any rent from an assignee, undertenant or occupant of the Premises shall not be deemed a waiver of the provision in this Lease prohibiting assignment or subletting by Tenant, or an acceptance of the assignee, undertenant or occupant as Tenant  No provision of this Lease shall be deemed to have been waived by Landlord or Tenant, unless such waiver is in writing and signed by the waiving party

## 27.  SURRENDER OF POSSESSION

Tenant agrees to vacate and surrender to Landlord possession of the Premises at the expiration or termination of this Lease, by lapse of time or otherwise, in as good a condition as when Tenant occupied the same at the Commencement Date, excepting only ordinary wear and decay, casualty which is covered by insurance maintained by Tenant or which should be covered by insurance required to be maintained by Landlord pursuant to the terms hereof, or damage by the elements (occurring without the fault of Tenant or other persons permitted by Tenant to occupy or enter the Premises of any part thereof), or by acts of God, insurrection, riot, invasion or commotion, or military or usurped power

417761 3 /SP33/33792/01/3090907                                    18

Unofficial Certified Copy of Daniel D. Murphy Clerk

## 28. NOTICES

All notices, demands or other writing required to be given by this Lease, shall be deemed to have been fully given, when served personally by delivering the same to an employee of Tenant or Landlord directly   Any notice shall also be deemed duly served by either party if (i) personally served; or (ii) three (3) day following deposit in the United States mail, certified mail, return receipt request, with proper postage prepaid, or (iii) delivery by Federal Express or other reliable overnight courier . The address to which any notice, demand or other writing may be given, made or sent to either party may be changed by written notice given by such party pursuant to this Article

Address of Landlord:                         Apex Katy Physicians, Ltd
                                            6161 Savoy, Suite 1214, Houston, TX 77036
                                            Attn: Partner, Adeel Zaidi or Dr P K Shah


Address of Tenant:                          APEX LONG TERM ACUTE CARE-KATY, LP

                                            _____
                                            _____
                                            Attn: _____

## 29. SEVERABILITY

If under present or future laws effective during the term of this Lease any clause or provision on this Lease is invalid or unenforceable, it is the intent of the parties that the remaining provisions of this Lease shall not be affected thereby

## 30. CAPTIONS

The captions of the Articles are added as a matter of convenience only and shall not be considered in construing any provision of this Lease. The word "Tenant" and the words "it" or "its" used with reference to Tenant, shall apply to individuals, partnerships, associations, corporations, and any other entity, whichever is appropriate

## 31. AMENDMENT OR MODIFICATION

Tenant acknowledges and agrees that it has not relied upon any statement, representation or agreement made by Landlord or any of its agents or employees except as are expressed in this Lease and that no amendment, modification or extension of this Lease shall be valid or binding unless expressed in writing and executed by the parties hereto

417761 3 /SPEI/03 799/01177810307                    19

Unofficial Copy Office of Chris Daniel District Clerk

SCAR00166

## 32. SUCCESSORS

All terms, obligations or promises to be kept and performed by the parties hereto shall be applicable to and binding upon their respective successors and assigns, as such assignment may be permitted hereunder

## 33 TRADE COVENANTS

33.1 During the term of this Lease, Landlord and its affiliates shall not, individually or jointly with others, directly or indirectly, whether for its own account or for that of any other person or entity, own or hold any ownership or voting interest in or act as landlord to any person or entity engaged in a long term acute care hospital the same as or substantially similar to Tenant's business which is located or intended to be located anywhere within a radius of three (3) miles of the Premises

33.2 Except in the performance of his duties hereunder, at no time during the term of this Lease or at any time thereafter shall Landlord, individually or jointly with others, for the benefit of Landlord or any third party, publish, disclose, use or authorize anyone else to publish, disclose or use, any secret or confidential material or information relating to any aspect of the business or operations of the Tenant or any information regarding the business methods, business policies, procedures, techniques, or trade secrets, or other knowledge or processes of or developed by Tenant, including, without limitation, any secret or confidential information relating to the business, customers, financial position, trade or industrial practices, trade secrets, technology or know-how of the Tenant Nothing in this section shall prohibit the Landlord from providing information to lenders, accountant, attorneys or others that agree to be bound by this confidentiality provision

33.3 During the term of this Agreement and for a period of one (1) year thereafter commencing upon expiration or termination of the term of this Lease, neither party nor any of their affiliates or any of their respective officers, directors, employees, or agents, shall, individually or jointly with others, directly or indirectly, whether for their own account or for that of any other person or entity, without the express written consent of the other party, disturb, hire, entice away or in any other manner persuade any employee of the other party to alter, modify or terminate his or her relationship with such party

33.4 The parties hereto recognize and acknowledge that the geographical and time limitations contained herein (hereinafter the "Restrictive Covenants") are reasonable and properly required for the adequate protection of the parties' respective interests It is agreed by the parties hereto that if any portion of the restrictions contained in the Restrictive Covenants are held to be unreasonable, arbitrary or against public policy, then the restrictions shall be considered divisible, both as to the time and to the geographical area, with each month of the specified period being deemed a separate period of time and each radius mile of the restricted territory being deemed a separate geographical area so that the lesser period of time or geographical area shall remain effective so long as the same is not unreasonable, arbitrary or against public policy. The parties hereto agree that in the event any court of competent jurisdiction determines the specified period or

417761 3 /SPH/03792/0117/081507

20

SCAR00167

the specified geographical area of the restricted territory to be unreasonable, arbitrary or against public policy, a lesser time period or geographical area which is determined to be reasonable, nonarbitrary and not against public policy may be enforced against Landlord

34. (Deleted Intentionally)

35. SURVIVAL OF OBLIGATIONS

Notwithstanding any termination of this Lease, the indemnity provisions and the trade covenants of Section 33 hereof shall continue in full force and effect subsequent to termination

36. RELATIONSHIP OF THE PARTIES

Landlord and Tenant are independent entities and nothing in this Lease shall be construed or be deemed to create a partnership, joint venture or other relationship other than that of independent parties contracting with each other solely for the purposes of carrying out the terms and conditions of this Lease

37. CONFIDENTIALITY OF TERMS

Landlord and Tenant agree to keep the terms and conditions of this Lease confidential, and to not disclose such items and conditions to any other party, other than its parent and affiliate organizations, lawyers, accountants, and other representatives and/or disclose in connection with any litigation, without written consent of the other, except as may be required by statute, regulation, or court order to disclose such matters  Notwithstanding the foregoing, either may disclose the existence of this Lease

38. EXCHANGE OF INFORMATION

To the extent permitted by law, each party hereto shall provide to the other on a timely basis, at its own cost, such information and access to such information as is necessary or appropriate to perform each respective party's obligations hereunder, including without limitation:  (i) federal and state accreditation survey results and (ii) hospital disaster and safety plans

39. GOVERNING LAW

The validity of this Lease, the reinterpretation of the rights and duties of the parties hereunder and the construction of the terms hereof shall be governed in accordance with the laws of Texas  The parties to this Agreement consent to personal jurisdiction in the courts of Harris County in the State of Texas  The parties agree that venue shall lie in Harris County

40. TIME

4177613 /SJTU/83792/0117/010307                    21

Unofficial Copy Office of Charles Daniels District Clerk

SCAR00168

Time is of the essence with respect to the performance of every obligation of either party hereto under this Lease in which time of performance is a factor.

## 41. ENTIRE AGREEMENT

All prior understandings and agreements between the parties are merged into this Lease and the Development Agreement, which this Lease and Development Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof. This Lease may not be amended or modified in any manner except by a writing signed by the party against which enforcement is sought. The covenants and agreements herein contained shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

## 42. Omitted

## 43 SECTION 93.012 OF THE TEXAS PROPERTY CODE WAIVER

Landlord and Tenant agree that the provisions of this Lease for determining charges, amounts and rents payable by Tenant (including without limitation payments of operating expenses, taxes, utilities and insurance) are commercially reasonable and valid even though such methods may not state a specific amount or a precise mathematical formula for determining such charges. ACCORDINGLY, TENANT VOLUNTARILY AND KNOWINGLY WAIVES ALL RIGHTS AND BENEFITS OF TENANT UNDER SECTION 93.012 OF THE TEXAS PROPERTY CODE (AS ENACTED BY ACTS 2001, 77TH LEGISLATURE, CH 1397, SEC 1)

(The Remainder of the Page Intentionally Left Blank)

417761.3 /SPB/13794/0112/030307

22

Unofficial Copy Office of Chris Daniel District Clerk

IN WITNESS WHEREOF, the parties hereto have executed this Lease the day and year first above written

TENANT:

APEX LONG TERM ACUTE CARE-KATY, L.P.

By: _____
Name: _____
Title: _____

LANDLORD:

Apex Katy Physicians, LLC

By: _____
Name: _____
Title: _____ 1/4/17

Unofficial Copy Office of Christ Daniel District Clerk

41,7761 3 /SPB/K3798/D117010407

23

SCAR00170

## LEASE ADDENDUM
## MINIMUM RENT SCHEDULE

This Exhibit designates the Minimum Rent per Net Rentable Square Foot of space within the Leased Improvements for each Lease Year of the Initial Lease Term

Rental Increases Based upon CPI – for purpose of the schedule Increases have been assumed at 3%/year after 10th year. Notwithstanding the hereinafter listed Annual Rental Schedule, the first four (4) months of the Lease Term shall be at no base or minimum rental cost to Tenant

| Year | RENT P.S.F. | Sq. Ft. |
|------|-------------|---------|
| 1 | $20.00 | 101,105 |
| 2 | $20.50 | 101,105 |
| 3 | $22.00 | 101,105 |
| 4 | $23.50 | 101,105 |
| 5 | $25.50 | 101,105 |
| 6 | $26.27 | 101,105 |
| 7 | $27.05 | 101,105 |
| 8 | $27.86 | 101,105 |
| 9 | $28.70 | 101,105 |
| 10 | $29.56 | 101,105 |

Rent will

commence upon the earlier of four (4) months after (i) the Completion Date or (ii) ninety (90) days after receipt of the Certificate of Occupancy

Unofficial Copy Office of Chris Daniel District Clerk

417761 3 /SPH/03793/0112/010407

24

SCAR0017

| | |
|---|---|
| 1 | 20.00 |
| 2 | 20.50 |
| 3 | 22.00 |
| 4 | 23.50 |
| 5 | 25.50 |
| 6 | 26.27 |
| 7 | 27.05 |
| 8 | 27.86 |
| 9 | 28.70 |
| 10 | 29.56 |
| 11 | 30.44 |
| 12 | 31.35 |
| 13 | 32.29 |
| 14 | 33.25 |
| 15 | 34.24 |
| 16 | 35.26 |
| 17 | 36.31 |
| 18 | 37.39 |
| 19 | 38.51 |
| 20 | 39.66 |

Unofficial Copy Office of Chris Daniel District Clerk

SCAR00172

**SCHEDULE A**

**DESCRIPTION OF PROPERTY**

**METES AND BOUNDS DESCRIPTION**

Unofficial Copy Office of Chris Daniel District Clerk

417613 /SPIH/13798/0117701401                          25

SCAR00173

## SCHEDULE B

### RENEWAL TERMS

This Schedule designates the annual rental rate for each year of the two (2) optional Renewal Terms
Each Renewal Term shall begin on the applicable anniversary of the Initial Term

Unofficial Copy Office of Chris Daniel District Clerk

417751 3 /SPE3/83792/01 17/01/407

27

SCAR00174

*Exhibit C*

**CERTIFICATE OF FORMATION**

OF

**APEX KATY PHYSICIANS, LLC.**

**FILED**
In the Office of the
Secretary of State of Texas

**JAN 10 2007**

**Corporations Section**

I, the undersigned natural person of the age of eighteen (18) years or more who is a citizen of the State of Texas, acting as Organizer of a Limited Liability Company (hereinafter referred to as "The Company") under the Texas Business Organizations Code, do hereby adopt the following Certificate of Formation for the Company.

### ARTICLE I.

The filing entity being formed is a limited liability company.

The name of the entity is APEX KATY PHYSICIANS, LLC.

### ARTICLE II.

SECTION 1. PURPOSES: The limited liability company is organized for the purposes of transacting any lawful business which may be conducted by a limited liability company and to do anything necessary and incident to the employment of the powers and privileges herein granted and to do anything necessary, proper, useful and incidental to carry on its business and the transaction of any and all lawful business for which the Company may be formed under the Texas Business Organizations Code.

SECTION 2. POWER: To have and exercise all powers necessary or convenient to further any and all purposes for which The Company is organized and in furtherance thereof, The Company shall have and exercise all the powers specified in The Act and in any other applicable laws of the State of Texas.

### ARTICLE III.

The period of duration of the limited liability company shall be perpetual.



EXHIBIT
C

1

KOCH00660

# ARTICLE IV.

**Registered Office:** The address of the principal place of business of the limited liability company is 6161 Savoy, Suite 1214, Houston, Texas 77036.

**Registered Agent:** The name of the initial registered agent of the limited liability company at the above address is ADEEL ZAIDI.

## ARTICLE V.

**Management:** The property, business and affairs of the limited liability company shall be governed by its managers.

**Names and addresses:** The names and business addresses of the initial managers of the limited liability company are:

| Name | Business address |
|---|---|
| ADEEL ZAIDI | 6161 Savoy, Suite 1214, Houston, Texas 77036 |
| Dr. P.K. SHAH, M.D. | 6161 Savoy, Suite 1214, Houston, Texas 77036 |

## ARTICLE VI.

**Effectiveness of Filing:** This document becomes effective when the document is filed with the Secretary of State.

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

**Date:** January 8, 2007.

ADEEL ZAIDI, Organizer

2

KOCH00661



## Office of the Secretary of State

*Exhibit C*

## CERTIFICATE OF FILING
## OF

## APEX KATY PHYSICIANS, LLC.
File Number: 800757875

The undersigned, as Secretary of State of Texas, hereby certifies that a Certificate of Formation for the above named Domestic Limited Liability Company (LLC) has been received in this office and has been found to conform to the applicable provisions of law.

ACCORDINGLY, the undersigned, as Secretary of State, and by virtue of the authority vested in the secretary by law, hereby issues this certificate evidencing filing effective on the date shown below.

The issuance of this certificate does not authorize the use of a name in this state in violation of the rights of another under the federal Trademark Act of 1946, the Texas trademark law, the Assumed Business or Professional Name Act, or the common law.

Dated: 01/10/2007

Effective: 01/10/2007



Roger Williams
Secretary of State

Come visit us on the internet at http://www.sos.state.tx.us/

Phone: (512) 463-5555
Prepared by: Delores Moore .

Fax: (512) 463-5709

TTY: 7-1-1
Document: 156992920002

KOCH00662

P3



**TEXAS STATE BANK**

Date: 01/31/07

Number of pages including cover sheet  3

---

To: Adeel Azaidi – TMG

Phone:

Fax phone:  713-795-5969

CC:

---

From;  Scott M. Stevens, Sr. Vice President

Texas State Bank

Riverway Banking Center

5 Riverway

Houston, Texas 77056

Phone:  713-881-0553

Fax phone:  713-881-0753

E-Mail:  s.stevens@txslbk.com

---

**REMARKS:**   ☐ Urgent   ☐ For your review   ☐ Reply ASAP   ☐ Please comment

Adeel:

Attached is our Commitment Letter. Please review and call to discuss any issues. I look forward to working with you in getting the loan closed.

Thanks, Scott

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message and are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

Unofficial Copy Office of Chris Daniel District Clerk



EXHIBIT
D



**TEXAS STATE BANK**

January 31, 2007

Mr. Adeel Zaidi
APEX Katy Physicians, Ltd.
c/o Turn-Around Management Group
6161 Savoy, Suite 1214
Houston, Texas 77036

RE: New Real Estate Term Loan for $8,800,000--
     To acquire an 80 bed Long-Term Acute Care Facility and Medical Office Building
     in Katy, Texas.

Dear Mr. Zaidi:

Texas State Bank-Riverway is very pleased with the opportunity to provide financing to APEX
Katy Physicians, Ltd. The new real estate loan was approved at the Bank's Loan Committee
meeting on January 31, 2007. The proposed terms of the loans are as follows:

**Borrower:**    APEX Katy Physicians, Ltd.

**Purpose:**    To acquire an 80 bed LTAC facility and Medical Office Building in Katy, Texas.

**Amount:**    $8,800,000 (65% advance rate on total project cost of $13,500,000
    Borrower's equity contribution of 35% = $4,700,000 contributed at closing).

**Rate:**    90 day LIBOR + 220 bpts. Adjusted 1st business day every 90 days.

**Term:**    3 years.

**Repayment:** Monthly interest only for first 12 months then converts to Principal and Interest
    payments based on a 20 year amortization with a balloon at maturity. Annual
    recast of principal payment to maintain a 20 year amortization schedule.

**Fee:**    ½ of 1%=$44,000.

**Collateral:**    1st lien deed of trust on 20.76 acres of land and (2) buildings totaling 140,006
    gross s.f. Assignment of Rents and Leases. (*) Assignment of Letter of Credit in
    the amount of $2,000,000 to Texas State Bank (issuing bank subject to Texas
    State Bank acceptance) or pledge a Texas State Bank interest bearing deposit
    account of $2,000,000.

(*) **Release Clause:** Release of the Letter of Credit or Texas State Bank interest bearing account
    will be conditioned on APEX Long-Term Acute Care-Katy (Lessor) meets

1

Unofficial Copy Office of Chris Daniel District Clerk

January 31, 2007
Mr. Adeel Zaidi
Continued-Page 2

specific net income performance benchmarks in year 2. (To be mutually agreed upon before loan closing).

**Guarantors:**  Dr. Pankaj Shah, Dr. Randeep Suneja, Mr. Upendra Vora, jointly and severally.

## Loan Agreement—
## Financial Reporting Covenants:

- Quarterly operating statements on the borrower.
- Annual financial statement on the borrower due within 30 days.
- Annual tax return on the borrower due within 60 days of filing.
- Annual financial statements and tax returns on the guarantors.
- Quarterly operating statements on the hospital and MOB due within 30 days.

Closing requirements: Subject to the Bank obtaining:
- Current Appraisal "As Stabilized" market value with a minimum value of $13,500,000.
- Title Policy
- Clean Phase I Environmental report.
- Survey
- Entity documents on borrower.
- Closing Fees to be paid by the Borrower.
- Open and maintain a Texas State Bank Depository Account.
- Copy of executed Lease Agreements on Hospital and Medical Office Building.

This commitment will remain valid until February 14, 2007. The loan must close by February 28, 2007. If these terms are agreeable, please sign below and return prior to February 14, 2007.

Sincerely,                                                    Agreed and Accepted by:

Scott M. Stevens                                          APEX Katy Physicians, Ltd.
Senior Vice President

By: Adeel Zaidi                          Date
Title:_____

Guarantors:

_____
Dr. Pankaj                               Date


_____
Dr. Randeep Suneja                  Date


_____
Mr. Upendra Vora                     Date

2

Unofficial Copy Office of Chris Daniel District Clerk



## COMMITMENT LETTER

February 1, 2007

Dr. Pankaj K. Shah
Apex Katy Physicians, LLC
5602 Medical Center Drive
Katy, Texas 77494

RE: $9,000,000 Term Loan

Dear Dr. Shah:

Based on our review of your loan application package, we are pleased to issue this commitment letter to you. The terms and conditions of this commitment are as follows:

A.  **Basic Credit Terms.**

Borrower(s):        Apex Katy Physicians, LLC

Guarantor(s):       Dr. Pankaj K. Shah       (guaranty limit of $7,320,000)
                    Dr. Rendeep Suneja      (guaranty limit of $840,000)
                    Mr. Upendra N. Vora     (guaranty limit of $840,000)

Loan Amount:        $9,000,000

Loan Purpose:       $8,800,000 to finance the purchase of land and improvements located at 5602 Medical Center Drive, Katy, Texas 77494 and $200,000 for closing costs and four months interest payments.  Project cost: $13,700,000 (including purchase price of $13,500,000 and closing and four months interest cost of $200,000).  MetroBank finances: $9,000,000 (65.59%); Borrower's injection: $4,700,000 (34.31%).

Fees:               $45,000, plus miscellaneous closing costs.

Terms:              five (5) years and four (4) months.

Interest Rate:      At Borrower's option, one of the following:

                    1)  Floating at Wall Street Journal Prime rate minus 1% on a 360-day accrual basis. In no event shall the interest rate be less than 7.0% or higher than 7.75%.
                    2)  Fixed rate of 7.25% on a 360-day accrual basis.

Amortization:       The loan will be amortized over twenty (20) years.

ITAC000113

**EXHIBIT E**

9600 Bellaire, Suite #252 • P.O. Box 4760, Houston, Texas 77210-4760 • Tel. (713) 776-3876

Borrower's Initial

02/08/2007   01:26   7137955959   EUMANA

Apex Katy Physicians, LLC

**MetroBank** N.A.

**Repayment:** 4 monthly payments of interest only; then 59 monthly payment of principal and interest, plus a final 60th payment of the remaining principal and interest.

**Loan to Value:** 80% maximum.

**Collateral:** A first and prior deed of trust lien on that certain real property, approximately 17.86 acres of land improved with a hospital building and a professional building, located at 5602 Medical Center Drive, Katy, Texas 77494, together with any and all improvements, fixtures, equipment, furniture, furnishings and other appurtenances thereto (the "Real Property").

**B. Additional Terms and Covenants of Borrower**

**Financial Report:**

From the Borrower(s), Apex Katy Physicians, LLC:
1) Quarterly financial statements within 45 days from period end.
2) Annual Consolidated and CPA-reviewed financial statements within 120 days from year-end.
3) Annual tax return by September 30 of the following year.

From the Guarantor(s), Dr. Pankaj K. Shah, Dr. Rendeep Suneja, and Mr. Upendra N. Vora:
1) Annual financial statement with cash flow on an approved MetroBank form within 120 days from year-end.
2) Annual tax return by August 15 of the following year.

**No Additional Liens:** Borrower's agreement not to grant or allow any security interest, pledge, lien or other encumbrance on any of its assets that constitute a portion of the Property, except those in favor of Lender.

**Subordination:** Borrower's agreement that all present and future indebtedness and obligations owing by Borrower to any of its shareholders, officers, directors, employees or affiliates would be subordinate in right of payment and claim to all indebtedness and obligations from time to time owing by Borrower to Lender.

**Cross-Default:** The facility outlined herein would be cross-defaulted with all other indebtedness and obligations from time to time owing to Lender by Borrower.

**Cross-Collateral:** The Property securing the financing outlined herein would also be collateral for and secure any and all other indebtedness and obligations from time to time owing to Lender by Borrower.

**Governing Law:** All legal aspects of the facility outlined herein would be governed by and construed in accordance with the laws of the State of Texas.

Page 2 of 4

719

Borrower's Initial

ITAC000114

Unofficial Copy Official of Christi Carrol District Clerk

**MetroBank**, N.A.

**Adverse Changes:** Borrower's agreement that there has been no unremedied adverse change in any material matter concerning the Borrower and / or guarantor since the date of the loan application that would warrant not making this credit facility.

**Legal Opinions:** Lender, at Lender's option, would have to receive a legal opinion from counsel for Borrower (i) as to the due authorization and delivery of all loan documentation executed by Borrower, (ii) as to the validity and binding effect of such documentation on Borrower, (iii) as to the enforceability of such loan documentation, and (iv) such other matters as Lender and its counsel may request.

**Investigations:** Lender, or independent contractors and appraisers retained by Lender, would have to complete a comprehensive environmental audit and appraisal report of Borrower's operating facilities, the results of which must be satisfactory to Lender in its sole and absolute discretion.

**Mortgagee's Title Insurance:** Lender would have to receive commitments from mortgagee's title insurance policies from one or more nationally recognized title insurers ensuring that the Lender's deed of trust lien on the Real Property is of first priority, and subject to no exceptions other than as may be agreed upon by Lender.

**Lien Property:** Lender would have to receive evidence of its filed security interest in the Personal Property and of its first lien priority therein, in form and substance satisfactory to Lender and its counsel.

**Insurance:** Lender would have to receive evidence of insurance covering Borrower's business assets, including the Property, in amounts and in form and substance satisfactory to Lender, plus evidence of following:

1) General liability insurance in the total aggregate amount of $3,000,000 per occurrence ($1,000,000 per occurrence) with MetroBank as additional insured.
2) Hazard insurance in the amount of $9,000,000 with MetroBank as loss payee.

**Financial Covenant:** Borrower shall maintain a minimum debt service coverage ratio of 1.30x throughout the term of the loan. Debt service coverage ratio is to be determined by EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) over the principal and interest payments.

**Other:** The following condition will be applied to the subject loan:

1) Title Policy and survey are required.
2) Lease Agreement and Assignment from the subject hospital.
3) MetroBank shall hold a letter of credit i/a/o $1,300,000 as a guarantee of 12 months of payment on the loan, first 4 months of interest payments and the next 8 months of principal and interest payments. The letter of credit shall be issued by Bank of America.
4) Prior to closing, Borrower shall inject $4,700,000.

ITAC000115

Page 3 of 4

720

Borrower's Initial

Unofficial Copy Official Records of Chris Daniel District Clerk

Apex Katy Physicians, LLC  **Ⅲ METROBANK,** N.A.

C. Documentation.

The Facility outlined herein would be evidenced by a loan agreement, promissory notes, security agreements, deeds of trust, guarantees, and such other agreements, instruments and documents as Lender and its counsel may require in their sole and absolute discretion. All such documentation would have to be satisfactory in form and substance to Lender and its counsel.

D. Fees and Reimbursement Expenses

Borrower would be required to pay to Lender a non-refundable commitment fee of $45,000. The proposed terms and conditions outlined in this letter will expire by February 9, 2007 if the letter has not been executed. In addition, Borrower would be required to reimburse Lender for all out-of-pocket costs incurred by Lender in connection with the financing outline herein.

This commitment letter represents the terms and conditions as approved by MetroBank. The terms and conditions have previously being discussed and agreed to, and not subject to any modification.

We at MetroBank appreciate the opportunity to do business with you and wish you much continued success. If you have questions or comments on the above, please do not hesitate to call.

Sincerely,

_Mohammad Tariq_
Mohammad Tariq
Area Business Manager/SVP

_Terrance Tangen_
Terrance Tangen
Chief Credit Officer/EVP

**ACCEPTED AND AGREED ON THIS** ___8th___ **DAY OF** ___February___, 2007

Borrower(s):

_signature_
Apex Katy Physicians, LLC

Guarantor(s):

_signature_
Dr. Pankaj K. Shah

_____
Dr. Rendeep Suneja

_____
Mr. Upendra N. Vora

*Unofficial Copy Office of Chris Daniel District Clerk*

ITAC000116

| | |
|---|---|
| Amount: $56,000.00 | Sequence Number: 1092201666 |
| Account: 5781917967 | Capture Date: 02/12/2007 |
| Bank Number: 11300002 | Check Number: 1004 |



**APEX KATY PHYSICIANS - TMG, LLC**
6161 SAVOY DR., STE. 1214
HOUSTON, TX 77036
PH: 713-554-0909

1004
35-1/1130 TX
4307

DATE 2.8.07

PAY TO THE ORDER OF *Merobank*                          $ 56,000.—

*Fifty Six Thousand & 00/xx*                         DOLLARS

**Bank of America**
ACH R/T 11000025

FOR *Metro Bank Obligation)/Allmin*

⑆0010004⑆ ⑆113000023⑆ 0057819179⑆7⑆

METROBANK, NA
HOUSTON, TX 77036  >1130-17346<
12006010607  PK03  02/09/07

Electronic Endorsements

| Date | Sequence | Bank # | BOFD | Bank Name |
|---|---|---|---|---|
| 02/12/2007 | 6310964430 | 111000038 | N | FEDERAL RESERVE BANK |
| 02/12/2007 | 001092201666 | 111012822 | N | BANK OF AMERICA, NA |
| 02/12/2007 | 6310860137 | 111000038 | N | FEDERAL RESERVE BANK |
| 02/09/2007 | 000010006010607 | 113017346 | Y | METROBANK, NA |



**EXHIBIT F**
tabbies

936                    ITAC000318

Unofficial Copy Office of Chris Daniel District Clerk

CAUSE NO. 2009-02578

| | | |
|---|---|---|
| APEX KATY PHYSICIANS, L.L.C.<br>Plaintiff, | §<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | HARRIS COUNTY, TEXAS |
| ADEEL ZAIDI, APEX LONG TERM ACUTE<br>CARE-KATY, L.P., APEX KATY<br>PHYSICIANS – TMG, L.L.C., and<br>US TMG, L.L.C.,<br>Defendants. | §<br>§<br>§<br>§<br>§ | 61ST JUDICIAL DISTRICT |

CAUSE NO. 2009-03055

| | | |
|---|---|---|
| STEPHEN M. KOCH, M.D., Individually,<br>VICTOR ANKOMA-SEY, M.D., Individually,<br>TERRY SCARBOROUGH, M.D.,<br>Individually, HATEM SAQR, Individually,<br>and each as MEMBERS on behalf of APEX<br>KATY PHYSICIANS, L.L.C., and ADEEL<br>ZAIDI, CO-MANAGER, APEX KATY<br>PHYSICIANS, L.L.C.,<br>Plaintiffs, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | HARRIS COUNTY, TEXAS |
| PANKAJ K. SHAH, M.D., BHARATI P.<br>SHAH, and INDUS ASSOCIATES, L.L.C.,<br>Defendants. | §<br>§<br>§ | 11TH JUDICIAL DISTRICT |

FILED
Loren Jackson
District Clerk

JUN 3 0 2009

Time: 6:30.09
Harris County, Texas
By _____
Deputy

FOURTH AMENDED ORIGINAL PETITION OF PLAINTIFFS,
KOCH, ANKOMA-SEY, ANKOMA-SEY PPSC, LTD.,
SCARBOROUGH, SAQR, PERACHA, WILSON, AND KEITH

TO THE HONORABLE COURT:

Plaintiffs, Stephen M. Koch, M.D., Victor Ankoma-Sey, M.D., Ankoma-Sey PPSC, Ltd., Terry Scarborough, M.D., Hatem Saqr, Waseem Peracha, M.D., Erik B. Wilson, M.D., and G. Thomas Keith, M.D., file this Fourth Amended Original Petition, complaining of Defendants, Pankaj K. Shah, M.D., Bharati P. Shah, Indus Associates,

1

F:\Cases\JWH\KOCH.973\SHAH.002\Pleadings\4THPOP063009.doc

LLC, Apex Katy Physicians, LLC, Randeep Suneja, M.D., Upendra N. Vora, and Katy Project, LLC, and would respectfully show the court as follows:

## I.
## Discovery Control Plan

1. Plaintiffs intend to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.

## II.
## Parties

2. Plaintiff, Stephen M. Koch, M.D., is an individual residing in Houston, Harris County, Texas.

3. Plaintiff, Victor Ankoma-Sey, M.D., is an individual residing in Houston, Harris County, Texas.

4. Plaintiff, Ankoma-Sey PPSC, Ltd., is a Texas limited partnership whose principal office is located in Houston, Harris County, Texas.

5. Plaintiff, Terry Scarborough, M.D., is an individual residing in Houston, Harris County, Texas.

6. Plaintiff, Hatem Saqr, is an individual residing in Houston, Harris County, Texas.

7 Plaintiff, Waseem Peracha, M.D., is an individual residing in Houston, Harris County, Texas.

8. Plaintiff, Erik B. Wilson, M.D is an individual residing in Houston, Harris County, Texas.

9. Plaintiff, G. Thomas Keith, M.D., is an individual residing in Houston, Harris County, Texas.

2

F:\Cases\JWH\KOCH.973\SHAH.002\Pleadings\4THPOP063009.doc

10.    Defendant, Pankaj K. Shah, is an individual residing in Sugar Land, Fort Bend County, Texas, and has previously been served with citation and appeared in this action.

11.    Defendant, Bharati P. Shah, is an individual residing in Sugar Land, Fort Bend County, Texas, and has previously been served with citation and has appeared in this action.

12.    Defendant, Indus Associates, LLC, is a Texas limited liability company which has its principal place of business in Sugar Land, Fort Bend County, Texas, and has previously been served with citation and has appeared in this action.

13.    Defendant, Apex Katy Physicians, LLC, is a Texas limited liability company which has its principal place of business in Houston, Harris County, Texas, and has previously been served with citation and has appeared in this action.

14.    Randeep N. Suneja is an individual residing in Katy, Harris County, Texas, and has previously been served with citation and has appeared in this action.

15.    Upendra N. Vora is an individual residing in Dallas, Dallas County, Texas, and has previously been served with citation and has appeared in this action.

16.    Katy Project, LLC is a Texas limited liability company which has its principal place of business in Dallas, Dallas County, Texas, and has previously been served with citation and has appeared in this action.

## III.
## Venue

17.    Pursuant to Section 15.002 of the Texas Civil Practice and Remedies Code, venue is proper in Harris County, Texas because all or a substantial part of the

3

Unofficial Copy Office of Chris Daniel Harris District Clerk

events or omissions giving rise to Plaintiffs' claims occurred in Harris County.

## IV.
## Background Facts

18.     Plaintiffs, Stephen M. Koch, M.D. ("Dr. Koch"), Victor Ankoma-Sey, M.D. ("Dr. Ankoma-Sey"), Ankoma-Sey PPSC, Ltd. ("Ankoma-Sey PPSC"), Terry Scarborough, M.D. ("Dr. Scarborough"), Hatem Saqr ("Saqr"), Waseem Peracha, M.D. ("Dr. Peracha"), Erik B. Wilson, M.D. ("Dr. Wilson"), and G. Thomas Keith, M.D. ("Dr. Keith") (collectively, the "Plaintiffs") are part of a group of approximately 24 physicians and others who invested in Defendant, Apex Katy Physicians, LLC. ("Apex"). Apex was formed for the purpose of purchasing tracts of real estate situated in Katy, Texas and the improvements located thereon (the "Property"), and leasing those improvements to what is now Apex Hospital – Katy. The improvements consist of a 100,000 square foot hospital with 103 patient beds and a professional building. Defendant, Pankaj K. Shah, M.D. ("Shah"), through his ownership and/or control of Defendant, Indus Associates, LLC ("Indus"), is also an investor in Apex. Shah was an Initial Manager of Apex and at all times relevant remained a Manager, and now purports to be a Manager of Apex.

19.     In conjunction with their investment in Apex, Plaintiffs, along with substantially all of the other investors, also invested in Apex Long Term Acute Care-Katy, L.P. ("Apex LTAC"). Almost every person or entity who invested in Apex is also an investor in Apex LTAC. Defendants are aware of this. For purposes of this petition, the investments made in Apex and Apex LTAC will be referred to collectively as the "Hospital Project".

20.     Apex LTAC was formed to start, own and operate Apex Hospital – Katy

4

(the "Hospital"), which is now operating as a long term acute care facility on the Property. The Hospital specializes in providing comprehensive services to medically complex patients, including those requiring intensive care, pulmonary management, and cardiac monitoring. Apex LTAC leases the Property from Apex pursuant to that certain Lease Agreement, dated January 4, 2007 (the "Lease").

21. When Plaintiffs were first approached about making their investments, it was represented, and Plaintiffs relied on the representation, that all investors in Apex would be paying $40,000 cash per investment unit, and that Apex would have a total of 450 units. A form of Binding Letter of Intent establishing the cost at $40,000 per unit was provided to all potential investors, including Plaintiffs. In conformity with their understanding of the investment, Plaintiffs paid $40,000 per unit for their membership interests in Apex, with Dr. Koch paying $240,000 for 6 units, Dr. Ankoma-Sey/Ankoma-Sey PPSC paying $240,000 for 6 units, Dr. Scarborough paying $40,000 for 1 unit, Mr. Saqr paying $80,000 for 2 units, Dr. Peracha paying $400,000 for 10 units, Dr. Wilson paying $40,000 for 1 unit, and Dr. Keith paying $160,000 for 4 units. This feature of the investment, that everyone investing in Apex would be paying cash, was a material inducement for Plaintiffs to invest because they rightfully believed that Apex would be purchasing the Property free and clear of debt, which would mean their investments in Apex would not be burdened by debt service.

22. Now, Plaintiffs have learned that certain Apex members failed to pay $40,000 for each Apex unit that those members claim to own and/or control. Specifically, Plaintiffs have learned that the 244 units in Apex that Indus claims to own were not acquired for $40,000 cash per unit. Initially, Shah signed a Binding Letter of

5

Intent to purchase 125 Apex units, and paid $1,500,000, which he represented as being 30% of the $5,000,000 he would be paying. However, as detailed below, Shah, acting through Indus, which is owned and/or controlled by Shah and/or his wife, Defendant, Bharati Shah, eventually parted with only $1,260,000 for 244 Apex units, for an average of $5,163.93 per unit.

23. Plaintiffs have also learned that the 90 Apex units that Katy Project, LLC ("Katy Project") claims to own were not acquired for $40,000 cash per unit. Initially, Defendant, Randeep Suneja ("Suneja") signed a Binding Letter of Intent to purchase 40 Apex units at a cost of $40,000 per unit. Likewise, Defendant, Upendra Vora ("Vora") signed a Binding Letter of Intent to purchase 30 Apex units at a cost of $40,000 per unit. However, acting in concert with Shah, Katy Project, which is owned and/or controlled by Suneja and Vora, who is Shah's relative, parted with only $720,000 for 90 Apex units, for an average of $8,000 per unit. These collective failures to pay $40,000 cash per unit resulted in an $11,380,000 shortfall in the funding of Apex.

24. Without notice to or the consent of Plaintiffs and the other investors who paid in full for their Apex units, Shah, acting in concert with Suneja and Vora, substituted Apex debt for the cash that would have been available if they had paid all cash as did Plaintiffs and all the other investors in Apex. Shah, with assistance from Suneja and Vora, caused Apex to borrow $9,000,000 from MetroBank, N.A. ("MetroBank"). The Loan Agreement, dated March 22, 2007, names Apex as "Borrower," Shah, Suneja and Vora as "Guarantors," and MetroBank as "Lender." In connection with the loan, Shah delivered a Guaranty Agreement for $6,120,000 to MetroBank, Suneja delivered a Guaranty Agreement for $2,040,000, and Vora

6

delivered a Guaranty Agreement for $840,000. Of course, as known and intended by Shah, Suneja, and Vora, none of these guarantees has ever been substantially at risk because the Property is worth far more than the amount borrowed.

25. By causing Apex to borrow the $9,000,000, Shah, a Manager of Apex, violated, and caused Apex to violate, Section 3.05 of the Company Agreement of Apex (the "Company Agreement") because this provision of the Company Agreement prohibits Apex Managers from causing Apex to incur any liability in excess of $500,000 without the **written consent of all Members**. Neither Plaintiffs, nor any of the other investors in Apex, were approached about giving such consent. Moreover, not only did Shah knowingly violate the Company Agreement to further his scheme to control and ultimately hijack the Hospital Project, he burdened all of the other investors' units, including those owned by Plaintiffs, by causing Apex to secure the $9,000,000 loan with a first mortgage lien covering the Property.

26. Shah did not attempt to obtain the required written consent because doing so would have alerted Plaintiffs and the other members to the deal that he was cutting for himself and Suneja and Vora. Having been alerted to this material change in the terms of the investment, Plaintiffs would have either insisted on being afforded the same deal, which would have permitted them to purchase more units, or, more likely, would have insisted that Indus and Katy Project pay $40,000 cash per unit for each and every unit they were purchasing. Shah could not allow this to happen because he knew he needed majority control of Apex in order to perpetrate his hijack scheme, but he was unwilling or unable to pay the $9,760,000 that would be required if Plaintiffs and the other investors learned of his self-dealing. At a certain point during the time units in

7

Apex were being offered to investors, Shah instructed that no further units were to be sold. He did so to ensure that he would be majority owner. Doing so prevented units in Apex from being sold to investors who, unlike Shah, would have paid $40,000 cash per unit.

27. Shah went to great lengths to keep Plaintiffs and the other Apex investors in the dark, including taking at least the following actions to avoid having his scheme detected:

- Taking from Apex's offices not only the certificates for Indus's units, but also the receipts for those certificates so as to avoid the possibility of another Apex member seeing the handwritten reference to Shah's personal guarantee that Shah caused to be placed on the receipt for Certificate No. 24.

- When advised that he would have to forego 6 of the 250 Apex units he "purchased" because the deal was "oversold," Shah represented that he had paid for 250 units and insisted on being paid $240,000 for the 6 units to be surrendered, not $30,980.34, which is the collective amount of cash that he actually paid for the 6 units. This dropped his cash in the deal from $1,500,000 to $1,260,000.

- Shah immediately seized control of Apex's finances and refused to share the financial information, including failing to provide copies of bank loan closing documents to the accountants who were requesting the documents so that Apex's federal income tax return could be prepared.

- After June 2008, Shah stopping providing Apex's accountants with copies

8

of Apex's bank records.

- Shah repeatedly avoided calling meetings of the Apex members to discuss the status of Apex and the Hospital Project.

- When it was requested that he provide the members with Apex's financial information and documents, Shah agreed to do so, but never produced the promised information and documents.

- Shah repeatedly complained about Apex's 2007 federal income tax return because it showed Indus's capital account as $1,260,000, not a much larger amount including his guaranty amount, which would have been income tax fraud. Shah delayed signing Apex's 2007 federal income tax return and did not do so until the last possible day, that being January 5, 2009.

28. During early January, 2009, Shah began implementing the next phase of his scheme to hijack the Hospital Project. On January 10, 2009, Shah, as Manager of Indus, gave notice of a special meeting of the members of Apex to be held on Monday, January 19, 2009, beginning at 9:00 a.m. (the "Notice"). Shah noticed the meeting for a weekday and for 9:00 a.m. because he knew it would be very difficult for the investors who are doctors, which comprise the majority of Apex investors, to attend. As noticed, the meeting was held on January 19, 2009 (the "January 19th Meeting"). The January 19th Meeting was attended by only Shah, Suneja, Vora, and Dr. Kannappan Krishnaswamy ("Dr. Krishnaswamy"), another Apex member, who had been recruited to attend by Shah. During the January 19th Meeting, those attending purportedly authorized efforts to "enforce" the Lease, and the following resolutions were purportedly

Unofficial Copy Office of Chris Daniel District Clerk

9

passed:

   (a)   Shah was elected to continue serving as a Manager of Apex, which he had done from the inception of Apex;

   (b)   Dr. Krishnaswamy was elected to serve as a Manager of Apex; and

   (c)   The law firm of Kaiser & Conrad, LLP was authorized to take action to enforce the Lease.

29.   Indus had no authority to notice the January 19th Meeting because it does not own the 244 Apex units it claims to own. As detailed above, those 244 units were acquired by means of Shah's fraud and as a result of Shah's breach of fiduciary duties and breach of the Company Agreement. Consequently, Indus did not acquire viable or enforceable title to the 244 Apex units and therefore had no standing to notice the January 19th Meeting. Therefore, all resolutions passed and actions taken during the January 19th Meeting are of no force or effect, and all actions taken or to be taken after the January 19th Meeting based on those resolutions or at the direction of either Shah or Krishnaswamy, as purported Managers of Apex, are unauthorized and constitute or will constitute ultra vires acts.

30.   The January 19th Meeting was not properly noticed because the Notice did not adequately describe the agenda of the meeting. Because the January 19th Meeting was not properly noticed, all resolutions purportedly passed and any other actions purportedly taken during the January 19th Meeting were ineffective, and all actions taken or to be taken after the January 19th Meeting based on those resolutions are unauthorized and constitute or will constitute ultra vires acts.

31.   The January 19th Meeting and all resolutions purportedly passed and actions purportedly taken during the meeting are also ineffective because the Apex

Unofficial Copy Office of Chris Daniel District Clerk

10

units that Indus and Katy Project claim to own, and which were voted during the January 19th Meeting, were acquired by means of fraud and as a result of Shah's breach of fiduciary duties and breach of the Company Agreement. Consequently, Indus did not acquire legal or equitable title to the 244 Apex units it purportedly voted during the January 19th Meeting. Because the votes attributable to the 244 units are invalid and those 244 units represent approximately 54% of the Apex membership units, no resolution, action, or other measure taken during the January 19th Meeting received a majority of the Apex members' votes as required by Article 3.08 of the Company Agreement.

32.    On Monday, February 1, 2009, only 13 days after being elected, Dr. Krishnaswamy resigned as a Manager of Apex. Dr. Krishnaswamy did so after learning of Shah's fraud and deceit, and his plan to evict the Hospital. Article 3.01 of the Company Agreement requires that Apex be managed at all times by at least 2 Managers. Therefore, because the required number of Managers does not exist, any actions that Apex has taken or takes at the direction of Shah from February 1, 2009 onward are void and of no effect.

33.    Shah, purported Manager of Apex since the inception of Apex and purportedly re-elected at the January 19th Meeting, caused Apex to file a lawsuit to evict Apex LTAC from the Property. That lawsuit is numbered and styled Cause No. 09-CV31-04395; *Apex Katy Physicians, L.L.C. v. Apex Long Term Acute Care—Katy, L.P.*, and is pending in the Justice of the Peace Court, Precinct 3, Fort Bend County, Texas (the "Eviction Lawsuit"). Shah is aware that Plaintiffs do not support the decision to pursue eviction against Apex LTAC. More importantly, this action has not been

11

properly authorized by a legally constituted Board of Managers or by the Apex members because the votes attributable to the 244 units that Indus claims to own are invalid because, as explained above, Indus did not rightfully acquire title to those units.

34.    Upon information and belief, Shah is causing Apex to pursue the eviction proceeding because he is under financial pressure from MetroBank and Medistar. In fact, Medistar has sued Shah, claiming he owes millions of dollars to Medistar as result of the side agreement that Shah entered into without Plaintiffs' knowledge. That lawsuit is numbered and styled No. 2008-73728; *Medistar Corporation v. P.K. Shah*, and is pending in the 165th District Court of Harris County, Texas.

## V.
## Causes Of Action

### A.    Breach of Fiduciary Duty

35.    Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 18 through 34 above.

36.    Shah, as a Manager of Apex, owed fiduciary duties to Plaintiffs. Those duties include the duty of full disclosure, the duty of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing, and the duty to act with integrity of the strictest kind.

37.    Shah has breached one or more of the fiduciary duties he owed to Plaintiffs and those breaches are a proximate cause of the actual damages Plaintiffs have suffered. The amount of actual damages that Plaintiffs have suffered is within the jurisdictional limits of this court.

38.    As an alternative to money damages, an appropriate remedy for Shah's

12

F:\Cases\JWH\KOCH.973\SHAH.002\Pleadings\4THPOP063009.doc

breach of fiduciary duty, and one that Plaintiffs seek, is forfeiture of the Apex units which Shah purports to own. This equitable relief is appropriate under the circumstances.

39. Shah's breach of the fiduciary duties was intentional because he intended to gain an additional, unwarranted benefit for himself at the expense of Plaintiffs and the other investors in Apex. Plaintiffs therefore are entitled to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a). Plaintiffs seek exemplary damages in an amount that in the opinion of the jury is necessary to punish Shah and deter similar conduct in the future by him and others.

**B. Fraud**

40. Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 18 through 39 above.

41. Shah committed fraud against Plaintiffs. Because of his fiduciary status, the law imposed a duty on Shah to speak. By concealing or failing to disclose to Plaintiffs that he, Suneja, and Vora were not purchasing units in Apex on the same terms as Plaintiffs, Shah failed to disclose a material fact within his knowledge that he knew Plaintiffs were ignorant of and did not have an opportunity to discover. The information that Shah withheld or failed to disclose materially impacted the financial structure of Plaintiffs' investments. Shah took actions intended to prevent Plaintiffs from discovering his self-dealing. Plaintiffs, unaware of Shah's self-dealing, relied on Shah's deliberate silence as indicating that Apex's financial structure was as had been represented to them when they were making their investment decision. Shah intended

13

for Plaintiffs to make this assumption.

42. Shah's fraud is a proximate cause of the actual damages that Plaintiffs have suffered. Plaintiffs' actual damages are within the jurisdictional limits of this court.

43. The damages that Plaintiffs have suffered resulted from Shah's actual fraud or malice, which entitles Plaintiffs to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a). Plaintiffs seek exemplary damages in an amount that in the opinion of the jury is necessary to punish Shah and deter similar conduct in the future by him and others.

C. Conspiracy

44. Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 18 through 43 above.

45. Defendants, Bharati P. Shah, Indus, Suneja, Vora, and/or Katy Projects, conspired with Shah to breach Shah's fiduciary duty and/or aided and abetted, and/or assisted or encouraged, and/or assisted and participated in Shah's breach of fiduciary duty. Defendants, Bharati P. Shah, Indus, Suneja, Vora, and/or Katy Projects, conspired with Shah to commit fraud and/or aided and abetted, and/or assisted or encouraged, and/or assisted and participated in Shah's fraud. Defendants, Bharati P. Shah, Indus, Suneja, Vora, and/or Katy Projects knew their actions would result in harm to Plaintiffs.

46. This conspiracy is a proximate cause of the actual damages that Plaintiffs have suffered. Plaintiffs' actual damages are within the jurisdictional limits of this court.

47. As an alternative to money damages, an appropriate remedy for this

14

conspiracy, and one that Plaintiffs seek, is forfeiture of the Apex units which the conspirators purport to own. This equitable relief is appropriate under the circumstances.

48. The damages Plaintiffs have suffered as a result of the conspiracy perpetrated by Shah, Bharati P. Shah, Indus, Suneja, Vora, and/or Katy Projects resulted from their actual fraud or malice, which entitles Plaintiffs to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a). Plaintiffs seek exemplary damages in an amount that in the opinion of the jury is necessary to punish Shah Bharati P. Shah, Indus, Suneja, Vora, and/or Katy Projects and deter similar conduct in the future by them and others.

## D. Breach of Contract

49. Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 18 through 48 above.

50. Defendants have breached the Company Agreement and are continuing to breach the Company Contract by taking actions on behalf of Apex that are unauthorized and in direct contravention of the Company Agreement.

51. Defendants' breach of the Company Agreement is a proximate cause of the actual damages that Plaintiffs have suffered. Plaintiffs' actual damages are within the jurisdictional limits of this court.

52. Plaintiffs have fully performed the obligations required of them by the Company Agreement and all conditions precedent to Plaintiffs' claim for relief have been performed or have occurred.

15

53.     As a direct result of the breaches, Plaintiffs have been required to employ John W. Havins and the law firm of Havins & Associates, PC as their attorneys, and have agreed to pay the attorneys a reasonable attorney's fee for their services rendered and to be rendered in this cause.  Plaintiffs will present their claims to Defendants in accordance with Section 38.001 *et seq.* of the Texas Civil Practice and Remedies Code.  Pursuant to Section 38.001 *et seq.* of the Texas Civil Practice and Remedies Code, Plaintiffs are entitled to and do request an award of reasonable and necessary attorney's fees for services rendered and to be rendered in this case, which include the following:

(a)     Preparation and trial of this lawsuit; and

(b)     Post-trial, pre-appeal legal services; and

(c)     An appeal to the court of appeals; and

(d)     Making or responding to an petition for review to the Supreme Court of Texas; and

(e)     An appeal to the Supreme Court of Texas in the event petition for review is granted; and

(f)     Postjudgment discovery and collection in the event execution on the judgment is necessary.

## E.     Request For Declaratory Relief

54.     Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 18 through 53 above.

55.     Pursuant to the Uniform Declaratory Judgments Act, Chapter 37 of the Civil Practice and Remedies Code of Texas, Plaintiffs seeks a declaration that neither

16

Shah, Bharati P. Shah, nor Indus has equitable or legal title to the 244 Apex units they purport to own and/or control. Plaintiffs also seek a declaration that neither Suneja, Vora, nor Katy Project has equitable or legal title to the 90 Apex units they purport to own and/or control.

56.    Plaintiffs are entitled to recover reasonable and necessary attorney's fees that are equitable and just under Texas Civil Practice & Remedies Code section 37.009 because this is a suit for declaratory relief. Plaintiffs request an award of reasonable and necessary attorney's fees for services rendered and to be rendered in this case, which include the following:

(a)    Preparation and trial of this lawsuit; and

(b)    Post-trial, pre-appeal legal services; and

(c)    An appeal to the court of appeals; and

(d)    Making or responding to an petition for review to the Supreme Court of Texas; and

(e)    An appeal to the Supreme Court of Texas in the event petition for review is granted; and

(f)    Postjudgment discovery and collection in the event execution on the judgment is necessary.

57.    Plaintiffs are entitled to recover, and do request, awards of pre-judgment and post-judgment interest at the highest rates permitted by law.

WHEREFORE, Plaintiffs, Stephen M. Koch, M.D., Victor Ankoma-Sey, M.D., Ankoma-Sey PPSC, Ltd., Terry Scarborough, M.D., Hatem Saqr, Waseem Peracha, M.D., Erik B. Wilson, M.D., and G. Thomas Keith, M.D., respectfully request that Defendants, Pankaj K. Shah, Bharati P. Shah, Indus Associates, LLC, Apex Katy

17

Physicians, LLC, Randeep Suneja, M.D., Upendra N. Vora, and Katy Project, LLC be cited to appear and answer and, on final trial, the court declare that (i) neither Shah, Bharati P. Shah, nor Indus has equitable or legal title to the 244 Apex units they purport to own and/or control, and (ii) neither Suneja, Vora, nor Katy Project has equitable or legal title to the 90 Apex units they purport to own and/or control. In addition, Plaintiffs ask for judgment, jointly and severally, against Defendants for:

A.     Actual damages;

B.     Exemplary damages;

C      Reasonable attorney's fees;

D.     Costs of suit;

E.     Prejudgment and postjudgment interest at the highest rates permitted by law; and

F.     All other relief, in law and in equity, to which Plaintiffs may be entitled.

Respectfully submitted,

HAVINS & ASSOCIATES, PC

By:_____

John W. Havins
State Bar No. 09239800
Jeffery J. Davis
State Bar No. 24028276
2211 Norfolk, Suite 525
Houston, Texas 77098
T: (713) 650-3600
F: (713) 650-3601

ATTORNEYS FOR PLAINTIFFS,
STEPHEN M. KOCH, ET AL.

18

F:\Cases\JWH\KOCH.973\SHAH.002\Pleadings\4THPOP062609.doc

Unofficial Copy Office of Chris Daniel District Clerk

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing document was served on the attorneys listed below in the manner indicated on June _30_, 2009.

**VIA CMRR# 7002 2030 0006 1889 6844**
Jeffery B. Kaiser
Kaiser & Conrad, LLP
1911 Bagby, Second Floor
Houston TX 77002

**VIA CMRR# 7002 2030 0006 1889 6837**
Thomas F. Coleman
Law Office of Tom F. Coleman
817 Westheimer, First Floor
Houston TX 77006

**VIA CMRR# 7002 2030 0006 1889 6820**
Robert Remy
Two Memorial City Plaza
820 Gessner, Suite 1720
Houston TX 77024

**VIA CMRR# 7002 2030 0006 1889 6813**
Jerry von Sternberg
The von Sternberg Law Firm
820 Gessner, Suite 1720
Houston TX 77024

**VIA CMRR# 7002 2030 0006 1889 6806**
W. Ashton Randall III
Greenberg Trauring, LLP
2200 Ross Avenue, Suite 5200
Dallas TX 75201

Jeffery J. Davis

Unofficial Copy Office of Chris Daniel District Clerk

19

NO. 2009-02578

| | | |
|---|---|---|
| APEX KATY PHYSICIANS, LLC | § | IN THE DISTRICT COURT OF |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ADEEL ZAIDI, ET AL. | § | 61st JUDICIAL DISTRICT |

CONSOLIDATED WITH

NO. 2009-03055

| | | |
|---|---|---|
| STEPHEN M. KOCH, M.D., Individually, | § | IN THE DISTRICT COURT OF |
| ET AL., and each as MEMBERS | § | District Clerk |
| on behalf of APEX KATY PHYSICIANS, | § | |
| LLC, and ADEEL ZAIDI, CO-MANAGER, | § | JUN 3 0 2009 |
| APEX KATY PHYSICIANS, LLC | § | Time: 6-30-09 |
| | § | Harris County, Texas |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | Deputy |
| PANKAJ K. SHAH, M.D., | § | |
| BHARATI P. SHAH, and | § | |
| INDUS ASSOCIATES, LLC | § | 11ᵀᴴ JUDICIAL DISTRICT |

**FILED**
Loren Jackson
District Clerk

PLAINTIFF STEPHEN M. KOCH'S ADDITIONAL SUMMARY JUDGMENT EVIDENCE
IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT
ON HIS CLAIM FOR BREACH OF CONTRACT

Plaintiff, Stephen M. Koch, M.D. ("Plaintiff"), files additional evidence in support

of his Motion for Partial Summary Judgment on his claim for Breach of Contract.

I.    **SUMMARY JUDGMENT EVIDENCE**

1.    In accordance with Rule 166a(d) of the Texas Rules of Civil Procedure,

Plaintiff intends to use unfiled documents as summary judgment evidence. Specifically,

Plaintiff intends to use the following item(s), all of which are attached hereto as

exhibit(s) and incorporated herein by reference.

E.    Affidavit of Stephen M. Koch, M.D. ("Koch Aff.");

WHEREFORE, Plaintiff, Stephen M. Koch, M.D., respectfully requests that the court grant him a partial summary judgment on the liability portion of his breach of contract cause of action against Defendant, Pankaj J. Shah, M.D., and grant him such other and further relief as the court deems necessary.

Respectfully submitted,

HAVINS & ASSOCIATES, PC

By: _____
    John W. Havins
    State Bar No. 09239800
    Jeffery J. Davis
    State Bar No. 24028276
    2211 Norfolk, Suite 525
    Houston, Texas 77098
    T: (713) 650-3600
    F: (713) 650-3601

ATTORNEYS FOR PLAINTIFF,
STEPHEN M. KOCH, M.D.

Unofficial Copy Office of Chris Daniel District Clerk

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing document was served by certified mail and/or facsimile on the attorneys listed below on June 30, 2009.

**VIA CMRR#  7002 2030 0006 1889 6844**
Jeffery B. Kaiser
Kaiser & Conrad, LLP
1911 Bagby, Second Floor
Houston TX  77002

**VIA CMRR#  7002 2030 0006 1889 6837**
Thomas F. Coleman
Law Office of Tom F. Coleman
817 Westheimer, First Floor
Houston TX  77006

**VIA CMRR#  7002 2030 0006 1889 6820**
Robert Remy
Two Memorial City Plaza
820 Gessner, Suite 1720
Houston TX  77024

**VIA CMRR#  7002 2030 0006 1889 6813**
Jerry von Sternberg
The von Sternberg Law Firm
820 Gessner, Suite 1720
Houston TX  77024

**VIA CMRR#  7002 2030 0006 1889 6806**
W. Ashton Randall III
Greenberg Trauring, LLP
2200 Ross Avenue, Suite 5200
Dallas TX  75201

Jeffery J. Davis

Unofficial Copy Office of Chris Daniel District Clerk

NO. 2009-02578

| APEX KATY PHYSICIANS, LLC | § | IN THE DISTRICT COURT OF |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ADEEL ZAIDI, ET AL. | § | 61st JUDICIAL DISTRICT |

CONSOLIDATED WITH

NO. 2009-03055

| STEPHEN M. KOCH, M.D., Individually, | § | IN THE DISTRICT COURT OF |
| ET AL., and each as MEMBERS | § | |
| on behalf of APEX KATY PHYSICIANS, | § | |
| LLC, and ADEEL ZAIDI, CO-MANAGER, | § | |
| APEX KATY PHYSICIANS, LLC | § | |
| | § | HARRIS COUNTY, TEXAS |
| v. | § | |
| | § | |
| PANKAJ K. SHAH, M.D., | § | |
| BHARATI P. SHAH, and | § | |
| INDUS ASSOCIATES, LLC | § | 11TH JUDICIAL DISTRICT |

## PLAINTIFF STEPHEN M. KOCH'S MOTION FOR
## PARTIAL SUMMARY JUDGMENT ON CLAIM FOR BREACH OF CONTRACT

Plaintiff, Stephen M. Koch, M.D. ("Plaintiff"), has sued Defendant, Pankaj K. Shah, M.D. ("Shah"), for breach of contract, specifically that Shah, acting as a Manager of Apex Katy Physicians, LLC, failed to obtain unanimous written consent of the Apex Katy members, as required by the Company Agreement of Apex Katy, before causing Apex Katy to borrow $9,000,000 from Metrobank, N.A. Plaintiff moves for partial summary judgment on the liability portion of his breach of contract claim because no material factual dispute exists on the essential elements of that portion of his breach of contract claim.

FILED
HAR. XAS
2009 MAY 11 PM 1: 02
BY 5-11-09

1

## I.  SUMMARY JUDGMENT EVIDENCE

1.  In accordance with Rule 166a(d) of the Texas Rules of Civil Procedure, Plaintiff intends to use unfiled documents as summary judgment evidence. Specifically, Plaintiff intends to use the following items, all of which are attached hereto as exhibits and incorporated herein by reference:

A.  Affidavit of Stephen M. Koch, M.D. ("Koch Aff.");

B.  Company Agreement of Apex Katy Physicians, LLC;

C.  Affidavit of P.K. Shah, M.D.

D.  Promissory Note, dated March 22, 2007, in the original principal amount of $9,000,000, executed by Apex Katy Physicians, LLC in favor of Metrobank, N.A.

## II.  STATEMENT OF FACTS

2.  Plaintiff invested in Defendant Apex Katy Physicians, LLC. ("Apex") and is a member of Apex. (Koch Aff. at ¶¶ 2-3). Plaintiff paid $40,000 apiece for the six (6) units in Apex that he purchased. ("Koch Aff. at ¶ 3).

3.  Apex was formed for the purpose of purchasing tracts of real estate situated in Katy, Texas and the improvements located thereon (the "Property"), and leasing those improvements to what is now Apex Hospital – Katy. (Koch Aff. at ¶ 2). As a member of Apex, Plaintiff entered into that certain Company Agreement of Apex Katy Physicians, LLC dated February 9, 2007 (the "Company Agreement"). (Koch Aff. at ¶ 4). A true copy of the Company Agreement is attached hereto as Exhibit B and incorporated herein for all purposes. (Koch Aff. at ¶ 4). Defendant, Pankaj J. Shah (hereinafter "Shah"), as a Manager, also signed the Company Agreement. (Ex. B at 14).

4.	Section 3.05(7) of the Company Agreement provides that the Managers of Apex are prohibited from causing Apex to incur a liability in excess of $500,000 without the **written consent of all members** of Apex. (Ex. B at 5). On or about March 22, 2007, Shah, acting as a Manager of Apex, caused Apex to borrow $9,000,000 from Metrobank, N.A. (Shah Aff. at ¶ 2; Exhibit A-3 to Shah Aff. (Loan Agreement)). Attached hereto as Exhibit D is a true copy of that certain Promissory Note, dated March 22, 2007, in the original principal amount of $9,000,000 executed by Apex Katy Physicians, LLC to Metrobank, N.A. (the "Note"). Shah signed the Note as Manager of Apex. (Exhibit D at 6). Plaintiff, who is a member of Apex, never gave written consent to Shah for Apex to borrow $9,000,000 from Metrobank, N.A. (Koch Aff. at ¶ 5). In fact, no member of Apex gave the required written consent.

## III.	STANDARD OF REVIEW

5.	This court knows the standard for summary judgments under Rule 166a. Plaintiff would merely point out that the court must accept as true *uncontroverted* evidence favoring Plaintiff as movant. *See McIntyre v. Ramirez*, 109 S.W.3d 741, 749 (Tex. 2003). Thus, such testimony from interested witnesses will support summary judgment when it is "clear, positive, direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." Tex. R. Civ. P. 166a(c).

6.	Establishing each element of the liability portion of his breach of contract claim as a matter of law entitles Plaintiff to partial summary judgment. *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). Whether Shah "breached" the Contract presents a strict question of law for this court. *See Willis v. Donnelly*, 118 S.W.3d 10,

25 (Tex. 2003). "Where the evidence is undisputed regarding a person's conduct under a contract, the judge alone must determine whether it shows performance or breach of his contractual obligation." *Lafarge Corp. v. Wolff, Inc.*, 977 S.W.2d 181, 186 (Tex. App. -- Austin, 1998, writ denied). As proof of Shah's breach of the Company Agreement, this motion relies on and incorporates the affidavit of Plaintiff (Exhibit A) and Pankaj K. Shah, M.D. (Exhibit C), and true copies of the documentary evidence (Exhibits B, D).

## IV.    ARGUMENT AND AUTHORITIES

7.    Plaintiff is entitled to partial summary on the liability portion of his breach of contract claim because he can prove each liability element of his breach of contract action as a matter of law. Essential liability elements for a breach of contract claim are: (1) a valid contract, (2) performed by Plaintiff, (3) and breach by Shah. *Winchek v. American Express Travel Related Servs.*, 232 S.W.3d 197, 202 (Tex. App.—Houston [1st Dist] 2007, no pet.).

### A.    There Is A Valid Contract That Plaintiff Performed.

8.    The Company Agreement is a valid contract to which Plaintiff, as an Apex member, and Shah, as an Apex Manager, are parties. (Koch Aff. at ¶ 4; Ex. B). Plaintiff performed under the Company Agreement by paying $40,000 cash apiece for each of the six units of Apex that he purchased. ("Koch Aff. at ¶ 3) Accordingly, the first two elements of Plaintiff's breach of contract claim are satisfied.

### B.    Shah Breached the Company Agreement.

9.    It is undisputed that Apex, with Shah acting as a Manager of Apex and personally guaranteeing a portion of the loan, borrowed $9,000,000 from Metrobank, N.A. (Shah Aff. at ¶ 2; Exhibit A-3 to Shah Aff.; Ex. D). Prior to Apex borrowing the

$9,000,000, Shah did not receive the written consent of all Apex members. (Koch Aff. at ¶5). Shah failed to obtain that consent because he did want the other members to know that he was substituting Apex debt for the cash that should have been paid for the 244 Apex units that Indus Associates, LLC ("Indus"), a limited liability company controlled by Shah, claims to own. (Shah Aff. at ¶ 2). Instead of paying $40,000 cash for each of the 244 Apex units, which amounts to $9,760,000, Shah or Indus parted with only $1,260,000 or $5,163.93 per unit, and then caused Apex to borrow $9,000,000 to purchase the Property. (Shah Aff. at ¶ 2; Exhibit A-3 to Shah Aff.). By causing Apex to borrow the $9,000,000 from Metrobank, N.A., without obtaining the written consent of all Apex members, Shah breached Section 3.05(7) of the Company Agreement. (Exhibit B at 5). Based on the foregoing evidence and authorities, this court should grant a summary judgment against Shah on the liability portion of Plaintiff's breach of contract claim.

WHEREFORE, Plaintiff, Stephen M. Koch, M.D., respectfully requests that the court grant him a partial summary judgment on the liability portion of his breach of contract cause of action against Defendant, Pankaj J. Shah, M.D., and grant him such other and further relief as the court deems necessary.

F:\Cases\JWH\KOCH.973\SHAH.002\Pleadings\PartSdJBofKKoch.doc

Respectfully submitted,

HAVINS & ASSOCIATES, PC

By:_____
John W. Havins
State Bar No. 09239800
Jeffery J. Davis
State Bar No. 24028276
525 Norfolk, Suite 525
Houston, Texas 77098
T: (713) 650-3600
F: (713) 650-3601

ATTORNEYS FOR PLAINTIFF,
STEPHEN M. KOCH, M.D.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing document was served by certified mail on the attorneys listed below on May 8, 2009.

Jeffery B. Kaiser
Kaiser & Conrad, LLP
1911 Bagby
Second Floor
Houston TX 77002

Thomas F. Coleman
Law Office of Tom F. Coleman
817 Westheimer
First Floor
Houston TX 77006

Robert Remy
Two Memorial City Plaza
820 Gessner, Suite 1720
Houston TX 77024

W. Ashton Randall III
Greenberg Trauring, LLP
2200 Ross Avenue, Suite 5200
Dallas TX 75201

Mr. Jerry C. von Sternberg
The von Sternberg Law Firm
820 Gessner, Suite 1720
Houston TX  77024

John W. Havins

CAUSE NO. 2009-02578

| | | |
|---|---|---|
| APEX KATY PHYSICIANS, L.L.C., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| ADEEL ZAIDI, APEX LONG TERM ACUTE | § | |
| CARE-KATY, L.P., APEX KATY | § | |
| PHYSICIANS – IMG, L.L.C., and | § | |
| US IMG, L.L.C., | § | |
| Defendants. | § | 61ST JUDICIAL DISTRICT |

CAUSE NO. 2009-03-055

| | | |
|---|---|---|
| STEPHEN M. KOCH, M.D., Individually, | § | IN THE DISTRICT COURT OF |
| VICTOR ANKOMA-SEY, M.D., Individually, | § | |
| TERRY SCARBOROUGH, M.D., | § | |
| Individually, HATEM SAQR, Individually, | § | |
| and each as MEMBERS on behalf of APEX | § | |
| KATY PHYSICIANS, L.L.C., and ADEEL | § | |
| ZAIDI, CO-MANAGER, APEX KATY | § | |
| PHYSICIANS, L.L.C., | § | HARRIS COUNTY, TEXAS |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| PANKAJ K. SHAH, M.D., BHARATI P. | § | |
| SHAH, and INDUS ASSOCIATES, L.L.C., | § | |
| Defendants. | § | 11TH JUDICIAL DISTRICT |

FILED
Loren Jackson
District Clerk
APR -6 2009
Time: _____
4-6-09
By _____
Harris County, Texas
Deputy

## ORDER GRANTING UNOPPOSED
## MOTION TO CONSOLIDATE AND MEMORANDUM IN
## SUPPORT OF MOTION TO CONSOLIDATE

On this day came to be heard Apex Katy Physicians, L.L.C.'s Unopposed Motion to

Consolidate and Memorandum in Support of Motion to Consolidate, and the Court, having duly

0700607                                        1

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

considered same, any responses, and the arguments of counsel, if any, is of the opinion that the motion should be in all things, GRANTED. It is, therefore,

ORDERED that Cause No. 2009-02578 and Cause No 2009-03055 be consolidated and orders the Clerk to merge the cases into one lawsuit with Cause No. 2009-02578 pending in this Court, and shall note the consolidation on the docket sheets in the two cases

SIGNED on this _____ **APR 0 9 2009**___, 2009.

_____
JUDGE PRESIDING

APPROVED:

KAISER & CONRAD, L.L.P.

_____
Jeffery B. Kaiser
IBA No. 11079300
1911 Bagby, Suite 200
Houston, Texas 77002
Telephone: 713-571-8000
Facsimile: 713-571-8002
jkaiser@kaiserconrad.com

Attorneys for Plaintiff,
Apex Katy Physicians, L.L.C.

0700607                                    2

②）ᵔᵔᵔ

CAUSE NO. 2009-02578

| | | |
|---|---|---|
| APEX KATY PHYSICIANS, LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ADEEL ZAIDI, APEX LONG TERM | § | |
| ACUTE CARE-KATY, LP, APEX KATY | § | |
| PHYSICIANS-TMG, LLC, AND | § | |
| US TMG, LLC | § | |
| | § | |
| Defendants. | § | 61ˢᵀ JUDICIAL DISTRICT |

CONSOLIDATED WITH

CAUSE NO. 2009-03055

---

### AGREED THIRD AMENDED DOCKET CONTROL ORDER

---

The following docket control order shall apply to this case unless further modified by the Court. If no date is given below, the item is governed by the Texas Rules of Civil Procedure.

**N/A**      **JOINDER.** All parties must be added and served, whether by amendment or third-party practice, by this date. THE PARTY CAUSING THE JOINDER SHALL PROVIDE A COPY OF THIS DOCKET CONTROL ORDER AT THE TIME OF SERVICE.

         **EXPERT WITNESS DESIGNATION.** Expert Witness designations are required and must be served by the following dates. The designation must include the information listed in Rule 194.2(f). Failure to timely respond will be governed by Rule 193.6.

**07/13/12**      Experts for parties seeking affirmative relief.

**07/27/12**      All other experts.

**N/A**      **STATUS CONFERENCE.** Parties shall be prepared to discuss all aspect of the case, including ADR, with the Court on this date. TIME: Failure to appear will be grounds for dismissal for want of prosecution.

**N/A**      **DISCOVERY LIMITATIONS.** The discovery limitations of Rule 190.2 apply.

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

**09/23/12**   **ALTERNATIVE DISPUTE RESOLUTION.** By this date the parties must either conduct a mediation with a mediator to be agreed to by the parties.

**09/16/12**   **DISCOVERY PERIOD ENDS.** All discovery must be conducted before the end of the discovery period. Parties seeking discovery must serve requests sufficiently far in advance of the end of the discovery period that the deadline for responding will be within the discovery period. Counsel may conduct discovery beyond this deadline by agreement. Incomplete discovery will not delay the trial.

**DISPOSITIVE MOTIONS AND PLEAS.** Must be heard by oral hearing or submission.
If subject to an interlocutory appeal, dispositive motions or pleas must be heard by this date.

**9/30/12**   Summary judgment motions not subject to an interlocutory appeal must be heard by this date.
Rule 166a(i) motions may not be heard before this date.

**N/A**   **CHALLENGES TO EXPERT TESTIMONY.** All motions to exclude expert testimony and evidentiary challenges to expert testimony must be filed by this date, unless extended by leave of court.

**09/16/12**   **PLEADINGS.** All amendments and supplements must be filed by this date. This Order does not preclude prompt filing of pleadings directly responsive to any timely filed pleadings.

Parties shall be prepared to discuss all aspects of trial with the Court on this date.
TIME: Failure to appear will be grounds for dismissal for want of prosecution.

**10/22/12**   **TRIAL.** If not assigned by the second Friday following this date, the case will be reset.

Dated: _____ MAR 1 2 2012 _____, 2012.

**F I L E D**
Chris Daniel
District Clerk
MAR 0 2 2012

Time: _____
Harris County, Texas

Deputy

Unofficial Copy Office of Chris Daniel District Clerk

Hon. Alfred H. Bennett
Presiding Judge

MHDocs B#2023 2 11860.1

Filed
09 April 6 A11:21
Loren Jackson
District Clerk
Harris County
ED101J015380644
Accepted by:
Furshilla Brantley

CAUSE NO 2009-02578

| | | |
|---|---|---|
| APEX KATY PHYSICIANS, L.L.C., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| ADEEL ZAIDI, APEX LONG TERM ACUTE | § | |
| CARE-KATY, L.P., APEX KATY | § | |
| PHYSICIANS – TMG, L L C., and | § | |
| US TMG, L.L.C., | § | |
| Defendants. | § | 61ST JUDICIAL DISTRICT |

CAUSE NO. 2009-03-055

| | | |
|---|---|---|
| STEPHEN M. KOCH, M.D., Individually, | § | IN THE DISTRICT COURT OF |
| VICTOR ANKOMA-SEY, M.D., Individually, | § | |
| TERRY SCARBOROUGH, M.D., | § | |
| Individually, HATEM SAQR, Individually, | § | |
| and each as MEMBERS on behalf of APEX | § | |
| KATY PHYSICIANS, L.L.C, and ADEEL | § | |
| ZAIDI, CO-MANAGER, APEX KATY | § | |
| PHYSICIANS, L.L.C., | § | HARRIS COUNTY, TEXAS |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| PANKAJ K. SHAH, M.D., BHARATI P. | § | |
| SHAH, and INDUS ASSOCIATES, L.L.C, | § | |
| Defendants. | § | 11TH JUDICIAL DISTRICT |



## UNNOPPOSED MOTION TO CONSOLIDATE AND MEMORANDUM IN SUPPORT OF MOTION TO CONSOLIDATE

COMES NOW, Apex Katy Physicians, L.L.C. ("Katy Physicians") by and through its undersigned attorney, and requests that this Court consolidate the two pending cases between these same and affiliated parties, consisting of Cause No. 2009-02578; *Apex Katy Physicians, L.L.C v Adeel Zaidi, et al.*; in the 61st Judicial District Court, Harris County, Texas; and Cause

0700607                                             1

No. 2009-03055; *Stephen M. Koch, M.D., et al. v. Pankaj K. Shah, M.D., et al.*; in the 11th Judicial District Court, Harris County, Texas, into this first filed case involving both similar and identical parties, and relating to the same series of transactions.

# I.
# ARGUMENT AND AUTHORITIES

1. Texas Rule of Civil Procedure 174(a) provides for the consolidation and joint hearing or trial of actions "involving a common question of law or fact." TEX. R. CIV. P. 174(a). The trial judge is given broad discretion to consolidate cases. *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 525 (Tex.1982); *S.W. Prop. Trust v. Dallas County Flood Control Dist. No. 1,* 136 S.W.3d 1, 12 (Tex.App.-Dallas 2001, no pet.); *Excel Corp v. Valdez,* 921 S.W.2d 444, 448 (Tex.App.-Corpus Christi 1996, orig. proceeding); *In re Al Cardenas Masonry, Inc.*, 2006 WL 949974, (Tex.App.-Corpus Christi, 2006., no pet.).

2. In the case of consolidation for trial, the actions should relate to substantially the same transaction, occurrence, subject matter, or question, and they should be so related that evidence presented will be material, relevant, and admissible in each case. *Excel Corp. v. Valdez, supra,* 921 S.W.3d at 448.

3. These two (2) lawsuits involve the parties' investment, purchase, lease, and improvements to real property in Fort Bend County, Texas consisting of the former Memorial Hermann Hospital-Katy and a related professional office building (the "Property"), alleged breaches of contract and fiduciary duty regarding a January 4, 2007, Apex Long Term Acute Care-Katy, L.P. ("Apex Hospital") lease for a portion of the Property from Katy Physicians (the "Lease Agreement"), a February 9, 2007 Company Agreement of Apex Katy Physicians, L.L.C.

0700607                                    2

(the "Company Agreement"), the MetroBank, N.A. purchase loan for the Property, and claims of fraudulent use and transfer of funds.

4. The Plaintiff in this first filed case, Cause No. 2009-02578, is Apex Katy Physicians, L.L.C., and the Defendants are Adeel Zaidi, Apex Long Term Acute Care-Katy, L.P., Apex Katy Physicians – TMG, L.L.C., and US TMG, L.L.C ("Defendants"). Katy Physicians has sued Defendants for breaches of contract and fiduciary duty in regards to the Lease Agreement, the Company Agreement, and for misappropriation and wrongful transfers of Katy Physicians' funds from several Katy Physicians' bank accounts including MetroBank, N.A. (See Plaintiff's Original Petition, attached and incorporated herein for all purposes as Exhibit "1").

5. In the second filed Cause No. 2009-03055, the Plaintiffs, a group of investors in both Katy Physicians and Apex Hospital are suing on both their individual capacities and "on behalf of Apex Physicians," have sued Defendants, Pankaj K. Shah, M.D., the Co-Manager of Katy Physicians, and other investors of Katy Physicians for alleged breaches of fiduciary duty, fraud, conspiracy, and breach of contract regarding the Company Agreement, the MetroBank, N.A. purchase loan, and investments and improvements regarding the Property. (See Plaintiff's Third Amended Original Petition, attached and incorporated herein for all purposes as Exhibit "2").

6. The parties in the First and Second filed cases are identical or affiliated and possess information substantially related to the subject matters raised in both the First filed case, Cause No. 2009-02578, and the Second filed case, Cause No. 2009-03055. Discovery in the cases is overlapping and inextricably intertwined, the issues to be submitted to the trier of fact regard common questions of fact, the witnesses and testimony at the trial of the two cases will be substantially identical, and any judgment in any one of the two separate cases will likely be

subject to offsets and credits from the other. The central and primary requirement for consolidation of actions as directed by Rule 174 is that there must exist common issues of law or fact in both cases (*See* TEX. R. CIV. P. 174(a)). Such common issues of law and fact exist in both of these cases. The same evidence is material, relevant and admissible. Judicial economy and convenience will be gained by consolidation. There is no likelihood of prejudice or jury confusion from consolidation

8. Therefore, Apex Katy Physicians, L.L.C. requests that this Court order consolidation of the two lawsuits pursuant to Rule 174(a) under this First filed case, Cause No 2009-02578, because no party is opposed to the consolidation, consolidation will avoid unnecessary costs or delay, conserve judicial resources, and greatly reduce time and expense of trying the actions separately.

## II.
## CONCLUSION

9. WHEREFORE, PREMISES CONSIDERED, Apex Katy Physicians, L.L.C. respectfully requests this Court to order the unopposed consolidation of Cause Nos 2009-02578 and 2009-03055, and to order the Clerk of the Court to merge the cases into one lawsuit under Cause No. 2009-02578 pending in this Court

Respectfully submitted,

KAISER & CONRAD, L.L.P.

Jeffery B. Kaiser
TBA No. 11079300
1911 Bagby, Suite 200
Houston, Texas 77002
Telephone: 713-571-8000

Facsimile: 713-571-8002
jkaiser@kaiserconrad.com

Attorneys for Plaintiff,
Apex Katy Physicians, L.L.C.

## CERTIFICATE OF CONFERENCE

The undersigned, pursuant to Section 3.3.5(d)(1) and (2), of the Local Rules of the Harris County District Courts, conferred in good faith with opposing counsel regarding the above motion. The responses of the attorneys to Apex Katy Physicians, L.L.C.'s Unopposed Motion to Consolidate are as follows:

1.  **Jerry C. von Sternberger:**  ~~opposes~~/does not oppose

    Attorneys for Defendants,
    Apex Long Term Acute Care-Katy, L.P.,
    Apex Katy Physicians-TMG, L.L.C.,
    and US TMG, L.L.C.

2.  **Robert D. Remy:**  ~~opposes~~/does not oppose

    Attorneys for Defendant,
    Adeel Zaidi.

3.  **John W. Havins:**  ~~opposes~~/does not oppose

    Stephen M. Koch, M.D., Victor Ankoma-Sey, M.D.,
    Terry Scarborough, M.D., Hatem Saqr,
    Waseem Peracha, M.D., Erik B. Wilson, M.D.,
    Syed Hasnain, M.D., and Asif Akhtar, M.D.

4.  **Tom F. Coleman:**  ~~opposes~~/does not oppose

    Attorneys for Defendants,
    Pankaj K. Shah, M.D., Bharati P. Shah,
    and Indus Associates, L.L.C.,

    _____
    Jeffery B. Kaiser

Unofficial Copy Office of Chris Daniel District Clerk

0700607                 5

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct of the foregoing was sent to the parties listed below on the 6th day of April, 2009, as follows:

Jerry C. von Sternberg, Esq.        *Via Facsimile.* 713-856-7268
Heather S. von Sternberg
The von Sternberg Law Firm
820 Gessner, Suite 1720
Houston, Texas 77024

Attorneys for Defendants,
Apex Long Term Acute Care-Katy, L.P.,
Apex Katy Physicians-TMG, L.L.C.,
and US TMG, L.L.C.

Robert D. Remy, Esq.        *Via Facsimile.* 713-465-8018
Robert D. Remy Law Offices
Two Memorial City Plaza
820 Gessner, Suite 1720
Houston, Texas 77024

Attorneys for Defendant,
Adeel Zaidi.

John W. Havins, Esq.        *Via Facsimile.* 713-650-3301
Havins & Associates, P.C.
2211 Norfolk, Suite 525
Houston, Texas 77098

Attorneys for Plaintiffs,
Stephen M. Koch, M.D., Victor Ankoma-Sey, M.D.,
Terry Scarborough, M.D., Hatem Saqr,
Waseem Peracha, M.D., Erik B Wilson, M.D.,
Syed Hasnain, M.D., and Asif Akhtar, M.D.

Tom F. Coleman, Esq.        *Via Facsimile* 713-225-0264
The Law Offices of Tom F. Coleman
817 Westheimer
Houston, Texas 77006

Unofficial Copy Office of Chris Daniel District Clerk

0700607          6

Attorneys for Defendants,
Pankaj K. Shah, M.D., Bharati P. Shah,
and Indus Associates, L.L.C.,

_____
Jeffery B. Kaiser

Unofficial Copy Office of Chris Daniel District Clerk

7

CAUSE NO. 2009-03055

| | | |
|---|---|---|
| STEPHEN M. KOCH, M.D., Individually, | § | IN THE DISTRICT COURT OF |
| VICTOR ANKOMA-SEY, M.D. | § | |
| Individually, TERRY SCARBOROUGH, | § | |
| M.D., Individually, HATEM SAQR, | § | |
| Individually, and each as MEMBERS | § | |
| on behalf of APEX KATY PHYSICIANS, | § | |
| LLC, and ADEEL ZAIDI, CO-MANAGER, | § | HARRIS COUNTY, TEXAS |
| APEX KATY PHYSICIANS, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| PANKAJ K. SHAH, M.D., | § | |
| BHARATI P. SHAH, and | § | |
| INDUS ASSOCIATES, LLC, | § | |
| | § | |
| Defendants. | § | 11TH JUDICIAL DISTRICT |

THIRD AMENDED ORIGINAL PETITION OF PLAINTIFFS,
KOCH, ANKOMA-SEY, SCARBOROUGH, SAQR,
PERACHA, PATEL, WILSON, HASNAIN, AND AKHTAR

TO THE HONORABLE COURT:

Plaintiffs, Stephen M. Koch, M.D., Victor Ankoma-Sey, M.D., Terry Scarborough, M.D., Hatem Saqr, Waseem Peracha, M.D., Nilesh Patel, M.D., Erik B. Wilson, M.D., Syed Hasnain, M.D., and Asif Akhtar, M.D., Individually and each as a member on behalf of Apex Katy Physicians, LLC, file their Third Amended Original Petition, complaining of Defendants, Pankaj K. Shah, M.D., Bharati P. Shah, Indus Associates, LLC, Apex Katy Physicians, LLC, Randeep Suneja, M.D., Upendra N. Vora, and Katy Project, LLC, and would respectfully show the court as follows:

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

1

# I.
## Discovery Control Plan

1.     Plaintiffs intend to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.

# II.
## Parties

2.     Plaintiff, Stephen M. Koch, M.D., is an individual residing in Houston, Harris County, Texas.

3.     Plaintiff, Victor Ankoma-Sey, M.D., is an individual residing in Houston, Harris County, Texas.

4.     Plaintiff, Terry Scarborough, M.D., is an individual residing in Houston, Harris County, Texas.

5.     Plaintiff, Hatem Saqr, is an individual residing in Houston, Harris County, Texas.

6     Plaintiff, Waseem Peracha, M.D., is an individual residing in Houston, Harris County, Texas.

7.     Plaintiff, Nilesh Patel, M.D., is an individual residing in Houston, Harris County, Texas.

8.     Plaintiff, Erik B. Wilson, M.D is an individual residing in Houston, Harris County, Texas.

9.     Plaintiff, Syed Hasnain, M.D, is an individual residing in Houston, Harris County, Texas.

10.     Plaintiff, Asif Akhtar, M.D., is an individual residing in Houston, Harris County, Texas.

2

11.    Defendant, Pankaj K. Shah, is an individual residing in Sugar Land, Fort Bend County, Texas, and has previously been served with citation in this action.

12.    Defendant, Bharati P. Shah, is an individual residing in Sugar Land, Fort Bend County, Texas, and has previously been served with citation in this action.

13.    Defendant, Indus Associates, LLC, is a Texas limited liability company which has its principal place of business in Sugar Land, Fort Bend County, Texas, and has previously been served with citation in this action.

14.    Defendant, Apex Katy Physicians, LLC, is a Texas limited liability company which has its principal place of business in Houston, Harris County, Texas. Defendant, Apex Katy Physicians, LLC, may be served by serving citation, together with a copy of this petition, on its registered agent, P.K. Shah, M.D., at 1601 Main Street, Suite 102, Richmond, Texas 77469. P.K. Shah, M.D. may also be served with citation, together with a copy of this petition, at 17403 Rolling Brook Drive, Sugar Land, Texas 77479.

15.    Randeep N. Suneja is an individual residing in Katy, Harris County, Texas, and has previously been served with citation in this action.

16.    Upendra N. Vora is an individual residing in Dallas, Dallas County, Texas, and has previously been served with citation in this action.

17.    Katy Project, LLC is a Texas limited liability company which has its principal place of business in Dallas, Dallas County, Texas, and has previously been served with citation in this action.

### III.
### Venue

3

18. Pursuant to Section 15.002 of the Texas Civil Practice and Remedies Code, venue is proper in Harris County, Texas because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Harris County.

## IV.
## Background Facts

19. Plaintiffs, Stephen M. Koch, M.D. ("Dr. Koch"), Victor Ankoma-Sey, M.D. ("Dr. Ankoma-Sey"), Terry Scarborough, M.D. ("Dr. Scarborough"), Hatem Saqr ("Saqr"), Waseem Peracha, M.D. ("Dr. Peracha"), Nilesh Patel, M.D. ("Dr. Patel"), Erik B. Wilson, M.D. ("Dr. Wilson") Syed Hasnain, M.D. ("Dr. Hasnain), and Asif Akhtar, M.D. ("Dr. Akhtar") (collectively, the "Plaintiffs") are part of a group of approximately 24 physicians and other investors who invested in Defendant, Apex Katy Physicians, LLC. ("Apex"). Apex was formed for the purpose of purchasing tracts of real estate situated in Katy, Texas and the improvements located thereon (the "Property"), and leasing those improvements to what is now Apex Hospital – Katy. The improvements consist of a 100,000 square foot hospital with 103 patient beds and a professional building. Defendant, Pankaj K. Shah, M.D. ("Shah"), through his ownership and/or control of Defendant, Indus Associates, LLC ("Indus"), is also an investor in Apex. Shah was an Initial Manager of Apex and at all times relevant remained a Manager, and now purports to be a Manager of Apex.

20. In conjunction with their investment in Apex, Plaintiffs, along with substantially all of the other investors, also invested in Apex Long Term Acute Care-Katy, L.P. ("Apex LTAC"). For example, Dr. Koch invested $103,500 in Apex LTAC and guaranteed $75,000 in bank debt, Dr. Ankoma-Sey invested $2,500 and guaranteed

4

$65,000 in bank debt, and Dr. Scarborough invested $500.00 and guaranteed $20,000 in bank debt. Almost every person or entity who invested in Apex is also an investor in Apex LTAC. Defendants are aware of this. For purposes of this petition, the investments made in Apex and Apex LTAC will be referred to collectively as the "Hospital Project".

21. Apex LTAC was formed to start, own and operate Apex Hospital – Katy (the "Hospital"), which is now operating as a long term acute care facility on the Property. The Hospital specializes in providing comprehensive services to medically complex patients, including those requiring intensive care, pulmonary management, and cardiac monitoring. Apex LTAC leases the Property from Apex pursuant to that certain Lease Agreement, dated January 4, 2007 (the "Lease").

22. When Plaintiffs were first approached about making their investments, it was represented, and Plaintiffs relied on the representation, that all investors in Apex would be paying $40,000 cash per investment unit, and that Apex would have a total of 450 units. A form of Binding Letter of Intent establishing the cost at $40,000 per unit was provided to all potential investors, including Plaintiffs. In conformity with their understanding of the investment, Plaintiffs paid $40,000 per unit for their membership interests in Apex, with Dr. Koch paying $240,000 for 6 units, Dr. Ankoma-Sey paying $240,000 for 6 units, Dr. Scarborough paying $40,000 for 1 unit, Mr. Saqr paying $80,000 for 2 units, Dr. Peracha paying $400,000 for 10 units, Dr. Patel paying $40,000 for 1 unit, Dr. Wilson paying $40,000 for 1 unit, Dr. Hasnain paying $80,000 for 2 units, and Dr. Akhtar paying $40,000 for 1 unit. This feature of the investment, that everyone investing in Apex would be paying cash, was a material inducement for Plaintiffs to

5

invest because they rightfully believed that Apex would be purchasing the Property free and clear of debt, which would mean their investments in Apex would not be burdened by debt service.

23. Now, Plaintiffs have learned that certain Apex members failed to pay $40,000 for each Apex unit that those members claim to own and/or control. Specifically, Plaintiffs have learned that the 244 units in Apex that Indus claims to own were not acquired for $40,000 cash per unit. Initially, Shah signed a Binding Letter of Intent to purchase 125 Apex units, and paid $1,500,000, which he represented as being 30% of the $5,000,000 he would be paying. However, as detailed below, Shah, acting through Indus, which is owned and/or controlled by Shah and/or his wife, Defendant, Bharati Shah, eventually parted with only $1,260,000 for 244 Apex units, for an average of $5,163.93 per unit.

24. Plaintiffs have also learned that the 90 Apex units that Katy Project, LLC ("Katy Project") claims to own were not acquired for $40,000 cash per unit. Initially, Defendant, Randeep Suneja ("Suneja") signed a Binding Letter of Intent to purchase 40 Apex units at a cost of $40,000 per unit. Likewise, Defendant, Upendra Vora ("Vora") signed a Binding Letter of Intent to purchase 30 Apex units at a cost of $40,000 per unit. However, acting in concert with Shah, Katy Project, which is owned and/or controlled by Suneja and Vora, who is Shah's relative, parted with only $720,000 for 90 Apex units, for an average of $8,000 per unit. These collective failures to pay $40,000 cash per unit resulted in an $11,380,000 shortfall in the funding of Apex.

25. Without notice to or the consent of Plaintiffs and the other investors who paid in full for their Apex units, Shah, acting in concert with Suneja and Vora,

6

substituted Apex debt for the cash that would have been available if they had paid all cash as did Plaintiffs and all the other investors in Apex. Shah, with assistance from Suneja and Vora, caused Apex to borrow $9,000,000 from MetroBank, N.A. ("MetroBank"). The Loan Agreement, dated March 22, 2007, names Apex as "Borrower," Shah, Suneja and Vora as "Guarantors," and MetroBank as "Lender." In connection with the loan, Shah delivered a Guaranty Agreement for $6,120,000 to MetroBank, Suneja delivered a Guaranty Agreement for $2,040,000, and Vora delivered a Guaranty Agreement for $840,000. Of course, as known and intended by Shah, Suneja, and Vora, none of these guarantees has ever been substantially at risk because the Property is worth far more than the amount borrowed.

26. By causing Apex to borrow the $9,000,000, Shah, a Manager of Apex, violated, and caused Apex to violate, Section 3.05 of the Company Agreement of Apex (the "Company Agreement") because this provision of the Company Agreement prohibits Apex Managers from causing Apex to incur any liability in excess of $500,000 without the **written consent of all Members**. Neither Plaintiffs, nor any of the other investors in Apex, were approached about giving such consent. Moreover, not only did Shah knowingly violate the Company Agreement to further his scheme to control and ultimately hijack the Hospital Project, he burdened all of the other investors' units, including those owned by Plaintiffs, by causing Apex to secure the $9,000,000 loan with a first mortgage lien covering the Property.

27. Shah did not attempt to obtain the required written consent because doing so would have alerted Plaintiffs and the other members to the deal that he was cutting for himself and Suneja and Vora. Having been alerted to this material change in the

7

terms of the investment, Plaintiffs would have either insisted on being afforded the same deal, which would have permitted them to purchase more units, or, more likely, would have insisted that Indus and Katy Project pay $40,000 cash per unit for each and every unit they were purchasing. Shah could not allow this to happen because he knew he needed majority control of Apex in order to perpetrate his hijack scheme, but he was unwilling or unable to pay the $9,760,000 that would be required if Plaintiffs and the other investors learned of his self-dealing. At a certain point during the time units in Apex were being offered to investors, Shah instructed that no further units were to be sold. He did so to ensure that he would be majority owner. Doing so prevented units in Apex from being sold to investors who, unlike Shah, would have paid $40,000 cash per unit.

28. Shah went to great lengths to keep Plaintiffs and the other Apex investors in the dark, including taking at least the following actions to avoid having his scheme detected:

- Taking from Apex's offices not only the certificates for Indus's units, but also the receipts for those certificates so as to avoid the possibility of another Apex member seeing the handwritten reference to Shah's personal guarantee that Shah caused to be placed on the receipt for Certificate No. 24.

- When advised that he would have to forego 6 of the 250 Apex units he "purchased" because the deal was "oversold," Shah represented that he had paid for 250 units and insisted on being paid $240,000 for the 6 units to be surrendered, not $30,980.34, which is the collective amount of cash

8

that he actually paid for the 6 units. This dropped his cash in the deal from $1,500,000 to $1,260,000.

- Shah immediately seized control of Apex's finances and refused to share the financial information, including failing to provide copies of bank loan closing documents to the accountants who were requesting the documents so that Apex's federal income tax return could be prepared.

- After June 2008, Shah stopping providing Apex's accountants with copies of Apex's bank records.

- Shah repeatedly avoided calling meetings of the Apex members to discuss the status of Apex and the Hospital Project.

- When it was requested that he provide the members with Apex's financial information and documents, Shah agreed to do so, but never produced the promised information and documents.

- Shah repeatedly complained about Apex's 2007 federal income tax return because it showed Indus's capital account as $1,260,000, not a much larger amount including his guaranty amount, which would have been income tax fraud. Shah delayed signing Apex's 2007 federal income tax return and did not do so until the last possible day, that being January 5, 2009.

29. During early January, 2009, Shah began implementing the next phase of his scheme to hijack the Hospital Project. On January 10, 2009, Shah, as Manager of Indus, gave notice of a special meeting of the members of Apex to be held on Monday, January 19, 2009, beginning at 9:00 a.m. (the "Notice"). Shah noticed the meeting for a

9

weekday and for 9:00 a.m. because he knew it would be very difficult for the investors who are doctors, which comprise the majority of Apex investors, to attend. As noticed, the meeting was held on January 19, 2009 (the "January 19th Meeting"). The January 19th Meeting was attended by only Shah, Suneja, Vora, and Dr. Kannappan Krishnaswamy ("Dr. Krishnaswamy"), another Apex member, who had been recruited to attend by Shah. During the January 19th Meeting, those attending purportedly authorized efforts to "enforce" the Lease, and the following resolutions were purportedly passed:

(a) Shah was elected to continue serving as a Manager of Apex, which he had done from the inception of Apex;

(b) Dr. Krishnaswamy was elected to serve as a Manager of Apex; and

(c) The law firm of Kaiser & Conrad, LLP was authorized to take action to enforce the Lease.

30. Indus had no authority to notice the January 19th Meeting because it does not own the 244 Apex units it claims to own. As detailed above, those 244 units were acquired by means of Shah's fraud and as a result of Shah's breach of fiduciary duties and breach of the Company Agreement. Consequently, Indus did not acquire viable or enforceable title to the 244 Apex units and therefore had no standing to notice the January 19th Meeting. Therefore, all resolutions passed and actions taken during the January 19th Meeting are of no force or effect, and all actions taken or to be taken after the January 19th Meeting based on those resolutions or at the direction of either Shah or Krishnaswamy, as purported Managers of Apex, are unauthorized and constitute or will constitute ultra vires acts.

31. The January 19th Meeting was not properly noticed because the Notice

10

did not adequately describe the agenda of the meeting. Because the January 19th Meeting was not properly noticed, all resolutions purportedly passed and any other actions purportedly taken during the January 19th Meeting were ineffective, and all actions taken or to be taken after the January 19th Meeting based on those resolutions are unauthorized and constitute or will constitute ultra vires acts.

32.    The January 19th Meeting and all resolutions purportedly passed and actions purportedly taken during the meeting are also ineffective because the Apex units that Indus and Katy Project claim to own, and which were voted during the January 19th Meeting, were acquired by means of fraud and as a result of Shah's breach of fiduciary duties and breach of the Company Agreement. Consequently, Indus did not acquire legal or equitable title to the 244 Apex units it purportedly voted during the January 19th Meeting. Because the votes attributable to the 244 units are invalid and those 244 units represent approximately 54% of the Apex membership units, no resolution, action, or other measure taken during the January 19th Meeting received a majority of the Apex members' votes as required by Article 3.08 of the Company Agreement.

33.    On Monday, February 1, 2009, only 13 days after being elected, Dr. Krishnaswamy resigned as a Manager of Apex. Dr. Krishnaswamy did so after learning of Shah's fraud and deceit, and his plan to evict the Hospital. Article 3.01 of the Company Agreement requires that Apex be managed at all times by at least 2 Managers. Therefore, because the required number of Managers does not exist, any actions that Apex has taken or takes at the direction of Shah from February 1, 2009 onward are void and of no effect.

11

34. Shah, purported Manager of Apex since the inception of Apex and purportedly re-elected at the January 19th Meeting, caused Apex to file a lawsuit to evict Apex LTAC from the Property. That lawsuit is numbered and styled Cause No. 09-CV31-04395; *Apex Katy Physicians, L.L.C. v. Apex Long Term Acute Care—Katy, L.P.*, and is pending in the Justice of the Peace Court, Precinct 3, Fort Bend County, Texas (the "Eviction Lawsuit"). Shah is aware that Plaintiffs do not support the decision to pursue eviction against Apex LTAC. More importantly, this action has not been properly authorized by a legally constituted Board of Managers or by the Apex members because the votes attributable to the 244 units that Indus claims to own are invalid because, as explained above, Indus did not rightfully acquire title to those units.

35. Upon information and belief, Shah is causing Apex to pursue the eviction proceeding because he is under financial pressure from MetroBank and Medistar. In fact, Medistar has sued Shah, claiming he owes millions of dollars to Medistar as result of the side agreement that Shah entered into without Plaintiffs' knowledge. That lawsuit is numbered and styled No. 2008-73728; *Medistar Corporation v. P.K. Shah*, and is pending in the 165th District Court of Harris County, Texas.

## V.
## Causes Of Action

### A. Breach of Fiduciary Duty

36. Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 19 through 35 above.

37. Shah, as a Manager of Apex, owed fiduciary duties to Plaintiffs. Those duties include the duty of full disclosure, the duty of loyalty and utmost good faith, the

12

F:\Cases\JWH\KOCH.973\SHAH.002\Pleadings\3RDPOP022309.doc

duty of candor, the duty to refrain from self-dealing, and the duty to act with integrity of the strictest kind.

38.     Shah has breached one or more of the fiduciary duties he owed to Plaintiffs and those breaches are a proximate cause of the actual damages Plaintiffs have suffered. The amount of actual damages that Plaintiffs have suffered is within the jurisdictional limits of this court.

39.     As an alternative to money damages, an appropriate remedy for Shah's breach of fiduciary duty, and one that Plaintiffs seek, is forfeiture of the Apex units which Shah purports to own. This equitable relief is appropriate under the circumstances.

40.     Shah's breach of the fiduciary duties was intentional because he intended to gain an additional, unwarranted benefit for himself at the expense of Plaintiffs and the other investors in Apex. Plaintiffs therefore are entitled to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a). Plaintiffs seek exemplary damages in an amount that in the opinion of the jury is necessary to punish Shah and deter similar conduct in the future by him and others.

B.     Fraud

41.     Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 19 through 40 above.

42.     By concealing or failing to disclose to Plaintiffs that he, Suneja, and Vora were not purchasing units in Apex on the same terms as Plaintiffs, Shah defrauded Plaintiffs. Defendant, Bharati P. Shah, was aware of Shah's fraudulent conduct,

13

assisted and supported Shah's fraud, and benefited from that fraud. The information that Shah withheld or failed to disclose materially impacted the financial structure of Plaintiffs' investments. Shah knew that Plaintiffs were unaware of his self-dealing actions and did not have an equal opportunity to discover the truth. In fact, Shah took actions intended to prevent Plaintiffs from discovering his self-dealing. Plaintiffs, unaware of Shah's self-dealing, relied on Shah's deliberate silence as indicating that Apex's financial structure was as had been represented to them when they were making their investment decision. Shah intended for Plaintiffs to make this assumption.

43. Shah's fraud is a proximate cause of the actual damages that Plaintiffs have suffered. Plaintiffs' actual damages are within the jurisdictional limits of this court.

44. The damages that Plaintiffs have suffered resulted from Shah's actual fraud or malice, which entitles Plaintiffs to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a). Plaintiffs seek exemplary damages in an amount that in the opinion of the jury is necessary to punish Shah and deter similar conduct in the future by him and others.

## C. Conspiracy

45. Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 19 through 44 above.

46. Suneja and Vora conspired with Shah and thereby participated in his fraud and breach of fiduciary duty. Suneja, Vora, and Shah knew the agreed acts would result in harm to Plaintiffs.

47. This conspiracy is a proximate cause of the actual damages that Plaintiffs

14

have suffered. Plaintiffs' actual damages are within the jurisdictional limits of this court.

48.     As an alternative to money damages, an appropriate remedy for Shah, Suneja's, and Vora's conspiracy, and one that Plaintiffs seek, is forfeiture of the Apex units which Shah, Suneja, and Vora purport to own. This equitable relief is appropriate under the circumstances.

49.     The damages Plaintiffs have suffered as a result of the conspiracy perpetrated by Shah, Suneja, and Vora resulted from Shah's, Suneja's and Vora's actual fraud or malice, which entitles Plaintiffs to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a). Plaintiffs seek exemplary damages in an amount that in the opinion of the jury is necessary to punish Shah and deter similar conduct in the future by him and others.

**D.     Breach of Contract**

50.     Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 19 through 49 above.

51.     Defendants have breached the Company Agreement and are continuing to breach the Company Contract by taking actions on behalf of Apex that are unauthorized and in direct contravention of the Company Agreement.

52.     Defendants' breach of the Company Agreement is a proximate cause of the actual damages that Plaintiffs have suffered. Plaintiffs' actual damages are within the jurisdictional limits of this court.

53.     Plaintiffs have fully performed the obligations required of them by the Company Agreement and all conditions precedent to Plaintiffs' claim for relief have

15

been performed or have occurred.

54. As a direct result of the breaches, Plaintiffs have been required to employ John W. Havins and the law firm of Havins & Associates, PC as their attorneys, and have agreed to pay the attorneys a reasonable attorney's fee for their services rendered and to be rendered in this cause. Plaintiffs will present their claims to Defendants in accordance with Section 38.001 *et seq.* of the Texas Civil Practice and Remedies Code. Pursuant to Section 38.001 *et seq.* of the Texas Civil Practice and Remedies Code, Plaintiffs are entitled to and do request an award of reasonable and necessary attorney's fees for services rendered and to be rendered in this case, which include the following:

(a) Preparation and trial of this lawsuit; and

(b) Post-trial, pre-appeal legal services; and

(c) An appeal to the court of appeals; and

(d) Making or responding to an petition for review to the Supreme Court of Texas; and

(e) An appeal to the Supreme Court of Texas in the event petition for review is granted; and

(f) Postjudgment discovery and collection in the event execution on the judgment is necessary.

**E. Request For Declaratory Relief**

55. Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 19 through 54 above.

56. Pursuant to the Uniform Declaratory Judgments Act, Chapter 37 of the

16

Civil Practice and Remedies Code of Texas, Plaintiffs seeks a declaration that neither Shah, Bharati P. Shah, nor Indus has equitable or legal title to the 244 Apex units they purport to own and/or control. Plaintiffs also seek a declaration that neither Suneja, Vora, nor Katy Project has equitable or legal title to the 90 Apex units they purport to own and/or control.

57. Plaintiffs are entitled to recover reasonable and necessary attorney's fees that are equitable and just under Texas Civil Practice & Remedies Code section 37.009 because this is a suit for declaratory relief. Plaintiffs request an award of reasonable and necessary attorney's fees for services rendered and to be rendered in this case, which include the following:

(a) Preparation and trial of this lawsuit; and

(b) Post-trial, pre-appeal legal services; and

(c) An appeal to the court of appeals; and

(d) Making or responding to an petition for review to the Supreme Court of Texas; and

(e) An appeal to the Supreme Court of Texas in the event petition for review is granted; and

(f) Postjudgment discovery and collection in the event execution on the judgment is necessary.

58. Plaintiffs are entitled to recover, and do request, awards of pre-judgment and post-judgment interest at the highest rates permitted by law.

WHEREFORE, Plaintiffs, Stephen M. Koch, M.D., Victor Ankoma-Sey, M.D., Terry Scarborough, M.D., Hatem Saqr, Waseem Peracha, M.D., Nilesh Patel, M.D., Erik B. Wilson, M.D., Syed Hasnain, M.D., and Asif Akhtar, M.D., respectfully request

17

that Defendants, Pankaj K. Shah, Bharati P. Shah, Indus Associates, LLC, Apex Katy Physicians, LLC, Randeep Suneja, M.D., Upendra N. Vora, and Katy Project, LLC be cited to appear and answer and, on final trial, the court declare that (i) neither Shah, Bharati P. Shah, nor Indus has equitable or legal title to the 244 Apex units they purport to own and/or control, and (ii) neither Suneja, Vora, nor Katy Project has equitable or legal title to the 90 Apex units they purport to own and/or control. In addition, Plaintiffs ask for judgment, jointly and severally, against Defendants for:

A.     Actual damages;

B.     Exemplary damages;

C     Reasonable attorney's fees;

D.     Costs of suit;

E.     Prejudgment and postjudgment interest at the highest rates permitted by law; and

F.     All other relief, in law and in equity, to which Plaintiffs may be entitled.

Respectfully submitted,

HAVINS & ASSOCIATES, PC

By: _____

John W. Havins
State Bar No. 09239800
Jeffery J. Davis
State Bar No. 24028276
2211 Norfolk, Suite 525
Houston, Texas 77098
T: (713) 650-3600
F: (713) 650-3301

ATTORNEYS FOR PLAINTIFFS

18

F:\Cases\JWH\KOCH.973\SHAH.002\Pleadings\3RDPOP022309.doc

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing document was served on the attorneys listed below in the manner indicated on February 24, 2009.

**VIA FAX (713) 571-8002**
Jeffery B. Kaiser
Kaiser & Conrad, LLP
1911 Bagby
Second Floor
Houston TX 77002

**VIA FAX (713) 523-2804**
Thomas F. Coleman
Law Office of Tom F. Coleman
817 Westheimer
First Floor
Houston TX 77006

**VIA FAX (713) 465-8018**
Robert Remy
Two Memorial City Plaza
820 Gessner Suite 1720
Houston TX 77024

John W. Havins

Unofficial Copy Office of Chris Daniel District Clerk

F:\Cases\JWH\KOCH.973\SHAH.002\Pleadings\3RDPOP022309.doc

**CAUSE NO. 2009-03055**

| | | |
|---|---|---|
| STEPHEN M. KOCH, M.D., Individually, | § | IN THE DISTRICT COURT OF |
| VICTOR ANKOMA-SEY, M.D. | § | |
| Individually, TERRY SCARBOROUGH, | § | |
| M.D., Individually, HATEM SAQR, | § | |
| Individually, and each as MEMBERS | § | |
| on behalf of APEX KATY PHYSICIANS, | § | |
| LLC, and ADEEL ZAIDI, CO-MANAGER, | § | HARRIS COUNTY, TEXAS |
| APEX KATY PHYSICIANS, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| PANKAJ K. SHAH, M.D., | § | |
| BHARATI P. SHAH, and | § | |
| INDUS ASSOCIATES, LLC, | § | |
| | § | |
| Defendants. | § | 11TH JUDICIAL DISTRICT |

## SECOND AMENDED ORIGINAL PETITION OF PLAINTIFFS, KOCH, ANKOMA-SEY, SCARBOROUGH, SAQR, PERACHA, PATEL, WILSON, HASNAIN, AND AKHTAR

TO THE HONORABLE COURT:

Plaintiffs, Stephen M. Koch, M.D., Victor Ankoma-Sey, M.D., Terry Scarborough, M.D., Hatem Saqr, Waseem Peracha, M.D., Nilesh Patel, M.D., Erik B. Wilson, M.D., Syed Hasnain, M.D., and Asif Akhtar, M.D., Individually and each as a member on behalf of Apex Katy Physicians, LLC, file their Second Amended Original Petition, complaining of Defendants, Pankaj K. Shah, M.D., Bharati P. Shah, Indus Associates, LLC, Apex Katy Physicians, LLC, Randeep Suneja, M.D., Upendra N. Vora, and Katy Project, LLC, and would respectfully show the court as follows:

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

# I.
## Discovery Control Plan

1. Plaintiffs intend to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.

# II.
## Parties

2. Plaintiff, Stephen M. Koch, M.D., is an individual residing in Houston, Harris County, Texas.

3. Plaintiff, Victor Ankoma-Sey, M.D., is an individual residing in Houston, Harris County, Texas.

4. Plaintiff, Terry Scarborough, M.D., is an individual residing in Houston, Harris County, Texas.

5. Plaintiff, Hatem Saqr, is an individual residing in Houston, Harris County, Texas.

6 Plaintiff, Waseem Peracha, M.D., is an individual residing in Houston, Harris County, Texas.

7. Plaintiff, Nilesh Patel, M.D., is an individual residing in Houston, Harris County, Texas.

8. Plaintiff, Erik B. Wilson, M.D is an individual residing in Houston, Harris County, Texas.

9. Plaintiff, Syed Hasnain, M.D, is an individual residing in Houston, Harris County, Texas.

10. Plaintiff, Asif Akhtar, M.D., is an individual residing in Houston, Harris County, Texas.

11. Defendant, Pankaj K. Shah, is an individual residing in Sugar Land, Fort Bend County, Texas, and has previously been served with citation in this action.

12. Defendant, Bharati P. Shah, is an individual residing in Sugar Land, Fort Bend County, Texas, and has previously been served with citation in this action.

13. Defendant, Indus Associates, LLC, is a Texas limited liability company which has its principal place of business in Sugar Land, Fort Bend County, Texas, and has previously been served with citation in this action.

14. Defendant, Apex Katy Physicians, LLC, is a Texas limited liability company which has its principal place of business in Houston, Harris County, Texas. Defendant, Apex Katy Physicians, LLC, may be served by serving citation, together with a copy of this petition, on its registered agent, P.K. Shah, M.D., at 1601 Main Street, Suite 102, Richmond, Texas 77469. P.K. Shah, M.D. may also be served with citation, together with a copy of this petition, at 17403 Rolling Brook Drive, Sugar Land, Texas 77479.

15. Randeep N. Suneja is an individual residing in Katy, Harris County, Texas, and may be served with citation, along with a copy of this petition, at 2606 Sara Ridge Lane, Katy, Texas 77450.

16. Upendra N. Vora is an individual residing in Dallas, Dallas County, Texas, and may be served with citation, along with a copy of this petition, at 18333 Preston Road, Suite 545, Dallas, Texas 75252.

17. Katy Project, LLC is a Texas limited liability company which has its principal place of business in Dallas, Dallas County, Texas. Defendant, Katy Project, LLC, may be served by serving citation, together with a copy of this petition, on its

registered agent, Upendra N. Vora, at 18333 Preston Road, Suite 545, Dallas, Texas 75252.

## III.
## Venue

18.     Pursuant to Section 15.002 of the Texas Civil Practice and Remedies Code, venue is proper in Harris County, Texas because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Harris County.

## IV.
## Background Facts

19.     Plaintiffs, Stephen M. Koch, M.D. ("Dr. Koch"), Victor Ankoma-Sey, M.D. ("Dr. Ankoma-Sey"), Terry Scarborough, M.D. ("Dr. Scarborough"), Hatem Saqr ("Saqr"), Waseem Peracha, M.D. ("Dr. Peracha"), Nilesh Patel, M.D. ("Dr. Patel"), Erik B. Wilson, M.D. ("Dr. Wilson") Syed Hasnain, M.D. ("Dr. Hasnain), and Asif Akhtar, M.D. ("Dr. Akhtar") (collectively, the "Plaintiffs") are part of a group of approximately 24 physicians and other investors who invested in Defendant, Apex Katy Physicians, LLC. ("Apex"). Apex was formed for the purpose of purchasing tracts of real estate situated in Katy, Texas and the improvements located thereon (the "Property"), and leasing those improvements to what is now Apex Hospital – Katy. The improvements consist of a 100,000 square foot hospital with 103 patient beds and a professional building. Defendant, Pankaj K. Shah, M.D. ("Shah"), through his ownership and/or control of Defendant, Indus Associates, LLC ("Indus"), is also an investor in Apex. Shah was an Initial Manager of Apex and at all times relevant remained a Manager, and now purports to be a Manager of Apex.

20.     In conjunction with their investment in Apex, Plaintiffs, along with

substantially all of the other investors, also invested in Apex Long Term Acute Care-Katy, L.P. ("Apex LTAC"). For example, Dr. Koch invested $103,500 in Apex LTAC and guaranteed $75,000 in bank debt, Dr. Ankoma-Sey invested $2,500 and guaranteed $65,000 in bank debt, and Dr. Scarborough invested $500.00 and guaranteed $20,000 in bank debt. Almost every person or entity who invested in Apex is also an investor in Apex LTAC. Defendants are aware of this. For purposes of this petition, the investments made in Apex and Apex LTAC will be referred to collectively as the "Hospital Project".

21. Apex LTAC was formed to start, own and operate Apex Hospital – Katy (the "Hospital"), which is now operating as a long term acute care facility on the Property. The Hospital specializes in providing comprehensive services to medically complex patients, including those requiring intensive care, pulmonary management, and cardiac monitoring. Apex LTAC leases the Property from Apex pursuant to that certain Lease Agreement, dated January 4, 2007 (the "Lease").

22. Prior to Apex acquiring the Property, it was owned by Medistar Corporation ("Medistar"). During the initial conversations regarding the Property being purchased as part of the overall investment plan, Plaintiffs were told that the Property could be purchased for approximately $13,000,000. In fact, on or about January 2, 2007, Apex entered into that certain Agreement for Purchase and Sale of Real Property and Improvements with Medistar, which specifies a purchase price of $13,500,000 for the Property (the "Purchase Agreement").

23. When Plaintiffs were first approached about making their investments, it was represented, and Plaintiffs relied on the representation, that all investors in Apex

would be paying $40,000 cash per investment unit, and that Apex would have a total of 450 units. A form of Binding Letter of Intent establishing the cost at $40,000 per unit was provided to all potential investors, including Plaintiffs. In conformity with their understanding of the investment, Plaintiffs paid $40,000 per unit for their membership interests in Apex, with Dr. Koch paying $240,000 for 6 units, Dr. Ankoma-Sey paying $240,000 for 6 units, Dr. Scarborough paying $40,000 for 1 unit, Mr. Saqr paying $80,000 for 2 units, Dr. Peracha paying $400,000 for 10 units, Dr. Patel paying $40,000 for 1 unit, Dr. Wilson paying $40,000 for 1 unit, Dr. Hasnain paying $80,000 for 2 units, and Dr. Akhtar paying $40,000 for 1 unit. This feature of the investment, that everyone investing in Apex would be paying cash, was a material inducement for Plaintiffs to invest because they rightfully believed that Apex would be purchasing the Property free and clear of debt, which would mean their investments in Apex would not be burdened by debt service.

24. Only recently have Plaintiffs discovered that their investment in the Hospital Project was not as it was represented to them. First, Plaintiffs have learned that the purchase price of the Property may have been $17,500,000, not the $13,500,000 set forth in the Purchase Agreement. Without Plaintiffs' knowledge, Shah entered into a side agreement with Medistar that provided for $4,000,000 of seller financing. As described below, that side agreement is now the subject of a pending lawsuit.

25. Also, Plaintiffs have learned that the 244 units in Apex that Indus claims to own were not acquired for $40,000 cash per unit. Initially, Shah signed a Binding Letter of Intent to purchase 125 Apex units, and paid $1,500,000, which he represented as

being 30% of the $5,000,000 he would be paying. However, as detailed below, Shah, acting through Indus, which is owned and/or controlled by Shah and/or Defendant, Bharati Shah, eventually parted with only $1,260,000 for 244 Apex units, for an average of $5,163.93 per unit.

26.     Plaintiffs have also learned that the 90 units in Apex that Katy Project, LLC ("Katy Project") claims to own were not acquired for $40,000 cash per unit. Initially, Defendant, Randeep Suneja ("Suneja") signed a Binding Letter of Intent to purchase 40 Apex units at a cost of $40,000 per unit. Likewise, Defendant, Upendra Vora ("Vora") signed a Binding Letter of Intent to purchase 30 Apex units at a cost of $40,000 per unit. However, acting in concert with Shah, Katy Project, which is owned and/or controlled by Suneja and Vora, who is Shah's relative, parted with only $720,000 for 90 Apex units, for an average of $8,000 per unit. These collective failures to pay $40,000 cash per unit resulted in an $11,380,000 shortfall in the funding of Apex.

27.     Without notice to or the consent of Plaintiffs and the other investors who paid in full for their Apex units, Shah, acting in concert with Suneja and Vora, substituted Apex debt for the cash that would have been available if they had paid all cash as did Plaintiffs and all the other investors in Apex. Shah, with assistance from Suneja and Vora, caused Apex to borrow $9,000,000 from MetroBank, N.A. ("MetroBank"). The Loan Agreement, dated March 22, 2007, names Apex as "Borrower," Shah, Suneja and Vora as "Guarantors," and MetroBank as "Lender." In connection with the loan, Shah delivered a Guaranty Agreement for $6,120,000 to MetroBank, Suneja delivered a Guaranty Agreement for $2,040,000, and Vora delivered a Guaranty Agreement for $840,000. Of course, as known and intended by

Shah, Suneja, and Vora, none of these guarantees has ever been substantially at risk because the Property is worth far more than the amount borrowed.

28. By causing Apex to borrow the $9,000,000, Shah, a Manager of Apex, violated, and caused Apex to violate, Section 3.05 of the Company Agreement of Apex (the "Company Agreement") because this provision of the Company Agreement prohibits Apex Managers from causing Apex to incur any liability in excess of $500,000 without the **written consent of all Members**. Neither Plaintiffs, nor any of the other investors in Apex, were approached about giving such consent. Moreover, not only did Shah knowingly violate the Company Agreement to further his scheme to control and ultimately hijack the Hospital Project, he burdened all of the other investors' units, including those owned by Plaintiffs, by causing Apex to secure the $9,000,000 loan with a first mortgage lien covering the Property.

29. Shah did not attempt to obtain the required written consent because doing so would have alerted Plaintiffs and the other members to the deal that he was cutting for himself and Suneja and Vora. Having been alerted to this material change in the terms of the investment, Plaintiffs would have either insisted on being afforded the same deal, which would have permitted them to purchase more units, or, more likely, would have insisted that Indus and Katy Project pay $40,000 cash per unit for each and every unit they were purchasing. Shah could not allow this to happen because he knew he needed majority control of Apex in order to perpetrate his hijack scheme, but he was unwilling or unable to pay the $9,760,000 that would be required if Plaintiffs and the other investors learned of his self-dealing. At a certain point during the time units in Apex were being offered to investors, Shah instructed that no further units were to be

sold. He did so to ensure that he would be majority owner. Doing so prevented units in Apex from being sold to investors who, unlike Shah, would have paid $40,000 cash per unit.

30. Shah went to great lengths to keep Plaintiffs and the other Apex investors in the dark, including taking at least the following actions to avoid having his scheme detected:

- Taking from Apex's offices not only the certificates for Indus's units, but also the receipts for those certificates so as to avoid the possibility of another Apex member seeing the handwritten reference to Shah's personal guarantee that Shah caused to be placed on the receipt for Certificate No. 24.

- When advised that he would have to forego 6 of the 250 Apex units he "purchased" because the deal was "oversold," Shah represented that he had paid for 250 units and insisted on being paid $240,000 for the 6 units to be surrendered, not $30,980.34, which is the collective amount of cash that he actually paid for the 6 units. This dropped his cash in the deal from $1,500,000 to $1,260,000.

- Shah immediately seized control of Apex's finances and refused to share the financial information, including failing to provide copies of bank loan closing documents to the accountants who were requesting the documents so that Apex's federal income tax return could be prepared.

- After June 2008, Shah stopping providing Apex's accountants with copies of Apex's bank records.

Unofficial Copy Office of Chris Daniel District Clerk

- Shah repeatedly avoided calling meetings of the Apex members to discuss the status of Apex and the Hospital Project.

- When it was requested that he provide the members with Apex's financial information and documents, Shah agreed to do so, but never produced the promised information and documents.

- Shah repeatedly complained about Apex's 2007 federal income tax return because it showed Indus's capital account as $1,260,000, not a much larger amount including his guaranty amount, which would have been income tax fraud. Shah delayed signing Apex's 2007 federal income tax return and did not do so until the last possible day, that being January 5, 2009.

31. During early January, 2009, Shah began implementing the next phase of his scheme to hijack the Hospital Project. On January 10, 2009, Shah, as Manager of Indus, gave notice of a special meeting of the members of Apex to be held on Monday, January 19, 2009, beginning at 9:00 a.m. (the "Notice"). Shah noticed the meeting for a weekday and for 9:00 a.m. because he knew it would be very difficult for the investors who are doctors, which comprise the majority of Apex investors, to attend. As noticed, the meeting was held on January 19, 2009 (the "January 19th Meeting"). The January 19th Meeting was attended by only Shah, Suneja, Vora, and Kannappan Krishnaswamy ("Krishnaswamy"), another Apex member, who had been recruited to attend by Shah. During the January 19th Meeting, those attending purportedly authorized efforts to "enforce" the Lease, and the following resolutions were purportedly passed:

(a)    Shah was elected to continue serving as a Manager of Apex, which he had done from the inception of Apex;

(b)     Krishnaswamy was elected to serve as a Manager of Apex; and

(c)     The law firm of Kaiser & Conrad, LLP was authorized to take action to enforce the Lease.

32.     Indus had no authority to notice the January 19th Meeting because it does not own the 244 Apex units it claims to own.  As detailed above, those 244 units were acquired by means of Shah's fraud and as a result of Shah's breach of fiduciary duties and breach of the Company Agreement.  Consequently, Indus did not acquire viable or enforceable title to the 244 Apex units and therefore had no standing to notice the January 19th Meeting.  Therefore, all resolutions passed and actions taken during the January 19th Meeting are of no force or effect, and all actions taken or to be taken after the January 19th Meeting based on those resolutions or at the direction of either Shah or Krishnaswamy, as purported Managers of Apex, are unauthorized and constitute or will constitute ultra vires acts.

33.     The January 19th Meeting was not properly noticed because the Notice did not adequately describe the agenda of the meeting.  Because the January 19th Meeting was not properly noticed, all resolutions purportedly passed and any other actions purportedly taken during the January 19th Meeting were ineffective, and all actions taken or to be taken after the January 19th Meeting based on those resolutions are unauthorized and constitute or will constitute ultra vires acts.

34.     The January 19th Meeting and all resolutions purportedly passed and actions purportedly taken during the meeting are also ineffective because the Apex units that Indus and Katy Project claim to own, and which were voted during the January 19th Meeting, were acquired by means of fraud and as a result of Shah's

breach of fiduciary duties and breach of the Company Agreement. Consequently, Indus did not acquire legal or equitable title to the 244 Apex units it purportedly voted during the January 19th Meeting. Because the votes attributable to the 244 units are invalid and those 244 units represent approximately 54% of the Apex membership units, no resolution, action, or other measure taken during the January 19th Meeting received a majority of the Apex members' votes as required by Article 3.08 of the Company Agreement.

35. On Monday, February 1, 2009, only 13 days after being elected, Krishnaswamy resigned as a Manager of Apex. Krishnaswamy did so after learning of Shah's fraud and deceit, and his plan to evict the Hospital. Article 3.01 of the Company Agreement requires that Apex be managed at all times by at least 2 Managers. Therefore, because the required number of Managers does not exist, any actions that Apex has taken or takes at the direction of Shah from February 1, 2009 onward are void and of no effect.

36. Shah, purported Manager of Apex since the inception of Apex and purportedly re-elected at the January 19th Meeting, caused Apex to file a lawsuit to evict Apex LTAC from the Property. That lawsuit is numbered and styled Cause No. 09-CV31-04395; *Apex Katy Physicians, L.L.C. v. Apex Long Term Acute Care—Katy, L.P.*, and is pending in the Justice of the Peace Court, Precinct 3, Fort Bend County, Texas (the "Eviction Lawsuit"). Shah is aware that Plaintiffs do not support the decision to pursue eviction against Apex LTAC. More importantly, this action has not been properly authorized by a legally constituted Board of Managers or by the Apex members because the votes attributable to the 244 units that Indus claims to own are

invalid because, as explained above, Indus did not rightfully acquire title to those units.

37.     Upon information and belief, Shah is causing Apex to pursue the eviction proceeding because he is under financial pressure from MetroBank and Medistar. In fact, Medistar has sued Shah, claiming he owes millions of dollars to Medistar as result of the side agreement that Shah entered into without Plaintiffs' knowledge. That lawsuit is numbered and styled No. 2008-73728; *Medistar Corporation v. P.K. Shah*, and is pending in the 165th District Court of Harris County, Texas.

## V.
## Causes Of Action

### A.     Breach of Fiduciary Duty

38.     Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 19 through 37 above.

39.     Shah, as a Manager of Apex, owed fiduciary duties to Plaintiffs. Those duties include the duty of full disclosure, the duty of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing, and the duty to act with integrity of the strictest kind.

40.     Shah has breached one or more of the fiduciary duties he owed to Plaintiffs and those breaches are a proximate cause of the actual damages Plaintiffs have suffered. The amount of actual damages that Plaintiffs have suffered is within the jurisdictional limits of this court.

41.     As an alternative to money damages, an appropriate remedy for Shah's breach of fiduciary duty, and one that Plaintiffs seek, is forfeiture of the Apex units which Shah purports to own. This equitable relief is appropriate under the circumstances.

42. Shah's breach of the fiduciary duties was intentional because he intended to gain an additional, unwarranted benefit for himself at the expense of Plaintiffs and the other investors in Apex. Plaintiffs therefore are entitled to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a). Plaintiffs seek exemplary damages in an amount that in the opinion of the jury is necessary to punish Shah and deter similar conduct in the future by him and others.

B. Fraud

43. Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 19 through 42 above.

44. By concealing or failing to disclose to Plaintiffs that he, Suneja, and Vora were not purchasing units in Apex on the same terms as Plaintiffs, Shah defrauded Plaintiffs. Defendant, Bharati P. Shah, was aware of Shah's fraudulent conduct, assisted and supported Shah's fraud, and benefited from that fraud. The information that Shah withheld or failed to disclose materially impacted the financial structure of Plaintiffs' investments. Shah knew that Plaintiffs were unaware of his self-dealing actions and did not have an equal opportunity to discover the truth. In fact, Shah took actions intended to prevent Plaintiffs from discovering his self-dealing. Plaintiffs, unaware of Shah's self-dealing, relied on Shah's deliberate silence as indicating that Apex's financial structure was as had been represented to them when they were making their investment decision. Shah intended for Plaintiffs to make this assumption.

45. Shah's fraud is a proximate cause of the actual damages that Plaintiffs have suffered. Plaintiffs' actual damages are within the jurisdictional limits of this court.

46.     The damages that Plaintiffs have suffered resulted from Shah's actual fraud or malice, which entitles Plaintiffs to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a). Plaintiffs seek exemplary damages in an amount that in the opinion of the jury is necessary to punish Shah and deter similar conduct in the future by him and others.

**C.     Conspiracy**

47.     Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 19 through 46 above.

48.     Suneja and Vora conspired with Shah and thereby participated in his fraud and breach of fiduciary duty. Suneja, Vora, and Shah knew the agreed acts would result in harm to Plaintiffs.

49.     This conspiracy is a proximate cause of the actual damages that Plaintiffs have suffered. Plaintiffs' actual damages are within the jurisdictional limits of this court.

50.     As an alternative to money damages, an appropriate remedy for Shah, Suneja's, and Vora's conspiracy, and one that Plaintiffs seek, is forfeiture of the Apex units which Shah, Suneja, and Vora purport to own. This equitable relief is appropriate under the circumstances.

51.     The damages Plaintiffs have suffered as a result of the conspiracy perpetrated by Shah, Suneja, and Vora resulted from Shah's, Suneja's and Vora's actual fraud or malice, which entitles Plaintiffs to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a). Plaintiffs seek exemplary damages in an

amount that in the opinion of the jury is necessary to punish Shah and deter similar conduct in the future by him and others.

**D.    Breach of Contract**

52.    Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 19 through 51 above.

53.    Defendants have breached the Company Agreement and are continuing to breach the Company Contract by taking actions on behalf of Apex that are unauthorized and in direct contravention of the Company Agreement.

54.    Defendants' breach of the Company Agreement is a proximate cause of the actual damages that Plaintiffs have suffered. Plaintiffs' actual damages are within the jurisdictional limits of this court.

55.    Plaintiffs have fully performed the obligations required of them by the Company Agreement and all conditions precedent to Plaintiffs' claim for relief have been performed or have occurred.

56.    As a direct result of the breaches, Plaintiffs have been required to employ John W. Havins and the law firm of Havins & Associates, PC as their attorneys, and have agreed to pay the attorneys a reasonable attorney's fee for their services rendered and to be rendered in this cause. Plaintiffs will present their claims to Defendants in accordance with Section 38.001 *et seq.* of the Texas Civil Practice and Remedies Code. Pursuant to Section 38.001 *et seq.* of the Texas Civil Practice and Remedies Code, Plaintiffs are entitled to and do request an award of reasonable and necessary attorney's fees for services rendered and to be rendered in this case, which include the

following:

(a)     Preparation and trial of this lawsuit; and

(b)     Post-trial, pre-appeal legal services; and

(c)     An appeal to the court of appeals; and

(d)     Making or responding to an petition for review to the Supreme Court of Texas; and

(e)     An appeal to the Supreme Court of Texas in the event petition for review is granted; and

(f)     Postjudgment discovery and collection in the event execution on the judgment is necessary.

## E.     Request For Declaratory Relief

57.     Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 19 through 56 above.

58.     Pursuant to the Uniform Declaratory Judgments Act, Chapter 37 of the Civil Practice and Remedies Code of Texas, Plaintiffs seeks a declaration that neither Shah, Bharati P. Shah, nor Indus has equitable or legal title to the 244 Apex units they purport to own and/or control.  Plaintiffs also seek a declaration that neither Suneja, Vora, nor Katy Project has equitable or legal title to the 90 Apex units they purport to own and/or control.

59.     Plaintiffs are entitled to recover reasonable and necessary attorney's fees that are equitable and just under Texas Civil Practice & Remedies Code section 37.009 because this is a suit for declaratory relief.  Plaintiffs request an award of reasonable and necessary attorney's fees for services rendered and to be rendered in this case, which include the following:

(a) Preparation and trial of this lawsuit; and

(b) Post-trial, pre-appeal legal services; and

(c) An appeal to the court of appeals; and

(d) Making or responding to an petition for review to the Supreme Court of Texas; and

(e) An appeal to the Supreme Court of Texas in the event petition for review is granted; and

(f) Postjudgment discovery and collection in the event execution on the judgment is necessary.

60. Plaintiffs are entitled to recover, and do request, awards of pre-judgment and post-judgment interest at the highest rates permitted by law.

WHEREFORE, Plaintiffs, Stephen M. Koch, M.D., Victor Ankoma-Sey, M.D., Terry Scarborough, M.D., Hatem Saqr, Waseem Peracha, M.D., Nilesh Patel, M.D., Erik B. Wilson, M.D., Syed Hasnain, M.D., and Asif Akhtar, M.D., respectfully request that Defendants, Pankaj K. Shah, Bharati P. Shah, Indus Associates, LLC, Apex Katy Physicians, LLC, Randeep Suneja, M.D., Upendra N. Vora, and Katy Project, LLC be cited to appear and answer and, on final trial, the court declare that (i) neither Shah, Bharati P. Shah, nor Indus has equitable or legal title to the 244 Apex units they purport to own and/or control, and (ii) neither Suneja, Vora, nor Katy Project has equitable or legal title to the 90 Apex units they purport to own and/or control. In addition, Plaintiffs ask for judgment, jointly and severally, against Defendants for:

A. Actual damages;

B. Exemplary damages;

C Reasonable attorney's fees;

D. Costs of suit;

Unofficial Copy Official Copy of Chris Daniel District Clerk

E. Prejudgment and postjudgment interest at the highest rates permitted by law; and

F. All other relief, in law and in equity, to which Plaintiffs may be entitled.

Respectfully submitted,

HAVINS & ASSOCIATES, PC

By:_____

John W. Havins
State Bar No. 09239800
Jeffery J. Davis
State Bar No. 24028276
1001 McKinney, Suite 500
Houston, Texas 77002
T: (713) 650-3600
F: (713) 650-3301

ATTORNEYS FOR PLAINTIFFS

Unofficial Copy Office of Chris Daniel District Clerk

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing document was served on the attorneys listed below in the manner indicated on February 5, 2009.

**VIA FAX**
Jeffery B. Kaiser
Kaiser & Conrad, LLP
1911 Bagby
Second Floor
Houston TX 77002

**VIA FAX**
Thomas F. Coleman
Law Office of Tom F. Coleman
817 Westheimer
First Floor
Houston TX 77006

**VIA FAX**
Robert Remy
Two Memorial City Plaza
820 Gessner Suite 1720
Houston TX 77024

John W. Havins

Unofficial Copy Office of Chris Daniel District Clerk

| | | |
|---|---|---|
| STEPHEN M. KOCH, M.D., Individually, | § | IN THE DISTRICT COURT OF |
| VICTOR ANKOMA-SEY, M.D. | § | |
| Individually, TERRY SCARBOROUGH, | § | |
| M.D., Individually, HATEM SAQR, | § | |
| Individually, and each as MEMBERS | § | |
| on behalf of APEX KATY PHYSICIANS, | § | |
| LLC; and ADEEL ZAIDI, CO-MANAGER, | § | HARRIS COUNTY, TEXAS |
| APEX KATY PHYSICIANS, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| PANKAJ K. SHAH, M.D., | § | |
| BHARATI P. SHAH, and | § | |
| INDUS ASSOCIATES, LLC, | § | |
| | § | |
| Defendants. | § | 11TH JUDICIAL DISTRICT |

## FIRST AMENDED ORIGINAL PETITION, AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTIONS OF PLAINTIFFS, KOCH, ANKOMA-SEY, SCARBOROUGH, SAQR, PERACHA, PATEL, WILSON, HASNAIN, KHOURY AND AHTAR

TO THE HONORABLE COURT:

Plaintiffs, Stephen M. Koch, M.D., Victor Ankoma-Sey, M.D., Terry Scarborough, M.D., Hatem Saqr, Waseem Peracha, M.D., Nilesh Patel, M.D., Erik B. Wilson, M.D., Syed Hasnain, M.D., Sammy Khoury, M.D., and Asif Ahktar, M.D., Individually and each as a member on behalf of Apex Katy Physicians, LLC, complain of Defendants, Pankaj K. Shah, M.D., Bharati P. Shah, Indus Associates, LLC, and Apex Katy Physicians, LLC, and would respectfully show the court as follows:

### I.
### Discovery Control Plan

1. Plaintiffs intend to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

## II.
## Parties

2. Plaintiff, Stephen M. Koch, M.D., is an individual residing in Houston, Harris County, Texas.

3. Plaintiff, Victor Ankoma-Sey, M.D., is an individual residing in Houston, Harris County, Texas.

4. Plaintiff, Terry Scarborough, M.D., is an individual residing in Houston, Harris County, Texas.

5. Plaintiff, Terry Scarborough, M.D., is an individual residing in Houston, Harris County, Texas.

6. Plaintiff, Hatem Saqr, is an individual residing in Houston, Harris County, Texas.

7 Plaintiff, Waseem Peracha, M.D., is an individual residing in Houston, Harris County, Texas.

8. Plaintiff, Nilesh Patel, M.D., is an individual residing in Houston, Harris County, Texas.

9. Plaintiff, Erik B. Wilson, M.D is an individual residing in Houston, Harris County, Texas.

10. Plaintiff, Syed Hasnain, M.D, is an individual residing in Houston, Harris County, Texas.

11. Plaintiff, Sammy Khoury, M.D, is an individual residing in Houston, Harris County, Texas.

12. Plaintiff, Asif Ahktar, M.D., is an individual residing in Houston, Harris County, Texas.

Unofficial Copy Office of Chris Daniel District Clerk

13. Defendant, Pankaj K. Shah, is an individual residing in Sugar Land, Fort Bend County, Texas, and has previously been served with citation in this action.

14. Defendant, Bharati P. Shah, is an individual residing in Sugar Land, Fort Bend County, Texas, and has previously been served with citation in this action.

15. Defendant, Indus Associates, LLC, is a Texas limited liability company which has its principal place of business in Sugar Land, Fort Bend County, Texas, and has previously been served with citation in this action.

16. Defendant, Apex Katy Physicians, LLC, is a Texas limited liability company which has its principal place of business in Houston, Harris County, Texas. Defendant, Apex Katy Physicians, LLC, may be served by serving citation, together with a copy of this petition, on its registered agent, P.K. Shah, M.D., at 1601 Main Street, Suite 102, Richmond, Texas 77469. P.K. Shah, M.D. may also be served with citation, together with a copy of this petition, at 17403 Rolling Brook Drive, Sugar Land, Texas 77479.

## III.
## Venue

17. Pursuant to Section 15.002 of the Texas Civil Practice and Remedies Code, venue is proper in Harris County, Texas because the principal office of Defendant, Apex Katy Physician, LLC, is located in Harris County and because all or a substantial part of the events or omissions giving rise to the claim occurred in Harris County.

## IV.
## Background Facts

18. Plaintiffs, Stephen M. Koch, M.D. ("Dr. Koch"), Victor Ankoma-Sey, M.D.

3    F:\Cases\JWH\KOCH.973\SHAH.002\Pleadings\POP.doc

("Dr. Ankoma-Sey"), Terry Scarborough, M.D. ("Dr. Scarborough"), Hatem Saqr ("Saqr"), Waseem Peracha, M.D. ("Dr. Peracha"), Nilesh Patel, M.D. ("Dr. Patel"), Erik B. Wilson, M.D. ("Dr. Wilson") Syed Hasnain, M.D. ("Dr. Hasnain), Sammy Khoury, M.D. ("Dr. Khoury"), and Asif Ahktar, M.D. ("Dr. Ahtar") (collectively, the "Plaintiffs") are part of a group of approximately 18 physicians and other investors who invested in Defendant, Apex Katy Physicians, LLC. ("Apex"). Apex was formed for the purpose of purchasing tracts of real estate situated in Katy, Texas and the improvements located thereon (the "Property") and leasing those improvements to what is now Apex Hospital – Katy. The improvements consist of a 100,000 square foot hospital with 103 patient beds and a professional building. Defendant, Pankaj K. Shah, M.D. ("Shah") is also an investor in Apex. Shah was an Initial Manager of Apex and at all times relevant has remained a Manager or purported Manager of Apex. As explained below, Shah and Kannappan Krishnaswamy ("Krishnaswamy") are now the purported Managers of Apex.

19. In conjunction with their investment in Apex, Plaintiffs, along with substantially all of the other investors, also invested in Apex Long Term Acute Care-Katy, L.P. ("Apex LTAC"). For example, Dr. Koch invested $98,500.00 in Apex LTAC and guaranteed $72,500.00 in bank debt, Dr. Ankoma-Sey invested $2,500.00 and guaranteed $72,500.00 in bank debt, and Dr. Scarborough invested $500.00 and guaranteed $14,500.00 in bank debt. Almost every person or entity who invested in Apex is also an investor in Apex LTAC. Shah, Krishnaswamy, and Apex are aware of this. For purposes of this petition, the investments made in Apex and Apex LTAC will be referred to collectively as the "Hospital Project".

20. Apex LTAC was formed to start, own and operate Apex Hospital – Katy

(the "Hospital"), which is now operating as a long term acute care facility on the Property. The Hospital specializes in providing comprehensive services to medically complex patients, including those requiring intensive care, pulmonary management, and cardiac monitoring. Apex LTAC leases the Property from Apex pursuant to that certain Lease Agreement, dated January 4, 2007 (the "Lease").

21. Prior to Apex acquiring the Property, it was owned by Medistar Corporation ("Medistar"). During the initial conversations regarding the Property being purchased as part of the overall investment plan, Plaintiffs were told that the Property could be purchased for approximately $13,000,000. In fact, on or about January 2, 2007, Apex entered into that certain Agreement for Purchase and Sale of Real Property and Improvements with Medistar, which specifies a purchase price of $13,500,000.00 for the Property (the "Purchase Agreement"). A true copy of the Purchase Agreement is attached hereto as Exhibit A and incorporated herein for all purposes[1].

22. When Plaintiffs were first approached about making their investments, it was represented, and Plaintiffs relied on the representation, that all investors in Apex would be paying $40,000.00 cash per investment unit, with a total of 450 units being available for purchase. Attached hereto as Exhibit B, and incorporated herein for all purposes, is a true copy of the Binding Letter of Intent that was provided to Plaintiffs and the other investors. In conformity with their understanding of the investment, Plaintiffs paid $40,000.00 per unit for their membership interests in Apex, with Dr. Koch paying $240,000.00 for 6 units, Dr. Ankoma-Sey paying $240,000.00 for 6 units, Dr. Scarborough paying $40,000.00 for 1 unit, Mr. Saqr paying $80,000.00 for 2 units, Dr.

---

[1] The affidavit of Stephen M. Koch M.D. is attached hereto as Exhibit H and incorporated herein for all purposes.

Peracha paying $800,000.00 for 20 units, Dr. Patel paying $40,000.00 for 1 unit, Dr. Wilson paying $40,000.00 for 1 unit, Dr. Hasnain paying $80,000.00 for 2 units, Dr. Khoury paying $40,000,00 for 1 unit, and Dr. Ahktar paying $40,000.00 for 1 unit. This feature of the investment, that everyone investing in Apex would be paying cash, was a material inducement for Plaintiffs to invest because they rightfully believed that Apex would be purchasing the Property free and clear of debt, which would mean their investments in Apex would not be burdened by debt service.

23.     Only recently have Plaintiffs discovered that their investment in the Hospital Project was not as it was represented to them. First, Plaintiffs have learned that the purchase price of the Property was $17,500,000.00, not the $13,500,000.00 set forth in the Loan Agreement. Without Plaintiffs' knowledge, Shah entered into a side agreement with Medistar that provided for $4,000,000 of seller financing. Also, Plaintiffs have learned that the 244 units in Apex that Indus Associates, LLC claims to own were not acquired for $40,000.00 cash per unit. Instead, Indus, which is owned and/or controlled by Shah and/or Defendant, Bharati Shah, parted with only $1,260,000.00 for the 244 units, for an average of $5,163.93 per unit. Plaintiffs have also learned that the 90 units in Apex that Katy Project, LLC ("Katy Project") claims to own were not acquired for $40,000.00 cash per unit. Instead, Katy Project, which is owned and/or controlled by Randeep Suneja ("Suneja") and Upendra N. Vora ("Vora"), who is Shah's relative, parted with only $720,000.00 for the 90 units, for an average of $8,000.00 per unit. These collective failures to pay $40,000.00 cash per unit resulted in an $11,380,000.00 shortfall in the funding of Apex.

24.     Without notice to or the consent of Plaintiffs and the other investors who

paid in full for their Apex units, Shah, acting in concert with Suneja and Vora, substituted Apex debt for the cash that would have been available if they had paid all cash as did Plaintiffs and all the other investors in Apex. Shah, with assistance from Suneja and Vora, caused Apex to borrow $9,000,000.00 from MetroBank, N.A. ("MetroBank"). A true copy of the Loan Agreement, dated March 22, 2007, by and among Apex as "Borrower," Shah, Suneja and Vora as "Guarantors," and MetroBank as "Lender", is attached hereto as Exhibit C and incorporated herein for all purposes. In connection with the loan, Shah delivered a Guaranty Agreement for $6,120,000.00 to MetroBank, Suneja delivered a Guaranty Agreement for $2,040,000.00, and Vora delivered a Guaranty Agreement for $840,000.00. True copies of the Guaranty Agreements are attached hereto as Exhibit D and incorporated herein for all purposes. Of course, as known and intended by Shah, Suneja, and Vora, none of these guarantees has ever been substantially at risk because the Property is worth far more than the amount borrowed.

25. By causing Apex to borrow the $9,000,000.00, Shah, a Manager of Apex, violated, and caused Apex to violate, Article 3.05 of the Company Agreement of Apex (the "Company Agreement") because this provision of the Company Agreement prohibits Apex Managers from causing Apex to incur any liability in excess of $500,000.00 without the **written consent of all Members**. A true copy of the Company Agreement is attached hereto as Exhibit E and incorporated herein for all purposes. Neither Plaintiffs, nor any of the other investors in Apex, were approached about giving such consent. Moreover, not only did Shah knowingly violate the Company Agreement to further his scheme to control and ultimately hijack the Hospital

Project, he burdened all of the other investors' units, including those owned by Plaintiffs, by causing Apex to secure the $9,000,000.00 loan with a first mortgage lien covering the Property.

26.    Shah did not attempt to obtain the required written consent because doing so would have alerted Plaintiffs and the other members to the deal that he was cutting for himself and Suneja and Vora. Having been alerted to this material change in the terms of the investment, Plaintiffs would have either insisted on being afforded the same deal, which would have permitted them to purchase more units, or, more likely, would have insisted that Indus and Katy Project pay $40,000.00 cash per unit for each and every unit they were purchasing. Shah could not allow this to happen because he knew he needed majority control of Apex in order to perpetrate his hijack scheme, but he was unwilling or unable to pay the $9,760,000.00 that would be required if Plaintiffs and the other investors learned of his self-dealing. At a certain point during the time units in Apex were being offered to investors, Shah instructed that no further units were to be sold. He did so to ensure that he would be majority owner. Doing so prevented units in Apex from being sold to investors who, unlike Shah, would have paid $40,000.00 cash per unit.

27.    Shah went to great lengths to keep Plaintiffs and the other Apex investors in the dark, including taking at least the following actions to avoid having his scheme detected:

- Taking from Apex's offices not only the certificates for Indus's units, but also the receipts for those certificates so as to avoid the possibility of another Apex member seeing the handwritten reference to Shah's

personal guarantee that Shah caused to be placed on the receipt for Certificate No. 24.

- When advised that he would have to forego 6 of the 250 Apex units he "purchased" because the deal was "oversold," Shah represented that he had paid for 250 units and insisted on being paid $240,000.00 for the 6 units to be surrendered, not $30,980.34, which is the collective amount of cash that he actually paid for the 6 units.

- Shah immediately seized control of Apex's finances and refused to share the financial information, including failing to provide copies of bank loan closing documents to the accountants who were requesting the documents so that Apex's federal income tax return could be prepared.

- After June 2008, Shah stopping providing Apex's accountants with copies of Apex's bank records.

- Shah repeatedly avoided calling meetings of the Apex members to discuss the status of Apex and the Hospital Project.

- When it was requested that he provide the members with Apex's financial information and documents, Shah agreed to do so, but never produced the promised information and documents.

- Shah repeatedly complained about Apex's 2007 federal income tax return because it showed Indus's capital account as $1,260,000.00, not a much larger amount including his guaranty amount, which would have been income tax fraud. Shah delayed signing Apex's 2007 federal income tax return and did not do so until the last possible day, that being January 5,

2009.

28.     During early January, 2009, Shah began implementing the next phase of his scheme to hijack the Hospital Project.  On January 10, 2009, Shah, as Manager of Indus, gave notice of a special meeting of the members of Apex to be held on Monday, January 19, 2009, beginning at 9:00 a.m. (the "Notice").  A true copy of the Notice is attached hereto as Exhibit F and incorporated herein for all purposes.  Shah noticed the meeting for a weekday and for 9:00 a.m. because he knew it would be very difficult for the investors who are doctors, which is the majority of Apex investors, to attend.  As noticed, the meeting was held on January 19, 2009 (the "January 19th Meeting").  During the January 19th Meeting, which was attended by only Shah, Suneja, Vora, and Krishnaswamy, the following resolutions were purportedly passed:

(a)     Shah was elected to continue serving as a Manager of Apex, which he had done from the inception of Apex;

(b)     Krishnaswamy was elected to serve as a Manager of Apex; and

(c)     The law firm of Kaiser & Conrad, LLP was authorized to take action to enforce the Lease.

A true copy of the resolutions adopted during the January 19th Meeting is attached hereto as Exhibit G and incorporated herein for all purposes.

29.     Indus had no authority to notice the January 19th Meeting because it does not own the 244 Apex units it claims to own.  As detailed in paragraphs 20 through 25 above, those 244 units were acquired by means of Shah's fraud and as a result of Shah's breach of fiduciary duties and breach of the Company Agreement.  Consequently, Indus did not acquire viable or enforceable title to the 244 Apex units and therefore had no standing to notice the January 19th Meeting.  Therefore, all

resolutions passed and actions taken during the January 19th Meeting are of no force or effect, and all actions taken or to be taken after the January 19th Meeting based on those resolutions or at the direction of either Shah or Krishnaswamy, as purported Managers of Apex, are unauthorized and constitute or will constitute ultra vires acts.

30. The January 19th Meeting was not properly noticed because the Notice did not adequately describe the agenda of the meeting. Because the January 19th Meeting was not properly noticed, all resolutions purportedly passed and any other actions purportedly taken during the January 19th Meeting were ineffective, and all actions taken or to be taken after the January 19th Meeting based on those resolutions are unauthorized and constitute or will constitute ultra vires acts.

31. The January 19th Meeting and all resolutions purportedly passed and actions purportedly taken during the meeting are also ineffective because the membership units in Apex that Indus and Katy Project claim to own, and which were voted during the January 19th Meeting, were acquired by means of fraud and as a result of Shah's breach of fiduciary duties and breach of the Company Agreement. Consequently, Indus did not acquire viable or enforceable title to the 244 Apex units it purportedly voted during the January 19th Meeting. Because the votes attributable to the 244 units are invalid and those 244 units represent approximately 54% of the Apex membership units, no resolution, action, or other measure taken during the January 19th Meeting received a majority of the Apex members' votes as required by Article 3.08 of the Company Agreement.

32. Shah, purported Manager of Apex since the inception of Apex and purportedly re-elected at the January 19th Meeting, has caused Apex to file a lawsuit to

evict Apex LTAC from the Property. That lawsuit is numbered and styled Cause No. 09-CV31-04395; Apex Katy Physicians, L.L.C. v. Apex Long Term Acute Care—Katy, L.P., and is pending in the Justice of the Peace Court, Precinct 3, Fort Bend County, Texas (the "Eviction Lawsuit"). The trial in the Eviction Lawsuit is scheduled to begin on Tuesday, February 5, 2009, beginning at 2:00 p.m. Upon information and belief, Shah is causing Apex to pursue the eviction proceeding because he is under financial pressure being brought by MetroBank and Medistar. In fact, Medistar has sued Shah, claiming he owes millions of dollars to Medistar as result of the side agreement that Shah entered into without Plaintiffs' knowledge. That lawsuit is numbered and styled No. 2008-73728; Medistar Corporation v. P.K. Shah, and is pending in the 165th District Court of Harris County, Texas. As for MetroBank, upon information and belief, the final chapter of Shah's scheme to hijack the Hospital Project is that Shah intends to participate in a "friendly foreclosure" that will result in Shah, with Suneja and Vora possibly participating, purchasing the Property and thereby ridding himself of Plaintiffs and the other minority Apex members.

33.     Shah is aware that Plaintiffs do not support the decision to pursue eviction against Apex LTAC. More important, this action has not been properly authorized by a legally constituted Board of Managers or by the Apex members because the votes attributable to the 244 units that Indus claims are invalid because, as explained above, Indus did not rightfully acquire title to those units.

## V.
## Causes Of Action

### A.     Application for Restraining Order and Injunctive Relief

34.     Plaintiffs repeat and adopt all of the allegations and averments set forth in

paragraphs 18 through 33 above.

35.     Plaintiffs ask the court to prevent Defendants and their agents from pursuing the Eviction Lawsuit or taking any other action that interferes with Apex LTAC's occupation and use of the Property during the pendency of this action, or taking any other action that interferes with or disrupts the business of Apex LTAC or the Hospital.

36.     It is probable that Plaintiffs will recover from Defendants after a trial on the merits because it is undeniable that Shah, as a Manager of Apex, breached the Company Agreement when he caused Apex to incur debt of $9,000,000.00 without the written consent of Plaintiffs and all other members of Apex. Further, it is probable that Plaintiffs will prevail at trial because it is undeniable that neither Shah nor Indus fully paid for the 244 Apex units that Indus claims to own and that Shah failed to disclose this material "change in the deal" to Plaintiffs and the other Apex investors, except Suneja and Vora, who were in on the scheme with Shah. Finally, it is probable that Plaintiffs will prevail at trial because Defendants are taking actions to the detriment of Plaintiffs that they have no authority to take, and those actions will result in damage to Plaintiffs.

37.     If Plaintiffs' application is not granted, harm is imminent because Apex will attempt to evict Apex LTAC from the Property, the Hospital will fail, which will not only cause Plaintiffs to lose their investments in Apex LTAC, but will also disrupt their workplace and their relationships with patients.

38.     The harm that will result if the temporary order is not issued is irreparable. If Apex LTAC is evicted, its business operations will be totally disrupted and the

F:\Cases\JWH\KOCH.973\SHAH.002\Pleadings\POP.doc

Hospital will cease to exist. Plaintiffs' relationships with patients will be severely disrupted and some possibly lost. Plaintiffs will lose not only their investment in Apex LTAC, but also their rights in and the use of the Hospital, which is a unique asset because of its specialized nature. Further, the failure of the Hospital will harm Plaintiffs' reputations in the local medical and business communities. The failure of the Hospital will also leave the Property without a viable tenant, which will make it virtually impossible in the current market conditions to re-finance the MetroBank debt. That being so, it is very likely that MetroBank, which would not have a lien on the Property but for Shah's fraud, deceit, and self-dealing, will foreclose its lien. When that occurs, Plaintiffs' investments in Apex will be worthless, along with those of all the other investors. Plaintiffs have no adequate remedy at law because the damages that Plaintiffs would suffer, particularly from business and professional disruption and damage to personal and professional reputations, cannot be readily calculated or measured by any certain pecuniary standard. Additionally, Plaintiffs have no adequate remedy at law because, based on information and belief, Defendants will not be able to satisfy the judgments that Plaintiffs and other investors anticipate receiving against them.

39. Plaintiffs are willing to post a bond.

40. Plaintiffs ask the court to set their application for temporary injunction for a hearing and, after the hearing, issue a temporary injunction against Defendants.

41. Plaintiffs have joined all indispensable parties under Texas Rule of Civil Procedure 39.

F:\Cases\JWH\KOCH.973\SHAH.002\Pleadings\POP.doc

42. Plaintiffs ask the court to set their request for a permanent injunction for a full trial on the merits and, after the trial, issue a permanent injunction against Defendants.

**B. Breach of Fiduciary Duty**

43. Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 18 through 42 above.

44. Shah, as a Manager of Apex, owed fiduciary duties to Plaintiffs. Those duties include the duty of full disclosure, the duty of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing, and the duty to act with integrity of the strictest kind.

45. Shah has breached one or more of the fiduciary duties he owed to Plaintiffs and those breaches are a proximate cause of the actual damages Plaintiffs have suffered. The amount of actual damages that Plaintiffs have suffered is within the jurisdictional limits of this court.

46. As an alternative to money damages, an appropriate remedy for Shah's breach of fiduciary duty, and one that Plaintiffs seek, is forfeiture of the Apex units for which Shah did not fully pay. This equitable relief is appropriate under the circumstances.

47. Shah's breach of the fiduciary duties was intentional because he intended to gain an additional, unwarranted benefit for himself at the expense of Plaintiffs and the other investors in Apex. Plaintiffs therefore are entitled to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a). Plaintiffs seek

exemplary damages in an amount that in the opinion of the jury is necessary to punish Shah and deter similar conduct in the future by him and others.

**C.  Fraud**

48.  Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 18 through 47 above.

49.  By concealing or failing to disclose to Plaintiffs that he, Suneja, and Vora were not purchasing units in Apex on the same terms as Plaintiffs, Shah defrauded Plaintiffs.  Defendant, Bharati P. Shah, was aware of Shah's fraudulent conduct, assisted and supported Shah's fraud, and benefited from that fraud.  The information that Shah withheld or failed to disclose materially impacted the financial structure of Plaintiffs' investments.  Shah knew that Plaintiffs were unaware of his self-dealing actions and did not have an equal opportunity to discover the truth.  In fact, Shah took actions intended to prevent Plaintiffs from discovering his self-dealing.  Plaintiffs, unaware of Shah's self-dealing, relied on Shah's deliberate silence as indicating that Apex's financial structure was as had been represented to them when they were making their investment decision.  Shah intended for Plaintiffs to make this assumption.

50.  Shah's fraud is a proximate cause of the actual damages that Plaintiffs have suffered.  Plaintiffs' actual damages are within the jurisdictional limits of this court.

51.  The damages that Plaintiffs have suffered resulted from Shah's actual fraud or malice, which entitles Plaintiffs to under Texas Civil Practice & Remedies Code section 41.003(a). Plaintiffs seek exemplary damages in an amount that in the opinion

of the jury is necessary to punish Shah and deter similar conduct in the future by him and others.

**D.    Breach of Contract**

52.    Pleading in the alternative, and without waiving any of the foregoing, Plaintiffs repeat and adopt all of the allegations and averments set forth in paragraphs 18 through 51 above.

53.    Defendants have breached the Company Agreement and are continuing to breach the Company Contract by taking actions on behalf of Apex that are unauthorized and in direct contravention of the Company Agreement.

54.    Defendants' breach of the Company Agreement is a proximate cause of the actual damages that Plaintiffs have suffered. Plaintiffs' actual damages are within the jurisdictional limits of this court.

55.    Plaintiffs have fully performed the obligations required of them by the Company Agreement and all conditions precedent to Plaintiffs' claim for relief have been performed or have occurred.

56.    As a direct result of the breaches, Plaintiffs have been required to employ John W. Havins and the law firm of Havins & Associates, PC as their attorneys, and have agreed to pay the attorneys a reasonable attorney's fee for their services rendered and to be rendered in this cause. Plaintiffs will present their claims to Defendants in accordance with Section 38.001 *et seq.* of the Texas Civil Practice and Remedies Code. Pursuant to Section 38.001 *et seq.* of the Texas Civil Practice and Remedies Code, Plaintiffs are entitled to and do request an award of reasonable and necessary attorney's fees for services rendered and to be rendered in this case, which include the

following:

    (a)    Preparation and trial of this lawsuit; and

    (b)    Post-trial, pre-appeal legal services; and

    (c)    An appeal to the court of appeals; and

    (d)    Making or responding to an application for review to the Supreme Court of Texas; and

    (e)    An appeal to the Supreme Court of Texas in the event application for review is granted; and

    (f)    Postjudgment discovery and collection in the event execution on the judgment is necessary.

46.    Plaintiffs are entitled to recover, and do request, awards of pre-judgment and post-judgment interest at the highest rates permitted by law.

WHEREFORE, Plaintiffs, Stephen M. Koch, M.D., Victor Ankoma-Sey, M.D., Terry Scarborough, M.D., Hatem Saqr, Waseem Peracha, M.D., Nilesh Patel, M.D., Erik B. Wilson, M.D., Syed Hasnain, M.D., Sammy Khoury, M.D., and Asif Ahktar, M.D., respectfully request that Defendants, Pankaj K. Shah, Bharati P. Shah, Indus Associates, LLC, and Apex Katy Physicians, LLC, be cited to appear and answer and, on final trial, Plaintiffs have judgment, jointly and severally, against Defendants for:

    A.    Temporary restraining order;

    B.    Temporary injunction;

    C.    Permanent injunction;

    D.    Actual damages;

    E.    Exemplary damages;

    F.    Reasonable attorney's fees;

Unofficial Copy Office of Chris Daniel District Clerk

    F:\Cases\JWH\KOCH.973\SHAH.002\Pleadings\POP.doc

G. Costs of suit;

H. Prejudgment and postjudgment interest at the highest rates permitted by law.

I. All other relief, in law and in equity, to which Plaintiffs may be entitled.

Respectfully submitted,

HAVINS & ASSOCIATES, PC

By: _____

John W. Havins
State Bar No.: 09239800
Jeffery J. Davis
State Bar No. 24028276
1001 McKinney, Suite 500
Houston, Texas 77002
T: (713) 650-3600
F: (713) 650-3301

ATTORNEYS FOR PLAINTIFFS

F:\Cases\JWH\KOCH.973\SHAH.002\Pleadings\POP.doc

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing document was served on the attorneys listed below in the manner indicated on February 2, 2009.

**VIA MESSENGER**
Jeffery B. Kaiser
Kaiser & Conrad, LLP
1911 Bagby
Second Floor
Houston TX 77002

**VIA MESSENGER**
Thomas F. Coleman
Law Office of Tom F. Coleman
817 Westheimer
First Floor
Houston TX 77006

**VIA MESSNGER**
Robert Remy
Two Memorial City Plaza
820 Gessner Suite 1720
Houston TX 77024

**VIA MESSENGER**
Karen M. Zuckerman
Law Office of Karen M. Zuckerman
7202 Buffalo Speedway
Houston TX 77025

John W. Havins

F:\Cases\JWH\KOCH.973\SHAH.002\Pleadings\POP.doc

CAUSE NO. 20-09 - 03055

| | | |
|---|---|---|
| STEPHEN M. KOCH, M.D., Individually, | § | IN THE DISTRICT COURT OF |
| VICTOR ANKOMA-SEY, M.D., | | |
| Individually, TERRY SCARBOROUGH, | § | |
| M.D., Individually, HATEM SAQR, | | |
| Individually, and each as MEMBERS | § | |
| on behalf of APEX KATY PHYSICIANS, | | |
| LLC; and ADEEL ZAIDI, CO-MANAGER, | § | HARRIS COUNTY, TEXAS |
| APEX KATY PHYSICIANS, LLC | | |
| | § | |
| Plaintiffs, | | |
| | § | |
| v. | | |
| | § | 11th JUDICIAL DISTRICT |
| PANKAJ K. SHAH, M.D., BHARATI P. SHAH, | | |
| INDUS ASSOCIATES, LLC, | | |
| | | |
| Defendants. | | |

## PLAINTIFFS' ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

COMES NOW, Stephen M. Koch, M.D., individually, Victor Ankoma-Sey, M.D., individually, Terry Scarborough, M.D., individually, Hatem Saqer, individually, and each as Members on behalf of Apex Physicians, LLC, and Adeel Zaidi, Co-Manager of Apex Katy Physicians, LLC, and as grounds therefor shows the following:

### I. PARTIES

1. Plaintiff Stephen M. Koch, M.D. is an individual and a resident of the State of Texas. Dr. Koch is a licensed Texas physician and maintains a medical practice in the Houston area. He has fully paid for and owns 6 membership units of Apex Katy Physicians, LLC, a Texas limited liability company ("Apex LLC" or, the "Company"). Dr. Koch has owned these units at all times during which the acts or omissions complained of took place. Dr. Koch is one of 18 Members of Apex LLC and brings this action both individually and derivatively on behalf of the Company and, to that extent,

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

Apex LLC is nominally named as a party plaintiff so that the benefits of this litigation will be shared by the Members who are similarly situated.

2.     Plaintiff Victor Ankoma-Sey, M.D. is an individual and a resident of the State of Texas. He is a licensed Texas physician and maintains a medical practice in Houston, Texas. Dr. Ankoma-Sey has fully paid for and owns 6 membership units of Apex LLC. Dr. Ankoma-Sey has owned these units at all times during which the acts or omissions complained of took place. He is one of 18 Members of Apex LLC and brings this action both individually and derivatively on behalf of the Company and, to that extent, Apex LLC is nominally named as a party plaintiff so that the benefits of this litigation will be shared by the Members who are similarly situated.

3.     Plaintiff Terry Scarborough, M.D. is an individual and a resident of the State of Texas. He is a licensed Texas physician and maintains a surgical medical practice in Houston, Texas. Dr. Scarborough has fully paid for and owns 1 membership unit of Apex LLC. Dr. Scarborough has owned this unit at all times during which the acts or omissions complained of took place. He is one of 18 Members of Apex LLC and brings this action both individually and derivatively on behalf of the Company and, to that extent, Apex LLC is nominally named as a party plaintiff so that the benefits of this litigation will be shared by the Members who are similarly situated.

4.     Plaintiff Hatem Saqr is an individual and a resident of the State of Texas. He is a business professional with specialized expertise in analyzing the financial impact of Medicare reimbursement rules and regulatory changes as they concern long term acute care hospitals. Mr. Saqr has fully paid for and owns 2 membership units of Apex LLC. He has owned these units at all times during which the acts or omissions complained of

2

took place. Mr. Saqr is one of 18 Members of Apex LLC and brings this action both individually and derivatively on behalf of the Company and, to that extent, Apex LLC is nominally named as a party plaintiff so that the benefits of this litigation will be shared by the Members who are similarly situated.

5.     Plaintiff Adeel Zaidi is an individual residing in Sugar Land, Texas, Fort Bend County. He is the registered agent for Apex LLC and the Co-Manager of the Company. Mr. Zaidi has served as Co-Manager since the Company was formed and he was selected as an initial Co-Manager in or about February 2007. He is not a Member of the Company and does not own any membership units of Apex LLC.

6.     Defendant Pankaj K. Shah, M.D. is an individual residing in Sugar Land, Texas. Defendant Pankaj K. Shah, M.D. can be served at his residence address: 17403 Rolling Brook Drive, Sugar Land, Texas 77479, located in Fort Bend County. Dr. Shah is a Member of Apex LLC and its other Co-Manager. The number of membership units for which he fully paid and is entitled to vote, if any, has not been established and is being challenged by Plaintiffs. Likewise, the existence, extent and validity of any ownership interest he claims in the Company is presently uncertain and being challenged by Plaintiffs.

7.     Defendant Bharati P. Shah is an individual residing in Sugar Land, Texas. Defendant Bharati P. Shah is the wife of Defendant Pankaj K. Shah, M.D. and can be served at the same residence address: 17403 Rolling Brook Drive, Sugar Land, Texas 77479, Fort Bend County. Upon information and belief, Ms. Shah is a Member and manager of Defendant Indus Associates, LLC.

3

8.     Upon information and belief, Defendant Indus Associates, LLC ("Indus") is a Texas limited liability company formed by Defendants Pankaj K. Shah and Bharati P. Shah (the "Shah Defendants") and may be served through service made upon its agent, Bharati P. Shah, at the following address: 17403 Rolling Brook Drive, Sugar Land, Texas 77479, Fort Bend County. Defendant Indus is believed to beneficially hold and manage certain investment and business interests of one or both Shah Defendants. The number of membership units of Apex LLC which Defendant Indus paid for in full (directly or through its principals) is uncertain and being challenged by Plaintiffs. Likewise, the existence, extent and validity of any ownership interest claimed by Defendant Indus in the Company is uncertain and being challenged by Plaintiffs.

## II. DISCOVERY LEVEL

9.     Plaintiffs intend that discovery be conducted under Level 2 pursuant to Rule 190.3 of the Texas Rules of Civil Procedure.

## III. JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to Texas Civil Practice & Remedies Code §65.021 because this proceeding involves hearing and determination of an application for injunctive relief. Further, the Court has jurisdiction because the Defendants are either individuals residing in Texas or entities conducting business within and under the laws of Texas.

11.     Venue is proper in Harris County, Texas because all or part of the causes of action occurred Harris County, Texas. *See* Tex. Civ. Prac. & Rem. Code § 15.002.

4

## IV. FACTUAL BACKGROUND

12. Apex LLC was formed by a group of approximately 18 physicians and other investors with the primary purpose of owning a tract of real estate and improvements located in Katy, Texas (the "Property"). The improvements include a 100,000 square foot hospital building with 103 patient beds as well as a separate professional building which, since Apex LLC was formed in February 2007, has been nearly vacant but for one tenant who was occupying a small portion of this building when it was acquired by Apex LLC and continues to do so.

13. The operations of Apex LLC are to be conducted as provided for in its Company Agreement agreed to and adopted by the Members on February 9, 2007. Pursuant to the Company Agreement, the Company is to be managed by at least two managers. Upon its formation, the Members selected as their initial managers Plaintiff Adeel Zaidi and Defendant P.K. Shah. These Co-Managers have the exclusive authority, acting together in consultation and agreement with one another, to carry out and perform their duties in managing the business operations of the Company consistent with the regulations and terms of the Company Agreement. These regulations and terms place certain restrictions on the authority of the Managers to act without the written consent of all Members of the Company. Specifically, the Managers are prohibited from performing any act in contravention of the Company Agreement, and they are not authorized to incur any Company liability in excess of $500,000 without first obtaining the unanimous approval of the Members. In fact, Dr. Shah caused the Company to borrow $9,000,000 and allowed liens to be placed on all of the Company's real estate assets, without informing all Members or obtaining their required consent. The Company Agreement also provides

5

that differences between the Managers shall be decided by a vote of 65% in interest (not in number) of the Members.

14.     Further, Defendant P.K. Shah did not pay for the number of membership units in Apex LLC to which he subscribed and is claiming to own in order to control all decision-making of the Company by voting an alleged majority percentage ownership interest that he is not entitled to and may not legally possess. He has and continues to violate the Company Agreement as well as the fiduciary duties he owes the Members as a Manager, including the duty to disclose to Members all material financial and other information concerning Apex LLC and acting to protect and further the Members' interests and not his own personal interests. As made clear by the Affidavit testimony of Plaintiff Stephen M. Koch, M.D. attached hereto and incorporated herein for all purposes as Exhibit A, unless Dr. Shah is immediately restrained, the unilateral actions he is taking and intends to take in less than 48 hours will cause imminent harm to the other Members and leave them with no adequate remedy at law. This is because their interest in the Property and their investment in Apex LLC is being jeopardized, diminished and seriously compromised by Dr. Shah's unilateral decision-making. Dr. Shah is attempting to seize personal control of Apex LLC to further his personal interests in direct contravention of the Company Agreement and his fiduciary obligations owed to Members.

15.     Dr. Shah is also attempting to derail and/or pre-empt this Monday's January 19, 2009 meeting of all LLC Members to be held at 6:30 p.m. A meeting notice was distributed to the Members on January 6th by Adeel Zaidi, Co-Manager of Apex LLC (after discussion with Dr. Shah). Several days later, Dr. Shah sent out his own special meeting notice, attached hereto and incorporated herein as Exhibit B, calling for a

6

membership meeting to be held at 9:00 a.m. on Monday, January 19, 2009, the exact same date as the previously noticed 6:30 p.m. meeting. Dr. Shah's meeting notice set forth a list of actions he wants considered and acted on at his meeting. Among the items he is seeking is the removal of his Co-Manager, Mr. Zaidi. Dr. Shah, once again, is acting in his own interests and engaging in self-dealing to the neglect and harm of the LLC Members. The Shah personal agenda meeting notice also proposes to amend the Company Agreement but does not disclose the nature or purpose of such amendments, which in and of itself renders the meeting notice defective and invalid. Again, this demonstrates the purposeful secrecy Dr. Shah has been using to exploit the Members to achieve his own objectives and not the membership's objectives.

16.     Dr. Shah and the other Defendants must be restrained from attempting to manipulate the outcome of membership decision-making by voting interests in the Company that they do not own because they did not pay for them. Should he be permitted to vote membership units which Plaintiffs will prove he does not own, and therefore can not vote, Dr. Shah will irreparably injure Apex LLC and its Members. Moreover, Dr. Shah's transparent attempt to pre-empt the later meeting by attempting to hold, conduct and control the agenda and actions to be taken at his own meeting of the Members demonstrates that he is acting in bad faith to serve his own interests and not those he was entrusted by the LLC Members to serve. Dr. Shah's Co-Manager has tried to schedule Membership meetings on multiple occasions for over a year, yet no meetings were held because Dr. Shah would either cancel the meeting(s) or not be available to attend them and/or would request the meeting be postponed (and not provide any alternate dates). This has resulted in no Membership meetings having been held and has allowed Dr. Shah

7

to avoid sharing and disclosing to the Membership important financial, investment and other highly relevant information concerning transactions and other matters in which the Members have an interest and are entitled to be informed. Such information has been requested repeatedly and as recently as this past week but Dr. Shah controls access to these important financial and banking records and Dr. Shah has not responded nor made the material available to the Members.

17. Dr. Shah has failed to inform the Members of any business, financial or banking matters related to Apex LLC since its inception. He has failed to disclose the financial affairs of Apex LLC and his misuse of the cash proceeds of Apex LLC for his own benefit. He has canceled or otherwise thwarted every effort to conduct a regular or any other type of meeting of the company's Members, and thereby positioned himself to exploit and take undue advantage of their lack of knowledge about actions he took which adversely affected their ownership rights and interests in the Company. For example, almost all of the Members had no knowledge that Dr. Shah had encumbered the Company's real estate with a lien conveyed to MetroBank to secure the non-disclosed and non-approved $9,000,000 loan. This lien reduces the value and transferability of the Property and thus, damages the Company's and Members' interests.

18. Pursuant to the terms of the Apex LLC Company Agreement, the named Defendants have violated their commitments to the Company as well as adversely affected the investment interests of the other Members who paid for their interests in cash and in full when they became Members.

8

19. Dr. Shah and the other Defendants must be restrained from attempting to manipulate the outcome of membership decisions by voting interests in the company that they do not own because they did not pay for them.

## V. INJUNCTIVE RELIEF

### Irreparable Harm/Inadequate Remedy at Law

20. Plaintiffs re-allege paragraphs 1 through 19 as if fully set forth herein.

21. If Defendants are not immediately restrained from: (a) conducting the defectively noticed and bad faith Members' meeting called by Dr. Shah which otherwise will take place on Monday, January 19, 2009 at 9:00 a.m.; or (b) voting membership units they do not own because they have not paid for them, then the Plaintiffs and the other LLC Members will be irreparably harmed and will have no adequate remedy at law once Dr. Shah and those acting in concert with him vote interests that they may not legally possess and which the other Members believe will be voted by them in a manner not in the Company's best interests.

### (1) Temporary Restraining Order

22. Plaintiffs re-allege paragraphs 1 through 21 as if fully set forth herein. For each of the reasons stated above and the facts set forth herein, Plaintiffs request the entry of a temporary restraining order enjoining Defendants and those acting on their behalf or in concert with them from engaging in the activities Plaintiffs seek to restrain as set forth in the above paragraph.

### (2) Temporary Injunction

23. Plaintiffs re-allege paragraphs 1 through 22 as if fully set forth herein. For each of the reasons stated above, Plaintiffs request the entry of a temporary restraining order and,

Unofficial Copy - Office of Chris Daniel District Clerk

upon hearing, a temporary injunction enjoining Defendants and those acting on their behalf or in concert with them from voting any membership unit or taking any action on behalf of the Company that has not been consented to by the other Members until such time as Defendants' interest in the Company has been fully and accurately determined at a trial on the merits of this case.

**(3) Permanent Injunction**

24.    Plaintiffs re-allege paragraphs 1 through 23 as if fully set forth herein. Plaintiffs ask the Court to set their application for permanent injunction for a full trial, and after the trial, issue a permanent injunction against Defendants.

## Bond

25.    Plaintiffs are willing to post bond in the amount determined by the Court.

## VI. CAUSES OF ACTION

### A. BREACH OF FIDUCIARY DUTY, FRAUD AND NEGLIGENT MISREPRESENTATION

26.    Plaintiffs re-allege paragraphs 1 through 25 as if fully set forth herein.

27.    A fiduciary relationship and a relationship of trust and confidence exist between the Member Plaintiffs and Dr. Shah arising out of his responsibilities as a Manager of Apex LLC. These duties require Dr. Shah to act at all times with absolute candor, honesty and fairness in dealing with the Members and their interests. Dr. Shah is required to place those interests above his own and to not act for his own self-interest by initiating or engaging in any act that only furthers and benefits his own personal gain. Further, Dr. Shah must disclose all transactions and information that are pertinent to Members' interests and cannot maintain a cloak of secrecy or conceal such matters from the

10

Members or prevent them from learning about financial or any other transactions affecting their membership interests and the affairs of the Company.

28. Dr. Shah has engaged in a pattern of self-dealing, secrecy, and unilateral actions which constitute a breach of his fiduciary duties to the Members. He has violated the Company Agreement and is causing the value of the other Members' interests to deteriorate through improperly exercising unilateral control over decisions affecting Members' interests without their knowledge, consent or approval, and without the agreement of his Co-Manager, thereby jeopardizing the Members' investment in the Company.

29. Dr. Shah conveyed a lien on the Property to secure his own personal liabilities to MetroBank without disclosing such transaction to the other Members. This was not just a breach of his fiduciary duties but constitutes fraud. Dr. Shah and those acting in concert with him intended to cause substantial harm to Plaintiffs and other Members similarly situated to them and acted with conscious disregard for their' rights and best interests. They did so despite their actual awareness of the extreme degree of risk to Plaintiffs' and the other Members rights and welfare. Dr. Shah's failure to disclose the lien he gave MetroBank and his failure to share financial and other important information affecting the Members' interests constitutes negligent misrepresentation by omission. The Plaintiffs and other Members similarly situated relied on Dr. Shah's carrying out his fiduciary duties consistent with their best interests and his failure to disclose that he was acting contrary to their interests constitutes a negligent misrepresentation by omission.

30. Plaintiffs and the other similarly situated Members of Apex LLC have been injured by these breaches of fiduciary duties, fraud and negligent misrepresentation by

11

Dr. Shah and those acting in concert with him. These actions have resulted in injury to the Plaintiffs and the other Members similarly situated to them and in conferring an undue benefit to the Defendants who were unjustly enriched at the expense of the Plaintiffs and other similarly situated members of Apex LLC in an amount in excess of the minimum jurisdictional limits of this court.

## B. BREACH OF CONTRACT

31. Plaintiffs re-allege paragraphs 1 through 30 as if fully set forth herein.

32. Dr. Shah executed a valid and enforceable written subscription agreement in or about January 2007 committing to purchase and pay for membership units in Apex LLC. He failed to pay for the membership units to which he subscribed and has not done through the present. Demand has been made upon Dr. Shah and the other Defendants to pay the outstanding obligations owed to the Company, but none of the Defendants has responded to the demand nor have any of the Defendants paid the outstanding amount owed.

33. Further, Dr. Shah has breached his obligations under the Company Agreement by his incurring a Company liability in excess of $500,000 in contravention of the restriction on his authority as a Manger to incur an obligation exceeding $500,000 without the written consent of all the Members which he did not obtain nor disclose to the Members.

34. The foregoing actions taken by Dr. Shah constitute a breach of contract and have caused the Plaintiffs and the other LLC Members similarly situated to suffer damages in an amount that is in excess of the minimum jurisdictional limits of the court.

12

35. Plaintiffs and the other Members similarly situated to them should be awarded actual damages, consequential damages and attorney's fees for the breach of each contract identified above.

## CONDITIONS PRECEDENT

36. Plaintiffs re-allege paragraphs 1 through 35 as if fully set forth herein.

35. All conditions precedent to Plaintiffs' claims for relief have been performed or have occurred.

## PRAYER

WHEREFORE, Plaintiffs pray that:

A. A temporary restraining order be issued without notice to Defendants, restraining Defendants from (a) conducting the Special Meeting of Members noticed by Dr. Shah and Indus Associates, LLC, a copy of which notice is attached hereto and incorporated herein as Exhibit B, to take place Monday, January 19, 2009 at 9:00 a.m.; and (b) voting membership units in Apex LLC until the ownership and voting rights thereof are finally determined at trial.

B. Defendants be cited to appear and show cause and that upon conclusion of such hearing, a temporary injunction be issued, enjoining Defendants and those acting on their behalf or in concert with them, directly or indirectly, from voting membership units in Apex LLC until the ownership and voting rights thereof are finally determined at trial.

C. On final trial hereof, Plaintiffs have judgment against Defendants, jointly and severally, as follows:

   (1) Judgment against Defendants, jointly and severally, which permanently enjoins them from owning or voting membership units determined not to be owned by them;

   (2) Judgment against Defendants, jointly and severally, for monetary damages in excess of the minimal jurisdictional limits of this of of this Court, including all actual, consequential, general or or special damages, as allowed by law;

   (3) Reasonable and necessary attorney's fees incurred in prosecuting this action as allowed under Chapter 38 of the Tex. Civ. Prac. &

13

Unofficial Copy Office of Chris Daniel District Clerk

Rem. Code, and pursuant to any and all other applicable statutes and/or common law;

(4)     An accounting;

(5)     Imposition of a constructive trust upon all assets and financial, tax, accounting and other records pertaining or affecting, directly or indirectly, the investment and interests of the Members of Apex LLC that are in the custody, possession or control of each or any of the Defendants;

(6)     Prejudgment and post-judgment interest at the maximum lawful rates and from the earliest date permitted by applicable law on all sums awarded to Plaintiffs by the Court;

(7)     All costs of Court; and

(8)     Such other and further relief at law and in equity to which Plaintiffs and the other Members similarly situated may be justly entitled.

Respectfully submitted,

/s/Karen M. Zuckerman

_____
Karen M. Zuckerman, J.D.
SBOT No. 22290800
7202 Buffalo Speedway
Houston, Texas 77025
713-302-5666 (Telephone)
713-432-0286 (Facsimile)
ATTORNEY FOR PLAINTIFFS

14

# TAB 6

2/24/2014 12:16:06 PM
Chris Daniel - District Clerk Harris County
Envelope No. 546762
By: TERESA KIRBY

NO. 2009-02578

| APEX KATY PHYSICIANS, L.L.C., | § | IN THE DISTRICT COURT OF |
|---|---|---|
| Plaintiff, | § § § | |
| VS. | § § | |
| | § | HARRIS COUNTY, T E X A S |
| ADEEL ZAIDI, APEX LONG TERM | § | |
| ACUTE CARE – KATY, L.P., APEX | § | |
| KATY PHYSICIANS – TMG, L.L.C., | § | |
| and US TMG, L.L.C., | § | |
| | § | |
| Defendants. | § | 61st JUDICIAL DISTRICT |

## SUPPLEMENT TO DEFENDANT A. K.
## CHAGLA'S MOTION TO QUASH SUBPOENA

TO THE HONORABLE AL BENNETT, DISTRICT JUDGE:

Defendant A. K. Chagla moved to quash the Trial Subpoena served upon counsel by email on February 11, 2014, pursuant to the Texas Rules. The following and the attachment hereto supplement the factual record.

1.    As stated, Mr. Chagla is and has been in Pakistan for an extended period of time undergoing lengthy medical treatments for numerous maladies, and will not, and cannot, be back in Houston by March 17.

2.    Attached to Mr. Chagla's Motion as **Exhibits 1** and **2** were two status letters from Mr. Chagla's attending physician in Karachi, Pakistan, that outlined his condition as of January 20, 2013, and September 18, 2013. Attached hereto as **Exhibit 3** is a status report as of February 20, 2014, that was received today. It concludes that Mr. Chagla is not in a condition to travel from Pakistan to Texas by March 17.

3. Two points should be made:

• During the five-plus years that this case has been pending, Plaintiff never attempted to take or requested Mr. Chagla's deposition.

• Mr. Chagla will already be at a disadvantage at trial if he cannot appear to testify and offer his own story to the jury. He should not be further disadvantaged by a negative ruling from this Court under all the circumstances.

4. Defendant Chagla requests that Plaintiffs' subpoena be quashed.

DATED: February 24, 2014      Respectfully submitted,

LAW OFFICES OF DOUGLAS R. LITTLE

By *Douglas R. Little*

State Bar No. 12416600
Wedge International Tower
1415 Louisiana, 37th Floor
Houston, Texas 77002
713.275.2069
713.843.7901 (Fax)
doug@douglasrlittle.com

ATTORNEY FOR DEFENDANTS ZAIDI, CHAGLA, PRESTIGE, APEX TMG, and USTMG

Unofficial Copy Office of Chris Daniel District Clerk

     ZAIDI/Chagla SUPP to Mtn to Quash/2/24/14

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all

counsel listed below via: _____ hand delivery; _____ certified mail, return receipt requested;

_____ telefax transmission; _____ express mail; ___✓___ electronic mail; or _____ first class

United States mail, on the 24th day of February, 2014:

Andrew K. Meade                     Fred Wahrlich
Hawash Meade Gaston Neese           Munsch, Hardt, Kopf & Harr, PC
  & Cicack LLP                     700 Louisiana, Suite 4600
2118 Smith Street                   Houston, Texas 77002
Houston, Texas 77002

*Douglas R. Little*

Douglas R. Little

Unofficial Copy Office of Chris Daniel District Clerk

NO. 2009-02578

| APEX KATY PHYSICIANS, L.L.C., | § | IN THE DISTRICT COURT OF |
|---|---|---|
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | HARRIS COUNTY, T E X A S |
| ADEEL ZAIDI, APEX LONG TERM | § | |
| ACUTE CARE – KATY, L.P., APEX | § | |
| KATY PHYSICIANS – TMG, L.L.C., | § | |
| and US TMG, L.L.C., | § | |
| | § | |
| Defendants. | § | 61st JUDICIAL DISTRICT |

**AMENDED ANSWER OF DEFENDANTS ADEEL ZAIDI,
A. K. CHAGLA, PRESTIGE CONSULTING, INC.,
APEX KATY PHYSICIANS – TMG, L.L.C., AND US TMG, L.L.C.**

TO THE HONORABLE AL BENNETT, DISTRICT JUDGE:

Defendants Adeel Zaidi, A. K. Chagla, Prestige Consulting, Inc., Apex Katy Physicians

– TMG, L.L.C. ("Apex TMG"), and US TMG, L.L.C. ("USTMG"), answer Plaintiff Apex Katy

Physicians, L.L.C.'s ("Apex LLC") Third Amended Original Petition of July 29, 2011, as follows:

1. ALL DEFENDANTS: Pursuant to Rule 92 of the Texas Rules of Civil Procedure,

all Defendants generally deny the material allegations of Plaintiff's Third Amended Original Petition

and demand strict proof thereof.

2. DEFENDANTS CHAGLA AND USTMG: Defendant Chagla affirmatively denies

(a) that he had any meaningful financial interest in or profited in any way from any of the actions or

omissions of Plaintiff or any other Defendant in connection with any transactions involving Apex

LLC and Apex Long Term Acute Care – Katy, L.P. ("Apex LP"), whether or not as described in

Plaintiff's Third Amended Original Petition, and (b) that he took any actions or omitted to take any

required actions in connection with any transactions involving Apex LLC and Apex LP. Defendant Chagla did not cause, proximately or in fact, any damage to Apex LLC. Defendant USTMG affirmatively denies (a) that it had any financial interest in or profited in any way from any of the actions or omissions of Plaintiff or any other Defendant in connection with any transactions involving Apex LLC and Apex LP, whether or not as described in Plaintiff's Third Amended Original Petition, and (b) that it took any actions or omitted to take any required actions in connection with any transactions involving Apex LLC and Apex LP. Defendant USTMG was involved in a nephrology clinic and was not involved in any way in any transaction involving Apex LLC and Apex LP. Defendant USTMG did not cause, proximately or in fact, any damage to Apex LLC.

3. DEFENDANTS ZAIDI, PRESTIGE CONSULTING, INC., AND APEX TMG: These Defendants affirmatively deny that they committed any wrongful acts, or omitted to take any required actions, in connection with any transactions involving Apex LLC and Apex LP, of which Apex LLC complains in Plaintiff's Third Amended Original Petition. These Defendants did not cause, proximately or in fact, any damage to Apex LLC. Nevertheless, Apex LLC, principally through P. K. Shah, its co-manager in title but its only actual manager in fact, had actual or constructive notice of all actions that these Defendants did take in connection with any transactions involving Apex LLC and Apex LP Some of these actions produced benefits to Apex LLC. Accordingly, with this full actual or constructive knowledge, and acceptance of these benefits, Apex LLC ratified each such action or is estopped to complain about or assert it.

4. DEFENDANTS CHAGLA, PRESTIGE, AND APEX TMG: These Defendants were sued by Plaintiff's Second Amended Original Petition of December 30, 2010. Consequently, any claim against them that has a limitations period of two years that arises out of facts that occurred

- 2 -

prior to December 30, 2008, is barred by that statute of limitations.

5. ALL DEFENDANTS: Recovery for all of Apex LLC's "tort" claims is barred because Apex LLC's percentage of responsibility for any resultant damage of which it complains exceeds 50% under Tex. Civ. Prac. & Rem. Code § 33.001.

6. ALL DEFENDANTS: In the unlikely event that Apex LLC is deemed entitled to recover on any such tort claim, then its claims are subject to a determination of the percentages of responsibility assigned to all required entities under TEX. CIV. PRAC. & REM. CODE § 33.003, and any recovery is to be limited under TEX. CIV. PRAC. & REM. CODE § 33.012.

7. ALL DEFENDANTS: Apex LLC is not entitled to recover from any of these Defendants because it submitted its claims to the United States Bankruptcy Court in the case filed by Apex LP, and its claims were adjudicated in that forum.

As authorized by the Texas Rules of Civil Procedure, Defendants reserve the right to amend and supplement this pleading before the trial of this cause on its merits.

WHEREFORE, PREMISES CONSIDERED, these Defendants pray that Plaintiff take nothing, that they recover all their costs, and for such other and further relief, general or special, either at law or in equity, to which they may be justly entitled.

DATED: February 14, 2014

Respectfully submitted,

LAW OFFICES OF DOUGLAS R. LITTLE

By _Douglas R. Little_
State Bar No. 12416600
Wedge International Tower
1415 Louisiana, 37th Floor
Houston, Texas 77002
713.275.2069
713.843.7901 (Fax)
doug@douglasrlittle.com

- 3 -

ATTORNEY FOR DEFENDANTS ZAIDI,
CHAGLA, PRESTIGE, APEX TMG, and
USTMG

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all

counsel listed below via: _____ hand delivery; _____ certified mail, return receipt requested;

_____ telefax transmission; _____ express mail; __✓__ electronic mail; or __✓__ first class

United States mail, on the 14th day of February, 2014:

Andrew K. Meade
Hawash Meade Gaston Neese
& Cicack LLP
2118 Smith Street
Houston, Texas 77002

Fred Wahrlich
Munsch, Hardt, Kopf & Harr, PC
700 Louisiana, Suite 4600
Houston, Texas 77002

Earl S. Nesbitt
Nesbitt Vassar & McCown LLP
15851 Dallas Parkway
Addison, Texas 75001

*Douglas R. Little*
Douglas R. Little

Unofficial Copy Office of Chris Daniel District Clerk

- 4 -

NO. 2009-02578

| | | |
|---|---|---|
| APEX KATY PHYSICIANS, L.L.C., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | HARRIS COUNTY, T E X A S |
| ADEEL ZAIDI, APEX LONG TERM | § | |
| ACUTE CARE – KATY, L.P., APEX | § | |
| KATY PHYSICIANS – TMG, L.L.C., | § | |
| and US TMG, L.L.C., | § | |
| | § | |
| Defendants. | § | 61st JUDICIAL DISTRICT |

## DEFENDANT A. K. CHAGLA'S MOTION TO QUASH SUBPOENA

TO THE HONORABLE AL BENNETT, DISTRICT JUDGE:

Defendant A. K. Chagla, pursuant to the Texas Rules, moves to quash the Trial Subpoena served upon counsel by email on February 10, 2014, as follows:

1.      Plaintiffs's counsel served the referenced trial subpoena for March 17, 2014. As Plaintiff's counsel has been informed over a period of many months, Mr. Chagla is and has been in Pakistan for an extended period of time undergoing lengthy medical treatments for numerous maladies, and will not, and cannot, be back in Houston by March 17. The undersigned is candidly unaware when Mr. Chagla will be able to return.

2.      Attached as **Exhibits 1** and **2** are two letters from Mr. Chagla's attending physician in Karachi, Pakistan that outline his condition as of the last date upon which the undersigned was able to communicate with him. The undersigned is now attempting to obtain an updated evaluation and will submit it immediately upon receiving it.

3. Defendant Chagla requests that Plaintiffs' notice be quashed.

DATED: February 14, 2014

Respectfully submitted,

LAW OFFICES OF DOUGLAS R. LITTLE

By _Douglas R. Little_
    State Bar No. 12416600
    Wedge International Tower
    1415 Louisiana, 37th Floor
    Houston, Texas 77002
    713.275.2069
    713.843.7901 (Fax)
    doug@douglasrlittle.com

    ATTORNEY FOR DEFENDANTS ZAIDI,
    CHAGLA, PRESTIGE, APEX TMG, and
    USTMG

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all counsel listed below via: _____ hand delivery; _____ certified mail, return receipt requested; _____ telefax transmission; _____ express mail; __✓__ electronic mail; or __✓__ first class United States mail, on the 14th day of February, 2014:

Andrew K. Meade
Hawash Meade Gaston Neese
 & Cicack LLP
2118 Smith Street
Houston, Texas 77002

Earl S. Nesbitt
Nesbitt Vassar & McCown LLP
15851 Dallas Parkway
Addison, Texas 75001

Fred Wahrlich
Munsch, Hardt, Kopf & Harr, PC
700 Louisiana, Suite 4600
Houston, Texas 77002

_Douglas R. Little_
Douglas R. Little

-2-

Unofficial Copy Office of Chris Daniel District Clerk



# FATIMIYAH HOSPITAL فاطميه هسپتال

### Owned & Managed by KPSIAJ

Dated: 29-01-2013

## TO WHOM IT MAY CONCERN

Re: Mr. Abdul Khaliq Chagla

Mr. A.K. Chagla continues to suffer from severe sleep apnea which has in fact become more intense since the time of our last report dated 01-09-2012. He is on regular BIPAP support for this. His overall general condition has not changed much over this period. Moreover he also continues to complain of back problem, has started having migraine headaches and recently recovered from a bout of diarrhoea/ dysentery.

As he has also had cardiac problem in the past (underwent coronary quadrupule by-pass surgery) and keeping in view his advanced age, he is advised to avoid any stress situations. He is again advised not to undertake any long air journeys until such time as there is an improvement in his condition. This could take some more months.

29/1/13

**Dr. Husain Kanahi**
Medical Superintendent

272/2-3, Britto Road, Soldier Bazar No. 3, Karachi - Pakistan.
Tel: 92-21-32252321, 32259511, 32252349 Fax: 92-21-32237634 E-mail: info@fh.org.pk Web: www.fh.org.pk

Unofficial Copy Office of Chris Daniel District Clerk

EXHIBIT 1



# FATIMIYAH HOSPITAL فاطمیہ ہسپتال

### Owned & Managed by KPSIAJ

Dated :18.09.2013

## TO WHOM IT MAY CONCERN

Re: Mr. Abdul Khaliq Chagla

Ref previous assessment dated 29-01-2013, the medical condition of Mr. A. K. Chagla has not sufficiently improved to allow him to undertake any long air journeys. He is therefore advised not to undertake any such air journeys at least for the next couple of months after which his condition could be re-evaluated.

Dr. Husain Kanani

Chest Physician &

Medical Superintendent

Unofficial Copy Office of Chris Daniel District Clerk